147

1  Q. And you are still an employee of the company
2  today. Is that right?
3  A. Yes, I am.
4  Q. Do you remember what your salary was when you
5  started in 1984?
6  A. I remember my base pay was $182.50 per week.
7  Q. Okay. Let me just -- about $9,490 a year?
8      MR. GILLESPIE: If you know.
9  BY MS. ALEXANDER:
10  Q. Were you making about $9,500 a year?
11  A. About.
12  Q. And do you know how much you make now per year?
13  A. You had informed me of 68,000 earlier.
14  Q. Does that sound right to you?
15  A. It's approximate.
16  Q. Now, have you had leaves of absence at SNET
17  prior to your leave of absence of 2000 to 2001?
18  A. What particular type of leave absence?
19  Q. Any type of disability leave of absence?
20  A. I had -- yes, I have.
21  Q. Okay. And were you out on a leave of absence
22  in December of 1985 for a back injury?
23  A. I don't recall it being December.
24  Q. Do you recall being out on a leave of absence
25  for a back injury in 1985?

148

1  A. Yes, I do recall.
2  Q. Okay. What happened to you?
3  A. I pulled a muscle in my lower back, I believe.
4  Q. Okay. And do you recall being out on a
5  disability leave of absence a few years later for a
6  shoulder injury?
7  A. No, I don't recall that.
8  Q. Do you recall being out of work for a shoulder
9  injury from July of 1989 through December of 1989 a
10  period of five months?
11  A. No, I don't recall. No. I didn't have a
12  shoulder injury.
13  Q. Do you recall being out of work on a disability
14  leave of absence for any reason during that period?
15  A. Could you please restate the dates?
16  Q. July 10 of 1989 through December 18 of 1989.
17  A. No. No.
18  Q. And so you deny that you were on a disability
19  leave of absence --
20      MR. GILLESPIE: I think she said she
21      didn't recall.
22  BY MS. ALEXANDER:
23  Q. -- during that period of time?
24  A. I don't recall being out on disability during
25  that period of time.

149

1  Q. Do you recall a right shoulder injury after
2  trying to stop a ladder from falling on July 7, 1999
3  and treating with Dr. Dyer?
4  A. No, I don't recall.
5  Q. Okay. So are you denying that you were on a
6  five-month leave of absence in 1989, or is it that you
7  don't recall one way or another?
8  A. I don't recall being on a five-month leave of
9  absence ever from there.
10  Q. So you might have been; you just don't
11  remember?
12  A. I don't recall being on a five-month leave of
13  absence.
14  Q. Do you have any problem with memory generally
15  speaking?
16  A. Not generally.
17  Q. Do you recall being out on a pregnancy leave of
18  absence from August of 1992 through December of 1992?
19  A. Yes, I do.
20  Q. And do you recall that you had -- you had
21  complications for a uterine infection and a C-section
22  so you were out longer than the normal period of time?
23  A. I don't know if I was out longer than a
24  normal -- I don't know what a normal period of time.
25  Q. When was your son born?

150

1  A. September 11, 1992.
2  Q. Okay. And do you recall that you went out on a
3  leave of absence a month before that?
4  A. I don't recall it was a month before that.
5  Q. But you recall that you did go out before that?
6  Whose cell phone is that?
7  A. I think that's mine.
8       MS. ALEXANDER: Okay. Let's take a break
9       while she gets her cell phone.
10  (There was a discussion held off the record.)
11       THE WITNESS: I'm sorry.
12  BY MS. ALEXANDER:
13  Q. Do you recall being out on disability for a
14  hand injury in 1993 to '94?
15  A. No, I don't recall.
16  Q. You don't recall hitting your right hand on a
17  box and being diagnosed with hyperextended tendon?
18  A. I don't recall.
19  Q. Okay. So you don't recall at all being on a
20  disability leave of absence from December 1993 through
21  February of 1994, a period of three months?
22  A. No, I don't recall.
23  Q. Do you recall hitting your hand on a box on
24  December 6 of 1993 and injuring it?
25  A. No, I do not.

