UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KIMBERLY BACHIOCCHI | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02CV908 (CFD) |
| v. | : | |
| | : | |
| SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY | : | |
| | : | |
| Defendant. | : | APRIL 6, 2005 |

## LOCAL RULE 56(a) STATEMENT
## SUBMITTED IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

1.   Plaintiff is a current employee of SNET, who has received a promotion and pay increases and requested job transfers since the events underlying this case.

2.   Plaintiff was never terminated, demoted, or suspended while she worked in Kevin West's group at SNET.  Plaintiff did not suffer any tangible employment action during the time relevant to her Complaint.

3.   Plaintiff has been employed by SNET since 1984.  She currently holds a position as Service Executive which she says she enjoys very much.  Deposition of Kimberly Bachiocchi ("Bach. Dep.") 2/15/05 at 95:2-13.

1

4. Plaintiff is earning a higher salary now than she did at the time of the events that give rise to this lawsuit. Bach. Dep. 2/15/05 at 9:14-16.

5. SNET has policies against sexual harassment and discrimination of any sort, as well as unlawful retaliation. These policies are published in its Code of Business Conduct, Resource Guide for Management Employees, and other publications, along with instructions on how to report complaints to such places as SNET's internal EEO office and Asset Protection department. Exh. 23; West Aff. ¶ 15.

6. In June 1998, plaintiff applied for, and was hired into, a position as an Analyst Technical Sales (Engineering) in SNET's Business Communication Sales ("BCS") unit. She worked out of SNET's Derby, Connecticut office. She was hired for the position by Richard Light, the head of the Engineering unit within BCS, and Kevin West, the manager of the Technical Sales Support unit within BCS. West was Light's immediate superior.

7. Plaintiff was interviewed prior to being hired, and Light and West were clearly aware that plaintiff was a woman when they hired her. Bach. Dep. 5/12/03 at 16:15-17:12, 12/13/04 at 82:15-83:4.

8. West, as manager of the group, could have prevented her hiring if he had wanted to. Bach. Dep. 12/13/04 at 84:2-22. Since plaintiff had no prior engineering experience before being selected for the job, Light assigned a male Analyst, Chris Manouse, to help her out as needed; Manouse also volunteered to help her. Bach. Dep. 2/15/05 at 34:16-35:22, 43:5-9.

2

Plaintiff considered Manouse's assistance to be helpful and acknowledges that he caught some of the mistakes she made. Bach. Dep. 2/15/05 at 35:3-22.

    9. Apart from a one-year period when she was out of work on a medical leave, plaintiff remained in her position as Analyst Technical Sales (Engineering) until June 18, 2001. Before plaintiff left to take a medical leave in May 2000, her immediate supervisor was Light, who reported to West. Light CHRO Aff. 9/15/00 ¶ 2. After she returned to work in May 2001, she reported directly to West, because Light had left SNET with a company-wide retirement offer. Bach. Dep. 2/15/05 at 80:6-9.

    10. As an Analyst Technical Sales Engineering, plaintiff's job was to contact businesses that sought voice and data wiring services from SNET. This included telephone and fax services. Plaintiff's job included visiting business customers to assess their requirements, developing materials and labor lists for jobs, determining the price of jobs, and ordering materials.

    11. After these tasks were completed, plaintiff would turn the projects over to BCS's Installation unit, headed by Robert Vallario. Light CHRO Aff. 9/15/00 ¶¶ 3-4.

    12. Plaintiff felt that she lacked skills in some aspects of engineering required for the position, yet she was hired into the position by Light and West and she admits she received good performance reviews. Bach. Dep. 5/12/03 at 64:5-65:2.

    13. In the BCS group, plaintiff received raises of 3.6% in 2000 and 4.5% in 2001. Moffett Aff. ¶¶ 4-5.

14. While she worked in BCS on West's team, plaintiff's salary was virtually identical to the mean of the salaries of the male employees who worked in West's department on the same job title. In 2000, her base salary of $56,124.35 was almost identical to the mean base salary of the men who also worked as "Engineer PTS" (the title used for plaintiff's job during that year), which was $57,144.68. In 2001, plaintiff's salary of $58,856.98 was higher than the mean salary of the men who also worked as Analyst Technical Sales (Engineering) in West's department, which was $57,102.76. Moffett Aff. ¶¶ 6-8.

