UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| KIMBERLY BACHIOCCHI, | * |
| | * |
| | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * CIVIL ACTION NO. 02-CV-908 (CFD) |
| | * |
| | * |
| THE SOUTHERN NEW | * |
| ENGLAND TELEPHONE | * |
| COMPANY, | * |
| | * |
| Defendant. | * APRIL 6, 2005 |
| * * * * * * * * * * * * * * * * * * | * |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

I.     INTRODUCTION                                                          1

II.    STATEMENT OF FACTS                                                    2

       A.    Plaintiff Was Employed in Kevin West's Business               2
             Communication Sales Group from June 1998 to June 2001.

       B.    Plaintiff Engaged in Workplace Conduct with Nicholas Faiella
             That Drew Complaints from Co-workers and Contractors.          4

       C.    Plaintiff was Disrespectful and Openly Critical of Her
             Supervisors.                                                   7

       D.    Plaintiff Was Out of Work on Paid Leave from May 2000 to       7
             May 2001.

       E.    Plaintiff Returned to Work on May 14, 2001.                    10

       F.    Plaintiff Applied For and Was Promoted To a Position Outside
             West's Department, Which She Began on June 18, 2001.           15

III.   ARGUMENT                                                             16

       A.    Legal Standard                                                 16

       B.    There Is No Genuine Issue of Material Fact as to Plaintiff's
             Sexual Harassment Claims in Counts One and Two.                17

             1.    There is no Probative Evidence of Quid Pro Quo
                   Sexual Harassment.                                       18

             2.    The Evidence in the Record Cannot Sustain a Claim
                   of Hostile Work Environment Sexual Harassment.           19

                   a. Most of Plaintiff's Claims Fail Summarily Because
                      the Conduct Alleged Was Not Based on Gender.          20

                   b. Taken Together, Plaintiff's Remaining Claims Do Not
                      Rise to the Level of a Hostile Work Environment As
                      A Matter of Law.                                      33

3.  The Record Does Not Support a Claim of Discrimination
    Based on Gender in the Compensation, Terms,
    Conditions or Privileges of Plaintiff's Employment.          38

    a.  Plaintiff Did Not Suffer an Adverse Employment          39
        Action.

    b.  The Events Described Did Not Occur Under
        Circumstances That Would Give Rise to an Inference
        of Gender Discrimination.                               40

    c.  SNET's Legitimate Reasons for Its Actions Were Not
        a Pretext for Gender Discrimination.                    40

B.  There Is No Genuine Issue of Material Fact as to Plaintiff's
    Equal Pay Act Claim.                                        41

C.  There Is No Genuine Issue of Material Fact as to Plaintiff's
    Retaliation Claims.                                         43

IV.  CONCLUSION                                                 50

## I.    INTRODUCTION

Plaintiff is a current employee of SNET, who has received a promotion and several pay increases and requested job transfers since the events underlying this case. In her Complaint, plaintiff alleges that SNET violated federal and state statutes by sexually harassing her and retaliating against her, based on purported conduct by a variety of supervisors and co-workers. In essence, she claims that just about every person she encountered contributed to what she considered a "hostile work environment." Specifically, in Count One plaintiff alleges sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); in Count Two sexual harassment in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq ("FEPA"); in Count Three unlawful retaliation under Title VII; in Count Four unlawful retaliation under the FEPA; and in Count Five violation of the federal Equal Pay Act, 29 U.S.C. § 206(d).

The striking feature of this case is the absence of any evidence in the record that SNET took any adverse employment action toward plaintiff, or that SNET took any action at all related to either her gender or to any protected activity in which she allegedly engaged. While plaintiff has attempted to string together a number of minor incidents that clearly peeved her, she has neither identified a single "adverse employment action" nor provided any factual basis for claiming that SNET treated her adversely because of her gender or in retaliation for having complained of discrimination. Indeed, plaintiff repeatedly conceded at her deposition that she really has no factual basis for believing that the conduct she protests occurred because she is a woman or because she made any complaint of discrimination, other than that the events occurred. In essence, plaintiff's Complaint seeks to convert a series of idiosyncratic workplace

1

grievances that bear no relation to gender or retaliation into actionable claims under Title VII, CFEPA, and the Equal Pay Act.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Was Employed in Kevin West's Business Communication Sales Group from June 1998 to June 2001.

Plaintiff has been employed by SNET since 1984. She currently holds a position as Service Executive, which she says she enjoys very much. Deposition of Kimberly Bachiocchi ("Bach. Dep.") 2/15/05 at 95:2-13.[1] She is making more money now than she did at the time of the events that give rise to this lawsuit. Bach. Dep. 2/15/05 at 95:14-16. SNET has strong policies against sexual harassment and discrimination of any sort, as well as unlawful retaliation. These policies are published in its Code of Business Conduct, Resource Guide for Management Employees, and other publications, along with instructions on how to report complaints to such groups as SNET's internal EEO office and Asset Protection. Exh. 23; West Aff. ¶ 15.

In June 1998, plaintiff applied for, and was hired into, a position as an Analyst Technical Sales (Engineering) in SNET's Business Communication Sales ("BCS") unit. She worked out of SNET's Derby, Connecticut office. She was hired for the position by Richard Light, the head of the Engineering unit within BCS, and Kevin West, the manager of the Technical Sales Support unit within BCS. West was Light's immediate superior. Plaintiff was interviewed prior to being hired, and plaintiff acknowledges that Light and West were clearly aware that plaintiff was a woman when they hired her. Bach. Dep. 5/12/03 at 16:15-17:12; Bach. Dep. 12/13/04 at 82:15-83:4. Plaintiff admits that West, as manager of the group, could have prevented her hiring if he had wanted

---

[1] The deposition transcript pages and exhibits referred to throughout this memorandum are produced in SNET's Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment being filed on this same date.

to.  Bach. Dep. 12/13/04 at 84:2-22.  Since plaintiff had no prior engineering experience before being selected for the job, Light assigned a male Analyst, Chris Manouse, to help her out as needed; Manouse also volunteered to help her.  Bach. Dep. 2/15/05 at 34:16-35:22, 43:5-9. Plaintiff considered Manouse's assistance to be helpful and acknowledges that he caught some of the mistakes she made.  Bach. Dep. 2/15/05 at 35:3-22.

