Q. You recall something happening that supports that belief that it was due to your
   gender?

A. Yes. What I believe, yes.

Q. What I'm asking you is, what evidence or facts you have that support a belief that
   Mr. Vallario criticized your work because you're a woman?

A. The facts I have is what happened in that office. The things that were said. So that's
   what I have.

Q. Can you be any more specific than that?

A. I can give you incidents.

Q. What was said? What I'd like to know is what was said or what pieces of paper you
   have or what you saw that would support a belief that Mr. Vallario criticized your
   work because you're female?

Mr. Gillespie: Objection to form. Go ahead.

A. What I saw and what I heard, I can tell you. Often Bob Vallario would take my jobs
   that I had submitted to him and throw them in front of me and tell me that he was not
   going out there on this day because maybe the date was wrong or the bottom line that
   said PTS instead of System Cable wasn't right or whatever his reason may have been.
   And in other incidents he would not do that to other people. And I would hear in the
   office how major errors are made as far as hours or doing the job, major material was
   left off of the job.

Bach. Dep. 12/13/04 at 51:19-53:5; see also Bach. Dep. 2/15/05 at 25:17-34:4, 33:7-11

(testifying that the basis of her belief that the criticism was due to gender was that Light also

made a mistake in his work in 1999 and that she believes Vallario told Faiella something about

her work performance; but then admitting that she does not know whether Vallario in fact spoke

to Light about his mistake, does not know the substance of any such conversation, and has no

personal knowledge of whether other male employees were criticized for their work.)  Plaintiff

admitted directly that she has no personal knowledge about whether Vallario also had

conversations with her male co-workers about their work and, if so, the substance of those

conversations. Bach. Dep. 12/13/04 at 54:19-25.  Plaintiff also conceded that her comment about

uncriticized male employees was based on three incidents, and that in each case she did not

know whether and how the employee was criticized. Bach. Dep. 2/15/05 at 26:20-33:15.  She

further admitted that she has no idea what comments were made about her to Faiella. Bach. Dep.

2/15/05 at 33:16-34:1. She could not provide any reason for linking Vallario's "throwing" of papers to her gender. Bach. Dep. 12/13/04 at 52:20-53:4.

After plaintiff's leave of absence in 2000-2001, she only worked in Kevin West's group for four weeks, from May 14, 2001 through June 11, 2001. Bach. Dep. 2/15/05 at 38:21-39:4. During that time, she does not have any idea how many job scopes she may have completed and does not remember any specific feedback from Chris Manouse on her work. Bach. Dep. 2/15/05 at 41:3-23. Plaintiff has admitted she can produce no evidence to link any supervisor's criticism of her work to her gender, and such purported conduct is clearly not inherently gender-based. The law is clear that a supervisor's criticism of an employee's work performance that is not related to gender or any other protected status is not discriminatory. See Alfiero v. Sysco Food Servs.-Syracuse, 192 F. Supp. 2d 14, 25-26 (W.D.N.Y. 2001).

***Exclusion from conversations by West.*** In Paragraph 31(H)(v) of the Complaint, plaintiff alleges vaguely that West excluded her from conversations between him and "various [unidentified] men in the office." Complaint ¶ 31(H) (v). When asked at her deposition, plaintiff testified twice that she can remember only one occasion when she was excluded from a conversation. Bach. Dep. 12/13/04 at 94:22-98:24; 2/15/05 49:4-54:2. She claims that an office "meeting" was held immediately after the alleged paper incident in June 2001, after Faiella had called the police on her behalf and they had left the scene finding no basis for a criminal charge or further investigation. Exh. 16, Derby Police Report; Bach. Dep. 2/15/05 at 49:11-23, 52:23-53:3. Plaintiff claimed she saw some of her co-workers go into a conference room. Twice she testified that she does not know what the meeting was about; in fact she knows nothing about the meeting except that she saw one of her co-workers, Wayne Handfield, going from desk to desk summoning three of her other co-workers. Bach. Dep. 12/13/04 at 96:19-97:20; 2/15/05 at 52:5-

22. She does not know if she was harmed in any way by not being present at the meeting. Bach. Dep. 2/15/05 at 51:23-24, 53:4-15. Any claim that plaintiff was apparently "not summoned to a meeting" she should have attended because of her gender would be purely speculative, even if the event occurred as she described. There is simply no basis for attributing a gender basis to this purported event.

*West's responses to questions and telephone calls.* Plaintiff alleges in her Complaint that West "refused to answer Plaintiff's questions and failed to return telephone calls from Plaintiff."[10]  Compl. ¶ 31(A). First, even if this conduct occurred, it is not inherently gender-based and plaintiff has no basis, other than sheer speculation, to conclude that it was related to gender. Moreover, when asked the basis of this allegation at her deposition, plaintiff was unable to identify a single occasion when West refused to answer her questions. Bach. Dep. 12/13/04 at 99:3-19. Based on her testimony, her only reason for including this claim is an unsupported and speculative belief that West generally answered questions from male employees. See Bach. Dep. 12/13/04 at 100:11-12.

