UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

KIMBERLY BACHIOCCHI,                      \*
                                          \*
                   Plaintiff,             \*        CIVIL ACTION NO. 02-CV-908 (CFD)
                                          \*
            v.                            \*
                                          \*
THE SOUTHERN NEW ENGLAND                  \*
TELEPHONE COMPANY,                        \*        MAY 23, 2005
                                          \*
                   Defendant.             \*
                                          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTORY STATEMENT

In July, 1984 Kimberly Bachiocchi first commenced her employment with The Southern New England Telephone Company ("SNET").  Bachiocchi Deposition, Session of 5/12/03 Tr 20, excerpts from which are submitted herewith, having been marked as Plaintiff's Exhibit A[1].  She was then 19 years of age.

Throughout her employment with SNET, Ms. Bachiocchi always has performed her assigned tasks in a satisfactory manner, often exceeding expectations.  DX-9, ¶4.  She has never once been the subject of disciplinary action by SNET.  She has progressed through a variety of transfers and promotions, PX-A, Tr 59-60.

_____

[1] Exhibits submitted by Plaintiff in support of this Memorandum shall be referred to as "PX- __."   Exhibits offered by Defendant similarly shall be referred to as "DX- __."

SNET has maintained a separately located, more or less autonomous working group. It engages in the design and installation of wiring and cable for voice and data equipment. West Affidavit 4/6/05, ¶6.  Although the name of this group changed from time to time, throughout Ms. Bachiocchi's association with the group it was headed by an individual named Kevin West.  Plaintiff will refer to the group as the "West Group."

In or about 1998 Ms. Bachiocchi heard of an opening in the West Group from Nick Faiella, PX-A, Tr 15.  Ms. Bachiocchi and Mr. Faiella had known each other since 1984 when they were hired together.  Faiella Deposition, Session of 10/27/03 Tr 5, excerpts from which are submitted herewith, having been marked as PX-B.

Ms. Bachiocchi applied for that position.  She interviewed with her prospective supervisor, Richard Light.  PX-A, Tr 16.  The interview took an unsettling turn when Light stated that previously he had successfully terminated a black female.  PX-A, Tr 17; Bachiocchi Deposition, Session of 7/24/03 Tr 48, excerpts from which are submitted herewith having been marked as PX-C.  It was as though Light was proud of this.  PX-C, Tr 50:16.

Ms. Bachiocchi was not impressed by Light on the basis of the interview.  PX-A, Tr 18-19.  Nevertheless she took the job at the West Group because it was located 10 minutes from her home, it was enjoyable work, the work included customer contact, and the job provided a company car which could be used for commutation.  PX-A Tr 19; 62-65.  Ms. Bachiocchi started with the West Group in or about June, 1998.  DX-9, ¶5.

This case concerns the aberrant, uncorrected behavior of the employees and supervision of the West Group during the time that Ms. Bachiocchi worked there.  The renegade conduct at issue includes the creation of a hostile environment based upon sex and was followed by a course of retaliation directed against Ms. Bachiocchi when she sought relief

from this conduct and supported others who also sought such relief for her and for themselves.

## FACTS

In her first SNET assignment Ms. Bachiocchi performed installation work.  PX-A, Tr 20.  This required her to go to a customer location where she would install equipment together with all necessary wiring.  Often she would have to crawl through basements or other awkward or unkempt areas in order to do her work.  Ms. Bachiocchi discovered that she liked being "in the field," and especially enjoyed working with customers.

Ms. Bachiocchi progressed through a number of different assignments, including jobs where she used her skills to train other SNET employees.  PX-A, Tr 60.  As she performed successfully in her various assignments.  She was evaluated regularly and given increasing responsibilities and improved remuneration.  DX-9, ¶4.  However, she never lost her desire to work with customers at their own locations and to experience the satisfaction which came from delivering a working product in response to customer wishes and needs.

In 1998 Ms. Bachiocchi was hired as a engineer working in the West Group.  It seemed like an ideal mix of customer contact and interesting work.

The Work of the West Group.  The West Group was divided into two sections based upon function.  One section was staffed with individuals generally referred to as engineers. They reported to the engineering manager, Richard Light.  Light, in turn, reported to Kevin West.

When a customer inquiry was received it first was assigned to an engineer.  Vallario Affidavit, 2/16/01, ¶5, submitted herewith, having been marked as PX-D.  The engineer then would meet the customer; discuss what was needed; lay out the work to be done, frequently

including a diagram; prepare a materials list for the installation, include estimated quantities; and price the job. These materials were then put together to form a proposal to do the work for a set price. DX-7, ¶3. Such a proposal was called a "job scope."

Upon acceptance the job would then move to the installation section, the second section of the West Group. PX-D, ¶4. The installation section, sometimes called operations, was staffed with individuals who acted as project managers for each job being installed. These individuals did not do the actual installation work. Instead they would retain an independent contractor. The West Group would oversee the performance of the contractors. PX-D, ¶6.

Like engineering, installation had an installation manager, Robert Vallario. He, in turn, reported to Kevin West. PX-D,¶4. It was Vallario who was responsible for selecting contractors which would do installation work and be paid by the West Group. PX-D, ¶4

Although functionally inter-related, the work of the two sections in the West Group was separately organized and separately supervised.

Ms. Bachiocchi was an engineer. She reported to Mr. Light as her immediate supervisor. PX-A, 18-20. She was the only woman assigned to perform the actual production work of the West Group.[2] Manouse Deposition, Tr 86:21-24, excerpts of the deposition are submitted herewith, having been marked as PX-E; DX-7, ¶11.

Ms. Bachiocchi's work in the West Group provided just the mix of customer contact and interesting work that she had hoped for. Bachiocchi Deposition 6/1/04, Tr 23, excerpts from which have been submitted herewith, having been marked as PX-F. In addition, the job at the West Group was located 10 minutes from her home, it was enjoyable work, the work

---

[2] In the entire West Group there was only one other female employee, Carol Stanevich. Ms. Stanevich was Mr. West's administrative assistant.

included customer contact, and the job provided a company car which could be used for commutation.  PX-A 19; 62-65. Ms. Bachiocchi loved her job at the West Group.

When Ms. Bachiocchi first began in the West Group, Mr. Light introduced her to a fellow engineering employee, Chris Manouse.  PX-A, Tr 67-69.  She was told that Manouse, would help her as she tried to learn the ropes.  He did.  There was no formal training.

The Environment of the West Group.  Mr. West himself set the tone for the group, frequently referring to women as "broads."  DX-10, ¶17; PX-B, Tr 20. One particular client, a woman who oversaw communications matters at the University of Connecticut, was frequently referred to as that "bitch at UConn," PX-C, Tr 148, 172.  West also was heard saying that he wanted to "choke the bitch" and sometimes referred to the same client as a "broad."  PX-C 174.    Frequently, West Group members would talk about sports.  Mr. West would often interject that he had no use for female athletes, either amateur or professional. The UConn Huskies female basketball team was an object of frequent scorn.   DX-9, ¶14.

