## *Lunch*

Plaintiff claims that "[t]here were days when the men working in the West Group would all get up and go to lunch together at Noon. Neither Ms. Bachiocchi nor Carole Stanevich were invited to join. PX-F, Tr. 63." This allegation, completing lacking in specificity of any sort (including time and frequency), is clearly too vague to support plaintiff's claim and is further completely unrelated to gender. When asked at her deposition what is her basis for believing this occurred because she was a woman, plaintiff responded simply, "Because I am a woman." PX-F at 64. In addition, plaintiff admits that she never offered to go with her co-workers to lunch or asked if she could join them. PX-F at 63.

### Third Parties

### *Fishing Trip Sponsored by Vendor*

Plaintiff seems to assert that part is her hostile work environment claim was that an unidentified third-party vendor did not invite her on one or more fishing trips that at least some of her co-workers attended. However, plaintiff does not really claim that the unidentified vendor excluded her because she is a woman. She testified as follows:

> Q.   And are you claiming that you were excluded [from a fishing trip] because you're a woman?
> A.   I don't know the reason I was excluded. I would assume because I was a woman.

Pl. Dep. 7/24/03 at 75 (attached). Plaintiff further admits that the other woman in the office, Carole Stanevich, was invited on the fishing trips, and that Bachiocchi herself went once. Bach. Dep. 7/24/03 at 71-72 (attached). This claim is far too vague and so unrelated to gender that is cannot support plaintiff's claim.

### *Contractor Feedback*

Plaintiff includes a lengthy section about why she believes criticisms of her work by outside contractors was either unfair or made up. See Pl. Opp. at 15-18. However, any comments made by these outside contractors were not made by SNET, cannot be imputed to SNET, and resulted in no adverse action at all with respect to plaintiff. She claims she did not even know about them, except for one (which she disputes); thus it is clear she never received criticism based on them. Moreover, it is clear from her Opposition that the alleged criticism was lodged more directly to Mr. Faiella, a male. See Pl. Opp. at 17. Her complaint about outside contractor criticisms of her work cannot support a hostile work environment claim against SNET.

The above allegations, to the extent that they are supported by any evidence (and many are not supported by evidence, as noted above), clearly do not rise to the level of severe and pervasive conduct required in this Circuit to withstand summary judgment on a hostile work environment claim.

In addition to the legal authority previously cited in SNET's Memorandum, see Mem. at 35-37, in Braheney v. Town of Wallingford, No. 300CV2468(CFD), 2004 WL 721834, at *4 (D. Conn. Mar. 30, 2004) (copy attached), this Court granted summary judgment for the employer on a hostile work environment claim with allegations much more severe and pervasive than in the present case. In Braheney, (1) the plaintiff, who was a firefighter for the Town of Wallingford, had been issued a counseling memo for her involvement in a motor vehicle accident; (2) she also

21

received counseling regarding her use of sick time; (3) she received a verbal warning[14] for being absent without leave; (4) she was issued a written warning, which was reduced to a verbal warning, for her excessive use of sick time; (5) she was summoned to a counseling meeting regarding her absenteeism and pattern of sick leave; (6) she was charged with committing a dispatch error and received counseling; (7) she was suspended for four weeks and docked eleven and one-half hours for allegedly leaving work after receiving an order to stay; (8) she was suspended for two weeks for allegedly misrepresenting the truth in order to secure time off; (9) she was suspended again for four days as a result of allegedly committing a second dispatch error; and (10) she was suspended for six weeks for again allegedly misrepresenting the truth in order to secure time off. Id. at **1-2. The District Court described the claims as follows:

> Braheney alleges that she was subjected to greater scrutiny than male firefighters in every aspect of her employment and that she was unfairly and disproportionately punished for using her sick time and other accrued leave time to which she was entitled. While Braheney admits that she was suspended four times for the reasons listed above, she maintains that if the same acts had been committed by male firefighters, they would not have been disciplined as harshly. In particular, she contends that she is aware of two male firefighters who each committed a dispatch error and were not disciplined in a similar fashion. Braheney also alleges that she was one of the few employees who did not use her sick time for a longer vacation, to work a second job, or to have the weekends off. In addition, she claims that there was a notice on a bulletin board in the Captain's office stating "If Cindy [Braheney] calls, make sure to check it, see if she has the time."

