# Exhibit 1

PLAINTIFFS EXHIBIT KW 19

The SNET PTS Group

As of May, 2000

```
                    Kevin West ─────────── Carol Stanevich
                   Group Manager              Admin. Asst
                   ╱         ╲
                  ╱           ╲
         Richard Light      Robert Vallario
      Engineering Manager   Operations Manager
```

Frank Andrews

Kim Bachiocchi

~~Yvon~~ Ivan Boulet*                    Nick Faiella

Keith Casey                              Wayne Handfield

Walter Czapor*                           Carl Lorentzen*

John Dunn*                               Ken Violette

Ron Dursa                                Bill Volkert

Richard Green

Chris Manouse

Ron Lathrope*                            Olivier Laracb *
                                         Eric Huskall *
                                         Don Holworth ?*

* Temporary

**Bachiocchi Deposition**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -x

KIMBERLY BACHIOCCHI                           :

                                              :

                                              :  **ORIGINAL**

                                              :

VS                                            : 02 CV

                                              : 908 (CFD)

                                              :

SOUTHERN NEW ENGLAND TELEPHONE                :

COMPANY                                       :

- - - - - - - - - - - - - - - - - - -x


Continued deposition of KIMBERLY BACHIOCCHI taken pursuant to the Federal Rules of Civil Procedure, before Jacinda A. Grigaitis, Licensed Shorthand Reporter #00381 and Notary Public within and for the State of Connecticut, held at the Law Offices of Tyler, Cooper & Alcorn, New Haven, Connecticut, on July 24, 2003, at 12:08 p.m.


DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE                         100 PEARL STREET
MADISON, CT 06443                       HARTFORD, CT 06106
203 245-9583                            800 839-6867

A P P E A R A N C E S:

<u>ON BEHALF OF THE PLAINTIFF:</u>

PETER E. GILLESPIE, ESQ.
46 Riverside Avenue
Westport, CT 06880


<u>ON BEHALF OF THE DEFENDANT:</u>

LORI B. ALEXANDER, ESQ.
DEBBIE D. CANNAVINO, ESQ.*
Tyler, Cooper and Alcorn
265 Church Street
P.O. Box 1936
New Haven, CT 06509-1910

DAVID J. VEGLIANTE, ESQ.
SBC Southern New England Telecommuncations
310 Orange Street
New Haven, CT 06510


<u>ALSO PRESENT:</u>

Kevin West

*Present as noted in the transcript.

1  paragraph.
2      "Ms. Bachiocchi reported that there were often
3  inappropriate sexual jokes stated in her presence."
4      Did you tell Mr. Zacharia that?
5  A. Yes.
6  Q. What jokes were stated in your presence?
7  A. I don't recall the joke content.
8  Q. Can you recall a single joke that was stated in
9  your presence?
10 A. No.  I'm not a joke-rememberer.  I remember
11 some being offensive.
12 Q. How many jokes were stated in your presence
13 that were sexual offensive?
14 A. Several.
15 Q. What does several mean?  Three?
16 A. A week.
17 Q. Three a week?
18 A. About.
19 Q. And who stated these inappropriate sexual
20 jokes?
21 A. John Dunn.
22 Q. He's a coworker.
23 A. He's a job banker, a coworker, yes.
24 Q. Anybody else?
25 A. Not that I recall.

```
 1    A.   I don't recall.
 2    Q.   There were other people though; you weren't the
 3  only one sitting there.  Right?
 4    A.   I don't recall.
 5    Q.   So do you know whether Carl Loretzen was
 6  invited?
 7    A.   Yes, I think Carl was invited.
 8    Q.   Did you hear him get invited?
 9    A.   No.
10    Q.   So you don't know, do you, whether he was
11  invited?
12    A.   I do know.
13    Q.   How do you know?
14    A.   There's a photo.
15    Q.   Okay.  How about Ron Dursza?
16    A.   Yes.
17    Q.   Okay.  How about Chris Manouse?
18    A.   I'm assuming he was invited.  I was not
19  invited.
20    Q.   How about Carol Stanevich?
21    A.   Carol was invited.
22    Q.   Did she go?
23    A.   I don't recall.
24    Q.   How do you know she was invited?
25    A.   She told me in the past she had gone and
```

1  went on any of them?
2      A.  I don't know if he did when I was out.
3      Q.  And you don't know if Carol Stanevich went?
4      A.  I know Carol -- I don't know if Carol Stanevich
5  went on any.
6      Q.  And are you claiming that you were excluded
7  because you're a woman?
8      A.  I don't know the reason I was excluded.  I
9  would assume because I was a woman.
10     Q.  Even though Carol Stanevich went on the trips?
11     A.  I don't know that Carol Stanevich went on the
12 trips.
13     Q.  I thought you told me a minute ago that she
14 told you she had gone on some of these fishing trips?
15     A.  No.  I said we discussed whether or not she was
16 going, not that she had gone.
17     Q.  Okay.  In the next paragraph -- why don't you
18 take a minute to read the next paragraph.  Okay.  Have
19 you had a chance to read the second paragraph?
20     A.  Yes, I have.
21     Q.  Did you speak tearfully when you were meeting
22 with Dr. Zacharia in May 22 of 2000?
23     A.  Yes.
24     Q.  Did you tell him that during the two years you
25 would fight for your rights as a female coworker?

