1    Q.   It's public information.  Right?

2    A.   Yes.

3    Q.   So you're not saying he went into your

4    personnel file and found out secret information about

5    you.  Right?

6    A.   I don't know how he found out.

7    Q.   Well, he went on Mapquest.  Right?  You saw the

8    document?

9    A.   He needed to obtain my address, though.

10   Q.   Right.  Right.  But do you keep your address a

11   secret?

12   A.   I don't publicize it in the office.

13   Q.   How many people from that group have gone to

14   your house?

15   A.   Four.

16   Q.   And who are they?

17   A.   Bob Vallario, Yvan Boulet, John Dunn, and Carol

18   Stanevich.  I'm sorry.  And Chris Manouse and Ron

19   Dursza.

20   Q.   So six people out of that group --

21   A.   Uh-huh.

22   Q.   -- had gone to your house?

23   A.   Uh-huh.

24   Q.   And why do you think he -- well, do you claim

25   that he printed out the directions to your house

1  because you're a woman?

2      A.  I don't know why Richard Light printed out the

3  directions to my home.

4      Q.  Do you have any basis for believing that he did

5  that because of your gender?

6      A.  Well, I was informed that Richard Light had had

7  some sort of an affair with another woman in that

8  office at one point or something and he was taking

9  Prozac and he was medicated for certain things.  So I

10  did have a concern, yes.

11      Q.  Is -- but you never had an affair with him, did

12  you?

13      A.  No, I did not.

14      Q.  So is that your sole basis for believing that

15  he printed out your -- the directions to your house

16  because you're a woman, that he had an affair with

17  some other woman?

18      A.  I don't know what Richard Light's reasons were

19  for printing out my directions.

20      Q.  Okay.  Have you ever taken Prozac?

21      A.  Yes.  As a matter of fact, when I was thinking

22  of Richard Light -- I have not taken Prozac, but

23  Prozac was prescribed.  That was the medication that

24  Dr. Lyall prescribed to me.

25      Q.  In 1997?

1     A.  Uh-huh.  Yes, it is.

2     Q.  Okay.  The next point you made was you were

3     told you could not make phone calls pertaining to

4     payroll, et cetera, outside the department.  Right?

5     A.  That is correct.

6     Q.  And we talked about that last time.  Right?  If

7     you recall.

8     A.  I recall.

9     Q.  When did that -- when were you told -- that was

10    when you had called human resources.  Right?

11    A.  No.

12    Q.  About the temperature?  That was when you

13    called payroll about a question?

14    A.  Yes.

15    Q.  And that was in June -- on June 10 of 1999?

16    A.  I don't recall the exact date.  I think it was

17    June time frame.

18    Q.  June of 1999?

19    A.  I think it may have been.

20    Q.  And is it your claim in this case that you were

21    told you could not make phone calls pertaining to

22    payroll, etc., outside of the department because

23    you're a woman?

24    A.  Yes.

25    Q.  Or some other reason?

1     A.   Yes.

2     Q.   And what is your basis for that belief?

3     A.   Because Kevin told me he would handle it.

4     Q.   Anything else?

5     A.   Well, if you refer to the HR incident, a

6   gentleman in the office had also call and complained,

7   and I was the only one reprimanded for that.

8     Q.   And the gentleman -- now, what you you're

9   talking about is when you called to complain that the

10  office was cold?

11    A.   Uh-huh.

12    Q.   And that was in October of 1999?

13    A.   Uh-huh.  Yes, it was.

14    Q.   You have to say yes or no.

15    A.   Yes.  I know.  I'm sorry.

16    Q.   And the gentleman who called was Nick Faiella?

17    A.   There was several folks that had called.

18    Q.   And when you say you were spoken to, Kevin West

19  and Richard Light talked to you about that?

20    A.   They took me down to the confessional and spoke

21  to me.

22    Q.   The conference room?

23    A.   The confessional is what it was referred to.

24    Q.   Was it a conference room?

25    A.   It was a room.

1      A.   Yes.

2      Q.   And what if -- what factual basis do you have

3   for claiming that the incident with the piece of paper

4   in June of 2001 occurred because you're a woman?

5      A.   I never saw Kevin argue with another man.

6      Q.   Okay.  You said empty office, one day back.  Is

7   that in January of 2001 when you came back to the

8   office for one day?

9      A.   That's correct.

10     Q.   Do you recall the exact date?

11     A.   January 18.

12     Q.   And what do you claim -- and you claim it was

13  discriminatory because only Kevin West and two job

14  bankers were in the office on that day?

15     A.   Yes.

16     Q.   And what is your basis, if any, for claiming

17  that that occurred because you were a woman?

18     A.   When Nick returned from his leave of absence,

19  he was returned to a full office.

