## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KIMBERLY BACHIOCCHI,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.:  02-CV-908 (CFD) |
| v. | : | |
| | : | |
| **THE SOUTHERN NEW ENGLAND** | : | June 16, 2008 |
| **TELEPHONE COMPANY,** | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## DEFENDANT'S REPLY TO "PLAINTIFF'S MEMORANDUM SUPPORTING HER OBJECTIONS TO DEFENDANT'S PROPOSED EXHIBITS"

### I.    INTRODUCTION

At the status conference with the Court on May 21, 2008, the Court invited additional briefing on certain legal issues related to the parties' motions in limine concerning the admissibility of exhibits at the trial of this matter.  Both parties filed supplemental memoranda of law on May 28, 2008.  The Southern New England Telephone Company, Inc. ("SNET") submits this response to briefly address several of plaintiff's arguments in her Memorandum Supporting her Objections To Defendant's Proposed Exhibits ("Pl. Memorandum") dated May 28, 2008.

### II.    ARGUMENT

#### A.    Def. Exhs. 7 and 8:  The Administrative Findings Are Not Hearsay.

There is no need for SNET to establish that Exhs. 7 and 8 fall within an exception to the hearsay rule.[1]  As explained both at oral argument and in SNET's May 28, 2008 Supplemental Filing, the administrative findings (Def.'s Exhs. 7, 8) are not being offered for the truth of the

---

[1]  As set forth in SNET's previously filed Supplemental Filing dated May 28, 2008, they do also in fact fall within the hearsay exception for public records.

matters asserted within them.  In Pl. Memorandum, plaintiff does not respond at all to the fact

that these documents are not hearsay to begin with.

Plaintiff has made it clear that she will claim to the jury that during the period of May

2000 through May 2001 and beyond, she was so emotionally distressed because of SNET's

treatment of her that she could not work or do much of anything.  Since she is still an active

employee of SNET earning a far greater salary today that she earned in the BCS group, her

primary claim of damages in this case is for emotional distress.  SNET is entitled to offer as part

of its defense to her emotional distress claim that other events which took place during the period

for which she claims emotional distress caused any distress he may have suffered.  The receipt of

the ruling by the CHRO dismissing her case upon finding that the case had no merit and

criticizing her claim in sharp terms was clearly a stressor that occurred during this same time,

and the jury should have access to the content of this critical ruling  including the strong

language used by the CHRO in dismissing the claim.  Although the decision was eventually

reconsidered, the reconsideration  occurred two years later in 2002, well after plaintiff had left

the BCS department and well after the period for which she claims emotional distress.[2]  Rather

than being asserted for the truth of the matters contained within them, the documents are being

offered by SNET to show the causes of plaintiff's emotional distress and/or depression other than

SNET during the relevant period.   Because the adverse administrative findings are being offered

to expose an alternative reason for plaintiff's alleged emotional distress during her leave of

absence,[3] they are admissible as non-hearsay documents.

---

[2]  If plaintiff believes the documents are "misleading" because the decision were later reconsidered and the jury would not know this, she is free to testify that the decisions were later reconsidered.

[3]  Since the administrative findings are offered to show plaintiff's state of mind rather than the truth of the matters asserted, plaintiff's substantive attacks on them are inapposite.  See Mem. at 3-5.  For the same reason, SNET has never "proposed [the CHRO findings] as final agency action."  See Mem. at 4.

**B.**    **Def. Exhs. 31, 32, 34, and 36:  The Personnel Notes by West, Light, and Moffett are Business Records.**

In its Supplemental Memorandum, SNET argued that the personnel notes written by West and Light documenting employee performance problems and the human resource notes by Moffett documenting her actions as human resource manager are admissible as business records under Fed. R. Evid. 803(6).  Attached hereto as Exhibits A, B, and C are affidavits of West, Light, and Moffett establishing that documents are business records of SNET. See Exhs. A, B, and C.  West's and Light's affidavits confirm that it was the normal course of SNET's business in 1999-2001 for managers to write notes relating to employee performance issues, and that it was their normal practice to write and keep notes documenting performance problems with employees.  The affidavits also establish that West and Light kept these particular notes in the normal course of their business as SNET managers, and that the words in the documents were written at or near the time of the events recorded therein.  See Exhs. A and B.  Similarly, Moffett has attested that her notes describing a meeting with Faiella and Bachiocchi were kept in the normal course of her business as a Human Resources Generalist for SNET, that it was in the normal course of SNET's business for Human Resources Generalists to document such meetings related to employee complaints, and that she wrote the notes on the date of the meeting described therein.  See Exh. C.