151

1  Q. Do you recall being out on a disability leave
2  of absence in 1994 to 1995 for a back injury?
3  A. No, I do not recall that.
4  Q. Do you recall being out on a disability leave
5  of absence for a back injury in 1994 as a result of
6  learning to climb poles?
7  A. I remember a back injury as a result of
8  learning to climb poles. I do not recall the year.
9  Q. Do you recall being out on a disability leave
10  of absence for that back injury?
11  A. Yes, I do.
12  Q. And how long were you out on that disability
13  leave of absence?
14  A. To the best of my recollection, it was eight
15  weeks.
16  Q. Could it have been three months?
17  A. I don't know. What I recall is eight weeks.
18  Q. So you don't recall that either. Do you recall
19  treating with Dr. Kligfeld, K-l-i-g-f-e-l-d, in
20  September of 1997?
21  A. Yes, I do.
22  Q. Do you remember complaining to him about your
23  emotional distress related to various life events?
24  A. Yes, I do.
25  Q. Do you remember telling him you were concerned

152

1  about your marriage?
2  A. No. I don't recall that.
3  Q. Do you deny that it occurred or you simply
4  don't recall?
5  A. I don't recall.
6  Q. Do you recall telling Dr. Kligfeld that you
7  were anxious about the recent release of your brother
8  from prison?
9  A. Yes, I do.
10  Q. And do you remember being referred to him by
11  Dr. Lyall?
12  A. Yes, I do.
13  Q. What kind of doctor is Dr. Kligfeld?
14  A. He was a marriage counselor.
15  Q. How many times did you see him?
16  A. I don't know.
17  Q. Why were you emotionally distressed relating to
18  your marriage during this period?
19  A. I don't recall being emotionally distressed to
20  my marriage.
21  Q. I think you testified you were?
22  A. No. You told me I was. I said I did not
23  recall that.
24  Q. Were you upset concerning your marriage in
25  September of '97?

153

1  A. Not that I recall.
2  Q. Okay. So your sworn testimony is that you went
3  to see a marriage counselor in September of 1997, but
4  you do not recall being upset about anything to do
5  with your marriage. Is that your testimony?
6  A. I'm not sure if he was exactly a marriage
7  counselor.
8  Q. You just said he was a marriage counselor?
9  A. I know. Now I'm thinking.
10 Q. Yes, of course.
11 A. I'm not sure. No. I did not have an issue,
12 not that I recall.
13 Q. So is it your sworn testimony that you had no
14 issues concerning your marriage in September of 1997?
15 Is that your testimony?
16 A. Not that I recall.
17 Q. Wouldn't you recall that, Ms. Bachiocchi?
18 A. Not necessarily.
19 Q. How many problems do you have with your
20 marriage that would cause you to go see a marriage
21 counselor?
22     MR. GILLESPIE: Objection. Assumes a fact
23     not in evidence.
24 A. I believe I said I was there for my brother.
25 BY MS. ALEXANDER:

154

1  Q. No. I believe you said that he is a marriage
2  counselor. Don't you remember saying that before you
3  changed your mind?
4  A. I do. He's a family counselor, marriage
5  counselor I think is the whole story, the whole thing.
6  Q. Okay. Is it your sworn testimony that you did
7  not have any problems with your marriage in September
8  of 1997?
9  A. I do not recall.
10 Q. Wouldn't you recall that?
11 A. I do not recall.
12 Q. How about in 1997 in general?
13 A. I do not recall.
14 Q. How about 1998?
15 A. I do not recall.
16 Q. You don't recall very much, do you?
17 A. I don't recall who very much?
18 Q. You don't recall anything very much, do you?
19 A. I do. But I'm not going to give you an
20 inaccurate answer.
21 Q. You recall an incident in detail, do you not,
22 the emotional distress you that claim you suffered
23 because of SNET. Right?
24 A. Yes, I do.
25 Q. We spent the whole morning talking about little

155

1  tiny details?
2  A. Uh-huh.
3  Q. But on the other hand, you don't even recall if
4  you had any problems with your marriage in '97, '98,
5  '99, or 2000. Is that your testimony?
6  A. They were not significant issues that would
7  leave a lasting memory impression.
8  Q. That wasn't my question.
9  A. That's my answer.
10 Q. Okay. Is it your testimony -- let's go through
11 each year. Did you have any problems with your
12 marriage in 1997 that caused you emotional distress?
13 A. Not that I recall.
14 Q. Is that -- is your answer that you did not or
15 you simply don't know?
16 A. I do not recall having marital problems that
17 caused me emotional distress ever.
18 Q. Okay. Do you recall complaining to
19 Dr. Kligfeld concerning emotional distress as a result
20 of your marriage?
21 A. I do not recall.
22 Q. Are you saying that didn't occur or you simply
23 don't know?
24 A. I don't recall.
25 Q. Do you recall -- well, let's see what you