15. While plaintiff worked in West's department, she received the highest raise in salary of her twenty-one-year career with SNET, with the exception of a raise that accompanied her promotion when she left West's department, during the time she alleges she was discriminated against by the company. Bach. Dep. 2/15/05 at 110:18-111:21.

16. In early 2000, West, the Office Manager, and Vallario, head of Installation, began to receive complaints from co-workers and contractors about plaintiff's workplace interactions with an Analyst Technical Sales (Installation), Nicholas Faiella. Faiella, significantly older than plaintiff, worked on a number of plaintiff's jobs.

17. Vallario received complaints from outside contractors doing work for SNET that Faiella exhibited an inappropriately defensive and hostile attitude toward contractors who at any time dared to criticize plaintiff's work. The situation escalated to the point of creating difficulties for the contractors, who in turn objected to working on SNET projects to which plaintiff and Faiella were jointly assigned. Exh. 1, Vallario CHRO Aff. 9/19/00 ¶¶ 3-9.

4

18. With respect to the co-worker complaints, several workers in the office came forward and notified SNET of inappropriate physical conduct between plaintiff and Faiella at work. The co-workers indicated that this conduct made them uncomfortable to be around plaintiff and Faiella at the office and at business conferences they attended as a group. These co-workers stated that they were uncomfortable when plaintiff and Faiella gave each other neck and shoulder massages at work, sat at a conference with their legs interlocked, stroked each other's legs, and otherwise engaged in inappropriate touching in the workplace. Exh. 2 (notes from co-workers).

19. Co-workers complained of touching between plaintiff and Faiella at conferences held in Boston and Sturbridge, Massachusetts. Exh. 2; Manouse Dep. 7/28/03 63:20-64:19; 70:2-71:10, 81:12-84:23; Exh. 3, Faiella CHRO Aff. 12/13/02 ¶ 19.

20. Faiella was given a reprimand for his conduct, but plaintiff was not disciplined in any way. As part of this lawsuit, plaintiff complains that, as a result of these incidents, supervisors and co-workers spread rumors that she was having an affair with Faiella during the spring of 2000. Compl. ¶ 16.

21. Outside contractors also complained about plaintiff and Faiella. As manager of the group, West investigated these complaints by speaking directly with four outside contractors, all of whom suggested that Faiella's excessive tendency to jump to plaintiff's defense in any business situation was alienating them. West Aff. ¶¶ 10-13; Exh. 6, West CHRO Aff. 9/14/00 ¶¶ 4-11.

22. It was plaintiff's job as an Analyst to design projects and Faiella's as the engineer to work with the outside contractors to build the project. The first outside contractor whom West contacted told him that Faiella had verbally confronted him about a project on which plaintiff and the contractor were working. The contractor told West that Faiella confronted him in a hostile manner and accused him of trying to make plaintiff look bad. West Aff. ¶ 10; Exh. 6, West CHRO Aff. 9/14/00 ¶ 7. The second contractor told West he had had problems with plaintiff's work, but that whenever he had a problem on a job on which plaintiff did the engineering, Faiella became hostile and confrontational. The contractor told West that he would rather not do work for SNET anymore than suffer this kind of aggravation. West Aff. ¶ 11; Exh. 6, West CHRO Aff. 9/14/00 ¶ 8. The third contractor told West that on one of plaintiff's projects, her work was so poor that he had refused to work on it; Faiella then became defensive and accusatory toward him. West Aff. ¶ 12; Exh. 6, West CHRO Aff. 9/14/00 ¶ 9. The fourth contractor complained that he had a problem every time he worked on a SNET project on which plaintiff was the engineer and Failla was the installation supervisor. He told West that when there were changes in the work, plaintiff and Faiella "would stick him with the additional cost." West Aff. ¶ 13; West CHRO Aff. 9/14/00 ¶ 10. As a result of this information, Vallario and West decided that plaintiff and Faiella should no longer be assigned to the same projects. West Aff. ¶ 14; Exh. 6, West CHRO Aff. 9/14/00 ¶ 11.