Apart from a one-year period when she was out of work on a leave of absence, plaintiff remained in her position as Analyst Technical Sales (Engineering) until June 11, 2001.  Before plaintiff left to take a medical leave in May 2000, her immediate supervisor was Light, who reported to West.  Light CHRO Aff. 9/15/00 ¶ 2.  After she returned to work in May 2001, she reported directly to West, because Light had left SNET with a company-wide retirement offer. Bach. Dep. 2/15/05 at 80:6-9.

As an Analyst Technical Sales (Engineering), plaintiff's job was to contact businesses that sought voice and data wiring services from SNET.  This included telephone and fax services.   Plaintiff's job included visiting business customers to assess their requirements, developing materials and labor lists for jobs, determining the price of jobs, and ordering materials.  After these tasks were completed, plaintiff would turn the projects over to BCS's Installation unit, headed by Robert Vallario.  Light CHRO Aff. 9/15/00 ¶¶ 3-4.  That group performed the actual installation work, often using outside vendors. Plaintiff felt that she lacked skills in some aspects of engineering that would have been helpful for the position, yet she was hired into the position by Light and West and she admits she received good performance reviews. Bach. Dep. 5/12/03 at 64:5-65:2.  In the BCS group, plaintiff received raises of 3.6% in 2000 and 4.5% in 2001.  Moffett Aff. ¶¶ 4-5.

3

While she worked in BCS on West's team, plaintiff's salary was virtually the same as the mean of the salaries of the male employees who worked in West's department on the same job title. In 2000, her base salary of $56,124.35 was almost identical to the mean base salary of the men who also worked as "Engineer PTS" (the title used for plaintiff's job during that year), which was $57,144.68. In 2001, plaintiff's salary of $58,856.98 was higher than the mean salary of the men who also worked as Analyst Technical Sales (Engineering) in West's department, which was $57,102.76. Moffett Aff. ¶¶ 6-8.

While plaintiff worked in West's department, she received the highest percentage raise in salary of her twenty-one-year career with SNET, with the exception of a raise that accompanied her promotion when she left West's department, during the time she alleges she was discriminated against by the company. Bach. Dep. 2/15/05 at 110:18-111:21.

### B.    Plaintiff Engaged in Workplace Conduct with Nicholas Faiella That Drew Complaints From Co-Workers and Contractors.

In early 2000, West, the Office Manager, and Vallario, head of Installation, began to receive complaints from co-workers and contractors about plaintiff's workplace interactions with an Analyst Technical Sales (Installation), Nicholas Faiella. Faiella, significantly older than plaintiff, worked on a number of plaintiff's jobs. Vallario received complaints from outside contractors doing work for SNET that Faiella exhibited an inappropriately defensive and hostile attitude toward contractors who at any time dared to criticize plaintiff's work. The situation had escalated to the point of creating difficulties for the contractors, who began to object to working on SNET projects to which plaintiff and Faiella were jointly assigned. Exh. 1, Vallario CHRO Aff. 9/19/00 ¶¶ 3-9.

With respect to co-worker complaints, several workers in the office came forward and notified SNET of inappropriate physical conduct between plaintiff and Faiella at work. The co-

workers indicated that this conduct made them uncomfortable to be around plaintiff and Faiella at the office and at business conferences they attended as a group. These co-workers stated that they were uncomfortable when plaintiff and Faiella gave each other neck and shoulder massages at work, sat at a conference with their legs touching, stroked each other's legs, and otherwise engaged in inappropriate touching in the workplace. See Exh. 2 (notes from co-workers). Specifically, co-workers complained of touching between plaintiff and Faiella at conferences held in Boston and Sturbridge, Massachusetts. Exh. 2; Manouse Dep. 7/28/03 63:20-64:19; 70:2-71:10, 81:12-84:23; Exh. 3, Faiella CHRO Aff. 12/13/02 ¶ 19. It is undisputed that Faiella was given a reprimand for his conduct, but plaintiff was not disciplined in any way.[2]  In this lawsuit, plaintiff complains that, as a result of these incidents, supervisors and co-workers spread rumors that she was having an affair with Faiella during the spring of 2000. Compl. ¶ 16.

Plaintiff also had difficult interactions with other, non-supervisory employees. On May 15, 2000, an employee in Vallario's installation unit, Carl Lorentzen, sent an email to Vallario proposing an alternative to a plan proposed by plaintiff for an installation job. Exh. 4, Lorentzen CHRO Aff. 9/14/00 ¶¶ 3-7; Exh. 5, Lorentzen email 5/15/00. Plaintiff, who took issue with Lorentzen's implied criticism of her work, first met with Lorentzen to complain at the Derby office, and then followed him to a Wendy's restaurant around the corner and confronted him again about the criticisms. Lorentzen explained his concerns about the work, but plaintiff

---

[2]  Plaintiff has made it clear throughout this litigation that she is not complaining at all of discrimination or harassment by Faiella. In fact, she has been allied with Faiella, who also filed a complaint of discrimination against SNET, which plaintiff supported. Instead of complaining that Faiella's conduct toward her was inappropriate or discriminatory, she complains that she and Faiella were both discriminated against by SNET when they were both criticized for their workplace conduct and then were assigned to new jobs with other co-workers rather than being together. Plaintiff's position that both she (female) and Faiella (male) were treated adversely in the same ways, with Faiella undisputedly being treated more severely by a written reprimand, directly undermines any claim of disparate treatment because of gender.

apparently remained angry and disturbed.   Compl. ¶¶ 24-25; Exh. 4, Lorentzen CHRO Aff. 9/14/00 ¶¶ 3-8.