Likewise, at her deposition, plaintiff could not identify any telephone calls that West did not return. She does recall that she was unable to get through to him on three occasions during the three years she worked with him. Bach. Dep. 2/15/05 at 81:23-82:12. However, she concedes that on the first occasion, she simply reached West's voice mail, dialed zero to speak to his secretary, and did so. Bach. Dep. 2/15/05 at 82:17-84:14. On the second occasion, she left a message on West's voice mail, and he left an answering message on her voice mail. Bach. Dep. 2/15/05 at 84:15-86:7. On the third occasion, she succeeded in talking to him; either he answered his telephone or he called her back. Bach. Dep. 2/15/05 at 86:10-87:2. Plaintiff

---

[10]  Again, this claim is factually inaccurate, but SNET will take it as true for the purpose of the present motion.

testified that her reason for alleging that West refused to take her telephone calls was her idea that on one occasion she had a feeling he was sitting at his desk when she called and did not pick up the telephone; however, since she was out of the office at the time, she conceded that she does not know if he was sitting at his desk, if he was already talking on another line, or if some other situation was present that would explain why he did not answer her call. Bach. Dep. 2/15/05 at 87:3-88:13. Clearly, there is no evidence whatsoever in the record that West failed to answer plaintiff's telephone calls because of her gender, and on this record no reasonable juror could conclude that he did.

*__Assignment of accounts during 4-week return to work after leave.__*  Plaintiff also complains about the fact that she was removed from her two largest accounts during her year-long leave of absence, and was not reassigned to one of them upon her return. Compl. ¶ 31(B)-(C). Again, this is not gender-based conduct that could support a claim of hostile environment sexual harassment.

Moreover, plaintiff has testified at her deposition that she had no complaints about the projects she was assigned during the three-week period she worked in West's group after her leave of absence; she did not find them uninteresting or objectionable in any way. Bach. Dep. 2/15/05 at 71:24-72:3. As noted above, plaintiff returned to work on May 14, 2001 and left West's group with a promotion on June 11, 2001. She did not work with West at all after June 4, 2001, as he relocated his office. Bach. Dep. 2/15/05 at 39:2-4; West Aff. ¶ 31. Thus, plaintiff was only back to work in his group for three weeks before she voluntarily left to accept a new position. Bach. Dep. 2/15/05 at 39:2-23. In her affidavit to the CHRO, plaintiff explained that she had handled SNET's accounts with Yale and Cingular Wireless prior to her leave of absence. Exh. 20, Bachiocchi CHRO Aff. 10/02/01 ¶ 11. She conceded that West reassigned those

28

accounts to other employees while she was on medical leave, at a time when it was necessary to have another employee work on them. <u>Id.</u> She also acknowledged that "perhaps" West did not reassign the accounts to her when she returned to work in order to avoid disrupting the projects. <u>Id.</u> West has testified that he reassigned the accounts to others because plaintiff was on medical leave and did not reassign them back to her in order to avoid disrupting the projects. West CHRO Aff. 8/01/01 ¶ 7. Plaintiff has admitted that other analysts were already working on projects on those accounts when she returned to work, and that she knows little about what was going on with the projects in 2001. Bach. Dep. 12/13/04 at 119:4-122:16.

When plaintiff returned from her leave of absence, West did assign her the Pfizer account, the Enfield Board of Education account, and several other accounts, which involved major projects. West Aff. ¶ 24; Exh. 15, West CHRO Aff. 08/01/01 ¶ 7; Bach. Dep. 12/13/04 at 109:1-8, 110:9-17, 116:20-119:3. The Pfizer account was a large account. Bach. Dep. 12/13/04 at 110:9-17. The Enfield account was as interesting to work on as any of her previous accounts. Bach. Dep. 12/13/04 at 117:21-118:1. Plaintiff has stated that she has no complaints about having been assigned these projects. Bach. Dep. 2/15/05 at 71:24-72:3. Any claim of gender discrimination based on her assignment of accounts during the four-week period after her leave of absence fails because (1) this was not gender-based conduct, (2) by plaintiff's own admission, it was not an adverse employment action to assign her the new accounts, and (3) West's explanation certainly provides a legitimate non-discriminatory reason for his decision. Avoiding the disruption of projects that flows from reassignment of customer accounts is certainly a legitimate business motive. Moreover, replacing one account with other large accounts is not a severe and pervasive alteration of the terms or conditions of employment

___*"I am in charge" remark.*___   Plaintiff alleges that West said to her on one occasion, "I do not have to answer to you.  I am in charge."  Compl. ¶ 31(D), (H)(i).  Plaintiff remembers hearing these words but admits she does <u>not</u> recall the incident or other circumstances that led to the statement.  Bach. Dep. 2/15/05 at 88:14-22.  She also admits that Mr. West <u>was</u> in fact in charge of her work group, so if he said he was in charge, that statement was accurate.  Bach. Dep. 2/15/05 at 89:19-90:10. There is no evidence in the record to suggest that West made this statement, or that he made such a statement because plaintiff was a woman.  The statement does not, in itself, suggest any relationship to gender.  Plaintiff has conceded that she does not remember the context of the remark, and is not sure whether West made it because she is a woman.  Bach. Dep. 2/15/05 at 88:14-90:10.  Thus, this remark cannot form the basis of a hostile work environment sexual harassment claim.

___*Leave time and overtime.*___   Plaintiff alleges that supervisors responded in confusing and contradictory ways to her requests for funeral leave, personal time and vacation time, and told her she would not receive overtime or compensatory time.  Compl. ¶ 31(E), (H)(ii)-(iii).  Plaintiff has made it clear that she is claiming she was denied the opportunity to work overtime once only. Bach. Dep. 6/01/04 at 68:23-70:3.  On that occasion, she claims that she was denied the ability to work one hour of overtime.  <u>Id.</u>; Bach. Dep. 12/13/04 at 127:4-11; 2/15/05 at 62:4-63:17. Plaintiff does not and cannot allege that her co-workers were allowed to work overtime whenever they wished and were never denied overtime, even after taking paid time off.