There was an individual assigned to the West Group named John Dunn.  He was a temporary employee.[3]  Mr. Dunn liked to tell jokes and he was good for one per day.  PX-E, Tr 44-45.  Frequently his jokes dealt with sexually charged material taken, apparently, from the internet. PX-C, Tr 60-61; PX-B, Tr 19.

Throughout the office there was a running joke based upon a past interaction with a female installation contractor.  As one of the men left for a job, a particular salutation frequently would be offered:  "Don't send a woman back."  Bachiocchi Deposition 12/13/04, Tr 49-50, excerpts from which are submitted herewith, having been marked as PX-G;  PX-C, Tr

---

[3] In addition to regular, full-time employees, the West group supplemented its workforce with temporary workers.  Often these temporary workers were former SNET employees who, after retirement, came back to work on a temporary basis.

146.  The men most frequently heard by Plaintiff making this comment were Vallario, Dursza and Manouse.  PX-G, Tr 50.

There were days when the men working in the West Group would all get up and go to lunch together at Noon.  Neither Ms. Bachiocchi nor Carole Stanevich were invited to join. PX-F, Tr 63

One contractor who performed work for the West Group sponsored fishing trips for West Group employees.  PX-C, Tr 67; PC-E, Tr 88-91.  In 1999 Ms. Bachiocchi was offered participation in one, but only one, of these trips.  PX-F, Tr 60.  She attended and enjoyed it. Fishing trip pictures were framed and hung in the West Group office space.

In the Summer of 1999 SNET's unionized workforce went out on strike.  One can safely assume that there was quite a lot of tension, both before and after this event.  All of the employees working in the West group were assigned longer hours during this period. Ms. Bachiocchi was assigned to 12 hour shifts doing installation work.    West Deposition, Tr 18, excerpts having been marked as PX-H are submitted herewith.  After strike duty had ended, the West Group resumed its normal operations.

The First Hints of Friction.  In the June, 1999 Ms. Bachiocchi had a payroll question. She first asked Ms. Stanevich for clarification, but no answer was forthcoming.   Ms. Bachiocchi then called the payroll department. On the basis of the information given, she was able to conclude that everything was in proper order.

Shortly after this call to payroll had been made, Messrs. West and Light spoke with Ms. Bachiocchi to express their displeasure.  PX-F, Tr 49, 126; DX-9, ¶ 18.  Kevin West told Ms. Bachiocchi that members of his group were not to make complaints or pose questions to others outside of the group[4].  Any question or problem should be brought to him through Ms.

---

[4] The West Group occupied office space in a building in Derby Connecticut, physically

6

Stanevich.  No one outside of the group should be involved.  Then, in October, 1999, another incident arose.

The weather suddenly turned cold in late October, 1999.  However, the heat for the West Group office was not working at the time.  West Group employees began to complain about how cold their office was, but the problem continued.  On the third day that this problem remained unresolved, Ms. Bachiocchi called a SNET's group in New Haven.  PX-F, Tr 50; 127.  The problem was resolved within hours after that call.  Once again, however, Messrs. West and Light sought out Ms. Bachiocchi and warned her, although they did not counsel Mr. Faiella, who had also called.  PX-B, Tr 15-16

Mr. West spoke and reiterated his earlier instruction.  He became quite animated, stressing that this rule was firm and inviolate.  He warned Ms. Bachiocchi that if she ever again involved anyone outside of the group, for any reason, she would be risking future bonus awards and wage increases.  DX 9, ¶18.  He made the point very clearly:  Do not call anyone outside of the West Group with any problem or concern, regardless of what it might be.  It seems that she had already gone too far.

After Faiella was awarded a SNET MVP award for 1999, he and Vallario spoke.  Vallario told him that Kim Bachiocchi was next in line for such an award.  However, some time later, in 2000, Vallario told Faiella that because of Kim's behavior in calling outside of the office, she would not be eligible.  PX-B, Tr 31.

<u>Plaintiff's Remuneration at the West Group.</u>  As a member of the West Group Ms. Bachiocchi received a base salary together with the normal package of benefits provided by SNET to its employees.  If she worked hours beyond her regular schedule she received

---

separate from SNET's main hub which was located in New Haven.

overtime, PX-H, Tr 131, and a car was assigned to her for work related purposes, including commuting to the office.  PX-A, Tr 19.

In addition, members of the West Group participated in a type of bonus or incentive payment plan.  This plan, which included distinct payment components for both group and individual performance, was called the Compensation Plan, or just, "Compensation."  PX-H, Tr 22-25.  Each participating employee was given a rating based upon a five point scale.  This rating was then used to determine the amount of the payment attributable to the individual performance component of the plan.  These ratings were assigned by Mr. West with input from the relevant manager.

SNET also had a policy of recognizing achievement among its employees by giving them awards of various type.  These awards generally carried some financial benefit.  Ms. Bachiocchi never received any such award during her tenure at the West Group.

The Conduct of Robert Vallario.  As noted above, Robert Vallario was the installation manager.  Ms. Bachiocchi did not report to him.  However, Nick Faiella did report to him.  PX-B, Tr 7:15.  In or about the Fall, 1999 Vallario began to talk to Nick Faiella about Ms. Bachiocchi.  It seems that Vallario believed that Nick and Kim were having an affair.  Faiella stated that Vallario spoke to him on numerous occasions about whether he and Kim were having an affair.  PX-B, Tr 17:4-5.  He also asked if, in fact, whether she was good in bed, if her breasts were real and other innuendos.  PX-B, Tr 17-18.

Although Nick Faiella denied that any affair was taking place, Vallario continued to question Nick about the fantasized affair and continued to demean Ms. Bachiocchi.  "He never stopped."  PX-B, Tr 18:23  Vallario's enquiries about Ms. Bachiocchi continued until the time Faiella himself went out on a medical leave in June, 2000.  PX-B, Tr 22.   Mr. Vallario

8

also spoke about his own claimed affairs.  PX-B, Tr 19.  These conversations occurred at least on a monthly basis.  PX-B, Tr 20.

Ms. Bachiocchi noticed a change in Vallario's attitude toward her.  Earlier the two of them had gone for walks during lunch hour as a form of exercise.  However, Vallario began to refuse to continue this custom and then completely stopped participating in the walks.  PX-C, Tr 125-127.  Ms. Bachiocchi says that is when Vallario turned on her.

By late 1999 word of the rumored affair invented by Vallario began to spread through the open office environment of the West Group.  There came to be open and repeated references to the "Nick and Kim thing."  PX-F, Tr 92-3.  Vallario persisted in his rumor-mongering even after Nick Faiella told him that due to complications arising from an earlier bout with cancer he was incapable of sustaining an erection or participating in sexual activity.  Statement of Nick Faiella at page 6,  submitted herewith and made a part hereof, having been marked as PX-J.

Suggestions of an on-going affair, whether true or not, took on a life of their own.  Increasingly as the year 2000 dawned, Ms. Bachiocchi felt uncomfortable as rumors swirled and untoward references to her grew more common.  DX-9, ¶8.