Id. at *4. The conduct alleged in Braheney is much more severe and pervasive than the conduct complained of by Ms. Bachiocchi, who has presented no evidence of male employees being treated differently, and further admits that she was never disciplined for anything. Pl. Opp. at 1. Given the facts of the Braheney case, the Court concluded that, as to her hostile work

---

[14] By contrast, in the present case, it is undisputed that plaintiff received no discipline of any sort at any time. See Pl. Opp. at 1.

environment claim, "Braheney's representation that she has been treated differently from male firefighters is not sufficient to survive summary judgment," that the disciplinary actions taken against her were not severe or pervasive, and that the discipline with the other conduct did not establish that her "workplace was permeated with discriminatory intimidation, ridicule, or insult." Id. at *4.

Similarly, in Hanson v. Cytec Industries, No. 399CV86 (CFD), 2002 WL 519714 at *4 (D. Conn. Mar. 8, 2002) (copy attached), the District Court granted summary judgment to the employer on plaintiff's hostile work environment claim.  In Hanson, the plaintiff claimed race and national origin discrimination.  He alleged that (1) his supervisor used profanity with him and had also done so on a previous occasion with another man of Jamaican descent and African-American race; (2) his supervisor called him at home to see if he could work overtime, rather than scheduling him in advance as was the practice for white employees, in this case depriving him of the overtime opportunity; (3) his supervisor assigned him a sweeping duty which was not appropriate for an employee in plaintiff's job classification; (4) his supervisor assigned a white employee to work overtime as an "extruder operator," when normal practice was to schedule the employee who had worked a regular shift as extruder operator for that overtime (which would have been plaintiff); (5) Hanson's supervisor asked him to take an early lunch break, although it was not the supervisor's practice to schedule breaks for white employees; and (6) on the same day, his supervisor handed him an assignment while plaintiff was eating his lunch in the break room, although the normal practice was to leave assignments in the third-floor office.  Id. at *2-3.

The Court in Hanson held that, even if a trier of fact could find that these incidents were racially motivated,[15] they were "simply insufficient as a matter of law to constitute a hostile work environment under Title VII." Id. at *4. Compare Williams v. County of Westchester, 171 F.3d 98, 101-02 (2d Cir. 1999) (holding that plaintiff's evidence that a file containing racist material, including a memorandum entitled "Affirmative Action in Heaven" was found near his office, that the work environment made plaintiff feel like he did not belong there, that plaintiff was consistently given menial tasks and was treated as nothing more than a "driver" for the District Attorney, and that the plaintiff was told by some of his fellow criminal investigators to "go wash and gas the boss's car" did not establish a hostile work environment for purposes of Title VII claim), with Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68, 70-72 (2d Cir. 2000) (finding a hostile work environment where plaintiffs were subjected to a "stream of racially offensive comments over the span of two to three months," including a statement that a supervisor "should go out and buy a truck and drag someone by the truck who is black"), and Schwapp v. Town of Avon, 118 F.3d 106, 110-12 (2d Cir. 1997) (holding that question of material fact existed as to hostile work environment claim where plaintiff was subjected to at least ten clear "racially-hostile incidents" and two incidents reflecting racial bigotry during his 20 months of employment by the defendants).

Similarly, the Court in Brown v. Town of Greenwich, Civ. A. 3:02CV316 (CFD), 2004 WL 2106593, at *2 (D. Conn. Sept. 15, 2004) (copy attached), concluded that plaintiff's hostile work environment discrimination claim failed as a matter of law, because the plaintiff had failed to present evidence of a hostile work environment sufficient to withstand summary judgment. It so held because "[t]he incidents Brown alleges were not sufficiently severe or pervasive to alter

---

[15] The Court made no such finding in the case.