1    A.  Because Carl told me that he was -- to do this,
2  that he was given orders from the management personnel
3  at 90 Elizabeth Street.
4    Q.  Okay.  Now, wait a minute.  You're talking
5  about your conversation at the Wendy's.  Right?
6    A.  Uh-huh.
7    Q.  And at that time, he told you, did he not, that
8  he was -- well, at least your complaint says that he
9  said he was asked to write down problems with your
10  work?
11    A.  Correct.
12    Q.  He never told you that he was asked to lie
13  about problems with your work or find problems that
14  didn't exist.  Right?
15    A.  There were no problems with my work.
16    Q.  Could you repeat, readback --
17    A.  No.  Correct.
18    Q.  So the second verbal confrontation that you're
19  describing was with the same customer when
20  Carl Loretzen, in the office, away from the customer
21  disagreed with the way you were approaching the work?
22    A.  He dis -- yes.
23    Q.  What was the disagreement about precisely?  He
24  thought you needed more wiring and you thought you
25  needed less or something like that?

1   A.  No.

2   Q.  And you're not making a claim like that in this
3   case?

4   A.  Not against Carol, no.

5   Q.  You're not claiming that she harassed you in
6   any way right?

7   A.  No.  She was unfriendly.

8   Q.  How about Kevin West, how was your relationship
9   with Kevin West?

10  A.  I didn't have to deal with Kevin too often?

11  Q.  I'm not sure that that answers my question.
12  How was your relationship with Kevin West?

13              MR. GILLESPIE:  Objection.  At what point
14      in time?

15  BY MS. ALEXANDER:

16  Q.  During the time you worked with Kevin West, how
17  was your relationship with him?

18  A.  It was fine.

19  Q.  And do you claim that Kevin West discriminated
20  against you because you're a woman?

21  A.  Yes.

22  Q.  And do you claim that he harassed you because
23  you're a woman?

24  A.  Kevin did not, no.

25  Q.  What did he do to discriminate against you?

C E R T I F I C A T E

    I, Jacinda A. Grigaitis, LSR, hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

    I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing pages are a true and accurate copy of the original transcript of the testimony.

    I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

    Witness my hand and seal as Notary Public this 29th of July, 2003.

_Jacinda Grigaitis_
Jacinda A. Grigaitis, LSR
Licensed Shorthand Reporter #00381

```
            IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF CONNECTICUT
       - - - - - - - - - - - - - - - - - - - -x
KIMBERLY BACHIOCCHI                           :

                                              :

                                              :

                                              :

VS                                            : 02-CV

                                              : 008(CFD)

                                              :


THE SOUTHERN NEW ENGLAND                      :

TELEPHONE COMPANY                             :
       - - - - - - - - - - - - - - - - - - - -x
```

Continued deposition of KIMBERLY BACHIOCCHI taken pursuant the Federal Rules of Civil Procedure, before Jacinda A. Grigaitis, Licensed Shorthand Reporter #00381 and Notary Public within and for the State of Connecticut, held at the offices of Tyler, Cooper & Alcorn, 205 Church Street, New Haven, Connecticut, on June 1, 2004, at 9:29 a.m.

```
              DEL VECCHIO REPORTING SERVICES, LLC
                PROFESSIONAL SHORTHAND REPORTERS
                       117 RANDI DRIVE
                     MADISON, CT 06443
                       203 245-9583
HARTFORD                                            STAMFORD
```

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

PETER E. GILLESPIE, ESQ.
46 Riverside Avenue
Westport, CT 06880


ON BEHALF OF THE DEFENDANT:

LORI B. ALEXANDER, ESQ.
DEBORAH D. CANNAVINO, ESQ.
Tyler, Cooper & Alcorn
205 Church Street
P.O. Box 1936
New Haven, CT 06509-1910