20     Q.   Anything else?

21     A.   When anybody was out sick, they've always

22  returned to a full office.

23     Q.   Who was out sick besides Nick Faiella that

24  you're aware of who was on a leave of absence while

25  you were there?

1    A.    I think Richard Light was out for a time.

2    Q.    Was Richard Light on a leave of absence at any

3    time that you worked in Kevin West's group?

4    A.    I don't recall.  I think he was out for some

5    time.  I don't remember if it was a leave of absence

6    or whatever, but I know definitely Nick.

7    Q.    Okay.  Is he the only one that you sitting here

8    today can recall?

9    A.    He's the only one I'm 100 percent sure of.

10    Q.    And when Nick returned -- Nick Faiella you're

11    talking about.  Right?

12    A.    Yes, that is correct.

13    Q.    He had a leave of absence.  Right?

14    A.    Yes.

15    Q.    And he returned to work when?

16    A.    I'm not sure when Nick returned to work.

17    Q.    Do you recall approximately when it was?

18    A.    No, I don't.

19    Q.    It was before you went out on your leave of

20    absence.  Right?

21    A.    Oh, yes.

22    Q.    When he returned to work, was he coming back to

23    work for one day only like you were?

24    A.    I don't know what Nick's doctor arrangements

25    had been.

1    Q.  So as far as you know, when Nick Faiella

2    returned to work, he was returning to work for

3    consecutive days.  Isn't that right?

4    A.  I don't know what his doctor arrangements were.

5    Q.  So you don't know whether he returned for just

6    one day like you did?

7    A.  I don't know what his doctor arrangements were.

8           THE WITNESS:  May I use the restroom?

9           MS. ALEXANDER:  Yes.

10   (There was a recess taken from 11:05 to 11:24 a.m.)

11   BY MS. ALEXANDER:

12   Q.  Okay.  Back on the record.  Ms. Bachiocchi, who

13   is Edward Kurtz?

14   A.  Edward Kurtz?

15   Q.  Yes.

16   A.  Oh, he's a cousin.

17   Q.  And can you tell me about how that relationship

18   goes?  Is he your father's brother's son?

19   A.  Yes.

20   Q.  That's not the same person as Ned Kurtz.

21   Right?

22   A.  That's correct.

23   Q.  All right.  Would you look at that log which

24   we've marked as --

25   A.  Exhibit 2.

C E R T I F I C A T E

1

2

3    I, Jacinda A. Grigaitis, LSR, hereby certify that I

4    am a Notary Public, in and for the State of

5    Connecticut, duly commissioned and qualified to

6    administer oaths.

7    I further certify that the deponent named in the

8    foregoing deposition was by me duly sworn, and

9    thereupon testified as appears in the foregoing

10    deposition; that said deposition was taken by me

11    stenographically in the presence of counsel and

12    reduced to typewriting under my direction, and the

13    foregoing pages are a true and accurate copy of the

14    original transcript of the testimony.

15    I further certify that I am neither of counsel nor

16    attorney to either of the parties to said suit, nor am

17    I an employee of either party to said suit, nor of

18    either counsel in said suit, nor am I interested in

19    the outcome of said cause.

20    Witness my hand and seal as Notary Public this 4th

21    of June_____, 2004.

22

23

24    _Jacinda Grigaitis_
      Jacinda A. Grigaitis, LSR

25    Licensed Shorthand Reporter #00381

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF CONNECTICUT

3

4       --------------------------------------X

5       KIMBERLY BACHIOCCHI

6

7       VS                                    CA NO. 02-CV908(CFD)

8

9       THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY

10      --------------------------------------X

11

12

13                    Continued Deposition of Kimberly Bachiocchi

14      taken in accordance with the Federal Rules of Civil

15      Procedure at the Law Offices of Tyler Cooper Alcorn,

16      205 Church Street, New Haven, Connecticut, Before

17      Holly  Murphy, a Licensed Shorthand Reporter and

18      Notary Public, in and for the State of Connecticut at

19      10:00 AM on December 13, 2004.

20

21

22                    Holly Murphy, License No. 177
                       DEL VECCHIO REPORTING SERVICES
23                  PROFESSIONAL SHORTHAND REPORTERS
                    117 RANDI DRIVE, MADISON, CT  06443
24                     203 245-9583   800 839-6867
                          FAX 203 245-2760
25      HARTFORD              NEW HAVEN              STAMFORD