The law is clear that once statements are established as "business records," they are admissible unless the opposing party shows that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6).  In other words, *plaintiff* bears the burden of proving that the documents should be *excluded* from evidence. See Barry v. Trs. Of the Int'l Ass'n Full-Time Salaried Officers & Employees Of

Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan, 467 F. Supp. 2d 91, 106 (D. D.C. 2006) ("The structure of [Rule 803(6)] places the initial burden on the proponent of the document's admission to show that it meets the basic requirements of the rule, and the 'unless' clause then gives the opponent the opportunity to challenge admissibility, albeit now bearing the burden of showing a reason for exclusion."(quoting 2 McCormick On Evidence § 288)); United States v. Oates, 560 F.2d 45, 75 (2d Cir. 1977) ("The language contained within the subordinate 'unless' clause creates an exception to the general language of FRE 803(6) and, as such, is . . . subject to the rule of strict construction; that is, any doubt will be resolved in favor of the general provision and against the exception."(internal quotation marks omitted)).

Here, plaintiff has not met her burden at all of showing why this evidence should be excluded at trial. Her memorandum offers nothing more than sheer speculation to substantiate her theory that the notes were made "in anticipation of litigation."[4] Although plaintiff deposed West, she points to no testimony in his deposition suggesting that his notes were written for that purpose. SNET on the other hand has provided sworn affidavit from both West and Light confirming that their notes were not written in anticipation of litigation.

### C.    Def. Exhs. 1, 2, 3, 37, 40:  The Co-Worker Complaints Are Not Hearsay.

The co-worker complaints and affidavits are being offered to show Kevin West's state of mind, i.e., what he knew about plaintiff during the time plaintiff claims that West, as her manager, was "cold" toward her and allegedly excluded her from office matters.[5] The fact that

---

[4] In addition to not being created "in anticipation of litigation," SNET would also note that these documents are completely different from the one at issue in Palmer v. Hoffman, 318 U.S. 109 (1943) in that they were created pursuant to a company policy designed to effectuate SNET's statutory duty to investigate claims of harassment and hostile working environment. Furthermore, the employees had ample motive to be accurate since the complaints would likely trigger a full and thorough investigation by the company.

[5] To clarify, as set forth in its Supplemental Memorandum, SNET also seeks admission of the employee complaints as "business records." SNET has not claimed the affidavits are business records as suggested by the plaintiff. See Mem. at 7.

West knew several employees were so upset with plaintiff's and Nicholas Faiella's touching each other and other inappropriate conduct in the workplace that they filed written complaints is clearly relevant to West's state of mind with regard to plaintiff and how he treated her.

Contrary to plaintiff's assertion, West's knowledge of the complaints affected more than just plaintiff's performance evaluation in early 2001. See Mem. at 11-12. It triggered an investigation which both Faiella and plaintiff claimed was unfair and discriminatory. Moreover, plaintiff claims that co-workers, including Vallario, were spreading rumors that she might be having an affair with Faiella. The co-worker complaints, which Vallario was well aware of, are certainly probative of his state of mind also, and the jury should be informed of whatever information he had, whether accurate or not. It is important to show Vallario's knowledge of the situation to establish that his treatment of plaintiff, too, was a completely reasonable response and was not motivated by unlawful discrimination. In addition, both plaintiff and Faiella complain that they were not assigned jobs together after plaintiff came back from her medical leave of absence in May, 2001. The co-worker complaints, in addition to complaints by outside contractors concerning inappropriate behavior, are relevant to management's knowledge that led to decisions concerning these assignments. The jury should know that management was receiving such complaints by co-workers and that these complaints informed their decisions concerning Faiella and plaintiff going forward. The purpose is to show the state of mind of plaintiff's managers, not the truth or falsity of the statements. Because the complaints are not being offered for the truth of the matters asserted in them, they are not hearsay and are admissible.