156

1  recall, if you recall anything. In September --
2     MR. GILLESPIE: Objection. Move to
3     strike. If you have a question, why don't you
4     go ahead and ask it.
5     MS. ALEXANDER: I'm about to if you would
6     stop interrupting me.
7  BY MS. ALEXANDER:
8  Q. In September of 1998 Jeffrey Kurtz was arrested
9  for breach of peace and sale of illegal drugs. Right?
10 A. I don't recall the dates that my brother was
11 arrested.
12 Q. Okay. In 1998 he was though. Right?
13 A. I don't recall even the year except for the
14 1990 date that I gave you.
15 Q. Okay. And you know he was arrested for use of
16 drug paraphernalia and sale of hallucinogenic drugs?
17 A. I don't know what his exact charges were.
18 Q. He's your brother?
19 A. Yes, he is.
20 Q. Did he ever try to sell you or any member of
21 your family drugs?
22 A. No.
23 Q. And Harry Kurtz is your father?
24 A. Yes, he is.
25 Q. How would you describe your relationship with

157

1  him since 1999?
2     A.  My relationship with my father is very good.
3     Q.  And you stay in touch with him?
4     A.  Yes, I do.
5     Q.  And you know what's going on in his life?
6     A.  For the most part.
7     Q.  Do you recall that he was arrested for DWI and
8  failure to drive on the right in 1999?
9     A.  I bailed him out of jail that evening, yes, I
10 do.
11    Q.  Okay.  Did that cause you some distress?
12    A.  No.
13    Q.  It didn't cause you any distress to bail your
14 father out of jail?
15    A.  No.
16    Q.  What did you have to do to bail him out of
17 jail?
18    A.  Drive to the Southbury police barracks.
19    Q.  And then what did you do?
20    A.  I drove his dog home.
21    Q.  And then what?  I thought you said you bailed
22 him out?
23    A.  I did.  But the first thing I did was take the
24 dog home.
25    Q.  He was arrested with his dog?

158

1     A.  Yes.
2     Q.  Does he get arrested for DWI periodically?
3     A.  I think there was another incident.  I'm not
4  sure.
5     Q.  Is he an alcoholic?
6     A.  Yes, he is.
7     Q.  Does he also have drug problems other than
8  alcohol?
9     A.  Not to my knowledge, no.
10    Q.  Did you have to pay a fine to get him released
11 from jail?
12    A.  Yes, I did.
13    Q.  And how much did you pay?
14    A.  $500.
15    Q.  What was your reaction to that?
16    A.  I didn't have a reaction.  It was just more,
17 oh, I don't believe I got to go through this, and that
18 was it.
19    Q.  So your testimony is that it did not upset you
20 or cause you concern to bail your father out of jail
21 for DWI in 1999?
22    A.  No, it did not.
23    Q.  In 1999 did you treat with Samuel Bridgers who
24 is a neurologist?
25    A.  I remember the name.  I do not believe any

159

1  ongoing treatment.
2     Q.  Do you remember seeing him for recurrent pain
3  in both legs?
4     A.  I remember seeing -- I remember one appointment
5  with Dr. Bridgers.
6     Q.  Okay.  Do you remember telling him that you had
7  recurrent pain to both legs?
8     A.  I don't recall if it was my legs or my hip.  I
9  remember seeing him.
10    Q.  What do you recall complaining to him about?
11    A.  Pain on my right side.
12    Q.  Okay.  Do you deny that you told him you had
13 recurrent pain in both legs?
14    A.  No, I don't deny telling him that I had pain.
15 I just don't know if I said both legs.  I remember the
16 right side being an issue.
17    Q.  Did you tell him that you had pain that was
18 worse after sitting?
19    A.  I don't recall what I told him.
20    Q.  Did you report to him that you had a congenital
21 dislocation of your right hip?
22    A.  I -- at birth I had a dislocated right hip.
23    Q.  Okay.  So that's what congenital means then.
24 So the answer to my question is yes?
25    A.  Yes.