23.  Plaintiff was openly and harshly critical of the supervisors in her work group.

24.  On May 19, 2000, plaintiff began a period of paid medical leave based on claimed emotional problems.  She thought she was on the verge of a "nervous breakdown."  Bach. Dep. 2/15/05 at 131:8-14.  She remained completely out of work for almost twelve months, receiving sickness benefits in the form of six months of full salary and an additional six months of pay at 60% salary.  Bach. Dep. 6/24/03 at 20:15-19.

25.  Plaintiff returned to work on May 14, 2001, just as her paid leave was about to expire.  Exh. 8, 2001 Absence Record (authenticated at Bach. Dep. 2/15/05 at 55:12-14).  During this time, plaintiff was under the care of psychologist Gary Zachariah, who diagnosed her as depressed.  After plaintiff ceased coming to work, West reassigned the customer accounts she had been working on, including major accounts with Cingular Wireless and Yale University, to other Analysts since they required engineering work during her absence.

26.  While plaintiff was on medical leave, Light and Vallario retired during a company-wide early retirement offer.  West Dep. 9/18/03 138:21-139:7.

27.  On July 24, 2000, while plaintiff was still out of work on paid medical leave, plaintiff filed complaints against SNET with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). And the U.S. Equal Employment Opportunity Commission ("EEOC"). Exh. 9, CHRO Complaint #0130048; Exh. 10, EEOC Charge # 16aa03399.  In the administrative charge, plaintiff alleged that she had been sexually harassed, had suffered retaliation, and had been paid less than men for the same work.  On December 19, 2000, the CHRO dismissed the

claim on the ground that "there [was] no reasonable possibility that further investigation will result in a finding of reasonable cause inasmuch as it was determined that you were not discriminated against because of your sex." Exh. 11, CHRO Merit Assessment Dismissal. The EEOC adopted the CHRO's findings. Exh. 12, EEOC Dismissal and Notice of Rights.

28.    Plaintiff also assisted her former co-worker, Faiella, who had also gone out on a medical leave of absence during part of the same time plaintiff was out, to pursue his own claim of discrimination against SNET and Vallario. See, Exh. 3, Complaint #0130268.

29.    During her treatment with Zachariah, plaintiff notified SNET's medical department that she wished to return to work for a single day on January 18, 2001 to "become re-acclimated to her job." Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 10; West Aff. ¶ 20; Exh. 15, West CHRO Aff. 08/01/01 ¶ 4.    She indicated that she planned to return for one day only, and not to continue working after January 18th.

30.    The SNET Medical Department contacted Zachariah to clarify the purpose of the single-day visit, as this was an unusual request and the purpose of her visit was unclear. Zachariah made it clear that plaintiff was not returning to work permanently, and that this was to be just one day in the office to "re-acclimate" herself, look at her e-mails, etc.

31.    Thus, West, to whom Bachiocchi then reported after Light's retirement, did not assign her to any ongoing customer projects or return her to the work then in the office. West Dep. 9/18/03 139:17-141:7; West Aff. ¶ 20.

32. While plaintiff was out on a paid disability leave based on a claim of total disability from working, she and a friend secretly sat across the street from the SNET Derby office in an SUV for several days in January – March, 2001, videotaping her co-workers entering and leaving the building. Bach. Dep. 2/15/05 at 169:7-23, 179:2-24; see also Bach. Dep. 2/15/05 at 181:1-182:25. She did this in order to gain "evidence" for this litigation.

33. Just short of one year out of the office on a leave of absence, and just as her period of paid leave under SNET's policies was about to expire, plaintiff returned to work in West's department on May 14, 2001. Exh. 22.

34. Chris Manouse was again asked to assist plaintiff as needed to prepare her "scope of work" and "materials" documents. Bach. Dep. 2/15/05 at 34:16-38:11. Manouse (male) gave her very helpful input that she appreciated. Bach. Dep. 2/15/05 at 42:7-14.

35. In February and July of every year, SNET managers set compensation ratings (i.e., bonus ratings) for each employee based on the employee's work performance during the previous period. West Aff. ¶ 23, Moffett Aff. ¶ 9. In early 2001, West set plaintiff's compensation rating at "meets expectations" (a middle rating). He did this because she had not worked during the review period. West Aff. ¶ 23; Exh. 15, West CHRO Aff. 08/01/01 ¶ 13; Bach. Dep. 7/24/03 at 154:13-155:6.