Outside contractors also complained about plaintiff and Faiella.   As manager of the group, West investigated these complaints by speaking directly with four outside contractors, all of whom suggested that Faiella's excessive tendency to jump to plaintiff's defense in any business situation was alienating them.   West Aff. ¶¶ 10-13; Exh. 6, West CHRO Aff. 9/14/00 ¶¶ 4-11.   It was plaintiff's job as an Analyst to design projects and Faiella's as the engineer to work with the outside contractors to build the project.   The first outside contractor whom West contacted told him that Faiella had verbally confronted him about a project on which plaintiff and the contractor were working.   When the contractor and plaintiff disagreed about the work, plaintiff called on Faiella to intercede.   The contractor said that Faiella confronted him in a hostile manner and accused him of trying to make plaintiff look bad.   West Aff. ¶ 10; Exh. 6, West CHRO Aff. 9/14/00 ¶ 7.   The second contractor told West he had had problems with plaintiff's work, but that whenever he had a problem on a job with plaintiff, Faiella became hostile and confrontational.   The contractor told West that he would rather not do work for SNET anymore than suffer this kind of aggravation.   West Aff. ¶ 11; Exh. 6, West CHRO Aff. 9/14/00 ¶ 8.   The third contractor told West that on one of plaintiff's projects, her work was so poor that he had refused to work on it; Faiella then became defensive and accusatory toward him. West Aff. ¶ 12; Exh. 6, West CHRO Aff. 9/14/00 ¶ 9.   The fourth contractor complained that he had a problem every time he worked on a SNET project on which plaintiff was the engineer and Failla was the installation supervisor.   He told West that when there were changes in the work, plaintiff and Faiella "would stick him with the additional cost."   West Aff. ¶ 13; West CHRO Aff. 9/14/00 ¶ 10.   As a result of this information, West decided that plaintiff and Faiella should

no longer be assigned to the same projects.  West Aff. ¶ 14; Exh. 6, West CHRO Aff. 9/14/00 ¶ 11.[3]

### C.    Plaintiff Was Disrespectful and Openly Critical of Her Supervisors.

Meanwhile, plaintiff was openly critical of her supervisors, West and Light.  At a meeting of the Engineering department held in March 2000, plaintiff complained in front of her whole work group that Light "did not have a clue as to what his team was doing for workload." Bach. Dep. 12/13/05 at 86:11-22.  She proclaimed that Light, her supervisor at the time, spent too much time doing engineering work.  She said he did not spend enough time supervising the engineers, producing confusion among the engineers.  She stated that if only she could run the group for a couple of weeks she would show West and Light how to do things.  West Aff. ¶ 16; Exh. 7, Light CHRO Aff. 9/15/00 ¶¶ 7-8.  She also complained about the decision to have another Analyst do the engineering work for the Connecticut state prisons.  Light pointed out that this work required conduit wiring, which required electrical knowledge and experience, which she lacked.  Although Light did not state this at the meeting, he later told West he believed that plaintiff would not be given the necessary access to the job inside the prisons because her brother was incarcerated in a Connecticut maximum security prison.  West Aff. ¶ 16; Light CHRO Aff. 9/15/00 ¶¶ 7-8.  Plaintiff disregarded Light's explanations and continued to complain publicly about his supervisory skills and management of the group in general.

### D.    Plaintiff Was Out of Work on a Paid Leave from May 2000 to May 2001.

On May 19, 2000, plaintiff began a period of paid medical leave based on claimed emotional problems.  She testified that she understood she was on the verge of a "nervous

---

[3] One of the allegations of discrimination plaintiff makes in her Complaint is that Carl Lorentzen, an engineer in the Installation unit, allegedly told plaintiff that he had been "assigned to break up the Nick and Kim thing."  Compl. ¶ 25.  This alleged statement refers to the decision to separate plaintiff and Faiella on their job assignments, based on the legitimate business reason that contractors were complaining about their behavior when they worked as a team.

breakdown." Bach. Dep. 2/15/05 at 131:8-14. She remained completely out of work (except for a one-day visit, explained below) for almost twelve months, receiving sickness benefits in the form of six months of full salary and an additional six months of pay at 60% salary. Bach. Dep. 6/24/03 at 20:15-19. She returned on May 14, 2001, just as her paid leave was about to expire. Exh. 8, 2001 Absence Record (authenticated at Bach. Dep. 2/15/05 at 55:12-14). During this time, plaintiff was under the care of psychologist Gary Zachariah, who diagnosed her as depressed. Faiella was also out on a medical leave during part of the same time.

After plaintiff ceased coming to work, West needed to reassign the customer accounts she had been working on, including major accounts with Cingular Wireless and Yale University, to other Analysts since they required engineering work during her absence. While plaintiff was on medical leave, Light and Vallario retired during a company-wide early retirement offer. West Dep. 9/18/03 138:21-139:7.

On July 24, 2000, while plaintiff was still out of work on paid medical leave, she filed complaints against SNET with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the U.S. Equal Employment Opportunity Commission ("EEOC"). Exh. 9, CHRO Complaint #0130048; Exh. 10, EEOC Charge # 16aa03399. In the administrative charges, plaintiff alleged that she had been sexually harassed, had suffered retaliation, and had been paid less than men for the same work. On December 19, 2000, the CHRO dismissed the claim on the ground that "there [was] no reasonable possibility that further investigation will result in a finding of reasonable cause inasmuch as it was determined that you were not discriminated against because of your sex." Exh. 11, CHRO Merit Assessment Dismissal. The EEOC adopted the CHRO's findings. Exh. 12, EEOC Dismissal and Notice of Rights. Plaintiff also assisted her former co-worker, Faiella, who had also gone out on a medical leave of

8

absence, to pursue his own claim of discrimination against SNET and Vallario. See, Exh. 3, Complaint #0130268.