Exercising supervisory authority on the granting of overtime is not gender-based conduct. Moreover, West has offered a legitimate non-discriminatory reason for denying plaintiff's request to work one hour of overtime:  plaintiff had been paid for a full day the day before, even though she attended a funeral in the morning and then was expected to,

but never did, return to work. Plaintiff agrees that she took time off from work on June 1, 2001 for the funeral and then kept an appointment with her psychologist on work time. Bach. Dep. 2/15/05 at 137:7-144:2. West did not believe it appropriate for her to take paid time off in this way and then ask to work overtime at time-and-a-half pay or comp. time the following day. West Aff. ¶ 27; Exh. 15,West CHRO Aff. 8/01/01 ¶ 10. West was responsible for the budget in his department and had no obligation to approve overtime work when it was not in the best interests of the company. West Aff. ¶ 28. She "cannot recall" whether she visited any job sites on that day. Plaintiff has conceded that she does not know what overtime male employees were or were not granted. Bach. Dep. 12/13/04 at 128:18-134:6. West did not approve overtime for any male employee who attended a funeral and then decided not to return to work, and then put in for overtime the following day. There is no evidence on the record of this case that she was denied overtime because she is a woman.

Plaintiff also states that West told her after her return from medical leave that she would not be able to take compensatory time in lieu of compensation for overtime work, as she had done in the past. Bachiocchi CHRO Aff. 6/08/01 ¶ 17(c). West told plaintiff on or around May 31, 2001 that she could not work overtime whenever she wanted and then, instead of being paid overtime, take time off later as "compensatory time," because overtime work depended on business needs and he had been told it was improper to allow compensatory time outside of the pay period in lieu of overtime pay. West Aff. ¶ 28; Exh. 15, West CHRO Aff. 8/01/01 ¶ 11. West told all other employees the same thing during the time plaintiff was out on her medical leave. Plaintiff has conceded that she has no knowledge that any male employee continued to receive compensatory time after her return from medical leave. Bach. Dep. 12/13/04 at 108:6-18.

As to her allegation concerning "funeral time," plaintiff admits that she was <u>granted</u> funeral time on the sole occasion when she requested it. Plaintiff conceded in her deposition that she was paid for the time she spent at the funeral of a friend's father on June 1, 2001. Bach. Dep. 2/15/05 at 59:24-61:24.

With respect to vacation time, within a couple of weeks of her return after being out on a medical leave of absence for a year, plaintiff put in her request for four weeks plus sixteen full or half days all during the upcoming July and August of 2001. West Aff. ¶ 29. West told plaintiff that she could not take all of her vacation time—four weeks plus sixteen full or half days—in July or August, but would have to take the sixteen individual vacation days as the needs of the business allowed. Exh. 14, Bachiocchi CHRO Aff. 6/08/01 ¶ 17(e); Exh. 15, West CHRO Aff. 8/01/01 ¶ 12. There is no evidence in the record to suggest that this reason was a pretext for sex discrimination.

*__Customer contact.__* Plaintiff alleges that she was also instructed "to avoid customer contact." Compl. ¶ 31(F). Plaintiff testified that this allegation relates to her request to a Cingular Wireless manager, Janice Vereb, to intercede with West to have the Cingular Wireless account reassigned to her after her leave of absence. Bach. Dep. 12/13/04 at 170:3-171:8. After he learned plaintiff had asked the Cingular manager to request that West reassign plaintiff to the account, replacing the SNET Analyst then handling it, West instructed plaintiff that she was not to attempt to persuade customers to intercede on her behalf related to her assignments. West Aff. ¶ 25; Exh. 15, West CHRO Aff. 8/01/01 ¶ 8; Bach. Dep. 12/13/04 at 171:13-16. Plaintiff has conceded that West did not ask her to avoid all customer contact, and that she <u>did</u> in fact have customer contact after this incident. Bach. Dep. 12/13/04 at 171:17-19, 198:4-199:10; 2/15/05 at

90:15-92:15. For these reasons, an allegation concerning "no customer contact" cannot support a hostile work environment sexual harassment claim.

        **b.**    **Taken Together, Plaintiff's Remaining Claims Do Not Rise to the Level of a Hostile Work Environment As A Matter of Law.**

Plaintiff also alleges, among the "factors" supporting her claim of a hostile environment, that Vallario, another supervisor in her department (as noted above, <u>not</u> plaintiff's supervisor in the engineering unit), once said to her, "You're not so bad. I'd go out with you myself if I were younger." Compl. ¶ 16(D)(v). It is undisputed that Vallario only worked with plaintiff until her leave of absence began in May 2000, as he retired from the company while she was on the leave. West Aff. ¶ 5. Vallario was at least 59 years old at this time.[11] Moffett Aff. ¶ 8. She admits that Vallario never made advances toward her, and she did not interpret Vallario's remark to be discriminatory. Bach. Dep. 7/24/03 at 113:7-13, 113-114:8; Bach. Dep. 6/24/03 at 44:1-3.

Plaintiff also alleges that she heard "references" to women in disparaging terms; when questioned at her deposition, the only example she was able to give was that she heard the word "broad" used by West in the workplace and "negative commentary" on female athletes. Compl. ¶ 16(E). With respect to the former, plaintiff testified that she can only remember two occasions when West referred to women as "broads," and that West never referred to plaintiff as a "broad." Bach. Dep. 7/24/03 at 171:24-172:25. As to the second, plaintiff has testified that her claim concerning women athletes was also based on comments from West, and that West's only remark about female athletes was that "he wasn't interested in women's sports because it was just women, no big deal." Bach. Dep. 7/24/03 at 148:3-4, 177:1-14.