The Light Incident.   On or about December 16, 1999 Ms. Bachiocchi arrived at the West Group office early one morning to start her work day.  There was a printer in the office, networked for use by the entire office staff.  Ms. Bachiocchi went to the printer to retrieve her work and she saw that directions to her family home had been printed and left at the printer.  DX-9. ¶¶12-13.  This both puzzled and disturbed her.  She looked for some indication as to why directions to her residence were printed and then discarded in public view, but there was no apparent reason.  She then began to ask people in the office who had printed these

directions, but no one admitted doing it and no one told her who did.  DX-9, ¶13; PX-F, Tr 33-34.

Ms. Bachiocchi was then reduced to going from desk to desk asking each person in the office if they had printed this material. Finally, when she spoke to engineering manager Richard Light  (the individual who was her direct supervisor), [5] he admitted that he had printed the directions.  DX9, ¶13.  She asked him why he had done so, but he shrugged it off, saying only that he had heard she lived in a nice house and he wanted to see it.  PX-C, Tr 48-49.  On a later occasion he maintained that the directions were "public record" and there was nothing she could do about his having printed them.  DX-9, ¶15.

This incident came to the attention of Kevin West who spoke with Mr. Light about it.  PX-H, Tr 107.  However, Mr. West was satisfied with Light's explanation – whatever it may have been.

West explained that Light had heard that others in the office went to Kim's house and that it was spectacular, so he wanted to see it.  PX-H, Tr 107:24 – 108:6.  West initially thought that the office folks had gone to see a hot tub, but admitted that it might have been an awning.  PX-H, Tr 109:13-23.  In any event it was a spring or summer item, making Light's reason for printing directions on December 16, 1999 a little stale.

West then volunteered that as Ms. Bachiocchi's supervisor Light was "entitled to know where she lives."  PX-H, Tr 110: 7-9.  West admitted, however, that maps to personal

---

[5] The West Group offices were an open space floor plan with workers being given individual cubicles.  The cubical walls were approximately five feet high and did not contain sound.  In fact, members of the group would frequently speak to each other over the cubicles without ever leaving their own desks.  Ms. Bachiocchi's repeated enquiries about the printed directions would very likely have been over-heard by Light, yet he waited for her canvas to reach him before admitting what he had done.  Similarly, rumors of an affair would have spread quickly in this environment.

residences are not routinely printed; not routinely kept in personnel files.  PX-H, Tr 110:21 – 111:20.

If, as Mr. West had, at first, concluded: "I was fine with that explanation," PX-H Tr 108:8, why did he go on to talk about Light's entitlement to know, or Light's potential need to "pick up a car," PX-H Tr 110:11-13, something which did happen - - but not until May, 2000, 6 months later.  In any event, notwithstanding Light's conduct[6],  no discipline or counseling of any kind was given to him.  And thus it was that two West Group managers declared open season on Kim Bachiocchi.

THE ACCELERATING EVENTS OF SPRING, 2000.

1. Vallario's Conduct.  In the Spring, 2000 Vallario began to speak with Ms. Bachiocchi directly about Nick Faiella.  He repeatedly asked her if anything was going on between she and Nick.  PX-F, Tr 108; PX-J at page 5-6; DX 3, ¶8; DX-9 ¶8-11.  On some occasions he would ask her "what was up" between she and Nick.  Then Vallario would laugh.

Vallario also asked Ms. Bachiocchi if she knew Nick's wife, observing that Mrs. Faiella was a real nice lady and that she puts up with a lot.  DX-9.  Vallario also asked Ms. Bachiocchi what she saw in Nick because he was older than Kim and was sick.  DX-9, ¶10; PX-F, Tr 108.    There were two occasions when Vallario looked at Ms. Bachiocchi and observed: "You're not so bad.  I'd go out with you myself if I was younger."  DX-9, ¶11.

---

[6] Puzzling to Plaintiff, is Defendant's submission of the initial dismissal of her administrative administrative charge of discrimination.  DX-10.  Plaintiff would have thought that document to be irrelevant as this is a *de novo* proceeding.  It should be noted, however, that Defendant's exhibit is also misleading in the limited form of its submission.

Following the dismissal, Plaintiff sought reconsideration and prevailed.  The dismissal was set aside and the Charge was reinstated for further investigation.  A copy of the CCHRO ruling is submitted herewith, having been marked as PX-I.  In granting Plaintiff's request for reconsideration, the Agency noted, in part: "Complainant alleged, and Respondent admitted, that she caught her supervisor printing directions to her home off the Internet.  **This fact would upset any reasonable woman in the workplace.**" (Emphasis added.)  CCHRO Decision at page 3.  Plaintiff asks that this Court consider this conclusion as the rule of this case.  So, perhaps this is the area of relevance intended by Defendant.

Both Plaintiff and Mr. Faiella asked Vallario to stop this conduct, but their requests did not produce any relief or improvement. DX-9, ¶18; PX-J at page 5-6.

2.  Increased Scrutiny of Plaintiff's Work. In early May, 2000, at Ms. Bachiocchi's request, Mr. Faiella met with Mr. Vallario, asking that he stop his campaign of innuendo. Vallario responded that he had thought that Nick was "one of the guys." DX-3, ¶8.

For some time Vallario had been criticizing Ms. Bachiocchi's jobs as they passed over his desk. PX-C, Tr 106-107; PX-F, Tr 70. She felt that the frequency and level of this criticism was unfounded. During April, 2000 West Group managers, including Vallario, began to make personal visits to installation sites where Ms. Bachiocchi had prepared the job scope. DX9, ¶16. Then, at about the time of Faiella's meeting with Vallario, Carl Lorentzen, an employee of the installation section reporting to Bob Vallario, was assigned to check up on Ms. Bachiocchi's jobs.

Among the installations based on job scopes prepared by Ms. Bachiocchi were several SNET Wireless sites. She was assigned to these sites because of her special expertise concerning the key phone system. PX-H, Tr 50:10-15. It is undisputed that she did a good job. PX-H, Tr 50:19-20. SNET Wireless was represented by its real estate manager, Janice Vereb, who was especially complimentary of both the effort and quality of Ms. Bachiocchi's work: "Kim was excellent. We - - Kim was knowledgeable.   .   .   . Kim would meet me at job sites at 7 o'clock in the morning if I asked her. Kim knew her job." Vereb Deposition, Tr 9, excerpts from which are submitted herewith, having been marked as PX-K. Ms. Vereb estimated that Plaintiff worked on 6 or 7 sites for SNET Wireless[7]. PX-K, Tr 7-8.

---

[7] SNET Wireless went through a name change to become known as Cingular. PX-K, Tr 13.

Ms. Vereb knew Carl Lorentzen from earlier years when they both worked for SNET. PX-K, Tr 10.  In Spring, 2000 Lorentzen was a job banker working as an installation supervisor reporting to Vallario.  PX-H, Tr 15.  During that Spring Ms. Vereb chanced upon Lorentzen at a SNET Wireless site which had been engineered by Ms. Bachiocchi.  PX-K, Tr 13-14.  When Ms. Vereb asked Lorentzen why he was at her site,  he responded that he "was checking up on Kim."  PX-K, Tr 14:20.