the conditions of her employment." Brown, 2004 WL 2106593, at *2.  In support of her claims,

plaintiff presented evidence (1) that in April 1998, she was denied training in desktop publishing

software necessary to produce the Human Resources Department newsletter while such training

was provided to a white female colleague; (2) plaintiff's November 1998 performance evaluation

included the comments that she appeared "reluctant at times to `think out of the box'"; (3) the

Deputy Director of Human resources told another member of the department that plaintiff had a

"minority chip on her shoulders"; and (4) plaintiff was wrongfully accused by the Director of

Human Resources of improperly maintaining petty cash receipts.  Such evidence did not rise to

the level of severe and pervasive conduct as a matter of law.  See also Faragher v. City of Boca

Raton, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be extreme to

amount to a change in the terms and conditions of employment, and the Courts of Appeals have

heeded this view.").  The work environment must be both subjectively and objectively hostile.

Harris, 510 U.S. at 21-22; see also Oncale v. Sundowner Offshore Servs., Inc. 523 U.S. 75, 81

(1998) (emphasizing that "the objective severity of harassment should be judged from the

perspective of a reasonable person in the plaintiff's position.").

### d.   The Cases Cited by the Plaintiff Do Not Support Denial of Summary Judgment on Plaintiff's Hostile Work Environment Claim.

In plaintiff's Opposition, she first argues that the Court should look to "the totality of the

circumstances" to determine whether a hostile work environment existed, citing two cases for

that proposition:  Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2001) and

Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 319 (2d Cir. 1999).  SNET generally agrees that a

Court should look to the totality of the circumstances.  More precisely, however, the Courts in

25

both of those cases held that whether an environment is "hostile" and "abusive" must be determined by looking at "all of the circumstances." However, the Second Circuit has never held, in those or any other cases, that a plaintiff may bypass the prima facie requirement of showing gender-related harassment that was sufficiently severe and pervasive to alter the terms of her employment and rely on a "totality of the circumstances" argument in his proof. To the contrary, both cases illustrate the point made in SNET's Memorandum that summary judgment for the employer is appropriate unless there is evidence of gender-related conduct that is far beyond what the record even minimally supports here.

In the second case cited by the plaintiff, Brennan v. Metro. Opera Ass'n, 192 F.2d 310, 319-20 (2d Cir. 1999), the Second Circuit affirmed summary judgment for the employer on a hostile work environment claim because the plaintiff had not presented evidence of sufficiently severe harassment. The plaintiff's proof included evidence that (1) her supervisor was rude to her; (2) she had overheard "lewd banter" between her supervisor and another employee; and (3) co-workers had placed provocative pictures of nude or partially clothed men on the walls in her workplace. Id. at 318-19. The Second Circuit found that these incidents did not rise to the level of actionable conduct. Id. at 319.

The other case cited by plaintiff for the "totality of the circumstances" concept is Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2001). However, Howley involved evidence of gender-based harassment far more severe than any conduct alleged by plaintiff. Id. at 148-49 In that case, a female firefighter sued her employer and a coworker for, inter alia, a hostile work environment based on the coworker's conduct. The plaintiff presented evidence that the

26

coworker (1) told the plaintiff to "shut the f - - -[16] up, you f - - - ing whining cunt"; (2) made remarks about her menstrual cycle; (3) yelled in her direction that "there is no f - - - ing way that I will f - - - ing apologize to the f - - - ing cunt down there"; (4) subjected her to an extended barrage of verbal abuse, including the statement that she had not been promoted to assistant chief because she did not "suck cock good enough and only made lieutenant"; and (5) implied that because the plaintiff was a woman he would not follow her orders in an emergency, endangering her life. Id. The plaintiff presented substantial evidence to support all of these allegations, and in fact the coworker did not deny making any of the abusive, gender-related statements. Id. The Court observed that the significance of the last allegation was very compelling because "[i]n an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may . . . impair[] her ability to lead in the life-threatening circumstances often faced by firefighters." Id. at 154. No gender-related conduct alleged by plaintiff in the present matter approaches this level, and therefore Howley does not support denial of summary judgment in this case.