DAVID VEGLIANTE, ESQ.
SNET Legal Department
310 Orange Street
8th Floor
New Haven, CT 06510

```
 1     Q.   But give me a time, a date, a time period.
 2     A.   Every day, every day, anytime, anytime he
 3  walked by me if I said hello, good morning, Ron Dursza
 4  would just walk and grunt.
 5     Q.   Did he do that to Carol Stanevich?
 6     A.   No.  He'd stop and talk to Carol Stanevich.
 7     Q.   So he treated you differently from Carol
 8  Stanevich?
 9     A.   Yes.
10     Q.   And what is your basis for believing he treated
11  you differently because you're a woman?
12     A.   I have no idea.  Maybe because I was, quote,
13  comparable to what he was.
14     Q.   What do you mean by that?
15     A.   Same, similar titles Ron Dursza was bargaining
16  union at the time.  Carol is an office assistant.
17  There's no threat there.
18     Q.   So you thought that it was the threat that you
19  posed to him that --
20     A.   I didn't impose a threat but sometimes men
21  are --
22     Q.   Could you let me finish my question?
23  Sometimes men are what?
24     A.   Finish your question.
25     Q.   Was it the fact that you posed a threat to him
```

```
 1      A.   No.
 2      Q.   That's not your claim?
 3      A.   I'm not here to rate other people and what they
 4 deserve.
 5      Q.   I just want to be sure the record is clear.  I
 6 didn't understand your answer.  That's not your claim?
 7      A.   That he didn't deserve?
 8      Q.   Right.
 9      A.   No.
10      Q.   What was Rich Greene's salary when you worked
11 in Kevin West's group?
12      A.   I don't know.
13      Q.   What was his award when he worked in your
14 group?
15      A.   I don't really know.
16      Q.   So, again, what is the basis for your claim
17 that your pay was different and that you received
18 unequal pay?  Because you're a woman?
19      A.   I believe that.
20      Q.   What is the basis for that claim?  What facts
21 do you have to support that claim?
22      A.   I'm a woman.
23      Q.   Any other facts?
24      A.   No.  And -- well, when I returned, Kevin
25 changed my rating.
```

1  Q. Okay. But I'm not asking about changing your
2  rating. I'm asking what facts you have to support a
3  claim that you were paid differently from men?
4         MR. GILLESPIE: Objection. Asked and
5  answered. She just answered.
6         MS. ALEXANDER: You can answer it.
7         THE WITNESS: I've answered it.
8         MS. ALEXANDER: Answer it again.
9  A. Because I'm a woman.
10 BY MS. ALEXANDER:
11 Q. Anything else?
12 A. No.
13 Q. Okay. The third point you made was that
14 directions to your house were printed out. Right?
15 A. That is correct.
16 Q. And we talked about this last time. This was
17 when Richard Light printed out directions to your
18 house and left them on the computer at work. Right?
19 A. Left them on a printer at work.
20 Q. Printer at work. Right?
21 A. Yes.
22 Q. And when did that occur?
23 A. December, I think it was December 16.
24 Q. Of what year?
25 A. 1999.

1  Q. And he told you, did he not, that he did that? You asked who did it and he said that he did?

3  A. He denied it first. I asked three times who did it.

5  Q. Well, when you say "He denied it first," did he say I didn't do it?

7  A. There was no acknowledgment as I walked past him asking the question.

9  Q. So that's different than a denial?

10 A. Everybody else responded, Not me.

11 Q. That's a little different than denying it, isn't it?

13         MR. GILLESPIE: I'm sorry. Is that a
14         question?
15         THE WITNESS: Are you asking me a
16         question?
17         MS. ALEXANDER: No, I'm not.

18 BY MS. ALEXANDER:

19 Q. After you -- after he acknowledged that he had printed out the directions to your house, did he tell you why?

22 A. No -- yes. I'm sorry. He did tell me why.

23 Q. And what did he tell you?

24 A. That he heard I had a nice house and he wanted to take a ride by.

```
 1      Q.   And were you afraid he was checking up on you
 2   to see if you were at home during work hours?
 3      A.   I was curious as to why he would want that and
 4   that thought did cross my mind, yes.
 5      Q.   Were you concerned that he was going to stalk
 6   you at home?
 7      A.   Sure.
 8      Q.   You were afraid of that?
 9      A.   I didn't know what Richard Light was up to.
10      Q.   Did Richard Light ever make -- proposition you
11   or make a sexual advance toward you?
12      A.   No.
13      Q.   Was he married?
14      A.   From what I understand, yes.
15      Q.   So your sworn testimony is that you were afraid
16   he was going to stalk you and he was checking up to
17   see if you were home during work hours?
18      A.   Yes.
19      Q.   And when you say he printed out directions to
20   your home, was that from Mapquest?
21      A.   I -- yes, it was.
22      Q.   What is Mapquest?
23      A.   Mapquest is a tool that's used for directions.
24      Q.   And anyone can access Mapquest.  Right?
25      A.   Yes.
```