                         DEL VECCHIO REPORTING
                    PROFESSIONAL SHORTHAND REPORTERS

```
 1    A P P E A R A N C E S:
      ON BEHALF OF THE PLAINTIFF:
 2    PETER GILLESPIE, ESQ.
      46 RIVERSIDE AVENUE
 3    WESTPORT, CT   06880

 4    ON BEHALF OF THE DEFENDANT:
      LORI ALEXANDER, ESQ.
 5    TYLER COOPER ALCORN
      205 CHURCH STREET
 6    NEW HAVEN, CT   06509

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    work.

2         Q.    Did you do any mental work for SNET during

3    that period?

4         A.    No.

5         Q.    So you didn't do any work for that period

6    for SNET; isn't that correct?

7         A.    Yes.  It is correct.

8         Q.    During the period of June of 2000 through

9    December of 2000, you didn't do any work that exceeded

10   expectations; did you?

11        A.    No.

12        Q.    During the period of June of 2000 to

13   December of 2000 you didn't go into the office; did

14   you?

15        A.    I wasn't permitted, but no.

16        Q.    You referred before to the guideline that

17   said that your compensation rating is not to be

18   changed if you're out on a medical leave.

19             Such a document has not been provided to us

20   in this case.  Have you ever seen such a document?

21        A.    Kevin gave it to me.

22        Q.    Do you have such a document?

23        A.    I don't believe I have it.

24        Q.    So you're testifying from a document that

25   you don't have and you cannot provide to me?

1          A.      You have everything I have.

2          Q.      My question is, are you testifying about a

3    document that you don't have and cannot provide to me?

4          A.      Yes.

5          Q.      What was the title of the document?

6          A.      Compensation something or other.  I think

7    it was compensation guidelines.  I'm not sure.  I

8    don't recall the exact title.

9          Q.      Have you seen the compensation guidelines

10   that were provided to you in this case?

11         A.      I'm not understanding the question.  In

12   this case?  Meaning the case?

13         Q.      Yes.  We have provided the compensation

14   guidelines to your counsel in this case.

15                 Have you seen those?

16         A.      I believe I reviewed portions, but I don't

17   recall seeing -- plus those are under SBC guidelines,

18   not SNET guidelines. So it wouldn't be the same

19   guidelines.

20         Q.      Is there any document that you can provide

21   to me that says that SBC or SNET had a policy not to

22   change compensation ratings if you're out on medical

23   leave?

24         A.      I don't believe I still have that document.

25         Q.      Do you have any evidence or any testimony

1    to support such a claim?

2        A.    Maybe SNET has archives.

3            MS. ALEXANDER:  Read back the question.

4            (Whereupon the court reporter read back the

5    previous question.)

6    BY MS. ALEXANDER:

7        Q.    Its' a very simple question.  Do you have

8    any evidence or testimony to support such a claim?

9        A.    I don't have any.

10        Q.    Why do you believe that Kevin West changed

11    your compensation rating when you came back from your

12    leave of absence?

13        A.    Kevin West told me he changed my

14    compensation rating because I was sick.

15        Q.    So do you believe he was treating you badly

16    because you had been ill?

17        A.    Yes.

18        Q.    Is there any other reason that you believe

19    he changed your compensation rating?

20        A.    Because I'm a woman.

21        Q.    Pardon me?

22        A.    Because I was a woman.

23        Q.    Any other reason?

24        A.    No.

25        Q.    Do you have any evidence that Mr. West

1    changed your compensation rating because you're a

2    woman?

3         A.    From what I have been told he did not

4    change the compensation rating on men who had been out

5    sick for a length of time.

6         Q.    Do you know any men other than Nick Faella

7    who had been out sick for a length of time?

8         A.    No.

9         Q.    First, when did he go out sick?

10        A.    When?

11        Q.    Yes.

12        A.    I don't know.

13        Q.    When did he come back?

14        A.    I don't know.

15        Q.    How many months was he out?

16        A.    Nick was out for a very long extended

17   period of time.  I don't know the number of those

18   months but I know it was a long time.

19        Q.    My question is, how many months was he out?

20        A.    I don't know.

21        Q.    What was his compensation rating before he

22   left?

23        A.    I don't know.

24        Q.    What was his compensation rating when he

25   came back?

1       A.      I don't know.

2       Q.      So you really don't know any of the details

3   concerning Mr. Faella's leave and his compensation; do

4   you?

5       A.      I did say to you I was told that Nick was

6   not effected.   Not only was I told by Mr. Faella, I

7   was also told that by Robert Vallario.

8       Q.      Mr. Faella wasn't out for an entire year,

9   was he?

10      A.      I do not know how long Mr. Faella was out.

11      Q.      Do you know any other men who had been out

12  for a long period of time?

13      A.      I don't know.

14      Q.      How about women?

15      A.      No.

16      Q.      Did Mr. Faella ever come back to work?

17      A.      During what period of time?

18      Q.      After his leave of absence.

19      A.      Which leave of absence?

20      Q.      Did he have more than one?

21      A.      I believe Nick was sick continually for

22  quite some time.

23      Q.      Did he take more than one leave of absence?

24      A.      I don't know.

25      Q.      What leave of absence are you talking about

1    when you say that you understand that his compensation

2    was not changed?

3        A.    One prior to me coming to that group.  I

4    think in 1996, 1997.  I'm not sure.

5        Q.    Any others?

6        A.    Nick was in and out all the time.  I don't

7    know.

8        Q.    So as you sit here today, are you able to

9    identify any male employee who was out of work on a

10   leave of absence for an entire year?

11       A.    I believe Mr. Faella was out if not a full

12   year, very darn close to it.

13       Q.    That was during what period of time?

14       A.    I believe it was '96, '97.  It may even

15   have been 1995.  I don't recall his exact dates.

16       Q.    Who was his supervisor?

17       A.    I don't recall.

18       Q.    Do you have any personal knowledge that his

19   compensation was the same when he came back as when he

20   left?

21       A.    Only what I have been told by Robert

22   Vallario.

23       Q.    Do you have any personal knowledge of that?

24             MR. GILLESPIE:  Asked and answered.  Go

25   ahead.  Answer it again.

1    job.   The customer was requesting some changes in

2    pricing being turned around in a very short time

3    frame.

4         Q.    With respect to Pfizer, what did you want

5    to do to work overtime on any particular day?   The

6    paper work?

7         A.    The portion of the job I was assigned to,

8    yes.  The paper work.

9         Q.    I think you already testified that you're

10   not able to be more specific than that.  You recall it

11   was paper work?

12        A.    The job scope.  Type in the words.

13        Q.    Did anything bad happen as a result of your

14   not working that extra hour that day?

15        A.    I don't believe anything bad happened.

16        Q.    With respect to the Board of Ed, can you

17   remember any particular piece of work that you wanted

18   to work overtime for?

19        A.    I needed to make the corrections that they

20   were requesting.  And I believe I did return to the

21   office and work and did not put in for overtime pay.

22        Q.    How much would that have been?

23        A.    I believe an hour, an hour and a half of

24   time.

25        Q.    Are you able to think of any other

1    instances in which business necessity would have

2    warranted you working overtime in May or June?

3         A.    Of 2001?

4         Q.    Yes.

5         A.    No.   Just workload.

6         Q.    I want to go back to your testimony about

7    the difference in your compensation bonus rating, what

8    you're calling compensation.   Do you remember that

9    about an hour and a half ago?

10        A.    Yes.

11        Q.    That change occurred when you came back

12   from your medical leave of absence right?

13        A.    That is correct.

14        Q.    How many times did you receive your

15   compensation bonus after you came back from work but

16   while you were still in Kevin West's group?

17        A.    I believe twice.   No more than two times,

18   no less than once.

19        Q.    It was paid monthly; right?

20        A.    Yes, it was.

21        Q.    So you would have received it in May, maybe

22   and June before you left or maybe after you left?

23        A.    I believe I received it in June and July

24   because it ran behind.

25        Q.    But it might have been one month; right?