Plaintiff contends that the employee complaints should be excluded under Fed. R. Evid. 403 without ever explaining *how* their probative value is substantially outweighed by the danger

of unfair prejudice. SNET's receipt of complaints that plaintiff and Faiella's inappropriate conduct negatively impacted the workplace environment is highly probative evidence of SNET's reasons for acting the way it did. Although it is prejudicial, it is not *unfairly* so. Nor is its prejudicial value *substantially* outweighed by any such danger. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997)("[F]or relevant evidence to be excluded on this basis, the imbalance must be *substantial*, and the prejudice must be *unfair*." (emphasis added)); Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (citing Weinstein's Federal Evidence § 403.04[1][a] (2d ed. 1997)).

<div style="margin-left: 35%;">

THE DEFENDANT,

SOUTHERN NEW ENGLAND TELEPHONE COMPANY

By ___*Lori B. Alexander*_____

Lori B. Alexander
Federal Bar No. CT08970
Littler Mendelson, P.C.
110 Washington Avenue
North Haven, Connecticut  06473
Tel. (203) 234-6344
Fax (203) 234-6345
E-Mail: lalexander@littler.com

</div>

**EXHIBIT A**

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| KIMBERLY BACHIOCCHI, | * |
| | * |
| | * |
| | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * CIVIL ACTION NO. 02-CV-908 (CFD) |
| | * |
| | * |
| THE SOUTHERN NEW | * |
| ENGLAND TELEPHONE | * |
| COMPANY, | * |
| | * |
| Defendant. | * JUNE 16, 2008 |
| * * * * * * * * * * * * * * * * * * | * |

## AFFIDAVIT OF KEVIN WEST

I, Kevin West, being duly sworn, do hereby depose and say:

1.    I am over eighteen (18) years of age and believe in the obligations of an oath.

2.    I have personal knowledge of the facts contained herein, and they are true and accurate to the best of my knowledge and belief.

3.    Attached hereto as Defendant's Exhibits 31 and 36 are true and accurate copies of documents I wrote describing meetings and conversations related to Kim Bachiocchi and Nick Faiella, two employees who worked in the department of which I was the manager.  Both documents were kept in the normal course of my business as a second-level manager and head of the Business Communication Sales group, and it was the normal course of SNET's business for managers to document conversations and meetings related to personnel problems.  I created these notes on or about the dates that

the meetings and conversations described occurred, writing them by hand. I then later re-typed them.

4.   I did not create the attached documents for litigation. I do not believe that anyone has ever claimed they are confidential work product prepared in anticipation of litigation in this or any other matter.

Kevin West

STATE OF CONNECTICUT)
                                    ) ss:    North Haven          , Connecticut
COUNTY OF New Haven    )           June 16 , 2008


Personally appeared, Kevin West, who subscribed and swore to the foregoing before me on this   16th   day of June, 2008.


Commissioner of the Superior Court
~~Notary Public~~
~~My Commission Expires:~~_____

2

*Documentation: Nick Faiella By Kevin West Manager PTS*



DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
31

11/15/99

I met with Nick Faiella over a number of issues he wanted to discuss regarding the Engineer's and the Engineering Manager Rich Light. I talked to Nick regarding the verbal disagreements he has had with Rich Greene, Ron Lathrope, John Dunn, Rich Light and Yvan Boulet and while everyone felt that these out bursts were due to the medication he was taking from the cancer operation that this behavior was unacceptable. Nick promised that he would do his best to control himself and speak to me before he reacts.

2/3/00

After Nick's Manager Bob Vallario informed me of the message from SNET Executive Response Group regarding the incident with Mrs. Emerson and the driver of SNET Pick-up truck registration # 580 CZR. This truck is assigned to Nick and he is the driver. ( See Bob Vallario's notes for details) Nick denies this ever happened, again I stressed that this is not appropriate behavior and would not be tolerated.

5/16/00

I received a call from Nick Faiella telling me he needed to meet with me immediately regarding his area and projects. Nick and I discuss the fact that his Manager Bob Vallario has taken away some of his projects and assigned them to someone else. I told him I would speak to Bob Vallario and find out what was going on. Nick went on to say that he was not having an affair with Engineer Kim Bachiocchi and his nick name for her was Barbie. I told Nick that all of this was new news to me and that I was not interested as long as nothing happens on Company time or Company property. Nick went to say that because of his cancer operation he was not able to function sexually and that he had a wonderful wife. Again I told Nick I was not interested in anything other than SNET work functions.