160

1     Q.  Did you tell him you were concerned that the
2  pain was related to those -- to degenerative changes
3  in your hip?
4     A.  No.
5     Q.  Did he put you on Celebrex?
6     A.  No.
7     Q.  He didn't?
8     A.  Oh, yes.  Yes, he did.  Yes, Celebrex.
9     Q.  And is it true that in 1999 you were suffering
10 recurrent pain to both legs?
11    A.  I don't recall both legs.  I recall the right
12 side.
13    Q.  Is it true that you were suffering in late 1999
14 recurrent pain to your right side?
15    A.  I believe there was pain to my right side, yes.
16        MS. ALEXANDER:  Could you read back my
17    question.  These are yes-or-no questions.
18        THE WITNESS:  I answered yes.
19        MS. ALEXANDER:  No, you didn't.
20 (The requested portion was read back by the court
21        reporter.)
22 BY MS. ALEXANDER:
23    Q.  Is that true or is it not true?
24    A.  I believe yes.
25    Q.  Okay.  And then in early 2000 -- oh, and did

161

1 that pain, recurrent pain in your right side cause you
2 any distress?
3  A. No.
4  Q. In early 2000 do you recall seeing Dr. Lyall
5 about a lump in your left breast?
6  A. No.
7  Q. Do you deny that that occurred?
8  A. No.
9  Q. You just don't recall it?
10  A. I don't recall seeing Dr. Lyall on that.
11  Q. Do you recall seeing Dr. Bridgers about a lump
12 in your left breast?
13  A. No.
14  Q. Do you recall seeing anyone about a lump in
15 your left breast?
16  A. Dr. Tirado.
17  Q. Okay. And did that cause you distress?
18  A. No.
19  Q. That didn't cause you any distress?
20  A. No, it did not.
21  Q. What did you have to do about it?
22  A. I had to go for a mammogram, and they did not
23 proceed with an ultrasound and because the mammogram
24 was clear and there was no need to continue on. And I
25 followed up with Dr. Nina Horowitz.

162

1  Q. And in February of 2000, do you remember your
2 father Harry Kurtz getting arrested again for DWI and
3 failure to display his lights?
4  A. I don't recall the dates. I do remember
5 repeated arrests, yes.
6  Q. Did you have to go bail him out this time?
7  A. No.
8  Q. How did he get out of jail?
9  A. I don't know.
10  Q. Did he call you and ask you to come get him?
11  A. No.
12  Q. Did it cause you distress that your father was
13 again arrested for DWI?
14  A. No.
15  Q. No distress at all?
16  A. No.
17  Q. Do you care about your father?
18  A. Yes, I do.
19  Q. And then from May of 2000 to May of 2001 you
20 were out on disability again for stress related -- for
21 stress. Right?
22  A. Could you please repeat those dates?
23  Q. The dates that we've been talking about here,
24 May of 2000 to May of 2001 you were out again on a
25 disability leave. Right?

163

1  A. Yes.
2  Q. And that's the disability leave that's been the
3 subject of this -- part of this lawsuit. Right?
4  A. That is correct.
5  Q. And then do you recall that in June of 2000
6 your father Harry was again arrested for DWI operating
7 under -- with his driver's license under suspension,
8 reckless driving, and unsafe backing?
9  A. I don't recall all the charges, but I do recall
10 an additional arrest.
11  Q. Do you recall him calling you related to that?
12  A. I don't believe -- I believe he called and
13 informed me of what had happened, but that was all.
14  Q. Were you concerned at all that he was
15 repeatedly driving under the influence?
16  A. My concern -- yes, of course I'm concerned.
17  Q. Did it cause you distress that he would be
18 doing that?
19  A. No, it did not.
20  Q. Do you condone people driving under the
21 influence?
22  A. No, I don't.
23  Q. Did you ever try to talk to him about that
24 situation?
25  A. Yes, I have.

164

1  Q. And what was the response?
2  A. He understood he had a problem and said he
3 could control it. There's only so much you can tell a
4 person.
5  Q. Is it your sworn testimony here today that --
6 that this situation with your father repeatedly being
7 arrested for DWI did not cause you emotional distress?
8  A. No, it did not.
9  Q. In October of 2000 you were treating with
10 Dr. Zachariah -- Mr. Zachariah. Right?
11       MR. GILLESPIE: Objection. He is
12    Dr. Zachariah.
13 BY MS. ALEXANDER:
14  Q. You recall treating with Mr. Zachariah?
15  A. No.
16       MR. GILLESPIE: Objection.
17 BY MS. ALEXANDER:
18  Q. In October of 2000 you weren't?
19  A. Not a Mr. Zachariah, no.
20  Q. Who were you treating with?
21  A. Dr. Zachariah.
22  Q. And what sort of doctor is he?
23  A. Psychiatrist.
24  Q. He's not --
25  A. Psychologist.