36. On advice by the human resources and compensation departments, West rated plaintiff as "meets expectations." Plaintiff had not worked during the review period, and she

correspondingly admits that she thus could not have done work that "exceeded expectations." Bach. Dep. 12/13/04 at 67:17-68:15.

37.    During her medical leave of absence and after she returned to work, plaintiff was prescribed and was taking Celexa and Wellbutrin "to help maintain [her] mood." Bach. Dep. 2/15/05 at 19:1-9; Bach. Dep. 12/13/04 at 22:2-9. These medications created problems for her at work. Bach Dep. 12/13/04 at 29:11-31:25. She had to "[k]eep asking the same question over and over again" and had to leave herself sticky memos to remember things. Bach. Dep. 2/15/05 at 19:5-20:5, 24:20–25:6.

38.    Because plaintiff had been absent for almost a full year, other Analysts were working on projects for some accounts previously assigned to her. These included the Cingular Wireless and Yale University accounts. To avoid disrupting those projects, when plaintiff returned to work on May 14, 2001, West did not reassign those accounts to plaintiff. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7. However, West assigned plaintiff major accounts such as Pfizer, the Enfield Board of Education, and others, which involved significant projects. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7; Bach. Dep. 12/13/04 at 109:1-8, 110:9-17, 116:20-119:3.

39.    Plaintiff was unhappy that West did not reassign at least one of her previous accounts to her immediately upon her return. In fact, she contacted Janice Vereb, her customer contact at Cingular Wireless, and instructed Ms. Vereb that "she would need to approach Kevin and request

10

me back on the [Cingular] account." Bach. Dep. 2/15/05 at 90:19-91:8. Vereb then discussed the matter with West as plaintiff had requested.

40. West never told plaintiff she could not have any contact with customers in general. Bach. Dep. 2/15/05 at 92:6-9. Plaintiff never acknowledged the inappropriateness of her contact with Vereb and was angry with West for counseling her about it. West Aff. ¶ 25.

41. Plaintiff brought a tape recorder to the meeting indicating she intended to tape what West said, but West told her she could not tape the meeting. Bach. Dep. 2/15/05 at 135:23-136:11.

42. After meeting with West on May 31, 2001, plaintiff told West that she would be taking time off on the following morning, a Friday, to attend the funeral of a friend's father. West granted her the time off with pay. West Aff. ¶ 27. The next day, June 1st, 2001, plaintiff did not return to work after the morning funeral, because she had apparently scheduled an appointment with her psychologist during work hours to talk about workplace issues. Bach. Dep. 2/15/05 at 137:7-138:12, 137:1-25, 144:21-145:2. Nevertheless, she received a full day's pay for June 1st.

43. Plaintiff later called West and told him that since rain was predicted for the weekend, she would come into the office on Saturday, for which she would be paid overtime. West Aff. ¶ 27; Bach. Dep. 2/15/05 at 62:22-63:19.

44. Plaintiff concedes that she never asked to work overtime on any other date after June 1, 2001. Bach. Dep. 2/15/04 at 64:2-4.

45.  Although plaintiff had been back to work for only two weeks, by June 1st, she had already submitted her vacation requests for four full weeks and sixteen additional full or half days all in July and August.  Because of the needs of the business, West told her that she could not take all her vacation time in July and August, but they would have to coordinate the vacation requests of all the engineers.  West Aff. ¶ 29; Exh. 15, West CHRO Aff. 8/01/01 ¶ 12.

46.  On June 4, 2001, the following working day, plaintiff was upset with West for several things including failing to approve her overtime request for June 1st and telling her she could not tape record their conversations in the office.  See Bach. Dep. 2/15/05 at 144:3-20.  At approximately 9:00 a.m. or 10:00 a.m., West visited plaintiff's work area to return a project proposal that she had drafted.  Plaintiff had attached a form she created, on which she insisted West place either his signature or his initials, apparently to create a record that he had seen the proposal and approved it.  Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 18; West Aff. ¶ 30; Exh. 15, West CHRO Aff. 8/01/01 ¶ 14.