During her treatment with Zachariah, plaintiff notified SNET's Medical Department that she wished to return to work for a single day on January 18, 2001 to "become re-acclimated to her job." Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 10; West Aff. ¶ 20; Exh. 15, West CHRO Aff. 08/01/01 ¶ 4. She indicated that she planned to return for one day only, and not to continue working after January 18th. The SNET Medical Department contacted Dr. Zachariah to clarify the purpose of the single-day visit, as this was an unusual request and the purpose of her visit was unclear. Dr. Zachariah made it clear that plaintiff was not returning to work permanently, and that this was to be just one day in the office to "re-acclimate" herself, check her e-mails, etc. Thus, West, to whom Bachiocchi reported after Light's retirement, was unable to assign her to any ongoing customer projects or return her to the work then in the office. West Dep. 9/18/03 139:17-141:7; West Aff. ¶ 20.

On January 18, 2001, the date selected by the plaintiff, many workers were out of the office for various business and personal reasons. In addition, during the period that plaintiff was on medical leave, four employees had retired and had not been replaced and both plaintiff and Faiella were out on medical leaves; therefore, at that time, significantly fewer employees reported to the Derby location than previously. Of those who did, on January 18th, one employee was attending a pre-planned business conference in Florida, one took a vacation day in connection with purchasing a new car, and several others were attending customer appointments or were at job sites. West Aff. ¶ 21; Exh. 15, West CHRO Aff. 08/01/01 ¶ 5. As a result, only three employees, other than plaintiff, were in the office that day: West, Victor Peregolise, and

9

Walter Czapor. West Aff. ¶ 21. Plaintiff interpreted the fact that most employees were out of the office to have been an act against her.

In the afternoon of January 18th, West allowed the employees who were in the office to go home early because of a local snow squall in Derby. West Dep. 9/18/03 123:17-124:21. Plaintiff refused to go home and remained in the office with West until 5:00 p.m. West Aff. ¶ 22. There were no incidents between them. After that day, plaintiff did not return to work for another four months.

Plaintiff acknowledges that while she was out on a paid disability leave based on a claim of total disability from working, she and a friend secretly sat across the street from the SNET Derby office in an SUV for several days in January – March, 2001, videotaping her co-workers entering and leaving the building. Bach. Dep. 2/15/05 at 169:7-23, 179:2-24; see also Bach. Dep. 2/15/05 at 181:1-182:25. She did this in order to gain "evidence" for this litigation.

       **E.**    **Plaintiff Returned to Work on May 14, 2001.**

Just short of one year out of the office on a leave of absence, and just as her period of paid leave under SNET's policies was about to expire, plaintiff returned to work in West's department on May 14, 2001.[4] Exh. 22. Chris Manouse was again asked to assist plaintiff as needed to prepare her "scope of work" and "materials" documents. Bach. Dep. 2/15/05 at 34:16-38:11. Plaintiff admits that Manouse (male) gave her very helpful input that she appreciated. Bach. Dep. 2/15/05 at 42:7-14.

In February and July of every year, SNET managers set compensation ratings (i.e., bonus ratings) for each employee based on the employee's work performance during the previous

---

[4] She wanted to return on May 7th, but West was scheduled to be out of the office that week so SNET paid her an additional week that did not count toward her sick, vacation, or personal time, and she was able to remain out of work until May 14, 2001. Exh. 8 (2001 Absence Record); Bach. Dep. 2/15/05 at 57:16-59:11.

period. West Aff. ¶ 23; Moffett Aff. ¶ 9. In early 2001, West set plaintiff's compensation rating at "meets expectations" (a middle rating), because she had not worked during the review period. West Aff. ¶ 23; Exh. 15, West CHRO Aff. 08/01/01 ¶ 13; Bach. Dep. 7/24/03 at 154:13-155:6. Quite logically, and on advice by human resources and the compensation group, West did not rate plaintiff as "exceeding expectations" because she had not actually worked during the prior twelve-month period. Plaintiff admits that she did not work during the review period, and she correspondingly admits that she thus could not have done work that "exceeded expectations." Bach. Dep. 12/13/04 at 67:17-68:15.

Plaintiff testified that during her medical leave of absence and after she returned to work she was prescribed and was taking Celexa and Wellbutrin "to help maintain [her] mood." Bach. Dep. 2/15/05 at 19:1-9; Bach. Dep. 12/13/04 at 22:2-9. These medications created problems for her at work. She testified, "I would not be able to retain anything. I could meet you, rephrase your name to you and five minutes later not remember who I just met." Bach Dep. 12/13/04 at 29:11-31:25. She had to "[k]eep asking the same question over and over again" and had to leave herself sticky memos to remember things. Bach. Dep. 2/15/05 at 19:5-20:5, 24:20–25:6.

Because plaintiff had been absent for almost a full year, other Analysts were working on projects for some accounts previously assigned to her. These included the Cingular Wireless and Yale University accounts. To avoid disrupting those projects, when plaintiff returned to work on May 14, 2001, West did not re-reassign those accounts to plaintiff. This was a legitimate business decision based on a desire not to disrupt relationships between the clients and the Analysts to whom the accounts had been assigned. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7. However, West assigned plaintiff major accounts such as Pfizer, the Enfield Board

of Education, and others, which involved significant projects. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7; Bach. Dep. 12/13/04 at 109:1-8, 110:9-17, 116:20-119:3.