---

[11] As noted above, Vallario retired from the company during the time plaintiff was out of work on a medical leave of absence.

33

Even if these incidents did occur, they are certainly not severe and pervasive enough, even taken together, to rise to the level of an actionable hostile work environment.[12] As noted above, a hostile work environment claim can succeed only if the plaintiff shows that the harassment was so severe or pervasive that it altered the terms and conditions of the plaintiff's employment. Harris v. Forklist Sys., 510 U.S. 17, 21 (1993). On a hostile work environment claim under Title VII, a plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). When analyzing the pervasiveness of the alleged harassment, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably termed pervasive.'" Quinn, 159 F.3d, 759, 768 (2d Cir. 1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)); see also Carrero v. New York City Hous. Auth., 890 F.2d 569, 577-78 (2d Cir. 1989) (stating that in order to be deemed pervasive, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted"); Harris, 510 U.S. at 21 ("[The] mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."). "'Simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 82 (1998)). In other words, Title VII is not to be used as "a general civility code," Oncale, 523 U.S. at 80. Rather, alleged

---

[12] SNET disputes plaintiff's account of these events but the dispute is not material. Summary judgment should be granted even if plaintiff's account were accurate.

34

discriminatory conduct must be "extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788 (emphasis added).

There is no precise test for determining what constitutes a hostile work environment. Instead, the Court must focus on the totality of the circumstances. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the plaintiff's] work performance." Harris, 510 U.S. at 23. These factors must be evaluated from both a subjective and an objective viewpoint. See id. at 21-22.

Circuit Courts of Appeals have regularly upheld the grant of summary judgment in cases where defendants' alleged conduct was substantially more severe than anything alleged here, on the ground that the conduct was not sufficiently severe and pervasive. For example, in Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), the plaintiff's supervisor told her that she had been voted the "sleekest ass" in the office, and deliberately touched her breasts with some papers he was holding. The Second Circuit held that those incidents "are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff's] work environment," and that they were not "of sufficient severity to alter the conditions of [the plaintiff's] employment." In Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-74 (5th Cir. 1999), the plaintiff's supervisor (1) said to the plaintiff, "Your elbows are the same color as your nipples"; (2) told her, "You have big thighs" while pretending to look under her dress; (3) on several occasions, tried to look down her clothing; (4) on several occasions, rubbed one of his hands down her arm from the shoulder to the wrist; and (5) on one or two occasions when she was looking for a place to sit, patted his lap and said "Here's your seat." The Fifth Circuit affirmed summary judgment for the employer, emphasizing

35

that "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." Id. at 874 (quoting Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir. 1996), cert. denied, 519 U.S. 1055 (1997)).

Similarly, in Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1260-63 (10th Cir. 1998), a case with two plaintiffs, the plaintiffs' supervisor (1) frequently and needlessly touched the plaintiffs; (2) often snuck up behind them and grabbed their shoulders to startle them; (3) once tried to look down one plaintiff's blouse; (4) insisted that one plaintiff work with him in his hotel room during a business trip; (5) took one plaintiff to a Hooters restaurant during a business trip; (6) told one plaintiff that one of her bra straps was showing but that he liked it that way; (7) asked one plaintiff what she was wearing under her dress; (8) made an anatomical remark to each plaintiff about the shape of a mall; (9) made a pun in one plaintiff's hearing about a female assistant allowing him into her "drawers"; (10) called a female assistant over in the plaintiffs' hearing by saying, "Bring your buns over here"; and (11) frequently stared at one plaintiff while she was working. The Tenth Circuit held that these incidents "were too few and far between to be considered sufficiently severe or pervasive to alter the conditions of the victims' employment." Id. at 1263 (internal quotation marks omitted).

District Courts in this circuit have regularly granted summary judgment against hostile work environment claims on the grounds that the conduct alleged was not sufficiently severe and pervasive. In Cioffi v. The Allen Products Co., Case No. 3:98cv857(DJS), 2000 WL 33180448, at *9-12 (D. Conn. Sept. 29, 2000) (copy attached), (1) the president of the company allegedly spread rumors about an alleged affair between the plaintiff and a co-worker to a manager and others; (2) a co-worker waved a page with sketches of intimate male body parts on it in front of the plaintiff; (3) a supervisor and co-workers told off-color jokes in the plaintiff's presence at

work; (4) a co-worker often read the newspaper while leaning against a wall behind the plaintiff's cubicle, and (5) a co-worker made a statement to the plaintiff that had a sexual connotation/double meaning, at which another co-worker laughed. These events involved different employees and were spread over a period of several years. The District Court granted summary judgment for the employer finding that on these facts no reasonable jury could conclude that plaintiff was subjected to hostile work environment sexual harassment.