Ms. Vereb clearly remembered encountering Lorentzen at two of her job locations, one in Wallingford and the other in Orange.  PX-K, Tr 15.  Ms. Vereb also recalled seeing Lorentzen and Bachiocchi in conversation.  As she recalled it, Lorentzen was checking her work and her orders.  Vereb, who knew that Kim worked off a checklist and found that she always had documentation with her.  "It was almost like she had to go then prove to Carl [Lorentzen], this is what I ordered, you know, telling him that it is right."  PX-K, Tr 19.

Each time that Ms. Vereb questioned him, Mr. Lorentzen, an installation worker reporting to Vallario, responded that he was there to check up on Kim's work.  Kim was an engineering employee reporting to Mr. Light.  On each of the occasions that Ms. Vereb discovered Lorentzen at her sites, she observed that he came without any appointment or any advance notice.

In addition to having Lorentzen check up on Ms. Bachiocchi's work, West testified that while he had been out of the office, Vallario and Light decided to make an effort to ensure that Mr. Faiella and Ms. Bachiocchi would not continue to work on the same jobs.  PX-H, Tr 118-119.  This would have occurred sometime between May 2 and May 12, 2000.

On or about May 15, 2000 Ms. Bachiocchi met with Mr. Lorentzen in  the West Group offices to discuss some of his criticisms, DX9 ¶16.  Mr. Lorentzen asked to see some paperwork to which Ms. Bachiocchi had referred.  She went to get it and when she returned

Mr. Lorentzen had left the office to go to lunch at Wendy's, just around the corner.  PX-F, Tr 46-47.

Ms. Bachiocchi, who was upset, followed Mr. Lorentzen.  She asked him why he was visiting jobs that she had engineered and criticizing her work.  He responded that he had been instructed to find and document everything that was wrong with her jobs and to break up the Nick and Kim thing.  He said that his instructions came from "higher-ups" in the office. DX-9, ¶16; PX-F, Tr 46-47.

Ms. Bachiocchi complained to Mr. West about this conduct.  PX-F, Tr 47-48.  Kevin West responded by denying that Lorentzen had any such assignment and by telling Ms. Bachiocchi that she was being oversensitive.  PX-F, Tr 48.

Earlier Ms. Bachiocchi had come up against a similar response to similar complaints.  For example, she had spoken to Kevin West about Light printing out directions to her home, but no action was taken.  Also in December, 1999 she had discussed references to the "Nick and Kim Thing" with Mr. West.  PX-F, Tr 89.  No action resulted on that front either.

Ms. Bachiocchi spoke with Chris Macri, SNET's EEO officer, on or about December 17, 2000  telling her of the Light's incident, of Vallario's accusations of an affair, or increased, though unwarranted, scrutiny of her work, of West's rule against calling anyone outside of the West Group and of Kevin West telling her that she was being oversensitive.  PX-C, Tr 89-90.  However, she asked Ms. Macri to hold off because she "was fearful of what they may do  .  .  .  ." PX-F, Tr 94.  There is no indication that Ms. Macri tried to encourage Ms. Bachiocchi or to offer her any form of protection or comfort.

Shortly after meeting with West in May, 2000, Ms. Bachiocchi commenced a medical leave.  She was treated for depression and stress.  Her treating professional was Gary Zachariah, Psy. D.  Ms. Bachiocchi got his name from SNET sources.  PX-C Tr 34.  On her

first day of treatment Dr. Zachariah reported that Ms. Bachiocchi "presented with symptoms of Major Depressive Disorder" and that the "most alarming symptom of her depression was her report of having suicidal thoughts."  Dr. Zachariah's treatment summary at page 2, a copy of the summary being submitted herewith, having been marked as PX-L.

DEVELOPMENTS DURING PLAINTIFF'S MEDICAL LEAVE.

1.  A Failed Replacement for Plaintiff at SNET Wireless.  While Ms. Bachiocchi was on leave, the West Group assigned another employee, Frank Andrews, to interface with Janice Vereb at SNET Wireless.  PX-H, Tr 104.  Ms. Vereb was not satisfied with Mr. Andrew's work. In her own words, "He was terrible."  PX-K, Tr 23:15.  She spoke to Kevin West about him. PX-K, Tr 24, but she got no satisfaction from that.  Andrews continued to be assigned to SNET Wireless;  No manager from the West Group ever came out to review Frank Andrews; No one from the West Group responded to Ms. Vereb.  PX-K Tr 24.  Perhaps she was just one more "broad."

2.  Carol Is In the Men's Room.  After commencing her leave, Ms. Bachiocchi had occasion to call into the office seeking to speak with Carol Stanevich.  On one such occasion, early in her leave, Mr. Dursza answered the phone.  When Plaintiff identified herself and asked to speak with Ms. Stanevich, Dursza responded that Carol is in the men's room.  Tr 114:7-12.

3.  Alleged Employee Complaints about Nick and Kim.  Prior to commencing her medical leave in May, 2000, no one had ever informed Ms. Bachiocchi that her alleged interactions with Nick Faiella were the subject of complaints from co-workers.  PX-C, Tr 32 To the contrary, it was she who complained to West, among others.  PX-C, Tr 64.

Yet, in November, 2000, between the dates of November 9 and November 14, three employees made signed statements stating how they were offended by interactions between

Nick and Kim.  DX-2.  At that moment Ms. Bachiocchi had been out of the West Group, on leave, for approximately six months.

The odd timing of these statements can be explained only by the fact that none other than Robert Vallario, who retired in Mid-November, 2000, solicited them and forwarded them to Kevin West by covering memo of November 14, 2000.  PX-C, Tr 28 concerning Defendant's Deposition Exhibit 5.  Careful review of the three statements shows that they are inconsistent and, in some particulars, simply unbelievable.

Not one of the allegations made by these employees was under oath.  Each claim is denied under oath by both Ms. Bachiocchi, PX-C, Tr 9 (as to Boulet); Tr 15-18 (as to Volkert); Tr 24-28 (As to Dursza), and also by Faiella, DX-3 ¶19.

4.  Alleged Contractor Complaints.  Prior to the commencement of her leave, Plaintiff specifically remembered only one complaint from a contractor.  The complaint concerned her view that a contractor had used an excessive amount of wire and the contractor's competing view that she had allowed for an insufficient amount of wire.  The job was in Old Saybrook.  PX-C Tr 90; 132.

There may also have been a second, seemingly less significant complaint, from another contractor, Ernie Lemay.  This concerning the amount of time allocated for a job.  PX-C 133.  Ms. Bachiocchi knew of no other contractor complaints.

Of these two, Defendant deposed only Joseph Bordieri who had been the contractor for the Old Saybrook job.  He described the job and how, in his view, there was not enough wire.  Bordieri Deposition, Tr 8-9, excerpts from which are submitted herewith, having been marked as PX-O, Tr 8-9.  Bordieri asked Faiella for more wire.  According to Bordieri, on the day before Faiella had already questioned the amount of wire being used on the job.  PX-O, Tr 10.