Plaintiff next argues that a hostile work environment need not have been "unendurable or intolerable" to be actionable, citing Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004). Feingold, however, also does not stand for the proposition that a plaintiff may defeat summary judgment without meeting the basic prima facie burden.    To the contrary, the plaintiff in Feingold had presented ample evidence of severe and pervasive harassment that was linked directly to his religion. Id. at 150-51. The plaintiff presented evidence that (1) coworkers routinely mocked his name by using other "Jewish-sounding" names; (2) coworkers routinely

---

[16]   The full word was used by the plaintiff according to the decision.

made comments about Jewish lawyers; (3) one coworker singled him out "almost daily" on the basis of his religion; (4) one coworker asked "What's wrong with these [Jewish] people?"; and (5) another coworker made a remark about "Jewish pig food." Id. In the present case, plaintiff presents no evidence of comparable gender-related remarks or conduct based on plaintiff's gender.

In her Opposition, plaintiff further argues that harassing conduct need not be motivated by sexual desire, citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001). SNET has not taken the position that sexual desire is required, although until plaintiff filed her Opposition SNET did not know that plaintiff was alleging exclusively hostile-work-environment sexual harassment, rather than quid pro quo sexual harassment which *is* based on desire. SNET argued instead that summary judgment is warranted because plaintiff has not presented evidence of severe and pervasive gender-based harassment of any kind. In addition, Raniola involved actual evidence of conduct that was much more severe and pervasive than any conduct that plaintiff alleges here. In Raniola, the plaintiff offered evidence that a supervisor and/or coworkers (1) wrote the word "cunt" over her name in a ledger; (2) posted a flyer saying "Free Blow Jobs by [the plaintiff]"; (3) gave the plaintiff and the only other woman in her department unusually demanding assignments; (4) made a remark to the plaintiff about a husband failing to "smack his wife around"; and (5) sabotaged the plaintiff's work. The Second Circuit found that the clearly gender-based nature of the first four acts justified the inference that the fifth was also gender-based. Id. at 621-23.

Finally, plaintiff argues that even if each item among plaintiff's allegations was "small in character," the overall, cumulative impact of them could be significant, citing O'Bar v. Borough

28

of Naugatuck, 260 F.Supp.2d 514 (D. Conn. 2003). O'Bar made such a holding about a retaliation claim, not a claim of discriminatory hostile work environment. Id. at 516-17Since the claim at issue was one of retaliation, the fact that the alleged acts were not gender-related did not arise. O'Bar does not negate the requirement that plaintiff make out a prima facie case of a hostile work environment by presenting evidence of gender-based conduct severe and pervasive enough to alter the terms of her employment—something plaintiff has not done.

### e.   Plaintiff's Attempts to Add New Factual Claims Is Unavailing.

The Opposition refers to additional alleged conduct by SNET employees, much of which was not mentioned in the Complaint. The Opposition attempts to add allegations that (1) fellow employee Ronald Dursza refused to speak with plaintiff and left a car he dropped off for her blocking the street; (2) fellow employee Carl Lorentzen publicly embarrassed plaintiff by telling customer Janice Vereb that he had been assigned to check plaintiff's work; (3) plaintiff was excluded from lunches and fishing trips; (4) plaintiff was "whip-sawed" over vacation time; (5) plaintiff was denied overtime; (6) plaintiff's compensation rating was lowered; and (7) plaintiff was "man-handled" by West.   None of these acts are inherently gender-related, nor does plaintiff's Opposition link any of them to gender.

Plaintiff's Opposition also presents two new allegations which at least contain references to gender, but in neither case does the brief present any evidence that the conduct was based on plaintiff's gender. First, plaintiff alleges that supervisor Richard Light told plaintiff that he once fired a black female worker. Plaintiff concedes that this "would seem to be a racial reference more than a sex-based reference," and no evidence is presented that Light made the remark on the basis of plaintiff's gender. Pl. Opp. at 27. Second, the brief alleges that plaintiff's work "was

29

constantly examined in a concerted witch-hunt which no man in the West Group was ever made to endure." Pl. Opp. at 28. However, plaintiff makes absolutely no reference to any evidence in the record that plaintiff's work was examined any more carefully than the work of any male employee in West's group.[17] Thus, plaintiff makes no reference to any evidence that might establish that any of the above acts were based on plaintiff's gender or even the events as counsel described them in the first place.