```
 1      A.      It may have been one month.

 2      Q.      In terms of dollars, what was the

 3   difference to your monthly compensation bonus between

 4   the meets rating, individual rating and the exceeds

 5   rating?

 6      A.      I don't recall the exact dollar amount.

 7      Q.      Does it sound right that it was about $17?

 8      A.      That sounds approximately right.

 9      Q.      Per month?

10      A.      Yes.

11              MS. ALEXANDER:  Let's go off the record.

12              (Whereupon there was a lunch break in the

13   proceedings.)

14   BY MS. ALEXANDER:

15      Q.      Miss Bachiocchi, during the lunch break did

16   you take any medications?

17      A.      No.

18      Q.      Did you have any alcohol?

19      A.      No.

20      Q.      Do you feel ready to continue with your

21   deposition?

22      A.      Yes.

23      Q.      Again, the same ground rules apply.  If you

24   feel I'm talking too fast, let me know.  Did you feel

25   like I was talking too fast this morning?
```

```
1                    C E R T I F I C A T E

2

3           I hereby certify that I am a Notary Public,

4    in and for the State of Connecticut, duly commissioned

5    and qualified to administer oaths.

6           I further certify that the foregoing

7    deposition was taken by me stenographically in the

8    presence of counsel and reduced to typewriting under

9    my direction, and the foregoing is a true and accurate

10   transcript of the testimony.

11          I further certify that I am neither of

12   counsel nor attorney to either of the parties to said

13   suit, nor am I an employee of either party to said

14   suit, not of either counsel in said suit, nor am I

15   interested in the outcome of said cause.

16          Witness my hand as Notary Public this 13th

17   day of December, 2004.

18

19

20   _____

21   Holly M. Murphy

22   NOTARY PUBLIC in and for the

23   State of Connecticut.

24   00177

25
```