5/16/00

I had a meeting with Bob Vallario Nick Faiella's Manager as to my conversation with Nick Faiella and would like an explanation. Bob explained that on 5/9/00 he had a meeting with both Kim Bachiocchi and Nick at their request while I was on vacation. Bob went on to explain that both Nick and Kim brought up a project that SNET contractor J. Bordieri Electric was the subcontractor on and went on to say that he was wasting the wire. Bob told them both that once the test results were compiled we would be able to determine if the project was properly engineered. Bob did tell Nick and Kim that J. Bordieri did call Bob on 5/2/00 for a meeting to discuss the project in question. Joe Bordieri told Bob that he did not want any more work from SNET because it was not worth aggravation to get abused and lose money at the same time. Apparently both Nick and Kim attacked Joe Bordieri over the amount of wire used. Joe Bordieri felt that Nick 's attack was to cover up for Kim's mistake on the quantity of wire ordered. Bob Valarrio

went on to inform me that other contractors were complaining of abusive attacks by Nick and that they always were around projects engineered by Kim Bachiocchi. Bob told me that he informed both Nick and Kim that going forward any projects engineered by Kim Bachiocchi would be going to other Installation Supervisor's other than Nick and that both Nick and Kim were opposed to this plan.

5/17/00 1:45 pm

I met with Nick Faiella as a follow up to my meeting with Bob Vallario and basically went over what Bob Vallario had told me. I told Nick that if what Bob indicated was accurate it cannot continue and will not be tolerated. Nick became aggravated and demanded I contact the Contractors in question and prove he has never had confrontations with them and they all are willing to work with Nick. I told Nick that I would definitely talk to the contractors.

5/19/00 8:30 am

A. J. Communications Meeting

I spoke with Al Volpe owner of A. J. Communications at the request of Installation Supervisor Nick Faiella. Al had received a telephone call from Nick in the past few days regarding working together. I asked Al if he had a problem working with Nick Faiella his answer was no. I asked him if he had a verbal confrontation with Nick Faiella. Al stated that he did have a verbal confrontation with Nick Faiella over a meeting at Yale regarding a project Al was working on for SNET with Engineer Kim Bachiocchi. Kim called Nick and Nick called AL and asked him why he was trying to make Kim look bad. Al and Nick resolved the matter. Al did say that in the past he would use his own material rather than have a confrontation with Nick and Kim. I assured Al that this was not necessary and that SNET would provide any additional material required to make the projects run smooth. ( Al Volpe retired from SNET after 30+ years before opening his own business).

5/19/00 3:30 pm

Bordieri Electric Meeting

I spoke with Joe Bordieri owner of Bordieri Electric at the request of Installation Supervisor Nick Faiella. Joe had received a telephone call from Nick in the past few days regarding working together. I asked Joe if he had a problem working with Nick Faiella his answer was no. I asked him if he had a verbal confrontation with Nick Faiella. Joe stated that he did have a verbal confrontation with Nick Faiella and Kim Bachiocchi over a project Joe was working on for SNET. Joe stated that he felt that Nick was very defensive of Kim. I asked Joe if he ever told Bob Vallario that he did not want to work for SNET. He stated that he had a meeting with Bob Vallario on 5/2 at his request and told Bob he did not want another SNET project that Kim engineered. Because he felt that they were not correctly engineered and he was losing money and did not need the aggravation that went with it.

5/22/00 8:30am

**LeMay Communications Meeting**

I spoke with Ernie LeMay Sr. owner of LeMay Communications at the request of Installation Supervisor Nick Faiella. I asked Ernie if he had a problem working with Nick Faiella his answer was no. I asked him if he had a verbal confrontation with Nick Faiella. Ernie stated that he did have a verbal confrontation with Nick Faiella over a project Ernie was working on at Yale for SNET. On another project Ernie stated that was engineered by Kim Bachiocchi he felt that it was not engineered correctly and told Bob Vallario that he refused the project. Nick accused Ernie of going out to the customer on his own and that there was nothing wrong with the engineering. Ernie and Nick resolved the matter. He did say that if it was one of Kim's projects Nick was very defensive of Kim. ( Ernie LeMay Sr. retired from SNET after 30+ years before opening his own business).