1  Q. So he's not a medical doctor, is he?
2  A. No.
3      THE WITNESS: Do you want to answer for
4  me? You keep shaking your head to my replies.
5      MR. GILLESPIE: The witness is referring
6  to Mr. Vegliante. Why don't we just go on,
7  Ms. Bachiocchi.
8      MS. ALEXANDER: I would appreciate it if
9  you would just look at me and not make comments
10  about the other people in the room.
11 BY MS. ALEXANDER:
12  Q. Do you recall reporting to Zachariah that you
13 were distressed because you were contacted by EEO
14 regarding issues related to a coworker?
15  A. I was not distressed. I believe I told him
16 that I was contacted by EEO.
17  Q. Do you remember telling him that that was a
18 recent stress on you?
19  A. No, I don't recall telling him that.
20  Q. Do you deny that that occurred or you simply
21 don't recall?
22  A. Could you please ask the question again?
23  Q. Do you deny that you told Zachariah that you
24 were stressed because you were contacted by EEO
25 regarding issues of a coworker?

1  A. Yes.
2  Q. You deny it?
3  A. That I was stressed, yes.
4  Q. And you deny that you even told him you were
5 stressed?
6  A. You're taking what I told him out of context.
7      MS. ALEXANDER: Could you repeat my
8  question? We would go much faster if you would
9  answer my questions, and stop trying to --
10     THE WITNESS: You're manipulating it.
11     MS. ALEXANDER: I'm asking you yes or no
12  questions.
13     MR. GILLESPIE: No. She may not be able
14  to answer yes or no. You're going to have to
15  live with that. I'm going to instruct her to
16  listen to the question and try to answer it as
17  best as she can.
18     MS. ALEXANDER: When you ask a question
19  like, Did you tell someone X, Y, Z? the answer
20  is going to be yes or no. I either said it or
21  I didn't say it. My question was this, please
22  listen to my question.
23     THE WITNESS: May I --
24     MS. ALEXANDER: No, you may not.
25     THE WITNESS: You don't even know what I

1 was going to ask. Can I go to the ladies room?
2     MR. GILLESPIE: We're going to take a
3  break.
4     THE WITNESS: You bet we're taking a
5  break.
6  (There was a recess taken from 2:18 to 2:26 p.m.)
7 BY MS. ALEXANDER:
8  Q. Okay. We were talking about -- we were talking
9 about Dr. Zachariah. Right? And I believe my last
10 question was did you tell Dr. Zachariah in October of
11 2000 that you were stressed?
12  A. Could you repeat the date, please?
13  Q. October of 2000.
14  A. Yes.
15  Q. And you were still on your medical leave then.
16 Right?
17  A. Yes.
18  Q. And did you tell Dr. Zachariah that one of the
19 most recent stressors was that you were being
20 contacted by EEO regarding issues of a coworker?
21  A. No.
22  Q. So if Dr. Zachariah wrote that in his report,
23 he's lying?
24     MR. GILLESPIE: Objection, speculation and
25  form.

1     MS. ALEXANDER: You can answer.
2  A. I would not believe he's lying. I don't know
3 what's in Dr. Zachariah's report.
4 BY MS. ALEXANDER:
5  Q. The question was if Dr. Zachariah wrote that in
6 his report that you, in fact, said that to him, is he
7 lying?
8     MR. GILLESPIE: Objection, asked and
9  answered.
10     MS. ALEXANDER: You can answer the
11  question.
12     MR. GILLESPIE: Yet again.
13     THE WITNESS: I've answered the question.
14 BY MS. ALEXANDER:
15  Q. If he wrote that in his report, is it your
16 testimony that he was not telling the truth?
17  A. I don't -- you're saying for October of 2000?
18  Q. Right, while you were on medical leave.
19  A. I don't know what time frame -- I don't know.
20 I don't know how to answer that.
21  Q. So you don't know. Okay. Did you tell
22 Dr. Zachariah that you were stressed about the
23 possibility of taking an early retirement package
24 during the same period?
25  A. I don't recall using those particular words.