47.  West declined to sign or initial the form, stating that this was not how he operated the work group and informed her that he did not take his instructions from her.  After an incident in which the paper was eventually shredded, plaintiff called Faiella at home (because he was on disability leave at that time), who in turn called the Derby police about the incident on her behalf.  Plaintiff also promptly called her lawyer.  Bach. Dep. 2/15/05 at 51:1-5.

48.  Derby police officer Steve Chapman arrived at the SNET office.  West Aff. ¶ 30. After examining the situation and interviewing Bachiocchi and West, the officer refused

12

Bachiocchi's request to press criminal charges against West and observed to her that the red mark she pointed out on her arm was caused by her watch. Plaintiff sought to have West arrested for assault. Bach. Dep. 2/15/05 at 153:23-154:3, 152:7-154:3. After speaking with the individuals involved, the police officer noted there were no signs of any contact by West and noted that he did not "believe probable cause exists for any further action at this time." Exh. 16, Derby Police Dep't Incident Report 01-11941.

49. Plaintiff never returned to work with West after mid-day on June 4, 2001. Thus, she only worked with him a total of three weeks after returning from her leave of absence. Bach. Dep. 2/15/05 at 64:10-12, 65:21-23.

50. She was off on June 7th-8th and last worked in the group on June 11, 2001. Bach. Dep. 2/15/05 at 61:7-12, 66:18-20. On June 18, 2001, SNET offered plaintiff a promotion to a position for which she had applied as Manager, Sales Support, outside West's supervision. Bach. Dep. 2/15/05 at 114:23-115:2. Plaintiff accepted the promotion, which resulted in a 6% raise equaling $3,531 annually. Exh. 17; Moffett Aff. ¶ 10.

51. No one forced plaintiff to take the position as Manager, Sales Support. Bach. Dep. 12/13/04 at 79:1-80:24. This was after plaintiff had filed two CHRO charges of discrimination against her employer. See Exh. 9 and 18.

52. Plaintiff continues to work at SNET and has voluntarily moved into yet another position since that time. Moffett Aff. ¶ 11.

13

53.  On June 12, 2001, after the paper incident, plaintiff filed a second complaint against SNET with the CHRO.  Exh. 18, Complaint # 0130598.  The complaint made the same allegations as the previous one, and also referred to the paper incident.  On the same date, plaintiff made the same allegations in a charge filed against SNET with the Equal Employment Opportunity Commission (EEOC).  See Exh. 19, Charge # 16aa13352.  Plaintiff brought the present action on the following May 28th.

54.  Plaintiff was never propositioned or touched in an unwelcome way, or anything along those lines, during the period at issue when she worked in Kevin West's group at SNET.  Bach. Dep. 7/24/03 at 44:8-11.  Robert Vallario never "proposition[ed her] to go on a date with him or have a romantic relationship with him."  Bach. Dep. 7/24/03 at 113:7-9.  Neither Vallario nor anyone at SNET ever touched her inappropriately.  Bach. Dep. 7/24/03 at 113:10-13.  She did not consider Vallario's alleged remark that he would date her himself if he were younger to be discriminatory.  Bach. Dep. 7/24/03 at 113-114:8.  More importantly, no SNET employee ever subjected her to sexual conduct of any sort, Bach. Dep. 2/15/05 at 193:20-22, and no one at SNET ever propositioned her sexually.  Bach. Dep. 6/24/03 at 43:6-15; Bach. Dep. 6/24/03 at 44:1-3.

55.  SNET employees questioned Faiella about his behavior with plaintiff and reprimanded him for it.  See Exh. 3, Faiella CHRO Aff. 12/13/00 ¶ 19.  Robert Vallario, Faiella's supervisor, spoke repeatedly to Faiella about his relationship with Bachiocchi, allegedly asking

him questions about it that were never repeated to plaintiff.  Faiella Dep. 10/27/03 17:4-18:2, 10/31/03 33:22-34:13, 43:20-44:7.

56.  Plaintiff does not know why Light printed out directions to her house.  Bach. Dep. 6/1/04 at 36:24-37:19.  She admits that Light explained he had heard from others in the office that she had a nice house, and he wanted to know which one it was.  Bach. Dep. 7/24/03 at 49:1-6.