Plaintiff was apparently unhappy that West did not reassign the Cingular Wireless account to her immediately upon her return. In fact, she was so unhappy about this and so eager to challenge West that she contacted Janice Vereb, her customer contact at Cingular, and instructed Ms. Vereb that "she would need to approach Kevin and request me back on the [Cingular] account." Bach. Dep. 2/15/05 at 90:19-91:8. Vereb did discuss the matter with West as plaintiff asked her to. When West learned that plaintiff had contacted the customer to urge her to ask for a change in account assignment, he met with plaintiff on May 31, 2001. At the meeting, West reviewed some of the changes in the department and what new things plaintiff needed to do. Bach. Dep. 2/15/05 at 135:1-14. He also told plaintiff that it was inappropriate for her to contact a customer to undermine the existing relationship and ask the customer to intercede with respect to internal assignment issues, and he did not want her to contact any other former customers to try to get back on their accounts. Bach. Dep. 2/15/05 at 91:17-92:15; West Aff. ¶ 25; Exh. 15, West CHRO Aff. 8/01/01 ¶ 8; Bach. Dep. 12/13/04 at 171:13-19, 198:4-199:10. Plaintiff admits that West never told her she could not have any contact with customers in general. Bach. Dep. 2/15/05 at 92:6-9. Plaintiff never acknowledged the inappropriateness of her behavior and was angry with West for counseling her about her request of Ms. Vereb. West Aff. ¶ 25. In addition, she brought a tape recorder to the meeting and stated she intended to tape what West said, but West told her she could not tape the meeting. Bach. Dep. 2/15/05 at 135:23-136:11.

After meeting with West on May 31, 2001, plaintiff told West that she would be taking time off on the following morning, a Friday, to attend the funeral of a friend's father. West

12

granted her the time off with pay.  West Aff. 27.  The next day, June 1st, 2001, plaintiff did not

return to work after the morning funeral, although West expected her back to work around mid-

day.  She had apparently scheduled an appointment with her psychologist during work hours to

talk about workplace issues.  Bach. Dep. 2/15/05 at 137:7-138:12, 137:1-25, 144:21-145:2.  West

covered her assignments for the day.  West Aff. ¶ 27.  Nevertheless, she received a full day's pay

for June 1st.  She later called West and told him that since rain was predicted for the weekend,

she would come into the office on Saturday, for which she would get paid overtime. West Aff. ¶

27.  Plaintiff does not deny that she wanted to work overtime at some point after the funeral day,

but cannot recall the date she wished to work.  Bach. Dep. 2/15/05 at 62:22-63:19. West told her

that she could not be paid overtime for working on Saturday when she had already taken a full

day off with pay on Friday.  West Aff. ¶ 27; West CHRO Aff. 8/01/01 ¶ 10.  West also told

plaintiff that she could not take overtime whenever she wanted, and that he was prohibited by

company policy from continuing to give "comp time" in lieu of overtime payment to non-exempt

employees like plaintiff.  West Aff. ¶ 28; Exh. 15, West CHRO Aff. 8/01/01 ¶ 11.  Plaintiff

concedes that she never asked to work overtime on any other date after June 1, 2001.  Bach. Dep.

2/15/04 at 64:2-4.

Although plaintiff had been back to work for only two weeks, by June 1st, she had already

submitted her vacation requests for four full weeks and sixteen additional full or half days all in

July and August.  Because of the needs of the business, West told her that she could not take all

her vacation time in July and August, but they would have to coordinate the vacation requests of

all the engineers.  West Aff. ¶ 29; Exh. 15, West CHRO Aff. 8/01/01 ¶ 12.  He never denied her

any vacation to which she was entitled.

13

On June 4, 2001, the following working day, plaintiff admits she was upset with West for several things including failing to approve her overtime request for June 1st and telling her she could not tape record their conversations in the office. See Bach. Dep. 2/15/05 at 144:3-20. At approximately 9:00 a.m. or 10:00 a.m., West visited plaintiff's work area to return a project proposal that she had drafted. Plaintiff had attached a form she created, on which she insisted West place either his signature or his initials, apparently to create a record that he had seen the proposal and approved it. Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 18; West Aff. ¶ 30; Exh. 15, West CHRO Aff. 8/01/01 ¶ 14. West declined to sign or initial the form, stating that this was not how he operated the work group and informed her that he did not take his instructions from her. When West finished speaking, plaintiff grabbed the form from West and took it in her hand. Plaintiff alleges that West then held her wrist with one hand and took the form back with the other; after he took the paper from her, he crumpled it and shredded it. Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 18.[5]

Plaintiff immediately called Faiella at home (because he was on disability leave at that time), who in turn called the Derby police about the incident on her behalf. Plaintiff also called her lawyer. Bach. Dep. 2/15/05 at 51:1-5. Derby police officer Steve Chapman arrived at the SNET office. West Aff. ¶ 30. After examining the situation and interviewing Bachiocchi and West, the officer refused Bachiocchi's request to press criminal charges against West and observed to her that the red mark she pointed out on her arm was caused by her watch. Plaintiff admits she wanted to have West arrested for assault. Bach. Dep. 2/15/05 at 153:23-154:3, 152:7-154:3. After speaking with the individuals involved, the police officer noted there were no signs of any contact by West, declined Bachiocchi's request to arrest West, and noted that he did not

---

[5] SNET and West deny that the event occurred as alleged, but the factual dispute over whether West touched plaintiff's wrist or not is not a material fact that would affect a decision on summary judgment in this case.

"believe probable cause exists for any further action at this time." Exh. 16, Derby Police Dep't Incident Report 01-11941.