Similarly, in Parisi v. Buffalo Municipal Housing Authority, No. 01-CV-0171E, 2003 WL 21382893, at *4 (W.D.N.Y. Feb. 14, 2003) (copy attached), a supervisor (1) joked to another employee that he was going to get Viagra so he could "be with [the plaintiff]"; (2) repeatedly asked the plaintiff to go out with him on a date; (3) repeatedly commented on the plaintiff's appearance; (4) whispered in the plaintiff's ear; and (5) once stood in front of the plaintiff, blocking her way. In Feliciano v. Alpha Sector, Inc., No. 00-CIV-9309, 2002 WL 1492139, at *2, 8 (S.D.N.Y. July 12, 2002) (copy attached), the plaintiff's supervisor (1) said he wanted to date the plaintiff; (2) tried to hug her; (3) insisted on driving her home from a restaurant and, reaching her home, kissed her on the mouth; and (4) invited her to his house and asked if she would "lie down next to him." In O'Dell v. Trans World Entertainment Corp., 153 F.Supp.2d 378, 382-383, 386 (S.D.N.Y. 2001), the plaintiff's supervisor (1) repeatedly professed his love for the plaintiff, calling her at work and at home and visiting her at work; (2) said that the plaintiff's outfits were sexy; (3) told the plaintiff that he had "a thing for girls with glasses"; (4) played for the plaintiff a CD of a song that alluded to an extramarital affair; and (5) gave her cooking supplies for Christmas. In Parisi, Feliciano, and O'Dell, the Court granted summary judgment because the conduct alleged was not sufficiently severe and pervasive.

37

Plainly, based on the case law described above and the clear standards in this Circuit, the single remark Vallario is alleged to have uttered that he would date plaintiff if he were younger, West's alleged use of the word "broads" on two occasions, West's alleged comment that "he wasn't interested in women's sports because it was just women," and any other of the incidents the Court might find were conceivably gender-related, taken together, cannot be "severe and pervasive" enough to alter the terms and conditions of plaintiff's employment and thus rise to the level of a sexually hostile work environment.

> **3.      The Record Does Not Support a Claim of Discrimination Based on Gender in the Compensation, Terms, Conditions or Privileges of Plaintiff's Employment.**

Although Counts One and Two are labeled "Sexual Harassment," both counts also assert that SNET "discriminated against Plaintiff... on account of her sex." Although again plaintiff has remained vague as to what it is she is claiming in this case, any claim of gender discrimination she may attempt to assert now,[13] apart from her sexual harassment claim, similarly fails as a matter of law. To establish a prima facie case of disparate treatment under Title VII and by extension under the CFEPA, a plaintiff must show that (1) she belongs to a protected class; (2) she is qualified for the position she holds; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). If plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to show that it had a legitimate nondiscriminatory reason for the adverse action. If the defendant does so,

---

[13]   SNET briefs this issue without agreeing that plaintiff had pled such a claim in this case or waiving any right to object on this basis. In fact, plaintiff had not pled a claim of gender discrimination, and because of that fact, any such claim by plaintiff now should not be considered by the Court.

plaintiff may defeat summary judgment only by presenting evidence that the reason given was merely a pretext for discrimination. Id.

### a.    Plaintiff Did Not Suffer an Adverse Employment Action.

In her Complaint, plaintiff does not set forth a claim of disparate treatment in Counts One and Two. See Compl. Count Five. However, in her introductory Paragraph 18 of her Complaint, she alleges that,

> Plaintiff also saw that her supervisors treated her differently than the manner in which they interacted with her co-workers, who were male. For example, she would be told that work which she had completed was "all wrong" and then she would be required to explain and justify what she had done. With others, however, supervisors tended to be friendly and constructive in their tone. Men in the office often were asked how they had reached a conclusion or why they had done a project in a particular way. Playing in youth basketball [sic]. These were not isolated occurrences, but were typical.

Compl. ¶ 18. If plaintiff were to assert a claim disparate treatment based on gender under these allegations, such a claim would fail, first, because there was no adverse employment action with respect to plaintiff. As set forth above, a tangible employment "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. V. Ellerth, 524 U.S. 742, 761 (1998). "A tangible employment action in most cases inflicts direct economic harm." Id. at 762. Here, the conduct alleged does not consist of hiring, firing, failing to promote, reassignment, a change in benefits, or economic harm of any sort. Under these sorts of allegations, courts have routinely held that there was no tangible employment action within the meaning of Title VII. See, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54 (2d Cir. 2004) (female employee's claims that supervisor called her back from vacation early after she rejected his advances, reduced her working hours during one week,

and gave her a disciplinary notice for being one week late on an assignment were not tangible employment actions). Any claim of gender-based disparate treatment fails on this ground alone.

    **b.**    **The Events Described Did Not Occur Under Circumstances that Would Give Rise to an Inference of Gender Discrimination.**

As part of plaintiff's prima facie case on a claim of gender discrimination, she would have to establish, in addition to a tangible adverse employment action, circumstances giving rise to an inference that she was treated adversely *because of her gender*. For the reasons set forth in the individual sections concerning the events she describes in her Complaint above, the purported criticism of plaintiff's work by another supervisor in her department (not her supervisor) is not inherently gender-related nor is there any evidence that any such criticism was because of plaintiff's gender. See pp. 24-27, supra. Plaintiff's other allegations above are far too vague and conclusory to support a claim of gender discrimination.

    **c.**    **SNET's Legitimate Reasons for Its Actions Were Not a Pretext for Gender Discrimination.**

Even if plaintiff were able to establish a prima facie case of gender discrimination by identifying a tangible employment action and showing circumstance that give rise to an inference that she was adversely treated because of her gender – both of which she cannot do on the record of this case – there is no evidence that SNET's reasons for its action were a pretext for unlawful gender discrimination. See descriptions of events and plaintiff's deposition testimony concerning each event throughout the brief. "Conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

For the above reasons, there is no genuine issue of material fact as to Counts 1 and 2 because there is no evidence from which plaintiff can make out a prima facie case under any theory of discrimination, and she cannot rebut SNET's legitimate business reasons for its actions.