In any event, when Bordieri approach Nick and actually did ask for more wire, according to Bordieri: that's where we had the altercation. PX-O, Tr 10:11-12. This interaction was between Bordieri and Faiella. PX-O Tr 10: 16-17.

Bordieri referred to Faiella as "kind of hostile" and observed that Faiella basically told him he was incompetent. As Bordieri concluded "it kind of bothered me a lot." PX-O Tr 10-11. Contrary to Defendant's current view that this was all about Bachiocchi, Bordieri testified:

> [I]f someone's going to give me a hard time as I'm doing the work, I just told them I rather not work with **that** person **or** the engineer that was doing the job. PX-O Tr 12 (Emphasis added.)

On cross-examination Bordieri further clarified his view that it was Nick who spoke to him; Nick who confronted him; and Nick who said he was incompetent. PX-O Tr 33. Ms. Bachiocchi, Bordieri confirmed, was not rude, confrontational or out-of-line in any way. PX-O Tr 33-34.

Defendant now alleges that, including Bordieri, there were four contractor complaints about Plaintiff. DX 6 ¶¶ 7-10. However, no contractor had complained to Kevin West. PX-H Tr 120:9-10. The complaints were allegedly made to Vallario, PX-H Tr 120, who harbored animus and hostility toward Plaintiff and, in addition, was the individual who selected the contractors who would work for, and be paid by, the West Group. Thus Vallario had both the motive and the ability to influence the contractors. There is a further reason to doubt Defendant's current claim.

Kevin West testified that Ms. Bachiocchi was not evaluated while she was on medical leave. PX-H, 132: 16-17. Similarly, Chris Manouse who replaced Richard Light as the new engineering manager, testified that he never evaluated Ms. Bachiocchi in a formal sense, and that he never signed an evaluation of Kim's work. PX-E, Tr 47.

However, included in Ms. Bachiocchi's personnel file, a copy of which had been requested from, and provided by, Laurie Moffett of Human Resources, was an evaluation of Plaintiff.  It was signed by both West and Manouse, notwithstanding their sworn denials.  The evaluation was never presented to Plaintiff.  Perhaps that is what they meant.

In any event, Part III of the evaluation form, Supervisor's comments, recounts problems with **two** contractors – not four.  With reference to the first, the evaluation claims that Kim [not Nick] had a verbal confrontation.  West and Manouse signed the form on January 12, 2001, less than a week before Ms. Bachiocchi reported to the West Group office to reacclimate herself to the working environment.  A copy of the two page evaluation form is submitted herewith, having been marked as PX-P[8].  Also submitted herewith, having been marked as PX-Q is an affidavit from Chris O'Conner, a contractor with CNT.

While Bordieri did 3-6 jobs per year for SNET, PX-O Tr 6, O'Conner did 300, including 25-50 with Nick Faiella and 10 with Kim Bachiocchi.  O'Conner did not have problems with either employee.

PLAINTIFFF'S FRUSTRATED EFFORT TO RETURN TO WORK

Dr. Zachariah's treatment summary followed Ms. Bachiocchi's progress up to the point that she might be ready to return to work.  As he stated::

> On our 12/22/00 appointment it was becoming clinically evident that Ms. Bachiocchi's emotional state was becoming more stable.  We began to develop a plan for her return to work by the first week of February, 2001.
>
> She was to have a day at the office two weeks before she was to return to work.  We called this "A Get Reacquainted Day."  The goal of this day was to

---

[8] During discovery Plaintiff requested that she formally be provided with a copy of her personnel file through the discovery process.  Defendant objected.  Plaintiff moved to compel, prevailed on the motion, and Defendant then supplied a copy of Plaintiff's personnel file.  The file provided during discovery does not appear to include the evaluation now submitted as PX-P.  Perhaps, through innocent inadvertence, it has been filed with the missing copies of the sign-out log.  See n. 9, infra.

allow her to get a feel for how the work environment was, and to get caught up on any changes that had taken place since she was on leave.

PX-L at page 3.

Dr. Zachariah worked on this plan with SNET nurse Diane Deny.  He sent her a confirming letter dated January 4, 2001.  In his letter Dr. Zachariah specifically noted that the one day visit, mutually agreed to take place on January 18, 2001, was in preparation for "returning back to work full-time On Thursday, February 02/01/01."  Copies of Dr. Zachariah's letters of January 4 and 19, 2004 together with a response from Lorraine Mattei of SNET are attached hereto as PX-M.

Upon returning to the West Group office on Thursday, January 18, 2001 for her reacquaintance day, Ms. Bachiocchi found that except for Kevin West there was not one other regular full time employee n the office.  This, of course, frustrated the entire purpose of that day.  DX-20 ¶¶4-5.  Compounding the problem, West did not offer Ms. Bachiocchi any assignment, DX-14 ¶12; he refused to inform her of any changes which had occurred during her leave, telling her that he would do so when she actually returned and he otherwise did not communicate with her during that day, PX-G, Tr 103:3-8.

As the reacqaintance day drew to a close, Kevin West released the one temporary employee who was in the office that day.  DX-9.  Contrary to Ms. Bachiocchi's recollection, West, a manager at one of New England's mightiest utilities, claims to have sent him home early due to a snow squall.  PX-H, Tr 124-125.  There was no snow;  there was no accumulation. DX-20, ¶¶9-10.

Dr. Zachariah wrote a stinging rebuke to SNET, a letter of January 19, 2001.  PX-M. Lorraine Mattei of SNET's medical department then conferred with Kevin West and, based on his comments, answered Dr. Zachariah.  PX-H, Tr 91-92; Mattei letter, PX-M.  In her letter

Ms. Mattei asserted that "The only employees in the group who are not usually out of the office most of each day are Mr. West's administrative assistant and a long-term temporary worker. . . ."

Ms. Bachiocchi believes this statement is untrue.  DX-20 ¶6.  Manouse, the engineering manager, also testified, contrary to the Mattei letter, estimating that West Group employees spend 35 to 40 per cent of their time in the office.  PX-E, Tr 56:12-16.  Of course this dispute might be resolved by reference to SNET's regular business records, the sign out log for the West Group, but the relevant records cannot be located by SNET[9].

DX-13 purports to be an extract from the sign out log, the sheet for the week ending January 20, 2001.  Plaintiff also made a copy of the sign out log for this particular week before leaving the West Group.  Plaintiff gave her copy to Defendant during discovery and had Mr. West identify it at his deposition as Plaintiff's KW-22.  That sheet is now submitted as an exhibit, having been marked as PX–N.  Comparison of DX-13 and PX-N shows that DX-13 has additional entries, and in some cases altered entries, when compared to PX-N.  For example, on Thursday January 18, 2001, the date of Plaintiff's failed return, Stanevich's status is altered from "off," PX-N, to "VP," DX-13.   Dursza's status, originally blank for Thursday on PX-N, now has an entry on DX13.  There are additional variations as well.