> **f.      Plaintiff Is Incorrect That Comments of Which the Plaintiff Is Unaware Can Create a Hostile Work Environment.**

In her Opposition, plaintiff next argues that comments allegedly made by Vallario to Faiella are relevant to this claim, although plaintiff was admittedly unaware of them. Id. at 111. She cites Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) for this proposition. However, Schwapp does not stand for the proposition that comments of which a plaintiff was unaware can create a hostile work environment. Rather, it stands rather for the proposition that comments made when the plaintiff was not present, but which the plaintiff learns about during her employment, can contribute to a hostile environment at the time she learns them. "[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can also impact the work environment" at the time she learns them. Id. In fact, courts have specifically held -- quite reasonably -- that for alleged incidents or remarks to be relevant to showing the severity or pervasiveness of a plaintiff's hostile work environment claim, the plaintiff must have been aware of them at the time that the alleged hostile environment existed.

---

[17]  Moreover, when plaintiff was asked at her deposition why she believed that male coworkers were not criticized for making mistakes as she was, her only reply was that she did not happen to be present when the coworkers received comments from their supervisors and thus did not hear any criticisms herself. Appendix, Bach. Dep. 2/15/05 at 26:6-31:10, 32:24-33:14. Plaintiff effectively conceded that she has no evidence that her work was more closely examined or criticized than that of male coworkers.

Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1046 (7th Cir. 2000); Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir. 2000).

Moreover, Schwapp was a case involving facts quite different from the present matter, because the plaintiff (an African-American policeman suing the police department) presented evidence that he was aware of remarks far more extreme than anything alleged here.  These remarks included:  (1) "a N - - - - - bitch from Hartford was beating the shit out of her kids"; (2) "why do they have to do that jungle dance every time they score a touchdown?"; (3) a joke involving a play on the "N-word"; (4) a supervisor's comment that the plaintiff "should not expect the same courtesy" from his white coworkers that he showed them, for racial reasons; (5) "watch out for the N - - - - - at 48 [an address]"; (6) "I see you are working white man's hours"; and (6) a joke about criminal behavior using the names "Johnny, Jose, Rufus, Jerome, Willie, Raoul and Hector."  These remarks, among others, were enough to defeat summary judgment. Plaintiff presents no evidence of remotely comparable gender-based remarks here.

**B.    LEGITIMATE BUSINESS REASONS**

Where the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the [action complained of]. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the employer does so, the plaintiff bears the "ultimate burden" of "proving . . . that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

31

As set forth in SNET's Memorandum, SNET had legitimate business reasons for all of its actions.[18] See Mem. at 28-33 (assignment of accounts, leave time, overtime, customer contact), 6 (investigation of complaints by contractors), 9-10 (reasons why several employees out of office on business Jan. 18, 2001), 11-12 (re-assignment of accounts), 13 (overtime, vacation and compensatory time), 14-15 (taking back of paper on June 1, 2001). In her Opposition, plaintiff does not mention any of SNET's legitimate business reasons as set forth in its Memorandum, and does not present any evidence or even argument that such reasons were a pretext for unlawful discrimination. See Burbank v. Office of the Attorney General, 240 F.Supp.2d 167, 171 (D. Conn. 2003) (summary judgment granted for employer where plaintiff did not "contest with any evidence" his employer's legitimate business reasons for not hiring him into position as assistant attorney general). In Burbank, the District Court noted that disputing the employer's factual statement in the Rule 56 Statement was not enough to withstand summary judgment without producing evidence to the contrary. Id. at 172 ("Though [the plaintiff] disputes these facts in his Local Rule 9(C)(2) statement, he has not produced any evidence in contravention of them."). Similarly, in the present case, even if the plaintiff could establish a hostile work environment, at least the claims involving overtime, compensatory time, vacation, complaints by contractors, absence from the office of some co-workers on January 18, 2001, re-assignment of accounts, and taking back paper on June 1, 2001, cannot support such a claim as SNET had legitimate business reasons for its actions. Thus, if the actions were supported by business reasons cannot be discriminatory as a matter of law.