5/22/00 11:00am

**Northeastern Communications and Electrical Meeting**

I spoke with Ernie LeMay Jr. owner of Northeast Communications and Electrical at the request of Installation Supervisor Nick Faiella. I asked Ernie if he had a problem working with Nick Faiella his answer was no. Ernie had received a telephone call from Nick and Kim Bachiocchi in the past few days regarding working together. I asked him if he had a verbal confrontation with Nick Faiella. Ernie stated that he did not have a verbal confrontation with Nick Faiella but felt intimidated by Nick. On a SNET project Ernie was working on he called Kim about a customer change and the same day Nick is asking him what did you do to my Kimee. He felt that Kim and Nick were beating him out of additional dollars based on changes to the project. I assured Ernie that SNET would always pay him additional dollars if the changes were customer generated or if we made an error in engineering a project. Prior to having the above-mentioned talk with Nick and Kim Ernie had told Bob Vallario that he would not take another Project from Kim & Nick.

DEFENDANT'S
EXHIBIT

36

ALL-STATE LEGAL®

12/5/2000  9:05am

### Meeting Nick Faiella, Wayne Handfield & Kevin West

Meeting with Nick Faiella & Wayne Handfield around his past Behavior of verbally attacking people and the SBC Performance Plan I was putting Nick on. I explained to Nick that there would be no more verbal confrontations with anyone, not customers, vendors, contractors or fellow employees. If this behavior was not corrected immediately I would be taking his SNET Id and he would be terminated. Nick got loud and started pointing his finger at me in a threatening way and told me I did not know what was going on in the office. I had Nick stop his finger pointing and control himself, at first he resisted saying he was just expressing himself, I demanded and he did stop. I went over the notes in Nick's personnel file with Nick as backup to the behavior that needed correcting. I read to Nick the SBC performance plan that I had put together and discussed the behavior that needed correcting. I told Nick that he has the opportunity to start with a clean slate providing he followed the performance plan.

12/5/2000  1:40pm

### Meeting with Nick Faiella, Laurie Moffett & Kevin West

Meeting with Nick Faiella & Laurie Moffett regarding employee complaints of sexual harassment. Laurie reviewed the complaint information and Nick immediately said these were trumped up charges that were not true. Nick wanted to know when this charge came to Laurie and Laurie told Nick there was more than one complaint and that they came to her attention while he was on benefits, and that this was the first chance she had to review them with him. Laurie reviewed with Nick what sexual harassment was and that no future incidents would be tolerated. Nick indicated that he understood. The meeting ended at this time.

After the meeting Nick Faiella called Wayne Handfield to say he was sick and would not be back to work until he talked to his Doctor.

**EXHIBIT B**



# THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| * * * * * * * * * * * * * * * *  <br> KIMBERLY BACHIOCCHI, | * <br> * <br> * <br> * <br> * |
| Plaintiff, | * |
| v. | * CIVIL ACTION NO. 02-CV-908 (CFD) <br> * <br> * |
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, | * <br> * <br> * <br> * |
| Defendant. | * JUNE 6, 2008 |
| * * * * * * * * * * * * * * * * | * |

## AFFIDAVIT OF RICHARD LIGHT

I, Richard Light, being duly sworn, do hereby depose and say:

1.      I am over eighteen (18) years of age and believe in the obligations of an oath.

2.      I have personal knowledge of the facts contained herein, and they are true and accurate to the best of my knowledge and belief.

3.      Attached hereto as "Defendant's Exhibit 32" is a true and accurate copy of a document I wrote containing my description of certain events reflecting personnel issues relating to an Analyst Technical Sales, Nick Faiella, who worked in my department at SNET during the time I was employed by SNET.

4.      While the typed up version of Exhibit 32 was typed later, I wrote the words contained in the document at or about the time of the events described in the document. I prepared the document in the normal course of business in my role as a

manager for SNET, and it was my regular practice to write notes of situations reflecting or relating to performance problems of employees. It was the normal course of SNET's business during the 1999-2001 time period for managers to make written records of events relating to performance problems of employees.

4. I did not create the attached document for litigation, and it was never been treated, as far as I know, as a confidential work product document in this or any other matter.

_Richard Light_

Richard Light

STATE OF CONNECTICUT )
                         ) ss:   Bethel, Connecticut
COUNTY OF _Fairfield_ )         June _13th_, 2008

Personally appeared, Richard Light, who subscribed and swore to the foregoing before me on this _13th_ day of June, 2008.