169

1  Q. I'm not asking you for precise words,
2  Ms. Bachiocchi. Did you in essence tell Dr. Zachariah
3  that you were stressed about the possibility of taking
4  an early retirement package?
5  A. No.
6      MR. GILLESPIE: Objection to form.
7  BY MS. ALEXANDER:
8  Q. Were you, in fact, considering taking an early
9  retirement package while you were on a leave of
10 absence?
11 A. Yes.
12 Q. What was the retirement package that you were
13 considering?
14 A. I don't recall.
15 Q. Well, what's the general concept?
16 A. To leave.
17 Q. To leave and be paid money. Is that not
18 correct?
19 A. I was not entitled to payment.
20 Q. If you had been accepted for the early
21 retirement package, is it your testimony you would not
22 have received money?
23 A. I would not have received money I can access.
24 Q. You're playing with words with me. You would
25 have received an early retirement package; you would

170

1  have received a retirement enhancement. Right?
2      MR. GILLESPIE: Excuse me. I'd just like
3      to note Mr. Vegliante was actively nodding his
4      head during questioning, sighed, and glanced
5      away in exasperation.
6      MS. ALEXANDER: Well, if we're all going
7      to be required to sit here with straight
8      jackets on, that's one thing. But you've been
9      moving, she's been looking at you. He's not
10     doing anything that --
11     MR. GILLESPIE: I've been instructing you
12     her to focus on you.
13     MS. ALEXANDER: Okay. Well, let's
14     continue to do that.
15     MR. GILLESPIE: What he is doing is
16     disruptive.
17     MR. VEGLIANTE: Just for the record, I
18     have an appearance, I did not nod. I did look
19     out the window. I was a little bit flustered
20     with the noncompliance of your client to answer
21     the question asked by counsel. We've all been
22     going through a long day. It was out of
23     frustration.
24     MR. GILLESPIE: Is that it, we're all
25     going to sit there and say nasty things to the

171

1  plaintiff?
2      MS. ALEXANDER: Well, you're the one who
3  interrupted the deposition and raised this
4  issue --
5      MR. GILLESPIE: Not only interrupting it,
6  we're leaving.
7      MS. ALEXANDER: Now, that you raised it,
8  the questions are not being answered.
9      MR. GILLESPIE: I appreciate your time.
10     MS. ALEXANDER: For the record, I'm not
11 agreeing to end this deposition.
12     MR. GILLESPIE: I understand I think we've
13 given you more time than we're required to.
14     MS. ALEXANDER: And, again, you did make a
15 motion that was never granted by the Court.
16     MR. GILLESPIE: If you wish to proceed on
17 this basis, we will seek a protective order.
18     MS. ALEXANDER: Well, you should have done
19 that before.
20     MR. GILLESPIE: No. No. No. This
21 conduct arises right now --
22     MS. ALEXANDER: Please don't shout at me.
23     MR. GILLESPIE: -- and we are responding
24 to it as occurs.
25     MS. ALEXANDER: Mr. Gillespie, please

172

1  don't shout at me.
2      MR. GILLESPIE: Then don't talk over me.
3      MS. ALEXANDER: I wasn't talking over you,
4  and you shouldn't be shouting at the
5  deposition.
6      MR. GILLESPIE: Yes, ma'am.
7      MS. ALEXANDER: For the record, the
8  plaintiff and her counsel are leaving. I don't
9  agree to that. We have permission from the
10 Court to finish this deposition.
11     MR. GILLESPIE: I think -- I'm sorry. I
12 thought we were done.
13     MS. ALEXANDER: And you did not move for a
14 protective order of any sort or get a ruling.
15     MR. GILLESPIE: I think we discussed this
16 earlier. It's been a pleasure. Have nice
17 afternoon. Thank you, ma'am.
18 (The deposition concluded at 2:32 p.m.)

173

CERTIFICATE

I, Jacinda A. Grigaitis, LSR, hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing pages are a true and accurate copy of the original transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this____ of_____, 2004.

_____
Jacinda A. Grigaitis, LSR
Licensed Shorthand Reporter #00381

174

INDEX

WITNESS                                    PAGE
Kimberly Bachiocchi
Direct Examination by Ms. Alexander        4


EXHIBITS
Defendant's Exhibits Marked for Identification

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Job Pay History | 66 |
| 2 | Notes | 73 |
| 3 | Complaint to Commission On Human Rights and Opportunities | 78 |
| 4 | Complaint to Equal Employment Opportunity Commission | 78 |
| 5 | Complaint to Commission On Human Rights and Opportunities | 79 |

175

I have read the foregoing 174 pages and hereby acknowledge the same to be a true and correct record of the testimony.


_____
Kimberly Bachiocchi


Subscribed and Sworn to
Before me this____day of _____, 2003.

_____
Notary Public

My Commission Expires:

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 8th day of June, 2004 as follows: Peter E. Gillespie, Esquire, 46 Riverside Avenue, Post Office Box 3416, Westport, Connecticut 06880.

_____
Lori B. Alexander
Federal Bar No.: CT08970