57.  Plaintiff did not work with Vallario at any time after May 19, 2000 (the beginning of her leave of absence) because he retired while she was out on leave.  Bach. Dep. 2/15/05 at 80:10-12.  Richard Light was plaintiff's supervisor, Bach. Dep. 2/15/05 at 31:23-24; after Light retired during plaintiff's leave of absence, plaintiff reported directly to West.  West Aff. ¶ 5.  She does not claim that any other SNET employee other than Vallario criticized her work because she is a woman.  Bach. Dep. 12/13/04 at 59:10-14.

58.  After plaintiff's leave of absence in 2000-2001, she only worked with Kevin West group for three weeks, from May 14, 2001 through June 4, 2001.  Bach. Dep. 2/15/05 at 38:21-39:4.  During that time, she does not have any idea how many job scopes she may have completed and does not remember any specific feedback from Chris Manouse on her work.  Bach. Dep. 2/15/05 at 41:3-23.

59.  Plaintiff can remember only one occasion when she was excluded from a conversation in the office.  Bach. Dep. 12/13/04 at 94:22-98:24; 2/15/05 49:4-54:2.  She claims that an office "meeting" occurred immediately after the alleged paper incident in June 2001 after

15

Faiella had called the police on her behalf and they had left the scene finding no basis for a criminal charge or further investigation. Exh. 16, Derby Police Report; Bach. Dep. 2/15/05 at 49:11-23, 52:23-53:3. Plaintiff claimed she saw some of her co-workers go into a conference room. She does not know what the meeting was about, and in fact knows nothing about the meeting except that she saw one of her co-workers, Wayne Handfield, going from desk to desk summoning three of her other co-workers to a meeting. Bach. Dep. 12/13/04 at 96:19-97:20; 2/15/05 at 52:5-22. She does not know if she was harmed in any way by not being present at the meeting or at any meeting. Bach. Dep. 2/15/05 at 51:23-24, 53:4-15.

60.  Plaintiff is unable to identify any occasion when West refused to answer her questions. Bach. Dep. 12/13/04 at 99:3-19. Her only reason for including this claim is a general belief that West generally answered questions from male employees. See Bach. Dep. 12/13/04 at 100:11-12.

61.  Plaintiff cannot identify any telephone calls that West did not return. She does recall that she was unable to get through to him on three occasions during the years she worked with him. Bach. Dep. 2/15/05 at 81:23-82:12. She concedes that on the first occasion, she simply reached West's voice mail, dialed zero to speak to his secretary, and did so. Bach. Dep. 2/15/05 at 82:17-84:14. On the second occasion, she left a message on West's voice mail, and he left an answering message on her voice mail. Bach. Dep. 2/15/05 at 84:15-86:7. On the third occasion, she succeeded in talking to him; either he answered his telephone or he called her back. Bach. Dep. 2/15/05 at 86:10-87:2. Plaintiff's only reason for alleging that West refused to take her

telephone calls was her idea that on one occasion she had a feeling he was sitting at his desk when she called and did not pick up the telephone; however, since she was out of the office at the time, she conceded that she does not know if he was sitting at his desk, if he was already talking on another line, or if some other situation was present that would explain why he did not answer her call. Bach. Dep. 2/15/05 at 87:3-88:13.

62.    When plaintiff returned from her leave of absence, West assigned her the Pfizer account, the Enfield Board of Education account, and several other accounts, which involved major projects. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7; Bach. Dep. 12/13/04 at 109:1-8, 110:9-17, 116:20-119:3.  The Pfizer account was a large account.  Bach. Dep. 12/13/04 at 110:9-17.  The Enfield account was as interesting to work on as any of her previous accounts. Bach. Dep. 12/13/04 at 117:21-118:1.  Plaintiff has no complaints about having been assigned these projects. Bach. Dep. 2/15/05 at 71:24-72:3.

63.  Mr. West was in fact in charge of her work group, so if he said he was in charge, that statement was accurate. Bach. Dep. 2/15/05 at 89:19-90:10.  Plaintiff does not know whether he told her he was in charge because she is a woman. Bach. Dep. 2/15/05 at 88:14-90:10.