**F.    Plaintiff Applied For and Was Promoted to a Position Outside West's Department, Which She Began on June 18, 2001.**

Plaintiff never worked with West after mid-day on June 4, 2001. Thus, she only worked with him a total of <u>three weeks</u> after returning from her leave of absence.[6] Bach. Dep. 2/15/05 at 64:10-12, 65:21-23. She was off on June 7th-8th and last worked in the group on June 11, 2001. Bach. Dep. 2/15/05 at 61:7-12, 66:18-20. West relocated to another site to avoid further incidents with her. On June 18, 2001, SNET offered plaintiff a promotion to a position for which she had applied as Manager, Sales Support, outside West's supervision. Bach. Dep. 2/15/05 at 114:23-115:2. Plaintiff accepted the promotion, which resulted in a 6% raise equaling $3,531 annually. Exh. 17; Moffett Aff. ¶ 10. No one forced plaintiff to take the position; in fact, she selected it over a different position that was also offered to her through human resource manager Laurie Moffett. Bach. Dep. 12/13/04 at 79:1-80:24. This was after plaintiff had filed two CHRO charges of discrimination against her employer. <u>See</u> Exh. 9 and 18. Plaintiff continues to work at SNET and has voluntarily moved into yet another position since that time. Moffett Aff. ¶ 11.

------

[6]  Plaintiff's testimony on this small and undisputed point is typical of her repeated sparring with the questioning attorney at her deposition and her stubbornness in admitting the most minor facts:

> Q. So we're clear, you came back to work between May 14 of 2001 and June 4 of 2001?
> A. Actually I returned on record May 7 of 2001, yes.
> Q. I'm not asking you about a record. I'm asking you when you returned to work. Did you return to work and work in Kevin West's group between May 14 of 2001 and June 4 of 2001?
>     MR. GILLESPIE: Objection to form.
> A. I physically reported to the office on May 14, yes.
> Q. Did you mentally report to the office?
> A. Yes.
> Q. So you reported to the office, right?
> A. Yes.
> Q. You worked in Kevin West's group between those two dates, right?
> A. Yes.

On June 12, 2001, after the paper incident and after plaintiff had left West's work group, plaintiff filed a second complaint against SNET with the CHRO. Exh. 18, Complaint # 0130598. The complaint made the same allegations as the previous one, and also referred to the paper incident. On the same date, plaintiff made the same allegations in a charge filed against SNET with the Equal Employment Opportunity Commission (EEOC). See Exh. 19, Charge # 16aa13352. Plaintiff brought the present action on the following May 28th.

## III.   ARGUMENT

### A.    Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Second Circuit has noted that "[s]ummary judgment is appropriate even in discrimination cases," since "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination than to . . . other areas of litigation." Weinstock v. Columbia University, 224 F. 3d 33, 41 (2d Cir. 2000).

The United States Supreme Court has established that the burden is not on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact. Celotex Corp. v Cattrett, 477 U.S. 317, 325-26 (1986). The moving party may prevail "by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the [nonmovant's] case." Id. at 325. Thus, a defendant moving for summary judgment need not negate the plaintiff's claims by submitting evidence that refutes them. Id. at 323. Instead, the moving party may merely point out the lack of evidence supporting the

16

opposing party's position and need not "support its motion with affidavits or other similar materials negating the opponent's claim." Id.

Once the moving party points out the absence of evidence to support the plaintiff's claims, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Where, as here, the nonmoving party will bear the burden of proof at trial on dispositive issues, he must come forward and make an evidentiary showing sufficient to establish each essential element of his claim. See Celotex, 477 U.S. at 322.  A party opposing summary judgment "may not rest upon the mere allegations or denials of the pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added).  The facts must be submitted in the form of admissible and significantly probative evidence. Celotex, 477 U.S. at 322-23.  In opposing a motion for summary judgment, a plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible.  See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

**B.    There Is No Genuine Issue of Material Fact as to Plaintiff's Sexual Harassment Claims in Counts One and Two.**

In Counts One and Two, plaintiff claims that SNET sexually harassed her  in violation of Title VII and the state CFEPA.  Compl. ¶¶ 37, 41.  Connecticut courts follow the federal courts' interpretation of Title VII when interpreting the FEPA.  Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 53 (1982).  Thus, Title VII analysis applies to both counts.

Counts One and Two both bear the heading "Sexual Harassment," but plaintiff's complaint does not explain which theory of sexual harassment she is advancing.  She has

persisted in keeping the exact nature of this claim vague throughout the proceedings. Courts have divided sexual harassment complaints into two types:  quid pro quo and hostile work environment sexual harassment.  Gallagher v. Delaney, 139 F.3d 338, 346 (2d Cir. 1998).  On the record of this case, claims under either theory of sexual harassment must fail as a matter of law.

### 1.    There Is No Probative Evidence of Quid Pro Quo Sexual Harassment.

To establish a prima facie case of quid pro quo sexual harassment, a plaintiff must present evidence that she was subject to unwelcome sexual advances, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment.  Gallagher, 139 F.3d at 346.  The undisputed record of this case establishes that Ms. Bachiocchi was not subjected to sexual advances, nor was her reaction to any advance used as the basis for a decision affecting any aspect of her employment.  Thus, plaintiff cannot establish a prima facie case of quid pro quo harassment.

Plaintiff admits that she was never "propositioned, that [she was] never touched in an unwelcome way, [or] anything along those lines" during the period at issue when she worked in Kevin West's group at SNET.  Bach. Dep. 7/24/03 at 44:8-11.  She admits that Vallario never "proposition[ed her] to go on a date with him or have a romantic relationship with him."  Bach. Dep. 7/24/03 at 113:7-9.  She admits that neither Vallario nor anyone at SNET ever touched her inappropriately.  Bach. Dep. 7/24/03 at 113:10-13.  Further, she admits that she did not consider Vallario's alleged remark that he would date her himself if he were younger to be discriminatory.  Bach. Dep. 7/24/03 at 113-114:8.  More importantly, plaintiff readily admitted in her deposition that no SNET employee ever subjected her to sexual conduct of any sort.  Bach. Dep. 2/15/05 at 193:20-22.  No one at SNET ever propositioned her sexually.  Bach. Dep. 6/24/03 at 43:6-15.