**B.**    **There Is No Genuine Issue of Material Fact as to Plaintiff's Equal Pay Act Claim.**

In Count Five of her Complaint, plaintiff alleges that SNET violated the Equal Pay Act, 29 U.S.C. § 206(d), by giving her "less pay, compensation and benefits than Defendant SNET afforded to men employed to do work which was comparable to, the same as or substantially the same as work being performed by Plaintiff." Compl. ¶¶ 53-54. To establish a <u>prima facie</u> case of an Equal Pay Act violation, plaintiff must show that (1) SNET pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999). According to plaintiff's testimony, there were three male employees who held the same title as plaintiff during the relevant time: Chris Manouse, Richard Greene, and Ron Dursza. Bach Dep. 2/15/05 at 43:21-22. Although plaintiff did not recall him, Frank Andrews also worked in plaintiff's position during the relevant time. Throughout discovery in this case, plaintiff has been unable to identify any similarly situated male employee who was paid more than plaintiff. SNET still does not know who plaintiff claims was similarly situated but paid more. Simply, there is no evidence that SNET underpaid females in her position or that it paid male employees higher wages for doing the same work as the plaintiff.

Moreover, the record affirmatively supports summary judgment for SNET on this claim. Unrebutted evidence shows that plaintiff received essentially the same salary as the men who shared her position as Analyst Technical Sales (Engineering). Moffett Aff. ¶¶ 4-5; Exh. 21. In March 2000, plaintiff's salary of $56,692.90 was almost identical to the mean salary of the men who also held the position of Analyst Technical Sales (Engineering), which was $57,144.68. In

March 2001, plaintiff's salary of $58,856.98 was again almost identical to the mean salary of the male Analysts in her position, which was $59,487.81. Moffett Aff. ¶¶ 4-5; Exhs. 17, 21.

In addition, other than promotions, plaintiff received the highest raise of her 21-year career while she was working in West's group in February 2000, as she has conceded. Exh. 17; Bach. Dep. 2/15/05 at 111:16-21. Since she left West's group, she has continued to receive raises from her female supervisor, although the raises have not been as high as she received in Kevin West's group. Bach. Dep. 2/15/05 at 115:19-116:19.

Plaintiff stated at her deposition that her only basis for believing that men in her position (Analyst Technical Sales) were better paid was a hearsay remark by a co-worker, Richard Greene, about his salary. Bach. Dep. 7/24/03 at 157:20-158:11. Plaintiff admits that Greene was better and more experienced with fiber-related work than others in her group, including her. Bach. Dep. 2/15/05 at 71:8-19. She conceded that she does not know what Greene's salary or overall compensation was. Bach. Dep. 6//01/04 at 32:10-15. She also conceded that Greene had held his position significantly longer than she had, and she knew nothing about the quality of his work or his performance reviews. Bach. Dep. 7/24/03 at 157:20-162:20.

At another point in her deposition, plaintiff asserted that she believed a male employee, Chris Manouse, received higher pay, but then conceded that she had no basis for judging whether Manouse deserved higher pay. Bach. Dep. 7/24/03 at 149:18-150:5. She believes Mr. Manouse was promoted while she was out on her leave of absence, but believes he deserved it and it was not unfair in any way that he was promoted. Bach. Dep. 2/15/05 at 42:15-20. Manouse had several engineering certifications that Bachiocchi did not have. Bach. Dep. 2/15/05 at 45:19-46:6. She admits that he was a very good worker and had more experience than she had. Bach. Dep. 2/15/05 at 42:18-43:4.

She "do[es not] know" whether her base salary should have been higher than Ron Dursza's. Bach. Dep. 2/15/05 at 44:9-14. She admits that Dursza, Greene, and Manouse all had more seniority in the Analyst Technical Sales position than she had. Bach. Dep. 2/15/05 at 43:23-44:8. In fact, plaintiff has conceded that she does not know whether the men in her position made more than she did or whether they deserved to. Bach. Dep. 7/24/03 at 158:21-24, 2/15/05 at 44:15-45:4, 192:17-24. Similarly she is not "aware that any male employee received a compensation bonus that was unfairly high compared to [hers]." Bach. Dep. 2/15/05 at 48:25-49:3. She has stated that her only basis for believing that she received less than equal pay was that "I'm a woman." Bach. Dep. 6/01/04 at 32:16-22. Plaintiff's assertion that she *assumes* she was paid less than men because she is a woman amounts a conclusory assertion that cannot defeat summary judgment on the Equal Pay Act claim. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

Because there is absolutely no evidence in the record that SNET paid different wages to male employees doing the same work as plaintiff at the same level of skill, effort, and responsibility, there is no genuine issue of material fact concerning plaintiff's Equal Pay Act claim. Summary judgment on this count is appropriate.

## C.   There Is No Genuine Issue of Material Fact as to Plaintiff's Retaliation Claim.

In Counts 3 and 4 of her Complaint, plaintiff claims that SNET engaged in retaliation against her because she made claims arising under Title VII and the FEPA and/or because she assisted others in making such claims. Compl. ¶¶ 45, 49. Again, the Title VII analysis covers both claims. Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 53 (1982). To establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in an activity protected under Title VII; (2) SNET was aware of her participation in the protected

43

activity; (3) SNET took an adverse action against her; and (4) a causal connection existed

between her protected activity and the adverse action. Raniola v. Bratton, 243 F.3d 610, 624 (2d

Cir. 2001).    If plaintiff can make a prima facie case, the burden shifts to SNET to provide a

legitimate non-discriminatory reason for the adverse action.  If SNET does so, plaintiff may

defeat summary judgment only by providing evidence that SNET's action had retaliatory

motives. Id. at 625.