Having reported on January 18, 2001 in an effort to reacclimate herself, Plaintiff found her actual reception to be intimidating.  DX-18 ¶13.  At the conclusion of this experience, Ms. Bachiocchi relapsed; again, her depression deepened.  Suicidal ideation returned.  Instead of returning to work on February 1, as she had hoped and planned, Ms. Bachiocchi had to

---

[9] The West Group utilized a sign-out log which showed the work location(s) for each employee, each day.  PX-H Tr 93-95.  Manouse testified that in July, 2003 the sign out log was still in use.  Yet, when Plaintiff sought to obtain copies, we were informed that they were "were not required to be kept" and, in fact, could not be found.  PX-H Tr 95-96.

continue her medical leave.  PX-L at pages 4-5.  It became necessary to continue her on medical leave for further treatment.

PROBLEMS ATTENDANT TO PLAINTIFF'S RETURN TO WORK.

By April, 2001 Plaintiff was beginning to press Dr. Zachariah to authorize here return to work.  He felt that Ms. Bachiocchi was still vulnerable, especially in light of the reception she received in January.  Nevertheless, he finally authorized her return as of Monday, May 7, 2001.

As Plaintiff soon discovered, the failed and frustrated attempt at outreach on January 18 was only the beginning volley in a campaign of hostility and retaliation.  Defendant confronted Plaintiff with a series of incidents, ranging from the petty to the physically threatening.  They did so notwithstanding her emotional fragility.  Finally these efforts made their mark and drove Plaintiff from the West Group.  It only took a few weeks.

1.  Delays In Returning Telephone Calls.  West had always been prompt in returning telephone calls.  She was scheduled to return on May 7, 2001.  PX-C Tr 19.  However, when she left a message notifying West of her intended return, she had trouble getting a call back to make arrangements.  DX-14 ¶14.  Kevin West finally did call back on or about the Thursday preceding her planned return.  He told her that she should wait until May 14, 2001 to report. At his deposition West admitted that "The company delayed her for a week."  It was West's decision to do so because he was out of the office.  PX-H Tr 129.

2.  The Car Blocks the Road and Draws Comment.  In preparation for her return on May 14, Ms. Bachiocchi tried to get a ride into work anticipating that she would be assigned a company car after returning.  PX-F, Tr 107-108.  However, no one was available to give her a

ride.  That being true, she asked if a car could be dropped off in advance.  SNET agreed.  PX-F, Tr 109.  Plaintiff asked for the car to be left at the bottom of her driveway.

In fact, the car was left in the street with the front wheels at the curb pointing at the lawn of her home and the trunk of the car blocking the street.  PX-F, Tr 111.  This unnecessary and sophomoric prank caused Plaintiff hurt as well as some embarrassment with her neighbor who called to demand that the car be moved.  Further, the car was very dirty and, notwithstanding SNET's non-smoking policy, it smelled strongly of smoke.  Plaintiff had to be clean the car before it could be used.

3.  The Cold Office Environment.  Upon actually returning to the office Ms. Bachiocchi encountered a cold, uncomfortable environment.  PX-F, Tr 119.  As one small indicator, when she arrived each day she would call out Good Morning, but there would be no response.  Dursza was especially crude in his response to Ms. Bachiocchi upon her return.  When she tried to speak to him he would merely grunt and then turn to the side.  PX-F, Tr 26-7

4.  Decreased Compensation Rating.  Upon actually returning to the office, Ms. Bachiocchi was informed that her compensation rating had been changed, being lowered  to the median level on a five point scale. DX-20 ¶19.  This was done notwithstanding the advice of Defendant's plans and policies, including  Defendant's Disability Plan, "No one, including your employer,   .  .  .   may terminate you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA."  DX-22 at DI 12; Defendant's Equal Employment Opportunity Policy, "Employees are protected from retaliation for reporting, participating in an investigation or opposing potentially unlawful discrimination or harassment," DX-22, page 1; and other like policies.

Ms. Bachiocchi complained of this reduction to West, but he responded: It's only $17. It's not a big deal.  PX-C Tr 154.  He never offered Ms. Bachiocchi any further explanation of the reduction.  PX-F Tr 105.

5.  The Whipsaw Approach To Vacation Time.  On May 14, 2001, the first day that she returned, Kevin West asked Ms. Bachiocchi to prepare her vacation requests.  DX-14 ¶17(e). Then, on May 31 following an unpleasant exchange between himself and Plaintiff, West threatened to deny these vacation requests due to "the needs of the business."

6.  No Overtime For You, Kim.  After her return to the West Group in May, 2001, Plaintiff experienced several unpleasant exchanges with West.  He told her that contrary to her past experience there would no longer be any compensatory time available to her.  He alleged that this was a policy change due to the wage and hour laws.  However, in a further exchange, using a loud and angry voice, West also denied her request to work overtime, saying:  There will be no overtime for you, Kim.  DX-20 ¶¶15-16.

7.  Exclusion From the Fishing Trips.  Although arrangements for the recurring fishing trips were being made at the time Ms. Bachiocchi returned from her medical leave in May, 2001, no one mentioned it to her or offered her any kind of an invitation, or even a head's-up. PX-F Tr 61.

8.  Refusal of Requested Re-Assignments.  Upon her return Ms. Bachiocchi requested that she be reassigned to her accounts at Yale and SNET Wireless a/k/a Cingular Wireless. Her requests were met with "a blunt, absolute, unexplained negative response.  DX-20 ¶11. Her reassignment at Cingular was even requested by the client, but to no avail.  When Ms. Bachiocchi tried to inquire of West about this matter, he raised his voice and said:  I do not have to answer to you.  I am in charge.  DX-18 ¶14.

9. <u>Requirement That Others Check Her Work.</u>  Upon returning Ms. Bachiocchi was told that she must have her work reviewed before it is sent out of the office.  DX-14, ¶18.  So, logically enough, Plaintiff made a brief, neutral form which could be initialed by the reviewing party.  Manouse signed the form when he reviewed her work.  PX-E Tr ____.

10. <u>Failure to Offer Training.</u>  Plaintiff generally felt that others were given more opportunity for training than she was.  However, after her return, a circular for a training opportunity was circulated.  There was a hand-written distribution list for everyone in the West Group office, except for Plaintiff whose initials were omitted from the list.

11. <u>West Batters Plaintiff.</u>  On Monday, June 4, 2001 West reviewed one of Plaintiff's Jobs.  He carried down to her and returned it.  However, with reference to the approval form, he said "we are not doing this in this office.  Nobody will sign anything."  Plaintiff picked up the form while still sitting at her desk.  West became angry.  He grabbed her wrist in his hand and ripped the form from her.  Then he crumpled it up and ultimately shredded it.  So powerful was West's grip on Plaintiff's wrist that he caused her to bruise.  DX-14 ¶&18-19.

Although West denies being angry or grabbing Plaintiff, even SNET's human Resources generalist states that during her interview of West on the same day as the alleged incident, West denied grabbing Plaintiff but admitted that he had "ripped" the from her hand.

12. <u>Plaintiff's Pay is Docked.</u>  Frightened as she was by this physical outburst, Plaintiff left the West Group offices for the remainder of that day.  She was docked four hours pay for doing so.  PX-F Tr 125.