---

[18] Some of plaintiff's allegations, such as those involving comments by co-workers, are denied and thus the legitimate business reason analysis cannot apply to those purported incidents.

32

### III.   PLAINTIFF HAS FAILED TO PRESENT CONCRETE EVIDENCE TO ESTABLISH A CLAIM OF RETALIATION

In its Memorandum, SNET pointed out that plaintiff cannot make out a prima facie case of retaliation, because there is no evidence in the record of an adverse employment action by SNET, and there is no evidence of a causal connection between any (adverse) action and protected activity by plaintiff. See Mem. at 43-48.[19]   Plaintiff devotes only one page of her Opposition to the retaliation claim and cites no evidence to support such a claim. Opp. at 31. It is still unclear exactly what alleged incidents she alleges would support such a claim. In the Opposition, she fails to meet her clear burden at this stage, because she does not present concrete evidence of retaliatory conduct, a causal connection between conduct and protected activity, or any adverse employment action whatsoever.

Plaintiff makes only three weak responses to this point. First, she argues that retaliation "may be shown by an action as small as a reprimand," Morris does not stand for the proposition that "small" actions may constitute retaliation under Title VII. Instead, it simply lists "reprimand" among a set of examples of adverse employment actions that could support a First Amendment retaliation claim (there was no Title VII claim in that case), the other examples being "discharge, refusal to hire, refusal to promote, demotion, [and] reduction in pay." Morris at 110. A formal reprimand can be a significantly detrimental adverse employment action in some workplaces. Plaintiff was never reprimanded and does not claim that she was.

Plaintiff does seem to try to add a new allegation of retaliatory action to those listed in the Complaint. She now describes three acts by SNET employees as retaliatory. Pl. Opp. at 31.

---

[19] SNET's Memorandum pointed out that for each of the six alleged actions listed as retaliatory in plaintiff's Complaint, the action was not a cognizable adverse employment action, plaintiff had conceded at her deposition that she had no evidence to link them to retaliation, and SNET had presented a legitimate non-discriminatory reason for them. Plaintiff's Opposition does not rebut SNET's arguments on any of these points.

Of these, two were among those listed in the Complaint as retaliatory. Complaint ¶ 31. These are (a) West's alleged refusal of overtime (of one hour on one day) for the plaintiff, and (b) the reduction in plaintiff's compensation rating after she returned from her year-long medical leave. Plaintiff points to no evidence in the record to suggest that either of these decisions had any causal connection to any protected activities by plaintiff. As to overtime, plaintiff has admitted she was denied the opportunity to work overtime on one occasion only, and that the amount of overtime she was denied was one hour. SNET Appendix, Bach. Dep. 6/01/04 at 68:23-70:3; Appendix, Bach. Dep. 12/13/04 at 127:4-11; Appendix, Bach. Dep. 2/15/05 at 62:4-63:17; Mem. at 30. Such a minor event cannot constitute an adverse employment action under Title VII. As to the reduction in plaintiff's compensation rating, plaintiff testified that the difference in pay amounted to $17.00 per month. Bach. Dep. 12/13/04 at 136, 137:2-137:10 (attached). She claims it was changed in May 2001, and she left West's group in early June, 2001. Bach. Dep. 12/31/04 at 135:11-136:13 (attached). Thus, the change amounted to on or two months of $17.00, or a total of $17.00 or $34.00 at most. Bach. Dep. 12/13/04 at 136:21-137:1 (attached). This also cannot constitute an adverse employment action.

Moreover, SNET has offered West's legitimate reasons for these decisions to which plaintiff has supplied no rebuttal of any kind. See Mem. at 10-11, 30-31.

In her retaliation claim, plaintiff now attempts to add a third allegation of retaliatory conduct that is not alleged in the Complaint: that West "allowed the West Group" to treat plaintiff with hostility. But plaintiff cannot use this new conclusory and wholly unsupported allegation to support a prima facie case of retaliation, because plaintiff presents absolutely no evidence or details that West did in fact "allow" the West Group to treat her with hostility, nor

34

any evidence to link any such "allowing" to plaintiff's protected activities. Plaintiff does not say what the "hostility" from the West Group consisted of.