_Karen K Park_

~~Commissioner of the Superior Court~~
Notary Public
My Commission Expires: _March 1, 2013_

2

R. Ligh Log                                                                                    06/27/00

Approx June 1999



DEFENDANT'S
EXHIBIT

32

ALL-STATE LEGAL®

The Hartford Insurance Co. in Shelton,

This job was rewiring an occupied building, I asked Bob Vallario Operations Mgr. who will be the Installation Supv. for the walk through, because this is a Moves, Adds and Change type order (MAC) and will be done on time and material. This job was going to be done at night and would be done in phases and would require the Supervisor to understand what needed to be done.

Bob, assigned Nick Faiella. Nick couldn't make the first walk through. Then I scheduled a second walk through of the entire job with Nick, the contractor Starcom and the customer. The entire job was covered in detail. After the walk through I informed Nick that I would make up a job scope and provide engineering details of what was discussed on the walk through to make sure we all agreed. Nick was suppose to follow through with the customer about setting up a time to move a relay rack with an electrician because there were electrical outlets mounted on the racks. This was not done and after receiving a call from the customer I had to remind Nick to follow through with this two weeks later.

A couple days after issuing the paperwork on this job my manager Kevin brings over my engineering detail for this job and said Nick doesn't like my documentation because it was hand written and that he thought it was "crap work". Rather than calling me directly to discuss it first or ask me questions he chose to go over my head to Kevin and make a cute remarks about it. Nick and I had not worked that much together up to this point and I thought we had a good working relationship. I though it unusual for Nick to go over my head and then with the nasty little comments. I had heard of this type of behavior from other engineers, and supervisors, that Nick has a temper and has been known to argue over everyday situations which are encounter on most jobs. The arguments and problems that Nick causes on these jobs are not necessary.

I explained to Kevin that this was a MAC job at The Hartford Ins. Company and normally there is no paper work of any kind from the engineers. This type of work is normally handled by the installation supervisor, without involving the engineer unless there is something requiring engineering. This job was a standard station rewire that Nick is fully capable of handling without me.

The difference in this case was that Nick couldn't make the first walk through so I walked it because the customer wanted to get this project moving. So, that is why I went on the second walk through because I was at the first walk through and wanted a smooth transition to Nick.

The information I provided was readable and clearly understandable but, Nick had a big problem with the fact that it was hand written rather than typed. I talked it over with Kevin who agreed that if this is the procedure that the engineering detail was OK the way it was. Nick was not happy that I didn't have to type up all the notes as he would like. I believe Nick felt this was a **confrontation** we me that he had lost, rather than an every day business decision.

From this point on in this job Nick's attitude was not pleasant and basically was looking for something to complain about rather than working to get the job done.


July 1999

I was coming into the office one day from being out in field and Nick was standing near my desk and I greeted him by saying "Hi Nick, how are you doing today." His reply, " Shitty because I have to work with you and your crap engineering"

So, I said, " What !" (I didn't believe my ears) and he repeated himself. So, I said, "what is the problem?" He said, "you are the problem." I said, "What are you talking about?"

**Note: All of Nick's comments are nasty and argumentative. Nothing constructive or seriously looking for a solution or discussion but, just attacking.**

He said, "everybody has a big problem with you but, they don't have the guts to tell you."
I said, " what is the problem that everybody has?"
He said, " the problem is you and your attitude that you think you are better than everybody else."

I said, " what exactly is the problem with me."
He said, " you do crap work.'
I said, " tell me what jobs you are having a problem with and lets get them out and point out the problems, lets talk about it" I said, " the problem can't be resolved if I don't know what it is and nobody talks to me about it"

He said,' "everything is wrong people make suggestions and you don't do anything about it"

We went back and forth for about five minutes and he never gave me a specific problem suggestion or a name of anyone else that was having a problem with me.

He was very upset, angry, and was just out to verbally assault me. He really wasn't trying to resolve any issues just basically assault me and run. He just stopped talking and left.