64.  Plaintiff believes she was denied the opportunity to work overtime once only.  Bach. Dep. 6/01/04 at 68:23-70:3.  On that occasion, she claims that she was denied the ability to work one hour of overtime.  Id.; Bach. Dep. 12/13/04 at 127:4-11; 2/15/05 at 62:4-63:17.

65.  On that occasion, plaintiff took time off from work for the funeral and then decided to see her psychologist on work time rather than return to work.  Bach. Dep. 2/15/05 at 137:7-

144:2. West did not approve overtime for any male employee who attended a funeral and then decided not to return to work but to put in for overtime the following day. Plaintiff does not know whether any male employee continued to receive compensatory time after her return from medical leave. Bach. Dep. 12/13/04 at 108:6-18.

66. Plaintiff was granted funeral time on the only occasion when she requested it. She was paid for the time she spent at the funeral of a friend's father on June 1, 2001. Bach. Dep. 2/15/05 at 59:24-61:24.

67. Plaintiff has conceded that West never told her to avoid all customer contact, and that she did in fact have customer contact after she returned from her leave of absence. Bach. Dep. 12/13/04 at 171:17-19, 198:4-199:10; 2/15/05 at 90:15-92:15.

68. Since plaintiff left West's group, she has continued to receive raises from her female supervisor, although the raises have not been as high as she received in Kevin West's group. Bach. Dep. 2/15/05 at 115:19-116:19.

69. Plaintiff's only basis for believing that men in her position (Analyst Technical Sales) were better paid was a hearsay remark by a co-worker, Richard Greene, about his salary. Bach. Dep. 7/24/03 at 157:20-158:11. Greene was better and more experienced with fiber-related work than others in her group, including her. Bach. Dep. 2/15/05 at 71:8-19. Plaintiff does not know what Greene's salary or overall compensation was. Bach. Dep. 6//01/04 at 32:10-15. Greene had held his position significantly longer than she had, and she knew nothing about the quality of his work or his performance reviews. Bach. Dep. 7/24/03 at 157:20-162:20.

18

70. Plaintiff has no basis for judging whether Chris Manouse deserved higher pay than she did. Bach. Dep. 7/24/03 at 149:18-150:5. Mr. Manouse was promoted while she was out on her leave of absence, but plaintiff acknowledges that he deserved it and it was not unfair that he was promoted. Bach. Dep. 2/15/05 at 42:15-20. Manouse had several engineering certifications that Bachiocchi did not have. Bach. Dep. 2/15/05 at 45:19-46:6. Manouse was a very good worker and had more experience than she had. Bach. Dep. 2/15/05 at 42:18-43:4.

71. Plaintiff "do[es not] know" whether her base salary should have been higher than Ron Dursza's. Bach. Dep. 2/15/05 at 44:9-14. Dursza, Greene, and Manouse all had more seniority in the Analyst Technical Sales position than she had. Bach. Dep. 2/15/05 at 43:23-44:8.

72. Plaintiff does not know whether the men in her position made more than she did or whether they deserved to. Bach. Dep. 7/24/03 at 158:21-24, 2/15/05 at 44:15-45:4, 192:17-24. She is not "aware that any male employee received a compensation bonus that was unfairly high compared to [hers]." Bach. Dep. 2/15/05 at 48:25-49:3. She has stated that her only basis for believing that she received less than equal pay was that "I'm a woman." Bach. Dep. 6/01/04 at 32:16-22.

73. Plaintiff knew of SNET's anti-discrimination policies and complaint procedure, since she had complained of discrimination in other work groups prior to moving to Kevin West's group. Bach. Dep. 5/12/03 at 26.

74. Plaintiff did not avail herself of SNET's complaint procedure with respect to any claim of unlawful retaliation or any claim after her leave of absence and before she left West's department and then filed a second complaint with the CHRO.

Dated at New Haven, Connecticut this 6th day of April, 2005.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By_____

Lori B. Alexander
Federal Bar No. CT08970
Michael G. Caldwell
Federal Bar No. CT26561
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06509
Tel. (203) 784-8200
Fax No. (203) 789-2133
E-Mail: alexander@tylercooper.com
E-Mail: Caldwell@tylercooper.com

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 6th day of April, 2005 as follows:

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880

Lori B. Alexander
Federal Bar No.: CT08970