18

No one engaged in unwelcome sexual conduct toward her while she worked in West's department. Bach. Dep. 6/24/03 at 44:1-3.

Even if plaintiff had been subjected to unwelcome sexual conduct – which is refuted by the undisputed record of this case -- there is no evidence in the record to support the second necessary element of a prima facie case of quid pro quo harassment: that the plaintiff was subjected to an adverse employment action based on her rejection of a sexual advance. To succeed on a claim of quid pro quo sexual harassment, a plaintiff must show that an adverse employment action was linked to rejection of a sexual advance. This action must involve a "tangible job benefit" such as "compensation, terms, conditions or privileges" of employment. Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). Nowhere in plaintiff's Complaint, and nowhere else in the record, does plaintiff allege or are there facts to support that an adverse employment action was linked to rejection of a sexual advance. For this reason, too, plaintiff cannot make out a prima facie case of quid pro quo sexual harassment.

### 2. The Evidence in the Record Cannot Sustain a Claim of Hostile Work Environment Sexual Harassment.

To establish a prima facie case of sexual harassment based on a hostile work environment, plaintiff must show (1) that she is a member of a protected group, (2) that she was the subject of harassment, (3) that the harassment was based on her gender, and (4) that the harassment affected a term, condition or privilege of her employment. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993). To establish the fourth element, plaintiff must show that she suffered harassment that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklist Sys., 510 U.S. 17, 21 (1993). In addition, the plaintiff must establish "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Richardson v.

19

New York State Dep't of Correctional Serv., 180 F.3d 426, 436 (2d Cir. 1999) (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)). There is no evidence in the record that plaintiff was subjected to harassment that was based on her gender, or that was sufficiently severe and pervasive to alter the conditions of her employment. Thus, plaintiff cannot establish such a prima facie case.

Plaintiff's Complaint lists a set of "factors" allegedly contributing to a "hostile sexual environment." Compl. ¶ 16. The alleged "factors" are: (1) she was the subject of rumors that she was personally involved with and having an affair with Faiella; (2) she was questioned by supervisors about her relationship with Faiella; (3) Vallario, in a conversation with plaintiff, asked offensive questions about a possible affair between plaintiff and Faiella; (4) plaintiff once found directions to her home address from the public Website MapQuest on an office printer and learned that her supervisor, Richard Light, had left them there; and (5) there were references to women in disparaging terms in the workplace. Compl. ¶ 16. The Complaint does not allege that any other conduct by any supervisor or co-worker at SNET contributed to a hostile environment.

### a.  Most of Plaintiff's Claims Fail Summarily Because the Conduct Alleged Was Not Based on Gender.

***Allegations of inappropriate conduct between plaintiff and Nicholas Faiella.*** The factors listed in plaintiff's Complaint as contributing to a hostile environment include allegations about rumors that in 1999, she was personally involved with Faiella, an older co-worker who was married. Compl. ¶ 16(A)-(D); see Bach. Dep. 2/15/05 at 100:19-20. In fact, it was apparently the consensual physical touching between Bachiocchi and Faiella at work that led

20

several employees to complain that such conduct made them feel uncomfortable in their presence.[7]

Even if the conduct alleged occurred as plaintiff claims, this is precisely the sort of gender-neutral conduct that cannot support a claim of sexual harassment as a matter of law. First, there is no evidence whatever that asking plaintiff about her relationship with co-worker Faiella was a gender-related act.[8]  In fact, it is undisputed that supervisors and co-workers directed the greater part of their reactions to the alleged affair at Faiella, who is male.  Bach. Dep. 7/24/03 at 28:14-17; Exh. 2 (complaints by co-workers).  SNET employees questioned Faiella about his behavior with plaintiff and reprimanded him for it.  See Exh. 3, Faiella CHRO Aff. 12/13/00 ¶ 19.  Faiella testified at his deposition that his supervisor, Robert Vallario, spoke to him several times about the purported affair, allegedly asking him questions about it that were never repeated to plaintiff.  Faiella Dep. 10/27/03 17:4-18:2, 10/31/03 33:22-34:13, 43:20-44:7. Thus, any comments made about a personal relationship between Faiella and plaintiff were not based on gender or directed at plaintiff because she is a woman.  It is undisputed that the issue was raised more frequently and more forcefully with Faiella, who, unlike plaintiff, was reprimanded for his workplace conduct related to his interactions with plaintiff.[9]

---

[7] Notably, plaintiff does not claim that Faiella subjected her to any unwelcome conduct in the workplace.  Any conduct between Faiella and plaintiff was consensual.  She describes him as a "friend" (Complaint ¶ 12) with no supervisory authority over her.  Bachiocchi Dep. 5/12/03 15:13-16:3.  In fact, plaintiff supported Faiella when be brought his own claim of discrimination against SNET, which was partially based on the reprimand Faiella received (but plaintiff did not) for their inappropriate workplace conduct.  Bachiocchi Dep. 6/1/04 98:20-99:23.  Moreover, plaintiff has testified that Faiella never engaged in inappropriate conduct toward her in the workplace.  Bachiocchi Dep. 7/24/03 28:18-25 ( . . . never sexually harassed her or touched her in a sexual way in the workplace.)  Thus, Faiella's conduct toward plaintiff cannot support a claim of sexual harassment in this case.

[8]  Since Faiella was no longer with the company when plaintiff returned from her leave of absence, any such conduct pre-dated May 19, 2000, the first date she went out on leave.  See Bach. Dep. 2/15/05 at 80:10-15.