       Plaintiff cannot establish a prima facie case, because there is no evidence in the record of

a causal connection between any adverse action by SNET or any of its employees and any

protected activity by plaintiff.

       Plaintiff's Complaint alleges that SNET or its agents took numerous retaliatory adverse

actions against her after her return to work on May 15, 2001. Compl. ¶ 31. It does not describe

any other actions by SNET or its agents as retaliatory.  Using the same "kitchen sink" approach

plaintiff has utilized throughout this litigation, she appears to contend that all of the minor

incidents with which her Complaint is speckled are to be considered by the Court as part of her

claim.  Plaintiff clearly believes that barraging the Court with allegations of multiple purported

events involving a number of different employees, and the potential for confusion, is her best

defense to summary judgment.  However, SNET submits that an appropriate analysis results in

no other conclusion than that summary judgment must be granted on this claim, too.

       Plaintiff's retaliation claims fails for multiple reasons:  (1) many of the incidents cannot

be retaliatory as a matter of law, because, by plaintiff's own testimony, they pre-dated any

complaint of discrimination by Bachiocchi;[14] (2) none of the incidents constitute adverse

employment actions under the law of this Circuit; and (3) even if any of the incidents had been

---

[14]  Plaintiff's Complaint indicates that all of the events described in the Complaint form the basis of her retaliation
claim, as well as her claim of sexual harassment.  See Complaint at ¶¶ 45, 49.

adverse employment actions, there was no causal connection between the incidents and protected activities by the plaintiff. SNET has set forth below the conduct that plaintiff most likely will assert supports her claim of retaliation for filing a CHRO complaint in July 2000.

*__Failure to answer questions.__* As noted above, plaintiff has conceded that she cannot identify any questions that West did not answer or any telephone calls that he did not return. See pp. 28-29, supra.; Bach. Dep. 12/13/04 at 99:3-100:3, 2/15/05 at 82:9-88:13.

Even if West had failed to answer her questions or telephone calls, such failures to act are not cognizable as "adverse employment actions." For allegedly retaliatory conduct to constitute an adverse employment action, the plaintiff must suffer a materially adverse change in the terms and conditions of her employment. Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). An action may be "too trivial" to constitute such a materially adverse change. Hicks v. Rubin, No. 00-66079, 2001 WL 273831, at *3 (2d Cir. Mar. 20, 2001) (copy attached) (a supervisor's concealment of a memorandum critical of the plaintiff for her use of two desks, and a supervisor's failure to give the plaintiff any but short notice before performing a workload review, were too trivial to amount to adverse employment actions).

Refusing to answer some questions or even to return some telephone calls, if that had occurred, does not constitute a materially adverse change in the terms and conditions of plaintiff's employment as a matter of law. For example, in Dudley v. Metro-Dade County, 989 F. Supp. 1192, 1203-04 (S.D.Fla. 1997), the District Court granted summary judgment for the

defendant on a Title VII retaliation claim based on a supervisor's "abrupt" behavior to the plaintiff, including his refusal to answer her telephone calls.  The Court held that the supervisor's hostility, including his refusal to answer the plaintiff's phone calls, did not "rise to the level of an adverse employment decision as contemplated by Title VII." Id. at 1204.

*Assignments during 3-week return to work after leave.*  Plaintiff alleges that she was removed from her two largest accounts, and that SNET refused to honor a client's request to reassign one of them to her.  Compl. 31(B)-(C).  As noted at pp. 29-30 above, these charges refer to the Cingular Wireless account.  There is no evidence to suggest any causal connection between the assignment of that account and plaintiff's protected activities.

The account had to be reassigned to another Analyst because plaintiff was out of work for almost a year.  West Aff. ¶ 19.  As noted above, when plaintiff returned to work West assigned her the Pfizer account, the Enfield Board of Education account, and several other accounts, which involved major projects and were interesting to work on.  West CHRO Aff. 08/01/01 ¶ 7; Bach. Dep. 12/13/04 at 109:1-8, 110:9-17, 116:20-119:3.  Plaintiff has stated that she has no complaints about having been assigned these projects.  Bach. Dep. 2/15/05 at 71:24-72:3.  The reassignment /replacement of two large accounts with two different large and admittedly "interesting" accounts cannot be an adverse employment action.

Moreover, even if it were, SNET has presented a legitimate non-discriminatory reason for West's assignment decisions, in the form of the need to avoid disrupting existing projects.  Since plaintiff neither presented evidence that this explanation is false, nor presented evidence that West's decisions were motivated by unlawful retaliation, plaintiff cannot defeat summary judgment on this issue.  Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

***West's purported remarks.***   Plaintiff alleges that West said to her, "I do not have to answer to you. I am in charge." Compl. ¶ 31(D), (H)(i). First, the statement is not retaliatory in itself, and even if it was stated, there is no evidence to suggest that it was linked to any motivation to treat plaintiff adversely because she had filed a charge with the CHRO. Moreover, this alleged remark is certainly too trivial to constitute a materially adverse change in the terms and conditions of plaintiff's employment, and thus cannot be an adverse employment action supporting a Title VII retaliation claim. Richardson v.  New York State Dep't of Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999).