13. <u>No Discipline for West; A Transfer for Plaintiff.</u>  Shortly after these incidents SNET's Human Resources Department contacted Plaintiff and offered to transfer her to a job with fewer benefits and a poorer career path.  DX-14 ¶22.  She declined that offer, but even

Plaintiff agreed that she needed to transfer.  As she stated: "I had to leave a job that I really enjoyed doing.  I was basically forced out of there."  PX-F Tr 124:16-18.

She took a position reporting to Patty Companik.  As Defendant notes, the  new job included an increase in base salary.  However, Defendant overlooks its deficits:

    A.  No eligibility for overtime pay which she previously received;

    B.  No assigned company vehicle unlike the West Group position;

    C.  An increased commute for 10 to 40 minutes of approximately 70 miles a

        day, all at Ms. Bachiocchi's expense;

    D.  No eligibility for continued participation in the Compensation Plan; and

    E.  No satisfaction or enjoyment in the work function of the job.

PX-F Tr 23.

    14.  Satisfaction Upon Plaintiff's Departure.  The West Group maintained contact lists for group members.  One was a telephone list, the other an e-mail list.  Whenever there was a personnel change or a change of either e-mail address or phone number a new list was circulated, generally by e-mail.  These were purely ministerial acts, generally circulated without comment.

However, when Plaintiff transferred out of the West Group, John Dunn circulated the updated list.  He attached a short comment to the circular, noting that he was issuing the update "with great pleasure."  Although Dunn deleted Plaintiff's name, phone and email from the actual list, he failed to delete her from his own computer distribution list.  So Plaintiff was made to endure the hurt and embarrassment of receiving his message.  A copy of Mr. Dunn's covering email is submitted herewith, having been marked as PX-R.

It was in this way that the west Group sent Plaintiff off to her new placement at SNET.

ARGUMENT

1.    The Legal Standard

Generally, Plaintiff agrees with the description of the legal standard for determining if summary judgment is appropriate, as set forth by Defendant in its memorandum.  Defendant's Memorandum at 16-17.  Plaintiff. However, believes that there are many material facts in dispute, making this cased inappropriate for resolution by summary judgment.

Further, among the facts in dispute, are questions concerning Defendant's intent.  The Second Circuit has repeatedly cautioned that we must be particularly cautious about granting summary judgment in such instances.  _Schwapp v. Town of Avon_, 118 F.3d 106, 110 (2d Cir. 1997); _Feingold v. New York_, 366 F. 3d 138, 149 (2d Cir. 2004).

2.    Plaintiff Successfully Presented A Claim That
      Sexual Harassment Caused a Hostile Environment

To state such a claim, the plaintiff must show

> Conduct (1) that is "objectively" severe or persuasive – that is [conduct that] creates an environment that a reasonable person would find hostile or abusive, (2) that the plaintiff "subjectively perceives as hostile or abusive, and (3) that creates such an environment because of plaintiff's sex .   .   .   .

> _Brown v. Henderson_, 257 F. 3d 246, 252 (2d Cir. 2001).

It is well settled that to be actionable the conduct must be "sufficiently severe or pervasive to alter the conditions of employment.  _Pa State Police v Suders_,  124 S. Ct. 2342, 2347 (2004), quoting _Meritor Savings Bank FSB v. Vinson_, 477 US 57, 67 (1986).  It should also be noted, however, that this requirement "does not mean that employers are free from liability in all but the most egregious cases."  _Terry v. Ashcroft_, 366 F. 3d 128, 148 (2d Cir. 2003).

In *Howley v Town of Stratford*, 217 F. 3d 141 (2d Cir 2001) the Court considered a Plaintiff's claim that sexual harassment had caused a hostile work environment.

*Howley* rose to the Court of Appeals following a grant of summary judgment below in which the district court had stated that a single incident of verbal harassment was insufficient to create a hostile work environment.  *Howley*, 217 F.3d at 149.  The Court of Appeals reviewed the standards applicable to such a claim and, quoting *Cruz v. Coach Stores, Inc.* 202 F. 3d 560, 570 (2d Cir. 2000),  noted that the plaintiff must demonstrate

> [E]ither that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.
>
> \*               \*               \*
>
> However, [t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.
>
> \*               \*               \*
>
> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances (Citations and quotation marks omitted).

> *Howley*, 217 F. 3d at 153 – 4.

Thus here, as in *Howley*, we look to the totality of the circumstances to determine whether a hostile and/or abusive environment had arisen.  *See also, e. g.*, *Brennan v. Metro Opera Ass'n*,, 192 F. 3d 310, 319 (2d Cir. 1999).  From her first contact to the final insult, Plaintiff believes it to be so.

In her initial interview, light observed to her, with apparent pride, that he had once fired a black female worker[10].  This was Plaintiff's jarring introduction to the West Group.

---

[10]  This would seem to be a racial reference more than a sex-based reference.  Assuming that to be so, it is nonetheless admissible because "one type of hostility can exacerbate the effect of another, and . . . such aggravating harm is legally cognizable."
*Feingold v. New York*, 366 F. 3d 138, 151 (2d Cir.  2004).

Then throughout her employment she experienced the general ambient background of the West Group filled with references to "broads," "bitches," suggestive jokes, repeated references to not sending a woman to a job, and the like.  Beyond background, Plaintiff was the subject of repeated rumors that she and Nick Faiella were having an affair, rumors that hit their nadir when three employees wrote false statements accusing Plaintiff of engaging with inappropriate, sexually charges conduct with Nick.  Plaintiff also suffered direct questions and insinuations from Vallario about the alleged affair.  All of these comments tend to show us what the intention of the Defendant was.  They all support Plaintiff's claim that a hostile environment had arisen from her sexual harassment.  The abusive nature of that environment, however, far exceeded these examples.

Plaintiff suffered almost innumerable slights.  Dursza refused to speak with her and dropped off her car for her return in May, 2001, leaving it block the street; Lorentzen was assigned to check Kim's work and publicly embarrassed her by telling Ms. Vereb, a major customer;  Plaintiff's work was constantly examined in a concerted witch-hunt which no man in the West Group was ever made to endure;  She was excluded from lunches and fishing trips; she was whip-sawed over vacation time; she was denied overtime; her compensation rating was lowered; finally she was man-handled by West.

These and the other items set forth more fully in the statement of facts made her workplace environment hostile.  The standard does not require the environment to have become unendurable or intolerable, _Feingold v. New York_, 366 F. 3d 138, 150 (2d Cir. 2004), although it may have been so here.  When we consider the impact of the conduct on Plaintiff's emotional health, it certainly seems so.  And psychological harm is some of the relevant factors which may be taken into account.  Harris v Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

Defendant observes, from time to time, that Light and West hired Plaintiff and they knew she was a woman at the time. Presumably they believe that the court should draw an inference that the same actors who hired her would not fire her. This seems somewhat illogical in light of Vallario's strong role in the events concerning Plaintiff. Even if we consider West as being in charge, such an inference seems inappropriate in this case.