If the alleged hostility consisted of the same acts that plaintiff alleges constituted a hostile work environment, it is not here cognizable, because, as noted in SNET's Memorandum at 44, virtually all of these incidents pre-dated any complaint of discrimination by plaintiff, and none of the incidents constitute adverse employment actions under the law of this Circuit. Moreover, plaintiff did not complain to SNET about any hostility that occurred after her first CHRO complaint at least until _after_ she had left West's group (when she made her second CHRO complaint on June 12, 2001). It is undisputed in this case that she did not complain about anything between July 24, 2000 (the date of her first CHRO Complaint) and the time she left West's group. Appendix, Bach. Dep. 7/24/03 at 105. SNET cannot be liable for "hostility" as retaliatory harassment unless it knew about the harassment but failed to stop it. Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999). Plaintiff presents absolutely no evidence that SNET knew about any retaliatory activity—hostility or otherwise—and failed to stop it.

## IV.  PLAINTIFF HAS FAILED TO PRESENT CONCRETE EVIDENCE TO MAKE OUT A PRIMA FACIE CASE UNDER THE EQUAL PAY ACT.

In its Memorandum, SNET pointed to the absence of any evidence in the record that SNET had paid plaintiff less than any similarly situated male employee -- in short, any evidence that would establish plaintiff's prima facie case of a violation of the Equal Pay Act. See Mem. at 41-43. In response, plaintiff has failed to identify a single piece of such evidence. Instead, she has relied on a straightforwardly mistaken argument that the burden of proof on this question rests with SNET.

35

Plaintiff's Opposition on this issue relies entirely on unclear critiques of the evidence that SNET has presented to show that plaintiff was not paid less than male comparators. Pl. Opp. at 32-33. Plaintiff does not present evidence -- or even argument -- that any male technician was paid more than she was for equal work. This is the crux of an Equal Pay Act claim. Rather than offering any evidence at all that plaintiff *was* paid less, plaintiff simply states: "And it is the Defendant which carries the burden of proof on this issue." Pl. Opp. at 33. Plaintiff does not, and cannot, offer any legal support for the idea that SNET carries the burden of proof on the question of whether plaintiff has established a prima facie case under the Equal Pay Act. The Second Circuit has laid out the burdens of proof in an Equal Pay Act claim with clarity and consistency:

> In order to prove a violation of the EPA, a plaintiff must first establish a prima facie case of wage discrimination by demonstrating that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort and responsibility; (3) the jobs are performed under similar working conditions . . . Once the plaintiff makes out a prima facie case, the burden shifts to the employer to justify the wage differential . . . .

Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 524 (2d Cir. 1992) (emphasis added). The court reiterated this burden structure seven years later:

> To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of discrimination by showing: "i) the employer pays different wages to employees of the opposite sex" . . . Once a plaintiff makes out a *prima facie* case under the EPA, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act . . . .

Belfi v. Prendergast, 191 F.3d 129, 135-36 (2d Cir. 1999) (emphasis added). This is consistent with the typical burden structure in employment discrimination cases, in which the plaintiff carries a "burden . . . to survive a summary judgment motion at the *prima facie* stage." Belfi at 139.

36

Although the Equal Pay Act section of Plaintiff's Opposition does not present evidence on this issue, the brief's statement of facts refers to the reduction in plaintiff's compensation (i.e., bonus) rating after she returned from her year-long medical leave of absence. Pl. Opp. at 22. The Opposition presents absolutely no evidence that plaintiff's compensation rating was lower than that of comparable male employees or that plaintiff was treated differently from male employees in this regard. SNET has presented its legitimate business reason why plaintiff was rated as "meets expectations" for the one-year period when she did not work. See Mem. at 10-11 and evidence cited therein. Plaintiff has not produced anything to call those reasons into question. Instead she argues solely that, "This was done notwithstanding the advice of Defendant's plans and policies, including Defendant's Disability Plan, 'No one, including your employer, . . . . may terminate you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.' Pl. Opp. At 22. However, this language does not at all state that compensation ratings are frozen and cannot be changed during a leave of absence. Moreover, ERISA has nothing to do with this case.