I talked to Kevin about the encounter. Kevin, felt it was because he is on medication and it has made him irritable. I talked to Bob Vallario and asked, if he knew of any problem the men were having? Bob said, there were some issues with the job scopes, and engineering packages and other issues, but, we have been working on all these issues working toward a standard document for the whole group that both the installation supervisors and the engineers can agree upon. But, Bob said, nothing that should have caused Nick to personally assault me like he did.

I asked Bob to talk to all the installation supervisors and see if anyone is having any kind of a problem with me personally because I'd like to address it and correct whatever may be wrong.

Bob talked too all the supervisors and nobody said they were having a problem with me personally. They just wanted better standards for all the jobs. Kevin, Bobby, and myself had been working on the engineering standards for several months with changes each month and we were improving monthly and getting closer to published standard that everyone would be happy with. It was taking a little longer than everybody would like including myself but, with the work load and number of engineers at that time it was going along as fast as it could.

August 1999

I was coming into the office again and Nick was standing near my office and I said, "Nick, I just came from The Hartford Ins job and the customer said, she was very happy with the work that was done." Nick, muttered under his breath "No thanks to your engineering" So, I said, " What did you say" He said, " In spite of your engineering" So I said, " you mean in spite of the installation supervisor" Then I didn't want to further the conversation knowing that it was only going to get worst.

So, after a couple minutes I walked over to Nick and said softly Nick, do you want to go into the back room and talk and try to clear up whatever the problem is. He said, " No I don't want to talk about it" So, I said, Nick " lets talk about it and clear this up" He still said, "No I don't want to talk about it." So that was that.

So, I talked to Kevin and said that this has to stop and I would not allow Nick to come into the office and make verbal assaults at me or anyone else. Nick has had arguments with just about everyone in the office and in the field

Kevin, set up a sit down with Bob Vallario, Nick and myself to resolve whatever the problem was between Nick and myself.

So, Bob starts the meeting with OK lets get it out on the table and resolves this problem.

Nick, says " what do you want from me Rich is the problem" I said, " I don't know what the problem is, tell me what is the problem you have with me"
Nick, said, " Its all the attacks that I have made toward him in the office".
I said, "what are you talking about". (Up to this point the only conversation I've had with Nick was Hi, how are you.)
Nick said, " The other day you came into the office and made a smart remark at me and got me all worked up"
I said, " I didn't say anything against you and in fact it was a complement from the customer and then you made the nasty remarks"
Nick said, " That's a lie and I have an engineer that heard you and agrees with me" (Kim)
I said, " Bob was standing next to you during the whole conversation and agrees with me that I didn't say anything to attack you but, you attacked me"
Nick said, " That's a lie"
I didn't except this out right lying from Nick because everyone that was in the office heard what he said.
I said, " Nick you need help"
Nick really got crazy with that remark and said, " be careful you don't know who your dealing with and if you want to escalate this issue I'll win because I've got a lot of people who are having trouble with you and nobody is having trouble with me."

I knew at this point that Nick either, really believed what he was saying and needed help or he couldn't bring himself to admit that there were issues that needed to be addressed but, he can't bring himself to address them so he lies.

This went back and forth for five minutes or so getting nowhere.

So in an effort to get past this whole thing and move forward I said, " Nick If I attacked you as you say, I should be fired, I'd fire myself if I did this,  But, I know I didn't because that is not how I operate. I have never attacked people for any reason that's just not me. But, in an effort to resolve this issue I will apologize to you right now if I attacked you as you say and I'm truly sorry because that is not how anyone should be treated.  So, I'm apologizing for what you say I did.  But, be warned if you ever come into the office and verbally assault me or any of my engineers, as I say you did to me in this incident then I will bring this issue to some kind of closure.
So, he said, fine I accept your apology and we shook hands."

I talked to Kevin after the meeting and explained everything that took place.  I then informed Kevin that Nick has some serious problems and I believe he needs help.  I told Kevin that these issues with Nick are not going away but will continue until he gets himself fired or he has a significant emotional experience, which will causes him to seek help.

I personally have not had any additional problems with Nick since this meeting.