[9]  As indicated above, plaintiff joined Faiella in complaining to the company that Faiella's reprimand was unjustified and "discriminatory."  Bachiocci Dep. 6/1/04 98:20-99:23.

21

In fact, the Second Circuit has directly held that rumors or questions involving a purported heterosexual affair do not establish harassment based on gender. Brown v. Henderson, 257 F.3d 246, 255-56 (2d Cir. 2001). In Brown, one of the plaintiff's primary allegations of harassment was that she was subjected to rumors and teasing about an alleged relationship with a male co-worker known as "Tiny." The alleged rumors and teasing were far more inappropriate than any alleged conduct in this case. In Brown, co-workers were alleged to have posted a picture of a naked, masturbating woman labeled "Tiny's Girl," posted a picture of two elephants mating labeled "Tiny and Mary Lou" (the plaintiff was known as "Mary Lou"), drawn a sexually explicit cartoon of the plaintiff in a men's bathroom, and teased the plaintiff to her face about the purported affair. Id. at 249-50. The Second Circuit held that under these facts the plaintiff could not meet the summary judgment burden of producing evidence that harassment had occurred because of her gender. The Court found that "[t]he only basis for linking the harasser's conduct to [the plaintiff]'s sex is the fact that the bathroom cartoon and one of the pictures ... both relied for their effect upon a depiction of a naked female body." Id. at 256. The Court found that even with the addition of this element, the plaintiff had not raised a genuine issue of fact that the harassment was based on her gender. Accordingly, it affirmed summary judgment for the employer. Id.

Other courts have similarly found that rumors or questions regarding a purported affair are not necessarily "based on" the plaintiff's gender. In Snoke v. Staff Leasing, Inc., 43 F.Supp.2d 1317, 1326-27 (M.D.Fla. 1998), the plaintiff complained that her immediate supervisors suspected her of having an affair with a male executive, who was much higher up in the chain of command. She complained that she was sexually harassed when the supervisors told her co-workers to "keep track of" her, questioned her about the affair, and criticized her for

22

performance problems. The Court granted summary judgment for the employer in part because she had presented no evidence that the harassment was based on her gender. The Court noted that both the plaintiff and the male executive had been subjected to the rumors. Thus, the plaintiff had not shown and could not show that she was subjected to the rumors or questions about the purported affair because she was female. Id. Likewise, rumors of an affair, even when brought about by a supervisor's repeated sexual advances to the plaintiff, were found not to contribute to a hostile work environment in Metzger v. City of Leawood, 144 F.Supp.2d 1225, 1250-51 (D.Kan. 2001).

   ***Directions to plaintiff's house.***   The Complaint also lists, among the "factors" noted above, an incident in which Light allegedly printed directions to plaintiff's residence and left them on a printer in the office. Compl. ¶ 16(E). First, any complaint concerning this purported event is untimely and barred. Under the FEPA, a complaint of discrimination must be filed within 180 days of the discriminatory conduct complained of. Conn. Gen. Stat. § 46a-82. Plaintiff filed her CHRO Complaints on July 24, 2000 and June 12, 2001, respectively. Exhs. 9, 18. One hundred eighty days before the earliest filing was January 26, 2000. By plaintiff's testimony, the event related to directions to her house occurred on December 16, 1999. Bach. Dep. 6/1/04 33:13-35. This claim is thus time-barred under the FEPA.

   Even if plaintiff's claim concerning directions to her house being left on a printer were timely, neither the Complaint nor any other evidence in the record provides a basis for the Court to conclude that this incident was linked to plaintiff's gender. In her deposition, plaintiff stated that she did not know why Light printed out directions to her house, effectively conceding that she has no factual basis for believing that he did so because of her gender. Bach. Dep. 6/1/04 at 36:24-37:19. She admits that Light explained to her that he had heard from others in the office

23

that she had a nice house, and he wanted to know which one it was. Bach. Dep. 7/24/03 at 49:1-6. Moreover, printing directions publicly available on MapQuest, without more, is gender neutral and not wrongful at all, much less conduct that can be presumed somehow to be sexual harassment.

*Tone of installation supervisor.* In Paragraph 18 of her Complaint, plaintiff alleges that "her supervisors treated her differently than the manner in which they interacted with her co-workers, who were male." She asserts that a supervisor's tone to others was friendly and constructive but to her it was not. At her deposition, plaintiff clarified that this allegation related to criticisms of her work from Robert Vallario, who worked in Installation and was never her supervisor. Bach. Dep. 12/13/04 at 49:4-11; 2/15/05 at 81:4-22. Richard Light was plaintiff's supervisor. Bach. Dep. 2/15/05 at 31:23-24. After Light retired during plaintiff's leave of absence, plaintiff reported directly to West. West Aff. ¶ 5. Plaintiff admits that neither Kevin West nor Richard Light criticized her work, nor did any SNET employees other than Vallario. Bach. Dep. 2/15/05 at 81:2-22; Bach. Dep. 12/13/04 at 59:10-14.

In fact, plaintiff did not work with Vallario at any time after May 19, 2000 (the beginning of her leave of absence) because he retired while she was out on leave. Bach. Dep. 2/15/05 at 80:10-12. Plaintiff's testimony at her deposition showed that she has no basis for believing that any criticisms of her work by Mr. Vallario were related to her gender. When asked on two occasions her reason for thinking that any work criticisms were related to her gender, she testified as follows:

> Q. Do you have evidence, any sort of evidence that any criticism of your work by Mr. Vallario was due to your gender?
> Mr. Gillespie: Objection. Seeks legal conclusion . Answer it if you can.
> A. I believe that to be the case, the truth.
> Q. Do you have anything to support that belief?
> A. No. Just what I recall happening.