***Leave time and overtime.***   Plaintiff alleges that supervisors responded in confusing and contradictory ways to her requests for funeral leave, personal time and vacation time, and told her she would not receive overtime or compensatory time. Compl. ¶ 31(E), (H)(ii)-(iii). First, plaintiff's own admissions establish that she was never denied funeral leave, personal time off, or vacation time, with the exception of requiring her to spread out her request for all of her weeks of vacation right after returning to work. In addition, she was not treated differently in any material way from other employees with respect to overtime and compensatory time. Third, even if these events occurred, there is no evidence to link any of them to plaintiff's CHRO complaints. Fourth, these claims do not amount to adverse employment actions based on plaintiff's own testimony concerning them. See Bach. Dep. 12/13/04 at 154:25-155:6, 169:10-170:2; Bach. Dep. 2/15/05 at 56:8-17, 62:16-63:18.

Moreover, SNET has presented legitimate non-discriminatory reasons for its actions concerning these issues.  See pp. 31-33, supra. Since there is no evidence in the record that its explanations are false, or that West's real motives for his actions with respect to leave-time were

retaliatory, plaintiff cannot defeat summary judgment on this issue. <u>Raniola v. Bratton</u>, 243 F.3d 610, 625 (2d Cir. 2001).

    ***<u>Customer contact after leave of absence</u>***. Plaintiff alleges that she was instructed to avoid customer contact. Compl. ¶ 31(F). As noted above, however, plaintiff admits that West never instructed her to avoid all customer contact, and that she did have customer contact after this incident. Bach. Dep. 12/13/04 at 171:17-19, 198:4-199:10; 2/15/05 at 90:15-92:15. Plaintiff did ask a customer, Janice Vereb, to intercede with West to have the Cingular Wireless account reassigned to her, and West thereafter instructed plaintiff that she was not to talk to customers about the reassignment of projects; he did not order plaintiff to avoid customer contact. Exh. 15, West CHRO Aff. 8/01/01 ¶ 8; Bach. Dep. 12/13/04 at 171:13-16. West's actions cannot rise to the level of adverse employment actions, are not causally connected to any complaints of discrimination by plaintiff, and were based on legitimate business objectives and reasons.

    ***<u>June 4, 2001 incident</u>***. Plaintiff alleges that on June 4, 2001, West held her wrist and removed a document from her hands which he then shredded. Compl. ¶ 31(H)(vi); Bachiocchi CHRO Aff. 6/08/01 ¶¶ 18-19. Even if this event had occurred as plaintiff alleges, (1) it is not an adverse employment action under the law of this Circuit, and (2) there is no evidence in the record to suggest a causal connection between it and plaintiff's complaints. <u>Plaintiff has admitted that she has no basis for claiming that the incident occurred in retaliation for her complaints</u>, other than the fact that "I just believe that [West] has a very negative attitude toward me." Bach. Dep. 6/01/04 at 123:8-18. Asked if she had any other basis for thinking this incident occurred, plaintiff answered "No." <u>Id</u>. Plaintiff's belief that West had a negative attitude toward her does not establish a causal connection between the incident of June 4, 2001 and plaintiff's complaint filed with the CHRO in July 2000.

Even if the above claims were otherwise sufficient to withstand summary judgment on plaintiff's retaliation claim, they would fail for the additional reason that plaintiff has admitted she did not complain of retaliation after her leave of absence. All of the above events relate to alleged conduct after she returned from her leave on May 14, 2001. To the extent she may claim they are the basis for a retaliation claim, the claim is based on her filing her first CHRO complaint on or about July 24, 2000, Exh. 9, during her leave of absence. Yet she admits that she did not complain to SNET about any discriminatory conduct that occurred after July 24, 2000. She left West's group by June 11, 2001, and thereafter complained for the first time of retaliatory conduct after her leave, by way of her second CHRO Complaint filed on June 12, 2001.[15] Exh. 18.

Because plaintiff did not complain of retaliation based on any of the above conduct, all of which allegedly occurred after the leave, her claims must fail. This is because an employer is liable for retaliatory harassment only "if it knows about that harassment and fails to stop it." Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999), citing Burlington Indus. v. Ellerth, 118 S.Ct. 2257, 2267 (1998). Plaintiff clearly knew of SNET's complaint procedure, since she had complained of discrimination in other work groups prior to moving to Kevin West's group, Bach. Dep. 5/12/03 at 26, but she failed to avail herself of the procedure with respect to any claim of unlawful retaliation, or any claim whatsoever before she left West's department, based on conduct after her leave of absence (the only conduct that could have been retaliatory).

---

[15] This same defense applies to any claim of discrimination she may try to base on events that occurred after July 24, 2000, which she admittedly did not complain about until leaving West's group.

## IV.   CONCLUSION

For all of the above reasons, the Court should grant summary judgment in favor of SNET on all counts of plaintiff's Complaint. Notwithstanding the multitude of events about which plaintiff purports to complain, there is no evidence in the record with which plaintiff could make out a prima facie case of sexual harassment, gender discrimination, retaliation, or violation of the Equal Pay Act. In addition, SNET had legitimate business reasons for its actions with respect to plaintiff, and plaintiff suffered no tangible employment action on which to base such claims.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By_____
Lori B. Alexander
Federal Bar No. CT08970
Michael G. Caldwell
Federal Bar No. CT26561
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut  06509
Tel. (203) 784-8200
Fax No. (203) 789-2133
E-Mail: alexander@tylercooper.com
E-Mail: Caldwell@tylercooper.com

50

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 6th day of April, 2005 as follows:

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880

Lori B. Alexander
Federal Bar No.: CT08970