Many of the circumstances concerning Plaintiff in her employment had changed between the time of hiring in June, 1998 and the start of Defendant's campaign of sexual harassment and hostility which really began to pick up steam in the Fall, 1999. Plaintiff had done more rigorous strike duty than many of the men in the office; she had demonstrated some unwanted independence by calling SNET offices outside of the West Group when she had questions about payroll or concern over heating; she had refused to be silent in the face of misconduct by Light and Vallario and she complained to West about it, first in December, 1999, and so forth. Where such changes in circumstances occur, an inference is not warranted. _Feingold v. New York_, 366 F. #d 138, 155 (2d Cir. 2004).

Defendant also seems to maintain that many of the hostile actions cited by Plaintiff have no overtly sexual meaning or content. Such an observation seems irrelevant to Plaintiff.

> [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.
>
>    *    *    *
>
> Although sexual harassment is usually thought of in terms of sexual demands, it can include employer action based on [sex] but having nothing to do with sexuality. For example, a woman, entering a work-environment that previously had been all-male, might encounter severe, sustained hostile treatment by her male supervisors and/or co-workers.
>
>    *    *    *
>
> A hostile environment is not limited to sexual advances or even to sexual behavior targeted at the complainant (Citations and quotation marks omitted).
>
> _Raniola V. Bratton_, 243 F. 3d 610, 617 (2d Cir. 2001)

See, also cases cited in *Raniola* at n. 6.

In another effort to diminish Plaintiff's claim, Defendant maintains that no adverse employment action was taken against her.  Most of the facts set forth above, at least in Plaintiff's view, speak for themselves.  To the extent that Defendant's argument is based upon a lack of economic impact, that would also be incorrect.

Upon returning in May, 2001, Plaintiff was told that there would be no overtime for her and her Compensation rating was reduced with a related negative economic impact.  After being forced out of the West Group, she took a position that she did not like, lost regular access to an assigned company vehicle, encountered a commute 4 or 5 times as long as her earlier commute, now at her own expense, and lost her eligibility for both overtime pay and participation in the compensation plan.

Defendant notes that Faiella did not tell Plaintiff all that had been said to him.  Perhaps, but by May, 2000 they clearly had joined common cause.  At Plaintiff's request, Faiella spoke to Vallario about his continuing conduct.  Further, as noted in the Facts, Vallario was making comments directly to Plaintiff.  By September, 2001 Faiella was relating this conduct in a written complaint.  PX-J.  If nothing else, the comments to Faiella, by Vallario, corroborate Plaintiff, are relevant to her perception of the workplace, and shed light on Vallario's state of mind.  *Schwapp v. Town of Avon*, 118 F. 3d 106 (2d Cir. 1997).

Defendant seems to minimize the various acts of hostility and discrimination complained of by Plaintiff.  Clearly Plaintiff, who complained about the harassment and hostility she was experiencing felt that her working conditions had been "altered for the worse." *Feingold* at 150 and 151. Finally, as Vallario, Light and West were all supervisors of Defendant, there seems to be no doubt that Defendant is responsible for the conduct complained of in this matter.  Even assuming, however, as Defendant seems to maintain, that

each item was small in character the overall, cumulative impact is significant and may be considered as such.  _O'Day v. Borough of Naugatuck_, 260 F. Supp 2d 514 (D. Conn. 2003).

       3.      Plaintiff has Established A Claim For Retaliation.

       A claim of retaliation is shown where plaintiff (1) shows participation in a protected activity, (2) that activity is known to defendant, (3) an employment action disadvantaging plaintiff occurs and (4) a causal connection is established.  James v. New York Racing Assoc., 233 F. 3d 149, 153-154 (2d Cir. 2000).

       Among other things Plaintiff complained to West about Light and Vallario, she filed administrative charges which were served on Defendant.  Retaliation may be shown by an action as small as a reprimand.  _Morris v. Lindau_, 196, F. 3d 102, 110 (2d Cir. 1999).  In this case West refused overtime for Plaintiff, reduced her Compensation rating with a negative economic impact, allowed the West Group to treat her with hostility and ultimately forced her out of the Group causing her to take a position that she did not like, lose regular access to an assigned company vehicle, take on a commute at her own expense which was  4 or 5 times as long as her earlier commute, and lost her eligibility for both overtime pay and any participation in the compensation plan.

       Causation can be shown by circumstantial evidence, including a showing that the discriminatory conduct closely followed the protected activity.  _DeCintio v. Westchester County Medical Cente_r, 821 F. 2d 111, 115 (2d Cir. 1987).  Here she complained in December, 1999 and again in May.  Allowing for the fact that Plaintiff was out for a medical leave, the imposition of the discriminatory conduct was almost immediate with respect to her actual reporting schedule.

       _4.  The Equal Pay Act Claim._

Defendant seeks judgment on Plaintiff's Equal Pay Act Claim. Plaintiff had sought discovery of Defendant's records concerning information as to wages and hours. Defendant resisted. A motion to compel was filed and Defendant was ordered to produce all records relating to wages. Defendant failed to produce any such records and by motion of September 17, 2004 Plaintiff moved for an order and sanctions. Thereafter, Defendant began to produce some documents. Plaintiff's motion for order and sanctions remains pending.

Defendant then produced three sets of documents on October 6, 2004, October 19, 2004 and November 15, 2004. Defendant has never certified that it produced all materials, as ordered. As a sanction, Plaintiff sought entry of a default judgment on this Count. Plaintiff respectfully requests to be permitted to supplement her response on this issue after a ruling is issued on the pending motion.

As to the merits of Defendant's motion, it seems that Defendant relies on the analysis of Ms. Moffettt in her affidavit dated April 6, 2005. Although she purports to compare base salaries of Plaintiff with men in her department, she does not list any individuals by name, except for Plaintiff. Moffettt Affidavit at ¶¶4-5. Later n the affidavit she specifies two kinds of business records which were produced. Moffettt Affidavit ¶¶10-11. However, Ms. Moffettt does not give any analysis or explanation for how the records were used or as to how information may have been extracted.

Finally, at ¶11. of her affidavit Ms. Moffettt identifies five individuals by name who worked in Ms. Bachiocchi's department "during 2000 and/or 2001. It is not clear from the face of the affidavit whether or not these are the same individuals referred to, but not identified, in ¶4 which relates to a specific date of "March 1, 2000." Further, wages in the West Group had a bonus component arising under the Compensation plan. Ms Moffettt does not address, or even refer to, issues arising thereunder.

In short, the evidence presented by Defendant seems cryptic to Plaintiff.  In light of the discovery history in this matter concerning wage information, it is difficult, if not impossible for Plaintiff to analyze the confusing mélange of facts thrown up by Defendant.  And it is the Defendant which carries the burden of proof on this issue.

Plaintiff does know, and has set forth particulars in the Facts, above, that her compensation rating was unilaterally lowered by Mr. West.  She does not believe that this has been done to any other member of the West Group.  At least in that way, she receives less pay for comparable work.

Respectfully submitted,

The Plaintiff
Kimberly Bachiocchi


By:_____
Peter E. Gillespie  (ct06554)
46 Riverside Avenue
Westport, CT 06880
Tel: (203) 227-7000
Fax: (203) 454-5508
Email: petelaw@mac.com