Moreover, plaintiff has admitted at her deposition that her sole basis for believing her compensation (i.e., bonus) rating in effect for the one-month period she worked in Business Communications Systems after her leave of absence, is that someone once told her co-worker Nick Faiella had had a leave of absence sometime before she joined the group and his compensation (bonus) rating did not change when he returned. Bach. Dep. 12/13/04 at 71-72 (attached). Plaintiff has no personal knowledge of the situation, does not know how long Mr. Faiella was out of work, does not know who his supervisor was, does not know what his rating was before or after the leave, and does not know when the leave occurred. Bach. Dep. 12/13/04

37

at 72-73 (attached).  She has no documents or other evidence to support her speculation that

SNET had a practice not to change compensation ratings during review periods which occurred

while an employee was out on a leave of absence. Bach. Dep. 12/13/04 at 69:20-70:9 (attached).

In fact, at one point in her deposition, plaintiff asserted that she believed Mr. West had changed

her rating because she had been out sick. Bach. Dep. 12/13/04 at 68:15-17 (attached).  For all of

these reasons, this allegation does not suffice to make out a prima facie case on plaintiff's Equal

Pay Act claim.

Plaintiff's Opposition is consistent with her deposition testimony, where plaintiff

essentially acknowledged that she has no evidence to support an Equal Pay Act Claim.  She

testified as follows:

> Q.    So, again, what is the basis for your claim that your pay was different and that you
>        received unequal pay?  Because you're a woman?
> A.    I believe that.
> Q.    What is the basis for that claim?  What facts do you have to support that claim?
> A.    I'm a woman.
> Q.    Any other facts?
> A.    No.  And -- well, when I returned, Kevin changed my rating.
> Q.    Okay.  But I'm not asking about changing your rating.  I'm asking what facts you
>        have to support a claim that you were paid differently from men?
> MR. GILLESPIE:  Objection.  Asked and answered.  She just answered.
> MS. ALEXANDER:  You can answer it.
> THE WITNESS:  I've answered it.
> MS. ALEXANDER:  Answer it again.
> A.    Because I'm a woman.
> BY MS. ALEXANDER:
> Q.    Anything else?
> A.    No.

Bach. Dep. 6/1/04 at 32-33 (attached).

In her Opposition, like her deposition, plaintiff has been unable to points to any evidence

of any kind that SNET ever paid men different wages than it paid plaintiff for the same work.

Plaintiff cannot meet this burden simply by asserting that it is "difficult, if not impossible" for plaintiff to analyze the evidence presented by SNET to show the absence of a wage disparity. The evidence SNET presented in its Memorandum, showing that plaintiff was not paid less than male employees in her position, is the only evidence before the Court. Because plaintiff has not created a material issue of fact as to whether she has made out a prima facie case under the Act, summary judgment on Count Five of plaintiff's Complaint is appropriate.

## V.    CONCLUSION

"[I]n order to defeat a defendant employer's motion for summary judgment, a plaintiff employee must offer `concrete evidence from which a reasonable juror could return a verdict in his favor' and may not demand a trial simply because the central issue is the defendant employer's state of mind." Peters v. City of Stamford, No. 3:99-CV-764(CFD), 2003 WL 1343265 (D. Conn. Mar. 17, 2003) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)) (internal quotations omitted) (copy attached). Plaintiff has failed to meet this burden on each count of her Complaint; for the aforementioned reasons as well as those set forth in SNET's Memorandum, summary judgment should enter in favor of SNET on all counts of the Complaint.

Dated at New Haven, Connecticut this 28th day of June, 2005.

THE DEFENDANT,
THE SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By _Lori B. Alexander_

Lori B. Alexander
Federal Bar No. CT08970
Michael G. Caldwell
Federal Bar No. CT26561
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut  06509
Tel. (203) 784-8200
Fax No. (203) 789-2133
E-Mail: alexander@tylercooper.com
E-Mail: mcaldwell@tylercooper.com

40

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 28th day of June, 2005 as follows:

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880

Lori B. Alexander
Federal Bar No.: CT08970