**EXHIBIT C**

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| * * * * * * * * * * * * * * * * * *<br>KIMBERLY BACHIOCCHI, | *<br>*<br>*<br>*<br>* |
| Plaintiff, | * |
| v. | *<br>*  CIVIL ACTION NO. 02-CV-908 (CFD)<br>*<br>* |
| THE SOUTHERN NEW<br>ENGLAND TELEPHONE<br>COMPANY, | *<br>*<br>*<br>* |
| Defendant. | * JUNE 13, 2008 |
| * * * * * * * * * * * * * * * * * * | * |

## AFFIDAVIT OF LAURIE MOFFETT

I, Laurie Moffett, being duly sworn, do hereby depose and say:

1.     I am over eighteen (18) years of age and believe in the obligations of an oath.

2.     I have personal knowledge of the facts contained herein, and they are true and accurate to the best of my knowledge and belief.

3.     Attached hereto as Defendant's Exhibit 34 are true and accurate copies of documents I wrote describing a meeting I had with Mr. Faiella concerning a complaint of inappropriate conduct in the workplace Nick Faiella and Kim Bachiocchi.   These documents were kept in the normal course of my business as an Human Resources Generalist.   In addition, it was the normal course of SNET's business for Human Resources Generalist to document a meeting related to complaints of inappropriate conduct in the workplace.

4.     I created these notes on or about the date of my meeting with Mr. Faeilla. I wrote by hand the notes that are contained on the second page of Exhibit 34, and I typed the first page of Exhibit 34 shortly after the meeting on the computer.

Laurie Moffett

STATE OF CONNECTICUT)
                    ) ss:   Meriden, Connecticut
COUNTY OF _____ )        June 13, 2008

Personally appeared, Laurie Moffett, who subscribed and swore to the foregoing before me on this 13 day of June, 2008.

_____
Commissioner of the Superior Court
Notary Public
My Commission Expires:_____

Firmwide:85558975.2 053999.1009

DEFENDANT'S
EXHIBIT

34

ALL-STATE LEGAL®

12/05/00

I spoke with Nick Faiella today. Kevin West was present.

I told Nick that I had received several complaints while he was away (on benefits) regarding inappropriate behavior exhibited between he and Kim Biachiocchi in the work place. Specifically, I mentioned the Trade Show that he and Kim and his peers attended in Sturbridge MA in May 2000. Specifically, rubbing KimÆs neck, putting his arm around her at dinner and squeezing her thigh. I told Nick that this behavior was inappropriate on company time, at company sponsored events etc.

Nick said that they were ôtrumped up chargesö. I told Nick that when we (the company) receive complaints like this, we have to take them seriously. It is our responsibility to make sure that the working environment is comfortable for everyone. Nick said that he understood my responsibility.

I told Nick that any future complaints would be taken seriously and that the behavior would not be tolerated. Nick said he understood.

I told Nick that a good litmus test to use is, ôif you are about to say or do something and you are unsure whether the action could be perceived as inappropriate, ask your self the following question.

ôWould I do or say this if my spouse, or daughter or son were sitting right here next to meö? If not, then the behavior could be perceived as inappropriate.

Nick said that he understood what I was saying.

2/5/00  met w/ Nick - Kevin West was present.
    I told Nick that we received complaints while he was away regarding
inappropriate behavior w/ Kim - makes people uncomfortable
    + These behaviors will not be tollerated. Nick said he understood.

I + K
—————————

– were recd - letters - stating that there are people who have
   witnessed inappropriate behavior in the workplace + it
   makes them feel uncomfortable

– Specifically - when you are together
            – May 2, 2000 - a fiber trade show in Sturbridge Ma.
            – seen touching Kim's thigh

            – Rubbing her neck in the office

            – ~~May 3, 2000 Data seminar in Sturbridge Ma.~~

            – May 31st, 2000 - fiber optics show Foxboro Ma.
                @ Dinner - Nick constantly had his arm @ round Kim Rubbing back.

•  onfidentiality - Not at liberty to give names.


Don't feel comfortable when the 2 of you are together

What you do outside of work off Co. prop. is your business.
The Co. is obligated by law to follow up on such
Complaints. + make work environment comfortable
for all.

Touching - rubbing neck etc. is not appropriate
behavior in the workplace - wether invited or not.
Wether cousin, sister of friend.

•  We have looked into this matter + have not found
   harassment issues.
– But we must speak to all involved + stress the
   fact that inappropriate behavior in workplace
   will not be tollerated.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2008, a copy of the foregoing was filed electronically on all parties to this action. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system. Parties may access this filing through the court's CM/ECF System.

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880

Lori B. Alexander
Federal Bar No.: CT08970