# EXHIBIT 1

LEXSEE 1999 U.S. APP. LEXIS 12111

**LYNN M. MULKEY, Plaintiff-Appellant, -v.- HOFSTRA UNIVERSITY, Defendant-Appellee.**

98-9304

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**1999 U.S. App. LEXIS 12111**

**June 10, 1999, Decided**

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1999 U.S. App. LEXIS 23593.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of New York (Hurley, J.).

**DISPOSITION:** AFFIRMED.

**COUNSEL:** APPEARING FOR APPELLANT: MICHAEL H. SUSSMAN, Goshen, NY (Stephen Bergstein, Law Offices of Michael H. Sussman, on the brief).

APPEARING FOR APPELLEE: JILL L. ROSENBERG, New York, NY (Anthony Carabba, Jr., Rene Kathawala, Orrick, Herrington & Sutcliffe LLP, on the brief).

**JUDGES:** PRESENT: HON. ELLSWORTH VAN GRAAFEILAND, HON. DENNIS JACOBS, HON. CHESTER J. STRAUB, Circuit Judges.

**OPINION**

*SUMMARY ORDER*

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court be **AFFIRMED.**

Lynn M. Mulkey sued Hofstra University, claiming that its decision to deny her tenure constituted illegal sex discrimination. After trial, a jury concluded that Mulkey was "qualified" for tenure at Hofstra but that she had failed to carry her burden of proving that the tenure denial "occurred under circumstances permitting an inference of intentional gender discrimination." [*2] Mulkey asked the district court for a new trial, arguing that the jury's verdict was infected by an error in the jury charge. The district court (i) denied the new trial motion, concluding that the jury charge was correct; and (ii) granted Hofstra's motion (previously held in abeyance) for a judgment as a matter of law, concluding that Mulkey had not offered evidence from which a rational jury could infer Hofstra had discriminated against her on the basis of sex, *see* Fed. R. Civ. P. 50. Mulkey now appeals.

Because we affirm the district court's judgment as a matter of law in favor of Hofstra, we need not address Mulkey's jury instruction claim.

"'Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor.'" *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (*per curiam*) (quoting *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).

A Title VII plaintiff establishes her prima facie case by demonstrating: (i) "membership in a protected class"; (ii) her "qualification [*3] for the position"; (iii) "an adverse employment action"; and (iv) "the ultimate filling of the position by a person not of the protected class." *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) (*in banc*) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)), *cert. denied*, 118 S. Ct. 851 (1998). A successful prima facie case establishes a presumption of illegal discrimination, requiring the defendant to provide a "nondiscriminatory" reason for the action. *See id.*

Notwithstanding this burden-shifting, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993)) (internal quotation marks omitted). In other words, when the employer has come forward with a non-discriminatory explanation for its action, "'the *McDonnell Douglas* framework--with its presumptions and burdens--is no longer relevant.'" 114 F.3d at 1336 (quoting *St. Mary's*, 509 U.S. at 510, 113 S. Ct. at 2749). Therefore, [*4] "a plaintiff's satisfaction of the minimal requirements of the prima facie case does not necessarily mean . . . that plaintiff will ultimately have sufficient evidence to support a verdict on each element that plaintiff ultimately must prove to win the case." 114 F.3d at 1337.

Mulkey failed to adduce evidence from which a rational jury could have found that she was the victim of illegal sex discrimination. A reasonable jury could have found at most that Mulkey was treated unfairly, but the required nexus between alleged unfairness and an impermissible motivation is absent. *See Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 123-24 (2d Cir. 1997) ("Absent some evidence that it was motivated by discriminatory intent . . . bad treatment does not establish a violation of Title VII.")

Nearly all the evidence catalogued in Mulkey's brief concerns allegations that Hofstra deviated from its normal procedures when reviewing her case. She argues that personnel at Hofstra failed to apprise her of concerns with her teaching earlier in her career; impermissibly questioned the content of her lectures; allowed personal considerations to contaminate the tenure review process; and ignored [*5] positive evaluations of her teaching ability. When paired with evidence of an impermissible motivation, such evidence might support or reinforce an inference of discrimination. But without evidence of discriminatory animus, such evidence cannot support civil rights liability. *See Scaria v. Rubin*, 117 F.3d 652, 654-55 (2d Cir. 1997) (*per curiam*).

The only gender-related evidence Mulkey cites is her contention that her department "had never tenured a female sociologist and [that] males dominated Department, College and University decision-making." The first contention is immaterial, given Mulkey's failure to provide any evidence about the qualified pool of candidates for such positions. *See Halbrook v. Reichhold Chems., Inc.*, 766 F. Supp. 1290, 1301-02 (S.D.N.Y. 1991), *aff'd* 956 F.2d 1159 (2d Cir. 1992) (unpublished table decision); *see also Coser v. Moore*, 739 F.2d 746, 750 (2d Cir. 1984) ("Sex characteristics of a particular availabil-ity pool may differ from those of the general popula-tion."). Moreover, this contention is also misleading since a woman, Professor Cheryl Mwaria, had in fact been awarded tenure in the joint sociology/anthropology department that [*6] also considered Mulkey's tenure candidacy.

The second contention is irrelevant. Men are not presumed to have a discriminatory animus against women, just as women are not presumed to be free of it. *See Fisher v. Vassar College*, 70 F.3d 1420, 1448 (2d Cir. 1995), *aff'd in banc*, 114 F.3d 1332 (2d Cir. 1997), *cert. denied*, 118 S. Ct. 851 (1998).

Finally, Mulkey refers to a cryptic comment in a memo written by Tad Krauze, a member of her tenure committee, which stated: "I know of at least one case of a tenure candidate . . . who was given the opportunity to improve his teaching under departmental supervision." Krauze's letter did not name this individual or provide any more information about him, and Mulkey apparently did not elicit any evidence about this point at trial. The record reflects that plaintiff was also afforded an opportunity to improve her teaching, but she declined to accept the concomitant delay in tenure consideration. Krauze's memo did not say that the unnamed individual received tenure *before* having "the opportunity to improve his teaching"; it is therefore unclear how the treatment of this individual has any bearing on Mulkey's case. Indeed, other evidence [*7] at trial indicated that the practice employed by Hofstra was to afford a candidate the opportunity to extend the pre-tenure probationary period to improve teaching.

In the principal case on which Mulkey relies, there was sufficient evidence, of a kind Mulkey has not adduced, from which a rational jury could infer discrimination. *See Stratton v. Department for the Aging*, 132 F.3d 869, 880 (2d Cir. 1997) (plaintiff alleging age discrimination had her responsibilities assumed by younger colleagues; average age of staff fell significantly when new commissioner was appointed; and commissioner made comment "the jury could reasonably have viewed as evidencing a preference for young mothers over older workers").

In sum, "at no point did plaintiff present any credible evidence that [her employer's] decision to deny her tenure was in any way based on her sex." *Fisher*, 70 F.3d at 1449; *see also Hollander v. American Cyanamid Co.*, 172 F.3d 192, 201 (2d Cir. 1999) ("Nothing else in the record points to age discrimination as the real reason for [plaintiff's] termination.")

For these reasons, the judgment of the district court is **AFFIRMED** [*8] .

# EXHIBIT 2

LEXSEE 2008 U.S. DIST. LEXIS 10941

**MICHELE BRANT, Plaintiff, -v- COUNTY OF DUTCHESS and DUTCHESS COUNTY BOARD OF ELECTIONS, Defendants.**

**Case No. 05-CV-10590 (KMK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 10941**

**February 11, 2008, Decided**
**February 11, 2008, Filed**

**COUNSEL:** [*1] Appearances: Russell A. Schindler, Esq., Kingston, NY, for Plaintiff.

Karen Folster Lesperance, Esq., David Lewis Posner, Esq., McCabe & Mack LLP, Poughkeepsie, NY, for Defendants.

**JUDGES:** KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KENNETH M. KARAS

**OPINION**

OPINION AND ORDER

KENNETH M. KARAS, U.S. District Judge:

Plaintiff Michele Brant ("Plaintiff") is a staff employee of the Dutchess County Board of Elections (the "Board"). On November 23, 2005, she brought this action naming as defendants the County of Dutchess (the "County") and the Board. The Complaint states a hostile work environment claim on the basis of Plaintiff's gender under 42 U.S.C. § 2000e-2(a)(1). Plaintiff seeks damages of $ 250,000, attorney's fees and court costs, and unspecified injunctive relief. Defendants move for summary judgment. For the reasons stated in this Opinion, Defendants' Motion for Summary Judgment is GRANTED in its entirety.

I. Background

A. Plaintiff's Employment at the Board of Elections

The Dutchess County Board of Elections is an entity prescribed by New York state law. *See* N.Y. Election Law § 3-200 ("There shall be a board of elections in each county of the state. . . ."). By law, the Board consists of two commissioners, [*2] with each major political party eligible to recommend one commissioner. *See id.* The Board institutionally is empowered to hire and manage staff; in addition, each commissioner is permitted to "approve and at pleasure remove a deputy, establish his title and prescribe his duties." *Id.* § 3-300. The Board's Republican Commissioner is David J. Gamache ("Gamache") and its Democratic Commissioner is Frances Knapp ("Knapp").

Plaintiff was hired as a Republican staff member to the Board in or around January 2003. (Defs.' Stmt. Pursuant to Rule 56.1 ("Defs.' 56.1") P 9.) From December 2004 until at least the time of the filing of this Motion, Plaintiff held the title of elections administrator at the Board. (*Id.* P 2.) Prior to that time she was a senior elections specialist and prior to that an elections specialist. (*Id.* PP 7, 11.)

B. Plaintiff's History with Board Employee Thomas Sassaman

Although not the immediate subject of this lawsuit, the history between Plaintiff and former Board employee C. Thomas Sassaman ("Sassaman") is important background to it. When Plaintiff became employed by the Board, Sassaman was employed there as a Republican staff member. (*Id.* P 9.) Plaintiff and Sassaman developed [*3] a close working relationship, were friendly with one another in the workplace, and often ate lunch together and took smoke breaks together. [1] (*Id.* P 10.) In mid or late December 2004, Plaintiff told Gamache that Sassaman had confessed that he had "fallen" for her and that he wanted to take their relationship "to the next level." (*Id.* P 13.) In or around December 2004, Gamache effectively swapped the jobs of Plaintiff and Sassaman, promoting Plaintiff to elections administrator and demot-

2008 U.S. Dist. LEXIS 10941, *

ing Sassaman to elections specialist. (*Id.* P 12.) The Parties agree that the job switch was "for reasons not relevant to the issues in this action." (*Id.*; Dep. of David J. Gamache ("Gamache Dep.") 15 ("Well, [Sassaman] wasn't doing his job. . . .").) This personnel move was unwelcomed by other staff members, some of whom liked Sassaman, and some of whom felt Plaintiff should not have been promoted. (Dep. of Michelle Brant ("Brant Dep.") 112:19, 116:11.)

> 1   At least one Board staff member testified that it was a flirtatious relationship. (Dep. of Kimberly Ferese ("Ferese Dep.") 12:17-13:22.)

In early March 2005, Plaintiff again approached Gamache and told him that the situation with Sassaman had escalated. [*4] (*Id.* P 14.) Plaintiff said that Sassaman had telephoned her at home and at the office from his home on his days off. (*Id.* She told Gamache that Sassaman was making her uncomfortable and that she felt like he was stalking her. (*Id.* On advice from Gamache, Plaintiff documented her claim in writing. (*Id.* P 15.) Gamache spoke to Sassaman about the allegations, and also notified the Dutchess County Sheriff's Office, which conducted its own investigation. (*Id.* P 16.) Based on these investigations and Sassaman's admissions in course, Sassaman was given the choice in late March 2005 to resign or be terminated; he resigned effective April 1, 2005. (*Id.* P 18.)

C. Sassaman's Letter to the Dutchess County Legislature

On or about April 11, 2005, Sassaman delivered a letter to several members of the Dutchess County Legislature ("April 11 letter"), including then-minority leader Roger Higgins. (*Id.* P 19.) In the April 11 letter, Sassaman described himself as a "disgruntled employee" who was "discriminated against based on [his] age," was "harassed" by Gamache and Brant, had his rights violated, and had his "character brought into question." (Aff. of Karen Folster Lesperance ("Lesperance Aff."), Ex. [*5] D at 3.) The letter contained a series of detailed and salacious allegations about the purported professional misconduct of Gamache and the supposed personal misconduct of Plaintiff, including extramarital affairs. Sassaman wrote that he was "considering all legal options at this time." (*Id.* [2]

> 2   Sassaman apparently did pursue his "legal options," filing suit in federal district court on June 29, 2006. *See Sassaman v. Gamache*, No. 06-CV-5032. Plaintiff mentions this suit in passing. (Pl.'s Mem. 12.) On May 18, 2007, Judge Charles L. Brieant granted summary judgment to the defendant, a decision from which plaintiff has appealed.

Prior to sending the April 11 letter, Sassaman showed a draft of it and/or discussed its contents with Knapp and with Board employees Kim Ferese ("Ferese"), Jeanne Short ("Short"), and Bill Frazier ("Frazier"). (Defs.' 56.1 P 36.) Sassaman also mentioned the letter to Board employee Lynn Nippert ("Nippert") and said he would show it to her. Although Nippert did not see a draft before it was sent, she later was shown a copy of the letter by Short, who had obtained it from either Sassaman or Knapp. (*Id.* P 37.) When the letter was received by the various legislators [*6] to whom it was addressed, news of its existence spread rapidly throughout the Board's office. (*Id.* P 22.)

D. Ballo Acquires a Copy of the Letter

John Ballo ("Ballo") was Democratic Deputy Commissioner of the Board when Sassaman sent his April 11 letter. (*Id.* P 23.) Ballo was, at that time, the senior Democratic staff member in the office because Knapp was on vacation. [3] (Pl.s 56.1 P 47.) Ballo learned that some of the county legislators had received a letter from Sassaman attacking Gamache, and called the legislature to seek to obtain a copy. (Defs.' 56.1 P 23.) Ballo was told by administrative staff that the letter was being widely discussed, but that he would have to contact a recipient for the letter. (*Id.* P 24.) Ballo called Roger Higgins, the county legislature minority leader, who faxed a copy of the letter to Ballo. (*Id.*)

> 3   Ballo was formally vested with the powers of Democratic Commissioner in Knapp's absence. (Dep. of John Ballo ("Ballo Dep.") 12:20-22.) He had, however, only temporary tenure in such powers, he kept in close contact with Knapp while she was away from the office, and he would consult with Knapp as a matter of practice about any major decisions being made by the [*7] Board. (*Id.* 37:2-8.) 4

E. Ballo's Handling of the April 11 Letter

The Parties dispute the facts of Ballo's handling of the letter once he received it. Defendants state that Ballo showed the letter to only three people: (1) Ian MacDonald, County Attorney; (2) Lynn Raver, Board employee; and (3) Curtis Forbes, County EEO Officer. (Defs.' 56.1 PP 25-28.) Plaintiff alleges that Ballo "made several copies of the letter and distributed the letter to [Plaintiff's] co-workers." (Pl.'s Mem. at 4.) [4]

> 4   Plaintiff seeks to rely on statements that Ballo allegedly made to Dutchess County Sheriff's Office Detectives Stelmach and Wilkinson that he had made several copies of the April 11 letter and distributed it to his and Plaintiff's coworkers.

(Pl.'s Mem. 4.; Pl.'s Stmt. Pursuant to Rule 56.1 ("Pl.'s 56.1") P 50.) Ballo gave deposition testimony that he had neither spoken with Stelmach and Wilkinson about the letter nor made copies of the letter. (Pl.'s 56.1 PP 51-52.) The police statements on which Plaintiff seeks to rely present a classic hearsay problem. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in [*8] evidence to prove the truth of the matter asserted."). At oral argument, Plaintiff's counsel struggled to identify an appropriate exception through which this key evidence could be introduced. *Cf.* Fed. R. Evid. 803(8) advisory committee's note ("Police reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer."); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 908 (2d Cir. 1991) ("We hold that a hearsay statement contained in a police report would not be independently admissible at trial. . . ."). Although Ballo's alleged statements to the detectives are plainly hearsay, they could be used as prior inconsistent statements to impeach testimony Ballo might offer at trial. On a motion for summary judgment, however, the Court construes disputed facts against the moving party and thus, for purposes of this motion only, assumes that Ballo made wider distribution than he has admitted in his deposition.

### F. Workplace Environment Following Distribution of the April 11 Letter

Plaintiff contends that she experienced "sexual comments, jokes, and ridicule at the workplace," which she attributes to Ballo's alleged distribution of the April 11 [*9] letter. (Pl.'s Mem. at 4.) Plaintiff, however, stated at her deposition that she could not remember any of her coworkers making a sexual joke of which she was the subject. (Brant Dep. 222:11.) In fact, Plaintiff gave deposition testimony that she remembers very little about specifics, except for a single joke by Frazier that Plaintiff did not take to be offensive. (*Id.* 228:16-229:12.) Regardless of whether he received a copy of or information about the letter from Ballo, Frazier had previously received a copy of the letter and/or discussed it with Sassaman himself. (Defs.' 56.1 P 36.)

### II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court must view all evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmovant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material [*10] fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *see also Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the court is governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). At summary judgment, the court is not charged with weighing the evidence and determining its truth, but only with determining whether there is a genuine issue for trial. *See Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 U.S. Dist. LEXIS 32843, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); [*11] *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually unsupported claims. . . ." *Celotex Corp.*, 477 U.S. at 323-24.

### B. Hostile Work Environment Claims

Plaintiff asserts a claim for hostile work environment predicated on her gender. Specifically, Plaintiff alleges that she was subjected to a hostile work environment at the Board as a result of Ballo's "distributing copies" of the April 11 letter, causing Plaintiff to become "the subject of sexual comments, sexual jokes, rumors, harassment, and ridicule by her co-workers." (Compl. P 18.) It bears emphasis, however, that when pressed at oral argument, Plaintiff's counsel had great difficulty identifying what the sexual harassment was. In particular, counsel waffled between suggesting that the harassment was found in Ballo's alleged distribution of the letter and that it was found in the unspecified jokes allegedly made by Plaintiff's other coworkers, most of whom received or learned about the letter from Sassaman him-

self, regardless of whether they also received or learned about it from Ballo.

Under Title VII of the Civil Rights Act of 1964, [*12] it is "an unlawful employment practice for an employer -- (1) to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a). "The purpose of this provision is to prevent 'disparate treatment of men and women in employment.'" *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). The courts have interpreted a claim under this provision as requiring demonstration of two elements: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . [Plaintiff's] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Id.* at 221 (citations and internal quotation marks omitted); *accord Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

The first element of a hostile work environment claim itself has two components: (1) objective; that is, "'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive [*13] work environment;'" and (2) subjective; that is, "'the victim must also subjectively perceive that environment to be abusive.'" *Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). Here, Plaintiff has alleged the subjective component, claiming that she suffered "shame, humiliation, emotional distress and loss of reputation," (Compl. P 23). Defendants do not challenge that at this stage, instead asserting that summary judgment is appropriate because the conduct alleged by Plaintiff does not satisfy the objective element.

Plaintiff states that Defendants' contention is "without merit," but does not offer much relevant evidence to the contrary. First, Plaintiff complains about Sassaman's April 11 letter. (Pl.'s Mem. 8.) Because Sassaman had, by the time of his authorship of the letter, been required to resign from employment with the Board, his conduct in sending such letter cannot be deemed workplace misconduct. Second, Plaintiff points to a copy of the April 11 letter having been anonymously mailed to her husband at the residence she shared with him. (*Id.* 9.) There is, however, no evidence attributing this to Defendants or any their employees. The [*14] only alleged *workplace* misconduct for which Plaintiff has produced evidence is Ballo's allegedly-wide distribution of the April 11 letter and the jokes allegedly made as a result. Plaintiff points to evidence she suggests shows that the distribution of the letter caused men to make comments to her about whether they were among her extramarital suitors,

caused the Board atmosphere to be "tense" and "hostile," and led to alleged jokes and "whispering" by Plaintiff's coworkers, (*id.* 8-9).

To maintain a hostile work environment claim, Plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.'" *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *accord Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The Supreme Court has "set forth a non-exclusive list of factors" to consider, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. . . ." *Raniola v. Bratton*, 243 F.3d 610, 620 (2d Cir. 2001) [*15] (quoting *Harris*, 510 U.S. at 23). The test is at bottom one of "totality of circumstances," *Meritor*, 477 U.S. at 69, within which a court is to look at "the quantity, frequency, and severity of the incidents" in order to "obtain a realistic view of the work environment," *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (internal quotation marks omitted) (abrogated on other grounds by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006)). Further, the Second Circuit has reminded district courts that "'the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Richardson*, 180 F.3d at 439).

Considering the totality of the circumstances, Plaintiff has not raised a triable issue of fact as to the existence of a single incident so severe as to alter the conditions of her working environment, even if any misconduct could be imputed to her employer. Further, Plaintiff has not made any showing that the alleged hostility in her work environment was on account of her gender. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) [*16] ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discrimination* . . . because of . . . sex." (internal quotation marks omitted)); Barbara Lindemann & Paul Grossman, I *Employment Discrimination Law* 808 (3d ed. 1997) ("Harassment of *a woman* does not necessarily amount to *sexual* harassment; the plaintiff must show that the harassment was directed at her because of her sex.").

Facially, there is nothing about the apparent bulk of the statements in the April 11 letter, which dealt with alleged extramarital affairs -- unpleasant and degrading as many of those statements are -- that would cause harm based on gender. Almost all of the statements in the letter

are troubling on a gender-neutral basis; that is, they would be equally offensive if said about a man. *See Brown v. Henderson*, 257 F.3d 246, 255 n.3 (2d Cir. 2001) (stating there was "no indication" that mockery of plaintiff's alleged affair with a married coworker "was related to her being a woman"); *see also Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women . . . does not constitute a hostile working [*17] environment under the civil rights statutes."). Although Plaintiff's brief articulates a reading by which certain comments in the April 11 letter might be deemed gender-specific, (Pl.'s Mem. 8), the letter itself is not the subject of this lawsuit. And, Plaintiff has not produced evidence that Ballo's alleged distribution of the letter was motivated by gender animus as opposed to any other animus. [5]

> 5    Subsequent to the initial pleadings, Plaintiff has shifted her theory as to Ballo's motive and now suggests retaliation, which is addressed below.

Nor has Plaintiff shown that any ridicule she faced from those who learned about the April 11 letter was based on hostility to her gender. *Cf. Brown*, 257 F.3d at 256 (affirming summary judgment for defendant where there was "overwhelming evidence that the hostility toward [plaintiff] was grounded in workplace dynamics unrelated to her sex"). Plaintiff herself admits that workplace hostility toward her predated the April 11 letter. (Brant Dep. 115:4-117:8.) *Cf. Brown*, 257 F.3d at 256 ("[C]rucially, this overwhelming evidence derives substantially from [Plaintiff] herself, and her own view, clearly expressed, that the harassment was fundamentally [*18] the product of a workplace dispute . . . and not from her being a woman."). Further, comments by coworkers about an extramarital affair do not inherently constitute conduct motivated by gender animus. *See id.* (affirming summary judgment for defendant because plaintiff had failed to meet burden of showing sex-based discrimination where "the bulk of the behavior she cite[d], though often highly cruel and vulgar, related either to her union-related conflict . . . or to her purported affair" with a married coworker); *Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) ("There is not even a hint in the record that any rumors or vulgar statements concerning an illicit relationship between [plaintiff] and [coworker] were made because [of plaintiff's gender].");  *Dellefave v. Access Temps., Inc.*, No. 99-CV-6098, 2001 U.S. Dist. LEXIS 97, 2001 WL 25745, at *7 (S.D.N.Y. Jan. 10, 2001) ("Even if embarrassing or even humiliating, a statement that an employee is having a consensual relationship with a co-worker cannot be construed as discrimination or harassment on the basis of sex absent some additional showing, such as that the plaintiff

was singled out for such comments because of his or her gender."); *Huffman v. City of Prairie Vill.*, 980 F. Supp. 1192, 1198 (D. Kan. 1997) [*19] (holding that obscene comments about alleged sexual relationship between plaintiff and another coworker, "although offensive, [were not] made because of plaintiff's sex"). Plaintiff's coworkers reacted to the April 11 letter because of its salacious and lascivious content involving the two subjects of sex and politics. *Cf. Pasqua*, 101 F.3d at 517 ("In addition to what commonly motivates gossip of this type-a fascination with the prurient-perceptions [about workplace dynamics] added fuel to the fire in this case."). These reactions may well have been unpleasant or even painful for Plaintiff (as well as juvenile on the part of those reacting), but it does not make the reactions-or the environment they created -- illegal.

Even if some conduct was cognizable under Title VII, Plaintiff's theory for imputing to the Board such alleged workplace misconduct creating a hostile environment is weak, at best. Plaintiff seeks to make much of Commissioner Knapp's vacation at the time Ballo obtained a copy of the April 11 letter. Plaintiff's theory is that Ballo was, by virtue of Knapp's absence, the "Acting Elections Commissioner for the Democratic side of the Board of Elections." (Pl.'s Mem. at 6-8.) [*20] Plaintiff then reasons that because an employer can be held vicariously liable for the conduct of its supervisory employees, Defendants here should be vicariously liable for Ballo's conduct in distributing the letter. *See Fairbrother v. Morrison*, 412 F.3d 39, 49 (2d Cir. 2005) (explaining that imputation of employee's liability to employer differs where harassment is attributed to "a supervisor with immediate or successively higher authority" over a claimant (abrogated on other grounds by *Burlington Northern*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345)); *Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a 'supervisor with immediate (or successively higher) authority over the employee' has engaged in the complained of conduct, that the 'employer [may be] subject to vicarious liability.'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1988); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1988))).

Yet the facts fail to fill in Plaintiff's argument. Ballo, as Deputy Commissioner, did not have a say in any personnel matters respecting Plaintiff or any other employee of the Board. (Defs.' 56.1 P 39.) By law, the Board is required to "secure in the appointment of [its] [*21] employees . . . equal representation of the main political parties." N.Y. Election Law § 3-300. By practice, the Republican commissioner and deputy assigned daily work tasks to Republican staff members and the Democratic commissioner and deputy assigned work to the De-

mocratic staff members. (Defs.' 56.1 P 41.) Ballo, as Deputy Commissioner, did not participate in Plaintiff's employment interview, did not evaluate her work, and did not participate in her performance reviews. (*Id.* P 42.) On a day-to-day basis, Ballo did not assign tasks to Plaintiff, did not oversee her performance of tasks, and did not review or evaluate her work product. (*Id.* P 43.) [6] Plaintiff's sole theory that would make Ballo her supervisor is that, in Knapp's absence, he was "Acting Commissioner" at the time he allegedly distributed the April 11 letter, and therefore "his consent would be required before she could be fired, demoted, or disciplined during the time while Commissioner Knapp was on vacation." (*Id.* P 48.) In short, Plaintiff admits that Ballo was not her supervisor in fact, but contends that he should be deemed her supervisor for purposes of imputing workplace conduct by operation of the law.

6    All of [*22] this is illustrated by Democratic Commissioner Knapp's limited role in Republican Commissioner Gamache's decision to effect a job swap between Plaintiff and Sassaman.

Plaintiff's theory appears not to be entirely without support in New York Law. *See* N.Y. Election Law § 3-300 note 9 (McKinney 2007) ("A deputy election commissioner shall possess the powers and perform the duties of his principal during the absence or inability of his principal to act." (citing 1966, Op.Atty.Gen. (Inf.) 145)). Still, given the lack of dispute as to whether Ballo exercised supervisory authority in fact, especially in the partisan-split, special environment of the Board, this Court has great skepticism as to whether Ballo could be deemed Plaintiff's supervisor for purposes of this Title VII claim. As a matter of practice, Ballo would not have made a staffing decision without consulting with Knapp, who would in any case defer to Gamache on staff changes with respect to Republican staff members, as she did with respect to the November 2004 job swap between Plaintiff and Sassaman. Nevertheless, the Court need not, and does not, decide this question.

Plaintiff's claim fails regardless because she has not alleged [*23] discriminatory conduct that, even if imputable to her employer, is sufficiently severe and pervasive to itself constitute a hostile work environment. [7] Certainly, a single incident may be enough to constitute unlawful harassment. *See Alfano*, 294 F.3d at 374 ("[I]t is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."); I *Employment Discrimination Law* 795 & n.240. But Ballo's alleged conduct here-the single incident of distributing the April 11 letter to some number of Board staff members-is not the type of single incident that itself constitutes unlawful harassment. "A hostile environment claim that

does not involve unusually 'severe' conduct normally will require a showing of multiple instances," and this "is particularly likely to be the case with respect to verbal utterances . . . ." I *Employment Discrimination Law* 796; *see Alfano*, 294 F.3d at 374 ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997))). For example, [*24] in *Cosgrove v. Sears, Roebuck & Co.*, the Second Circuit held that offensive remarks by two male coworkers and an offensive anonymous note were not sufficiently severe and pervasive to constitute unlawful harassment. 9 F.3d 1033, 1041-42 (2d Cir. 1993). While Sassaman's letter itself may be severe and might have contributed to a hostile work environment claim had he been a Board employee at the time and had his conduct been unaddressed, it is not the subject of Plaintiff's Title VII claim.

7    Again, the Court need not and does not decide whether Ballo's alleged conduct would be attributable to his employer. If he was Plaintiff's supervisor, Plaintiff is correct that such imputation would be automatic. *See Fairbrother*, 412 F.3d at 49; *see also Faragher*, 524 U.S. at 807 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."); *Ellerth*, 524 U.S. at 762 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."). If Ballo was not Plaintiff's supervisor, the employer's vicarious liability "depends [*25] on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Fairbrother*, 412 F.3d at 49 (quoting *Petrosino*, 385 F.3d at 225 (internal quotation marks omitted)).

Instead, Plaintiff focuses on Ballo's alleged distribution of the letter and the generally alleged (and unspecified) jokes that Plaintiff claims ensued. The Court, however, cannot see how the alleged *distribution* could have caused a hostile work environment. The Board is not a large office: In April 2005, at the time of the events at issue in this case, the Board had about 12 employees. (Dep. of Frances A. Knapp 5:18; Dep. of David J. Gamache 5:15.) Sassaman himself showed a draft of the letter and/or discussed its contents with Commissioner Knapp and Board employees Ferese, Short, and Frazier. Sassaman also mentioned the letter to Nippert. (Defs.' 56.1 PP 37-38.) Deputy Commissioner John Kennedy first saw the letter from one of Plaintiff, Lynn Raver, or Ballo (*Id.*) Commissioner Gamache, who was a primary

subject of the April 11 letter, gave deposition testimony that he first saw it when "it was either given to me by one of the staff [*26] people or it was in my box." (Gamache Dep. at 46:18-19.) Thus, at most, Ballo showed the letter to a handful of Board employees. This cannot, on its own, be the kind of severe single incident that alone gives rise to a hostile work environment claim.

While Plaintiff submits in her brief that the distribution of the letter caused her to experience "sexual comments, jokes, and ridicule at the workplace" (Pl.'s Mem. 4), she has not provided evidentiary support for her claim. In fact, the record overwhelmingly shows that the substance of Sassaman's April 11 letter had spread like wildfire among personnel of the Board and the legislature *after Sassaman himself* had distributed the letter to personnel of each. Therefore, the notion that Ballo was responsible for triggering the rumor mill is folly.

In any event, no reasonable finder of fact could deem the jokes Plaintiff alleges were made at her expense to have been so severe or pervasive as to create a hostile work environment. Plaintiff does not identify particulars of jokes. She cannot say that any such jokes did not result from Sassaman's own distribution of the April 11 letter rather than from any conduct imputable to Defendants, nor [*27] that any such jokes were not the consequence of other sources of hostility in the office, such as political tension between Democrats and Republicans or the workplace tension that Plaintiff herself recognized following the reassignment by which she exchanged jobs with Sassaman.

Defendants' Motion for Summary Judgment must therefore be granted as to Plaintiff's hostile work environment claim because Plaintiff has failed to produce triable issues of fact as to: (1) conduct sufficient to create a hostile work environment; (2) any such conduct being on account of Plaintiff's gender; or (3) imputation of alleged hostile conduct to her employer.

## C. Retaliation Claim

Although not in the Complaint, Plaintiff's Memorandum purports to argue an additional claim "that the distribution of the April 11th letter by Deputy Commissioner Ballo was an act of retaliation in violation of 42 U.S.C. § 2000e-(3)(a)." The anti-retaliation provision of Title VII prohibits an act of discrimination against an individual because such individual has opposed an 16 unlawful employment practice under Title VII. *See* 42 U.S.C. § 2000e-(3)(a). Plaintiff's counsel conceded at oral argument that nowhere in the Complaint was [*28] a retaliation claim expressed or implied, and he recognized that discovery had been conducted in this case on the understanding that the sole claim was for harassment (and not retaliation). Plaintiff has not moved to amend

her Complaint, even to this day -- and it is, in any event, too late now. *See United States v. Hougham*, 364 U.S. 310, 316, 81 S. Ct. 13, 5 L. Ed. 2d 8 (1960) (stating that Fed. R. Civ. P. 15 "was designed to facilitate the amendment of pleadings *except where prejudice to the opposing party would result* " (emphasis added)); *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (holding that prejudice to opposing party is determined by whether "the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction" and stating that the longer the unexplained delay, the less is required for a showing of prejudice); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th Cir. 1998) (affirming denial of leave to amend where leave sought one year after initial pleading and five [*29] months after discovery cut-off and where plaintiff had full information at time of initial complaint and offered no explanation for delay). Thus, the Court appreciates Defendants' valid concern about lack of notice and opportunity to fully brief this apparent claim. (Defs.' Reply Mem. 9.) Nevertheless, in the interests of "just, speedy, and inexpensive determination of [this] action," the Court will address the retaliation claim. *See* Fed. R. Civ. P. 1.

"To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (internal quotation marks omitted); *accord Wilson*, 2005 U.S. Dist. LEXIS 21620, 2005 WL 2385866, at *16 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The Court's analysis here focuses on the third element of the claim: the required adverse employment decision.

In the recent case of *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme [*30] Court explained that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 126 S. Ct. at 2414. A plaintiff must show that the challenged action might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks omitted). The conduct of which Plaintiff complains-Ballo's alleged distribution of the April 11 letter -- does not rise to this standard.

For the reasons discussed above, Ballo's conduct probably cannot be imputed to the Board as his employer, given that he likely cannot be deemed Plaintiff's

supervisor. But, more importantly, a substantial number of employees in the relatively small Board office had independent knowledge of the existence and contents of the April 11 letter. Plaintiff has not raised a triable issue of fact as to whether the distribution was a sufficiently harmful action to dissuade a reasonable worker from making or supporting a charge of discrimination. The acts that Plaintiff alleges were taken by Ballo -- assuming they indeed occurred -- may have been disrespectful and unprofessional but, in the context of the [*31] Board office, they do not rise to the level of adverse employment action. For this reason, any retaliation claim that Plaintiff could make also fails.

In any event, however, Plaintiff has not made clear -- in her papers (on this Motion, that is, as the retaliation claim was not alleged in the Complaint) or through counsel at oral argument -- just what protected conduct she engaged in against which Ballo might have been attempting to retaliate. The nearest thing Plaintiff offers is the characterization of Ballo's deposition testimony that Ballo thought Sassaman had been wronged, but this is not evidence that Ballo was trying to hurt Plaintiff.

Construing all of the pleadings and evidence most favorably to Plaintiff, she is understandably upset about Sassaman's April 11 letter. Nevertheless, for reasons not evident to the Court, Plaintiff decided to sue the Board and the County and not Sassaman. Perhaps she was genuinely motivated by the immature reactions among her coworkers stimulated by Sassaman's letter. None of this, however, alters the necessary conclusion that there is no Title VII case here.

III. Conclusion

For the reasons stated in this Opinion, Defendants' Motion for Summary Judgment [*32] is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion on the docket (No. 11) and to close the case.

SO ORDERED.

Dated: February 11, 2008

White Plains, New York

/s/ Kenneth M. Karas

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

LEXSEE 2001 U.S. DIST. LEXIS 97

**MATTHEW B. DELLEFAVE, Plaintiff, - against - ACCESS TEMPORARIES, INC., STEVEN WEINSTEIN, a/k/a STEVEN WEBER, MICHAEL WEINSTEIN, MARK PAUL, LAWRENCE PAUL, RONALD AXELROD, KAREN P. DRUZI-AKO, JOHN DOES, 1-100 (being as yet unidentified employees, representatives, or agents of Access Temporaries, Access Personnel and/or other companies owned in whole or part by Steven Weinstein and/or Michael Weinstein), JANE ROES, 1-100 (being as yet unidentified persons, organizations of persons, or business entities that hold any ownership interest in Access Temporaries, Inc.), PETER POES, 1-100 (being as yet unidentified persons, organizations of persons, or business entities that are officers and/or directors of or are in any way involved in managing any of the activities of Access Temporaries, Inc.), and MICHAEL MOES, 1-100 (being as yet unidentified persons, organizations of persons, or business entities that have received assets from Access Temporaries, Inc., within the last six months), Defendants.**

99 Civ. 6098 (RWS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

2001 U.S. Dist. LEXIS 97

**January 10, 2001, Decided
January 11, 2001, Filed**

**DISPOSITION:** [*1] Motion for judgment on pleadings granted and plaintiff's motions for leave to replead and to compel production of witnesses for deposition denied. Complaint dismissed with prejudice.

**COUNSEL:** For Plaintiff: JOSEPH Di RIENZO, ESQ., Of Counsel, Di RIENZO & WALLERSTEIN, Fanwood, NJ.

For Access Temporaries, Inc., Defendant: PENNY ANN LIEBERMAN, ESQ., Of Counsel, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, New York, NY.

For Access Temporaries, Inc., Defendant: TERRI L. FREEMAN, ESQ., Of Counsel, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Morristown, NJ.

For Karen P. Druziako, Defendant: STEVEN A. BER-GER, ESQ., JOHN R. CAHILL, ESQ., KENNETH J. APPLEBAUM, ESQ., Of Counsel, BERGER STERN & WEBB, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.,**

Defendant Karen P. Druzakio ("Druzakio") has moved for judgment on the pleadings in this sexual harassment action pursuant to Rule 12(c), Fed. R. Civ. P. Plaintiff Matthew B. DelleFave ("DelleFave") opposes the motion and has moved for leave to amend the complaint if pleading deficiencies are found. The defendants oppose any amendments. Also pending are Druzakio's motion for sanctions, attorneys' fees and costs [*2] pursuant to Rule 11, Fed. R. Civ. P., and DelleFave's motion to compel depositions. For the reasons stated below, Druzakio's motion for judgment on the pleadings is granted, DelleFave is denied leave to replead, the motion to compel depositions is denied, and DelleFave is ordered to pay Druzakio's fees and costs.

***The Parties***

DelleFave, a resident of New Jersey, was an at-will employee of defendant Access Temporaries ("Access") until his termination, which gave rise to this suit.

Access is a New York corporation.

Steven Weinstein is a New York resident and an owner and employee of Access.

Michael Weinstein is a New York resident and the brother of Steven Weinstein. He is an owner and employee of Access.

Druzakio, a New Jersey resident, was Dellefave's immediate supervisor at Access.

Ronald Axelrod ("Axelrod") is a New York resident and an owner or employee of Access.

### Prior Proceedings

The prior proceedings in this case are set forth in an opinion of this Court, familiarity with which is assumed. *See DelleFave v. Access Temporaries, et al.*, 2000 U.S. Dist. LEXIS 347, No. 99 Civ. 6098, 2000 WL 45720 (S.D.N.Y. Jan. 19, 2000).

### Background

The complaint [*3] alleges the following facts, which are deemed true for the purpose of this motion. DelleFave was hired by Access on or about May 12, 1997. On or about March 1, 1998, Druzakio made false statements about Dellefave including allegations that he was involved in a romantic and/or sexual relationship with a co-employee. DelleFave alleges that these statements injured his reputation. When DelleFave learned that these statements had been made, he complained to Druzakio's supervisor, defendant Ronald Axelrod ("Axelrod"). Axelrod and other defendants failed to investigate the complaint adequately, and republished the statements to other Access employees. DelleFave was terminated from his position at Access sometime thereafter, allegedly as a result of his complaint about Druzakio's false statements. Access' contractual relationship with its employees, including DelleFave, included a provision that Access would not permit employees to suffer any retaliation for reporting instances of unwelcome sexual harassment to management. DelleFave also alleges that both Druzakio's statements, and her superiors' failure to investigate them created a "hostile work environment." Pltf. Mem. at 6.

Since the [*4] dismissal of Count Ten in the prior opinion, and DelleFave's withdrawal of the state law invasion of privacy and federal Title VII and 42 U.S.C. § 1983 claims, the remaining counts in the complaint include state law defamation (Count 1), retaliatory discharge (Counts 4, 5), and sexual harassment claims (Count 6). *See* Pltf. Mem. at 3.

On September 20, 2000, Druzakio filed a motion for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P. DelleFave filed a brief in opposition on October 4, 2000. Druzakio filed a reply memorandum on October 10, 2000, and the motion was deemed fully submitted upon oral argument on October 11, 2000.

On October 11, 2000, Druzakio moved for the imposition of sanctions, attorneys' fees and costs against DelleFave pursuant to Rule 11, Fed. R. Civ. P. By letter-motion of October 16, 2000, DelleFave moved to compel the production of witnesses for deposition. DelleFave filed a motion to amend the complaint on October 23, 2000. Each of these motions was briefed by Druzakio and by plaintiff, and the motions were deemed fully submitted after oral argument on November 8, 2000.

### Discussion

### I. Legal Standard [*5]  for Motion for Judgment on the Pleadings Pursuant to Rule 12(c)

Rule 12(c) provides for judgment on the pleadings "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). The pleadings include the complaint, the answer and any written instruments attached as exhibits. *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

The Rule 12(c) standard is the same as that applied under Rule 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). "Therefore, in reviewing a motion for a judgment on the pleadings, a court must assume the facts alleged by the plaintiff to be true and must liberally construe them in the light most favorable to the plaintiff." *AD/SAT a Div. of Skylight, Inc. v. Associated Press*, 885 F. Supp. 511, 514 (S.D.N.Y. 1995). A court should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim [*6] which would entitle [it] to relief." *Sheppard*, 18 F.3d at 150. In sum, "the Court's task is simply to determine whether the plaintiff has a legal right to seek relief based on the allegations in the complaint." *Henschke v. New York Hospital-Cornell Medical Center*, 821 F. Supp. 166, 168 (S.D.N.Y. 1993).

### II. The Motion for Judgment on the Pleadings is Granted

### A. The Defamation Claim is Dismissed

Count One alleges that Druzakio "made false statements about [DelleFave] which would be offensive to a reasonable person and which were damaging to [Delle-Fave's] reputation. These statements include allegations that plaintiff was involved in a romantic and/or sexual relationship with a co-employee." Compl. P17. Count One seeks damages against all named defendants for injuries sustained as a result of these allegedly defamatory statements.

The parties concur that New York law is applicable. The New York Court of Appeals has defined a defamatory statement as one that exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil [*7] opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 186 N.E. 217, 218 (1933); citing *Golub v. Enquirer/Star Group, Inc.*, 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 681 N.E.2d 1282, 1283 (1997)).

Under New York law, the plaintiff must establish four elements in order to prevail on a defamation claim: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff. *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993). In addition, the plaintiff must plead special damages unless the defamation falls into one of the categories of defamation per se. Druzakio contends that the complaint fails to allege either publication or special damages. DelleFave counters that he did plead publication, and that the statement was defamatory per se because it disparaged his office, profession or trade. *See Celle*, 209 F.3d at 179. [*8]

### 1. *Publication*

In support of his claim that he has met the publication requirement, DelleFave notes that the complaint alleges that the statements "were damaging to plaintiff's reputation" and that they were "republished by other employees of Access Temporaries." *See* Compl. PP17, 20. However, the fact that an allegation may be deduced through logic based upon the premises alleged does not suffice as a "pleading" pursuant to the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claims showing that the pleader is entitled to relief."); *Robinson v. N.Y.P.D. Personnel Employment Div.*, 1999 U.S. Dist. LEXIS 17746, No. 99 Civ. 1654 (DLC), 1999 WL 1044361, *1 (S.D.N.Y. Nov. 18, 1999) (dismissing federal sexual harassment claim because plaintiff claiming discrimination failed to allege required element that he was a member of a protected class). Just as deductions included in the pleadings are insufficient to state a claim, *see Miller v. HLT Check Exchange*, 215 B.R. 970, 972 (E.D. Ky. 1997) ("Legal conclusions, deductions or opinions couched as factual allegations in a complaint are not given a presumption [*9] of truthfulness."); *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1003 (S.D. Tex. 1995) (stating that "conclusory allegations and unwarranted deductions of fact are not admitted as true by a motion to dismiss"), pleadings which require

deductions in order to state all the elements are also insufficient as a matter of law. *See Curti v. Girocredit Bank*, 1994 U.S. Dist. LEXIS 1473, No. 93 Civ. 1782, 1994 WL 48835 (S.D.N.Y. Feb. 14, 1994) (dismissing complaint for failure to plead that defendant published statement to a third party, despite allegation that defendant's agents published statement).

Requiring a plaintiff to allege publication as such, rather than republication by a third party or damage to reputation, merely holds plaintiff to the standard pleading rules, rather than requiring him to "set out in detail the facts upon which he bases his claim," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), as DelleFave alleges. Although DelleFave did allege that the other defendants published the allegedly defamatory statement, DelleFave has failed to allege publication by Druzakio.

### 2. *Plaintiff's Defamation Claim Requires* [*10] *the Pleading of Special Damages*

Special damages consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation," as distinguished from actual damages, which include additional harms such as impairment of reputation and personal humiliation. *Celle*, 209 F.3d at 179 (citations omitted). Lost income does not qualify as special damages. *See Aronson v. Wiersma*, 65 N.Y.2d 592, 595, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985). Injury is assumed for statements that are slanderous per se, so a plaintiff could recover at least nominal damages even without pleading actual damages. *Id.* In order to satisfy the special damages requirement, "a plaintiff must set forth an itemized account of her losses; round figures or a general allegation of a dollar amount as special damages will not suffice." *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 441 (S.D.N.Y. 1997). Absent this pleading, a complaint will be dismissed. DelleFave has not pleaded special damages.

In *Celle v. Filipino Reporter Enterprises, Inc.*, the Second Circuit recently addressed the question [*11] of which statements qualify as defamation per se and therefore do not require a complaint to plead special damages. 209 F.3d at 179-80. As stated above, one general rule is that a statement "which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." *Id.*, 209 F.3d at 179. However, simply because a statement is made at a workplace by a supervisor or co-worker regarding an employee does not place it within the realm of statements that disparage the employee's work and therefore qualify as defamatory per se. The defamation per se rule requires that the statement relate to the quality of the employee's work or his competence or fitness for

the job. A leading treatise describes the quintessential examples of employment-related defamation per se as follows:

> It is actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney that he is a shyster, or a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, [*12] of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes ... - since these things discredit [one] in his chosen calling.

W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 112, at 791 (5th ed. 1984); *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 436, 590 N.Y.S.2d 857, 861, 605 N.E.2d 344 (1992) (stating that this exception is "limited to defamation of a kind incompatible with the proper conduct of the business, trade or profession or office itself. The statement must be made with a reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities."). A statement alleging that a person is in a consensual relationship with a co-worker at a temporary employee placement company -- unlike such a statement regarding a priest or a schoolteacher in the example cited above -- has no bearing on the employee's fitness to accomplish his function. The statement alleged in the complaint is not defamation per se. [1]

---

1 An alternate ground for slander per se is the implication that the plaintiff committed a crime. Under New York law, the inference that a married person has had a sexual relationship with a person other than his spouse implies adultery, which, although typically unenforced, is still an indictable offense. *See* N.Y.P.L. § 255.17 (McKinney 1999); *Meyer v. Somlo*, 105 A.D.2d 1007, 1008, 482 N.Y.S.2d 156, 157 (N.Y. App. Div. 1984). However, statements alleging that an unmarried person was in a sexual affair do not qualify as slander per se under this rule. As the complaint does not allege that DelleFave is married, he has failed to allege a claim for defamation per se under this theory.

One other potentially relevant common law ground for slander per se, which in twenty-first century Manhattan amounts to little more than an historical oddity, is imputation of homosexuality. This exception to the requirement of pleading special damages, along with those of employment, crime, loathsome disease, and imputation of chastity to a woman, "were established apparently for no other reason than a recognition that by their nature the accusations encompassed therein would be likely to cause material damage." *Matherson v. Marchello*, 100 A.D.2d 233, 236, 473 N.Y.S.2d 998, 1001 (N.Y. App. Div. 1984). Social acceptance of personal sexual choices has expanded significantly since the origination of these common law rules, and the viability of this exception is now in question. *See, e.g., Hayes v. Smith*, 832 P.2d 1022, 1025 (Col. App. 1992), *cert. denied*, (1992). In fact, the Restatement of Torts reports a trend toward limiting the exceptions to statements that are defamatory on their face without resort to extrinsic evidence, and expressly leaves open whether homosexuality falls into this category. Restatement (Second) of Torts § 571-574 (1977); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (disfavoring presumed damages and per se defamation). However, as Delle-Fave has failed to allege the gender of the co-worker he was reputed to have been involved with, he has failed to raise this exception and it need not be addressed further here.

[*13] The pleadings do not establish a claim for defamation under New York law. *See Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 763 (2d Cir. 1990) (upholding dismissal of slander claim for failure to plead publication, special damages, and failing to plead the actual words spoken). Druzakio's motion for judgment on the pleadings of Count One is granted, and Count One is dismissed pursuant to Rule 12(c).

**B. *The Retaliatory Discharge and Sexual Harassment Claims Are Dismissed***

Druzakio, construing Counts 4 and 5 as alleging that she violated the company's sexual harassment policy both intentional and negligently, contends that these counts must be dismissed (1) for failing to allege wrongful conduct on the part of Druzakio; (2) failing to state a claim; and (3) because they are conclusory and do not set forth their factual basis. DelleFave argues that these Counts adequately state claims against Druzakio for retaliatory discharge, aiding and abetting discrimination, and tortious interference with contract. Pltf. Mem. at 10-13.

As an initial matter, the vast differences between the parties' interpretations of Counts 4 and 5 are clear proof that DelleFave [*14] has failed to give fair notice

2001 U.S. Dist. LEXIS 97, *

through a "short and plain statement of the claim," as required by Rule 8(a)(2), Fed. R. Civ. P. *See also Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

Reference to the substance of Counts 4 and 5 enforces this finding. Count Four provides in relevant part:

> 2. Defendants Access Temporaries, Inc., Steven Weinstein, Michael Weinstein, Druzakio, Axelrod, John Does 1-100, Jane Roes 1-100, and Peter Poes 1-100 intentionally and maliciously violated Access Temporaries [sic] policy against sexual harassment by retaliating in various manners against plaintiff for reporting sexual harassment. This retaliatory conduct included, but was not limited to, terminating plaintiff.

> 3. As a result of this intentional and malicious conduct, plaintiff has suffered injuries, including, but not limited to, lost wages and emotional distress.

Compl. Count IV at PP2-3. Count Five duplicates Count Four except that it alleges negligence rather than malicious retaliation. Compl. Count V at P3. The complaint does not allege which legal provisions were violated by this alleged conduct.

### 1. *Discrimination-Related* [*15] *Claims*

A claim for retaliatory discharge under New York's Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1999) [2], requires the same standard of proof as a claim brought under federal law, 42 U.S.C. §§ 2000e et seq. (Title VII of the Civil Rights Act of 1964 ("Title VII")). *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998). In order to state a claim for retaliatory discharge, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995). New York law also provides a cause of action against those who aid or abet discrimination that is prohibited by the Human Rights Law. N.Y. Exec. Law § 296(6) (McKinney 1999).

2 This law provides:

> (1) It shall be an unlawful discriminatory practice:

>> (a) For an employer or licensing agency, because of the ... sex ... of

any individual, to ... discharge from employment such individual....

> (e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

(6) It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

(7) It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because ... he or she has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Exec. Law § 296 (McKinney 1999).

[*16] By referring to Access Temporaries' policy against sexual harassment, DelleFave apparently seeks to show that his complaint regarding Druzakio's statement was "protected activity," which satisfies the first element of retaliatory discharge. *See* Pltf. Mem. at 11-12. However, the policy is simply a codification of the New York Human Rights law, which renders it unlawful for an employer to discriminate against or discharge an employee due to the employee's sex. N.Y. Exec. Law § 296(1), (2) (McKinney 1999); *see* Access Policy Against Sexual Harassment, Applebaum Decl. Ex. I at Ex. B ("It is Access' policy to prohibit harassment of any employee . . . on the basis of sex or gender. . . Harassment also can include unwelcome joking, teasing or other conduct directed toward a person because of his or her gender which is sufficiently or pervasive to create an unprofessional and hostile working environment.").

Therefore, in order to decide whether DelleFave may bring a claim for retaliatory discharge for reporting sexual harassment and aiding and abetting discrimination in Counts 4 and 5, the sexual harassment/hostile work environment claim in Count 6 must first be addressed. Courts [*17] "have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998

(1998). Rather, a plaintiff must show a distinct adverse impact on him as a result of his sex. *Id.*, 523 U.S. at 81. Therefore, if the statement was not on the basis of Delle-Fave's sex, it does not state a *prima facie* case for sexual harassment, and necessarily cannot support any of the remaining discrimination-based claims as a matter of law.

Count 6 of the complaint states that Druzakio "engaged in discriminatory conduct based on plaintiff's gender" that created "an intimidating, hostile, or offensive working environment. . . ." Compl. Count 6 at P2. Under both Title VII and New York's Human Rights Law, a hostile work environment claim is stated if a plaintiff shows: (i) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) [*18] (*citing Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)); and (ii) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry*, 115 F.3d at 149. Again, in order to make out a hostile work environment claim, a plaintiff must allege unlawful discrimination on the basis of sex. *See Oncale*, 523 U.S. at 80-81 (noting that plaintiff must always prove that the conduct at issue actually constituted discrimination "because of . . . sex"). Moreover, even discriminatory conduct may not rise to the level of hostile work environment sexual harassment if limited to one or two instances and not particularly offensive. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).

As discussed above, mere conclusory allegations summarizing the elements of a claim do not meet the pleading requirements of the Federal Rules. *See, e.g., Invamed v. Barr Labs, Inc.*, 22 F. Supp. 2d 210, 216 (S.D.N.Y. 1998) ("the Federal Rules do not permit conclusory statements to substitute for minimally sufficient factual allegations. [*19] ") (internal quotation marks and citation omitted). The only factual allegation relevant to this inquiry is the March 1, 1998 statement by Druzakio cited above, claiming that DelleFave was having a "romantic and/or sexual relationship with a co-employee," Compl. P17, and that other defendants subsequently republished that statement, Compl. P20. On their face, these allegations do not state the presence of a pervasively hostile work environment. *See Whidbee*, 223 F.3d at 69. However, as noted above, infrequent incidents may create a hostile work environment if they are sufficiently severe and offensive. *See Carrero v. New York City Housing Auth.*, 890 F.2d 569, 578 (2d Cir. 1989).

The Honorable Leonard B. Sand recently noted that "certain sexual references will not sustain a charge of sexual harassment because they are not peculiar to one gender." *Nash v. New York State Executive Dep., Div. of Parole*, 1999 U.S. Dist. LEXIS 16066, 96 Civ. 8354 (LBS), 1999 WL 959366, *9 (S.D.N.Y. Oct. 20, 1999). In *Nash*, the court made an exception to that evolving rule in the Title VII case of a parole officer whose co-workers spread rumors that she had been a prostitute and was [*20] currently working as a madam, on the grounds that the gossip in that case was particular to the plaintiff's female gender. *Id.*

Here, in contrast, nothing about the alleged statement relates to DelleFave's gender. Even if embarrassing or even humiliating, a statement that an employee is having a consensual relationship with a co-worker cannot be construed as discrimination or harassment on the basis of sex absent some additional showing, such as that the plaintiff was singled out for such comments because of his or her gender, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.10, 96 S. Ct. 2574, 2580 n.10, 49 L. Ed. 2d 493 (1976). *See Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514 (7th Cir. 1996) ("There is not even a hint in the record that any rumors or vulgar statements concerning an illicit relationship between [the plaintiff] and [another employee] were made because [plaintiff] was a male."); *Snoke v. Staff Leasing, Inc.*, 43 F. Supp. 2d 1317, 1327 (M.D. Fla. 1998) (holding that "rumors" of affair between co-workers "do not show harassment 'because of' sex"); *Huffman v. City of Prairie Village*, 980 F. Supp. 1192, 1197-98 (D. Kan. 1997) [*21] (female police dispatcher's claim that false allegations of rumors of a sexual relationship with a male sergeant had resulted in a hostile work environment, were not based on her sex since the offensive comments and rumors were directed at both the female plaintiff and male sergeant). [3]

3  Rumors have been found to be on the basis of sex where there was proof that the rumor involved implications that the plaintiff's involvement with a superior who was of a different gender resulted in the plaintiff's advancement at work. *See Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir. 1994) (noting that rumors of sexual relationship between superior and subordinate could state *prima facie* case for sexual harassment where one subject of rumor was male and the other female); *Jew v. University of Iowa*, 749 F. Supp. 946, 958 (S.D. Iowa 1990) (same analysis regarding rumors of relationship between male superior and female subordinate). However, DelleFave has alleged that the statement in this case pertained to a "co-employee" rather than a person of superior or subordinate rank, so he cannot support his claim on this theory as a matter of law.

[*22] On the pleadings; DelleFave has failed to allege facts which could lead to relief under a theory of sexual harassment, aiding and abetting sexual harassment, or discrimination under New York's Human Rights Law. Judgment on Count 6 will therefore be entered against DelleFave pursuant to Rule 12(c).

### 2. Tortious Interference with Contract

The remaining theory on which DelleFave relies in support of Counts 4 and 5 is tortious interference with contract. In order to prevail on his claim that Druzakio tortiously interfered with his employment contract with Access, DelleFave must show "(1) the existence of a valid contract between himself and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional inducement of the third party to breach that contract, [4] and (4) damages." *Murray v. Sysco Corp.*, 273 A.D.2d 760, 710 N.Y.S.2d 179, 181 (N.Y. App. Div. 2000). Where, as here, the employment contract between a plaintiff and a third party is terminable at will, plaintiff must also show that defendant employed "wrongful means, such as fraud, misrepresentation or threats to effect the termination of employment." *Id.* (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). [*23] [5]

4 Because tortious interference with contract is an intent crime, it cannot form the basis for the negligence claim asserted in Count 5. As none of the legal theories advanced in support of Count 5 is sufficient in light of the facts alleged, Count 5 is dismissed.

5 Count 4 must be dismissed to the extent that it purports to bring a claim against defendants other than Druzakio who were parties to the contract with DelleFave, rather than outside third parties who could have induced a breach of it as a matter of law.

In support of the third element of tortious interference with contract, DelleFave argues that the complaint alleges that he "had an employment contract in accordance with the terms of his employee handbook, and that defendant violated that policy, then induced his employer to deviate from that policy, . . . [which] was a breach of contract wrongfully induced by [Druzakio]." Pltf. Mem. at 12. [6] However, Count Four alleges that Druzakio herself "intentionally and maliciously violated Access [*24] Temporaries [sic] policy by . . . terminating plaintiff," and fails to allege that she induced a third party to do so. Count Four P2. Moreover, such a claim is inconsistent with a tortious interference with contract claim and with Counts One and Two, which allege that every defendant *except* Druzakio was responsible for terminating Delle-Fave. *See* Compl. Count Two P3 ("Plaintiff's wrongful

termination from Access Temporaries, Inc. was conducted by, through, or at the direction of defendants, Steven Weinstein, Michael Weinstein, Axelrod, John Does 1-100, Jane Roes 1-100, and/or Peter Poes 1-100.").

6 To the extent that the complaint alleges that the only contract with Access was the Policy, the Policy itself states that "none of the information contained within this handbook should be considered contractual in nature." Applebaum Decl., Ex. F.

It is appropriate to dismiss a claim that is both unsupported and contradicted by other claims in the complaint. *See Salahuddin v. Jones*, 992 F.2d 447, 449 [*25] (2d Cir.) (affirming dismissal of claim where plaintiff "made wholly conclusory and inconsistent allegations"), *cert. denied*, 510 U.S. 902, 114 S. Ct. 278, 126 L. Ed. 2d 229 (1993). As the facts alleged in the Count Five do not entitle DelleFave to relief as a matter of law, the motion for judgment on the pleadings of Count Five is granted pursuant to Rule 12(c).

### III. The Motion to Amend is Denied

DelleFave seeks leave to amend the complaint to cure the deficiencies cited above. Druzakio opposes the motion on the grounds that it is unduly delayed, prejudicial, futile, and fails to provide the foundation for the exercise federal jurisdiction.

Rule 15(a) provides that a party may amend a pleading only by leave of the court if more than 20 days have passed after the pleading is served, and that leave shall be "freely given if justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has, however, interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when the party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, [*26] and (4) when the amendment is not futile. *See Chan v. Reno*, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962)).

Leave to amend is not appropriate where, as here, the motion is filed solely in anticipation of an adverse ruling. *See Berns v. EMI Music Publishing, Inc.*, 1999 U.S. Dist. LEXIS 17541, No. 95 Civ. 8130 (KTD), 1999 WL 1029711, *5 (S.D.N.Y. Nov. 12, 1999); *Schnepf v. Siegel*, 1998 U.S. Dist. LEXIS 12386, No. 98 Civ. 1255 (SHS) (AJP), 1998 WL 474132, *1 (S.D.N.Y. Aug. 11, 1998); *PI, Inc. v. Quality Products, Inc.*, 907 F. Supp. 752, 764 (S.D.N.Y. 1995); *Bymoen v. Herzog, Heine, Geduld, Inc.*, 1991 U.S. Dist. LEXIS 7169, No. 88 Civ. 1796, 199 WL 95387, *1 (S.D.N.Y. May 28, 1991);

*Reisner v. General Motors Corp.*, 511 F. Supp. 1167, 1172 (S.D.N.Y. 1981), *aff'd*, 671 F.2d 91 (2d Cir.), *cert. denied*, 459 U.S. 858, 74 L. Ed. 2d 112, 103 S. Ct. 130 (1982).

The complaint was originally filed in the New Jersey Superior Court on December 31, 1998. DelleFave blames the delay in filing the motion to amend on the fact that Druzakio only recently moved [*27] for judgment on the pleadings. Rather than excusing DelleFave's delay, however, this argument merely confirms the dilatory motive for his motion to amend, as DelleFave has advanced no other reason for the delay. *See Berns*, 1999 WL 1029711, at *5 (characterizing motion to amend filed in anticipation of adverse ruling to have dilatory motive); *Dais v. Lane Bryant, Inc.*, 2000 U.S. Dist. LEXIS 1228, *8, No. 97 Civ. 2011, 2000 WL 145755, *2 (S.D.N.Y. Feb. 8, 2000) ("if, as here, the plaintiff offers no excuse for the delay, denial of leave to amend is appropriate). In addition, Rule 15 is not the appropriate mechanism by which to add previously known facts to a poorly drafted complaint, *see Priestley v. American Airlines, Inc.*, 1991 U.S. Dist. LEXIS 4804, No. 89 Civ. 8265, 1991 WL 64459, *1 (S.D.N.Y. Apr. 12, 1991).

Finally, it would be futile to amend the complaint as proposed, most importantly because the proposed first amended complaint fails to include any jurisdictional statement or raise any grounds for subject matter jurisdiction, and would be subject to a successful motion to dismiss on jurisdictional grounds. *See Chan*, 916 F. Supp. at 1308. Although this Court exercised [*28] supplemental jurisdiction over the state law claims remaining in the complaint after the federal claims were withdrawn for the purpose of the Rule 12(c) motion, *see* 28 U.S.C. § 1367(c)(3), it has no original subject matter jurisdiction over the exclusively state law claims in the proposed amended complaint because neither of the components of diversity jurisdiction has been met or pled. *See* 28 U.S.C. § 1332 (requiring complete diversity of citizenship and that the complaint allege that at least $ 75,000 is at issue).[7]

> 7   The proposed amended complaint alleges that both DelleFave and defendant Druzakio reside in New Jersey, Compl. PP 1, 5, and fails to allege an amount in controversy. Count One alleges only that DelleFave lost wages in the amount of $ 2,000 plus unspecified commissions. Compl. Count One P 20.

### IV. *The Motion to Compel Production of Witnesses for Depositions is Denied*

In light of the above rulings, DelleFave's motion to compel [*29] production of witnesses for depositions is denied as moot.

### V. *Sanctions*

Druzakio has moved for sanctions on the grounds that the complaint was baseless as to her, and that Delle-Fave persisted in pursuing the claims despite their lack of merit, at substantial time and expense to Druzakio. The decision of whether to award sanctions pursuant to Rule 11 is subject to the Court's discretion. *See Margo v. Weiss*, 213 F.3d 55, 64 (2d Cir. 2000); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999). "Sanctions imposed for violations of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(2). In essence, all of the claims against Druzakio derive from her statement regarding DelleFave's alleged affair with a co-worker. Viewed charitably, DelleFave made a barely non-frivolous argument that Druzakio had defamed him. Yet a review of relevant case law would have revealed that such a claim is not on the basis of sex, and therefore cannot support a discrimination claim premised upon sexual harassment, or any derivative retaliation [*30] or tortious interference with contract claim. These claims -- to the extent that they were raised in the complaint -- had no basis in law or fact. *See Securities Indus. Ass'n v. Clarke*, 898 F.2d 318, 321 (2d Cir. 1990) ("A distinction must be drawn between a position which is merely losing, and one which is both losing and sanctionable.") (internal quotations omitted).

In the exercise of this Court's discretion pursuant to Rule 11, Druzakio shall be awarded attorneys' fees and costs for having to respond to claims that were unsupported by law or fact. *See Shafii v. British Airways, PLC*, 83 F.3d 566, 570 (2d Cir. 1996) (stating that sanctions are appropriate where "there is no chance for success" under existing precedent); *Global Liaisons, Inc. v. Black Diaspora Communications, Ltd.*, 1999 U.S. Dist. LEXIS 12200, No. 97 Civ. 8247 (JSR), 1999 WL 595647, *2 (S.D.N.Y. Aug. 9, 1999) (finding award of attorneys' fees and costs appropriate to satisfy purpose of Rule 11 to deter future frivolous filings).

### *Conclusion*

For the foregoing reasons, the motion for judgment on the pleadings is granted, and DelleFave's motions for leave to replead and to compel [*31] the production of witnesses for deposition are denied. The complaint is dismissed with prejudice. Druzakio is awarded attorneys' fees, costs, and expenses pursuant to Rule 11.

Submit accounting of actual attorney's fees and costs, as well as judgment, on notice.

It is so ordered.

**New York, NY**

2001 U.S. Dist. LEXIS 97, *

**ROBERT W. SWEET**

**January 10, 2001**

**U.S.D.J.**

# EXHIBIT 4

LEXSEE 2008 U.S. DIST. LEXIS 41454

**JOSEPH MARTINEZ, Plaintiff, -v- NEW YORK CITY DEPARTMENT OF EDU-CATION, Defendant.**

**No. 04 Civ. 2728 (LTS)(DFE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 41454**

**May 27, 2008, Decided
May 27, 2008, Filed**

**PRIOR HISTORY:** Martinez v. Sulner, 2006 U.S. Dist. LEXIS 12448 (S.D.N.Y., Mar. 22, 2006)

**COUNSEL:** [*1] Joseph Martinez, Plaintiff, Pro se, New York, NY.

For Dr. Ilisa Sulner, Defendant: Amy Grossberg, Shiyani Soni, LEAD ATTORNEYS, New York City Law Department, Office of the Corporation Counsel, New York, NY.

For Department of Education, Chancellor Mr. Klein, Defendant: Ivan A. Mendez, Jr., Lisa Marie Griffith, NYC Law Department, Office of the Corporation Counsel, New York, NY.

For Mr. Klein, Defendant: Amy Grossberg, LEAD ATTORNEY, New York City Law Department, Office of the Corporation Counsel, New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

**OPINION AND ORDER**

Pro se Plaintiff Joseph Martinez ("Plaintiff") brings this action against Defendant New York City Department of Education ("NYC DOE" or "Defendant"), alleging that Defendant engaged in discriminatory employment practices based on Plaintiff's sex and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 296. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction of Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

Defendant's [*2] motion for summary judgment dismissing Plaintiff's complaint in its entirety is now before the Court. Defendant's motion papers were accompanied by a Statement entirety is now before the Court. Defendant's motion papers were accompanied by a Statement pursuant to S.D.N.Y. Local Civil Rule 56.1, as well as a Notice to Pro Se Litigant Opposing Motion for Summary Judgment as required by Local Civil Rule 56.2, and a number of evidentiary submissions. Plaintiff submitted a series of letters and evidentiary proffers in response, which the Court has construed as his opposition to Defendant's motion., (Docket Entries Nos. 45, 48.) The Court notes that, although Plaintiff has not submitted the required response to Defendant's Rule 56.1 Statement and Defendant's factual proffers could for that reason be taken as admitted under Local Civil Rule 56.1(c), the Court has examined carefully Plaintiff's letters and evidentiary proffers in determining whether there are genuine issues of material fact. The Court has also considered carefully Defendant's memoranda and accompanying affidavits and exhibits. For the following reasons, Defendant's motion is granted.

BACKGROUND

Unless otherwise stated, the following [*3] material facts are undisputed to the extent that both parties submitted the same underlying evidence, or to the extent that they are premised on proffers by one party that are unrefuted by any proffer from the other.

Plaintiff is a male who was employed as a guidance counselor for most of the relevant period. (Declaration of Amy Grossberg, dated Jan. 29, 2007 ("Grossberg Decl.")

Ex. H.) Dr. Ilisa Sulner ("Sulner"), the principal of P.S. 721X ("721X"), was Plaintiff's supervisor during his employment there.

*April 2003 - McTaggart's claim of sexual harassment; OEO investigation*

On April 15, 2003, Kim McTaggart ("McTaggart"), another guidance counselor at 721X, sent a letter to Sulner accusing Plaintiff of sexual harassment. (Grossberg Decl. Ex. K.) Sulner thereafter ordered Plaintiff to "cease and desist" from his efforts to establish a personal relationship with McTaggart and informed him that representatives from the Board of Education's Office of Equal Opportunity ("OEO") would discuss the charges of sexual harassment with Plaintiff on May 7. (Id. Exs. L-N; Pl.'s Br. Ex. 2.)

At his May 7 interview with OEO, Plaintiff disputed most of McTaggart's factual assertions. (Grossberg Decl. Ex. [*4] O; see also Pl.'s Br. Exs. 6, 8.) McTaggart repeated her allegations that she was being sexually harassed, and some witnesses, including another guidance counselor named Wanda Huertas ("Huertas"), corroborated McTaggart's factual claims. Sulner added that Plaintiff was contributing to "workplace disharmony," that he had not been keeping the incident quiet, and asked if Plaintiff could be transferred. (Grossberg Decl. Ex. O; Pl.'s Br. Ex. 5.) [1]

1

> The record is not clear as to whether the OEO conducted a series of private interviews with the relevant parties, or whether the May 7 interviews were in the context of an informal hearing.

On May 22, the OEO issued a report finding that, while Plaintiff's actions did not constitute unlawful sexual harassment, they were "boorish, pestering, and insensitive," and that his conduct contributed to "workplace disharmony." (Grossberg Decl. Ex. O.) As a result, the OEO directed Plaintiff to attend sexual harassment training, to cease and desist conduct contributing to workplace disharmony, and to have no further personal contact with McTaggart. The OEO further recommended that Sulner issue a "cease and desist letter" to Plaintiff to be placed in his [*5] file and that the superintendent transfer Plaintiff as soon as reasonably possible "so as to minimize contact between the parties [Plaintiff and McTaggart]." (Id. Exs. O, R; Pl.'s Br. Ex. 1.) A few weeks later, Superintendent Susan Erber ("Erber") instructed Plaintiff to "cease and desist behavior which

contributes to workplace disharmony" and directed Plaintiff to attend sexual harassment training. (Grossberg Decl. Ex. U.)

Plaintiff asserted, and continues to assert, that the entire sexual harassment charge and resulting sanctions were purposefully orchestrated by Sulner and others because Sulner did not like Plaintiff. (Grossberg Decl. Ex. JJ at 83:13-24.) In a letter to OEO dated June 2, 2003, Plaintiff wrote:

> The whole matter seems to have a tone of malicious intent. The situation seemed to be a set-up by the administrator and certain staff members of the school. It seems that certain teachers complaining of Ms. McTagg[a]rt's work and the meeting by Ms. Huertas precipitated sexual harassment charges. The union chapter chairman showed strong conflict of interest against me. I believe these factors show malicious intent and resulted in defamation of character.

(Id. Ex. S.) Plaintiff [*6] repeated these allegations in sum and substance to co-workers, who in turn reported these conversations to Sulner. (Id. Exs. T, Z.) On June 19, Plaintiff wrote to the OEO that "[i]f anything I felt there was reverse harassment" with respect to McTaggart's allegations. [2] (Id. Exs. V-W; Pl.'s Br. Ex.) On July 3, Sulner noted to Plaintiff that she had become aware that Plaintiff was continuing to "engage in harassing behavior" associated with McTaggart, noted that Plaintiff's alleged remarks about McTaggart following the May 22 OEO report could be characterized as retaliation against McTaggart, ordered that Plaintiff "cease and desist" from any future conversations regarding McTaggart, and warned that failure to comply with her order might result in Plaintiff's removal from his position. (Grossberg Decl. Ex. CC.) Plaintiff told OEO about Sulner's July 3 letter and reiterated that he had "always felt that Ms. McTaggart filed sexual harassment [charges] because she felt pressure from Dr. Sulner. Once again I feel that I am being harassed by Dr. Sulner." (Id. Ex. DD; Pl.'s Br. Ex.)

2

> It is not clear whether he meant that McTaggart actually sexually harassed Plaintiff, as he appears to suggest [*7] elsewhere in the record, or that the allegedly false sexual harassment charge and re-

2008 U.S. Dist. LEXIS 41454, *

sulting sanctions themselves constituted "reverse harassment."

On or about August 23, Plaintiff filed an employment discrimination charge with the EEOC. (Grossberg Decl. Ex. JJ at 41.) In addition, Plaintiff wrote to the EEOC [3] that, with regard to OEO decisions that find no unlawful sexual harassment but nonetheless impose sanctions, "[t]he overwhelming plaintiffs in a male-female scenario are males with no hope of appeal," appearing to suggest that it is predominately males who are sanctioned in some way by the NYC DOE as a result. of alleged sexual harassment, even when no sexual harassment violation is found. (Id. Ex. MMM.) Chancellor's regulation A-830, which governs sexual harassment allegation investigations, is silent as to whether OEO had the authority to impose sanctions absent a finding that sexual harassment occurred. [4] (Id. Ex. N.) When asked at his deposition whether the alleged lack of an effective appeal system for OEO sanctions (where no finding of sexual harassment was made) was designed in such a way as to have an impact on one sex only, Plaintiff responded:

> They should change article [*8] A830 and put a clause in there for an appeal system for a person that is accused. And I don't care if it is a man, a woman, two bisexual woman or anything, one woman to a straight woman or a gay woman to a straight woman, they have to have an appeal system for the person that is accused . . . .

(Id. Ex. JJ at 127:18-24.)

3

> It is not clear whether this letter was filed as part of Plaintiff's EEOC charge, or whether it was submitted separately.

4

> It is undisputed, however, that the superintendent had the authority to order Plaintiff to attend sexual harassment training and issue the "cease and desist" letter for his file. (Id. Ex. QQ.)

*May 2003 - transfer to 721M*

On May 20, 2003, Superintendent Erber's office sent Plaintiff a letter indicating that Plaintiff would be tentatively assigned to work at P 721M ("721M") for the summer of 2003. (Pl.'s Supp. Ex.; Grossberg Decl. Ex. Q.) On June 12, Erber sent Plaintiff a confirmation letter expressing Erber's understanding that Plaintiff had worked at 721M for the summer session in the previous year, and that Plaintiff was accepting an assignment to 721 M again for the 2003 summer session. (Id. Ex. U.) However, on July 1, Plaintiff filed a "Step II [*9] Grievance" [5] with the OEO and asserted that he was not aware of the 2003 summer assignment to 721 M until that day. Plaintiff later testified, and in the grievance claimed, that the transfer was not permissible because he had seniority rights over Huertas, McTaggart, and Kennia Laucer ("Laucer") (another guidance counselor), none of whom was transferred to 721M that summer. (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. at 166:18-19; Grossberg Decl. Ex. BB.) The Step II Grievance did not allege discrimination on the basis of sex. Sulner responded that Plaintiff's assignment was based on the OED's transfer recommendation and Sulner's assertion that Plaintiff's harassment conduct was ongoing. (Id. Ex. EE.) On or about July 8, the OEO concluded that Plaintiff failed to demonstrate that the 721M transfer was "arbitrary or capricious." (Id.) No copy of the union contract or any other written agreement addressing seniority is included in the record.

5

> Based on the Step II Grievance complaint form, it appears to be a process whereby a complainant requests a conference with the superintendent to discuss alleged violations of union contract provisions. (Grossberg Decl. Ex. BB.) What follows such a [*10] conference is not clear from the record but is, in any case, not material to this action.

Plaintiff did not receive any cut in pay or benefits as a result of the transfer to 721M and 721M was close to Plaintiff's home, but he suffered emotionally because several 721M employees asked Plaintiff why he was transferred there. (Grossberg Decl. Ex. EE; Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. at 169:1-14.) Plaintiff additionally testified that rumors with negative connotations about his transfer spread amongst guidance counselors

from different districts, though he did not specify the basis of his knowledge of the rumors. (Id. at 172:1-15.)

*September 2003 - transfer out of counselors' suite*

On or about September 2, 2003, Plaintiff returned to 721X and was asked to meet with Sulner in her office. Sulner said, with the door open and speaking in a voice loud enough for others to hear, that Plaintiff's office was to be moved from the suite where guidance counselors and service providers worked because the suite had "a lot of female staff" and/or that "there were too many females there." (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. at 178:11-12.) She added that Plaintiff needed to be careful with what [*11] he said, and ordered him out of her office. (Grossberg Decl. Ex. II.) Plaintiff reported this incident to the OEO as another example of "harassment." (Id.)

Plaintiff alleged that, as a result of his segregation from the counselors' suite, female employees gossiped about him and whether the transfer was related to the McTaggart charges. In his deposition, Plaintiff testified about two female employees, Nellie Stabile ("Stabile") and Ms. Jervis ("Jervis"), who were afraid to speak with him because they feared that employees were spying on them or that, in Stabile's case, employees would ask her whether she was dating Plaintiff. (Grossberg Decl. Ex. JJ at 83:2-6; 103:2-9; id. Ex. WW at 38:11-13; 103:20-25; Pl.'s Br. Ex., Oct. 30, 2006, Pl's Dep. at 41:22-42:10; 42:16-17; 43:9-10.) Plaintiff also testified, with respect to the office transfer, that "[Sulner] wanted to just retaliate against me because I was bringing up a lot of charges. She was making charges on me, I was making charges on her." (Grossberg Decl. Ex. WW at 31:13-15.)

*September 2003 - alleged offensive behavior*

On September 11, 2003, the payroll secretary asked Plaintiff whether counselors were supposed to arrive at work 20 [*12] minutes or 10 minutes earlier than teachers. Plaintiff answered that he wasn't sure but that he thought it was 10 minutes. At a meeting with the guidance counselors, Sulner queried Plaintiff about this incident. Plaintiff described the conversation with the payroll secretary, and Sulner angrily stated that she would not tolerate Plaintiff's talking back to Sulner. (Grossberg Decl. Ex. MM; Pl.'s Supp. Ex.)

On September 12, at a guidance counselor meeting, Plaintiff told an incoming guidance counselor that if she had any problems with sexual harassment from men at the workplace, that it would be taken care of. (Pl.'s Supp. Ex.) Several guidance counselors, interpreting Plaintiff's remark as sarcasm in light of the McTaggart incident (see id.), thereafter informed Sulner by letter that Plaintiff's remark "took us by surprise" and "caused a great level of distress in the group," and that "we don't want to continue feeling uncomf[or]table, intimidated and ex-posed to an offensive work environment." (Grossberg Decl. Ex. KK.) Sulner asked Plaintiff to meet with her to discuss the incident (id. Ex. LL), and wrote in an e-mail to Superintendent Erber that Plaintiff was "defiant and clearly ill." [*13] (Pl.'s Supp. Ex.) The meeting did not occur, for disputed reasons not relevant to this motion practice.

Plaintiff immediately wrote a letter directly to the Chancellor of NYC DOE, alleging that Sulner's angry outburst on September 11 and her arranging of the disciplinary meeting in supposed response to the September 12 incident constituted retaliation for his August 23, 2003, EEOC charge. (Id. Ex. MM) The OEO responded [6] that it did not have jurisdiction to review Plaintiff's accusation of retaliation. (Pl.'s Br. Ex.; Grossberg Decl. Ex. NN.)

6

It appears that Plaintiff's letter was forwarded from the Chancellor's office to the OEO.

*May 2004 - Sulner e-mail*

On May 26, 2004, Sulner asked Margo Levy ("Levy"), the district's school-based services coordinator, via e-mail whether counselors were required to keep updated logs of their students at the school, available for review. Sulner wrote, "I have Martinez but good now-- tell me please that you have a written directive that he is mandated to keep a log." (Pl.'s Br. Ex.) After Levy responded that logs were required to be kept, Sulner responded, "Yes -- he told me his log is too heavy to carry to school - this time I got him but good." (Id.) [*14] The record is not clear as to what, if anything, transpired after this exchange.

*September 2004 - Huertas' allegations of bullying; anger management workshop*

On September 10, 2004, in a letter to Sulner, Huertas accused Plaintiff of having physically intimidated and threatened her at a meeting conducted by McTaggert. Huertas expressed a desire to file a formal complaint against Plaintiff of "psychological bullying and harassment." (Grossberg Decl. Ex. RR.) Plaintiff disputes Huertas' characterization of his conduct at the meeting.

Kevin McCormack ("McCormack"), a Local Instructional Superintendent, arranged a meeting with Huertas and Plaintiff to discuss the incident. (Grossberg Decl. Ex. UU.) On November 19, McCormack concluded that Huertas' account of the meeting was more credible than Plaintiff's, and he directed Plaintiff to enroll

in an anger management workshop on January 19, 2005. (Id. Ex. XX..) Plaintiff did not attend the anger management workshop. (Id. Ex. YY.) On March 11, 2005, McCormack found that Plaintiff's failure to attend the workshop constituted insubordination, directed him to attend an anger management workshop on March 16, and noted that further incidents of that [*15] nature would result in disciplinary action. (Id. Ex. BBB.)

With respect to whether Plaintiff believed that McCormack, through his letters and his direction to take anger management class, was discriminating against Plaintiff because he was male, Plaintiff responded, "I imagine he was influenced by Dr. Sulner but I can't say that that is a sex bias no, not on his part. . . . He would probably support or be swayed by Dr. Sulner's opinion than mine but . . . I don't think it would be a sex bias on his part." (Grossberg Decl. Ex. WW at 30:17-20.)

*February 2005 - annual health fair*

In or about February 2005, Plaintiff was asked by Mary Tierney ("Tierney"), another guidance counselor, to run the annual health fair, which consisted of various groups from the community or city agencies gathering to educate students about health issues. (Pl.'s Br. Ex., Oct. 30, 2006 Dep. at 60:19-61:4.) In order to prepare for the health fair, the coordinator had to send faxes out to the various agencies or groups, requesting them to return a fax indicating whether they were willing to participate.(Id. at 62:4-7.) Sulner had instituted a rule that no faxes were to be sent out unless they went through her secretary. [*16] (Id. at 63:19-64:5.) With about two weeks left before the fair, Tierney asked Plaintiff why they had not received any replies to their faxed invitations. (Id. at 63:12-14.) Plaintiff then asked Tierney who was preventing the faxes from going out, though the record is not clear as to what prompted him to ask this question. According to Plaintiff's testimony, Tierney replied that it was Sulner. The record does not shed any light on why Tierney asked Plaintiff about the lack of replies if she allegedly knew that Sulner prevented the invitations from going out. (Id. at 63:18, 66:3-8, 67:12-13.) Plaintiff did not ask Tierney why Sulner did that. (Id. at 68:14-17.) Shortly afterwards, on or about April 5, 2005, believing that Sulner was trying to sabotage his efforts and would try to fire him, Plaintiff retired. (Id. at 68:21-69:1; Grossberg Decl. Ex. FFF.)

*March 2005 - corporal punishment allegation*

On March 29, 2005, a parent alleged that Plaintiff had inflicted corporal punishment on a student, and Sulner met with the parent on March 31. (Grossberg Decl. Ex. EEE at 2.) On April 7, after Plaintiff had retired, Sulner scheduled a meeting with Plaintiff to take place on April 13 in order to [*17] discuss the corporal punishment charge. (Id. Ex. GGG.) Plaintiff did not attend

the meeting. Sulner then sent him a letter rescheduling the meeting for April 19 (id. Ex. HHH), and Plaintiff also failed to attend that meeting. Sulner then rescheduled the meeting for May 11, and informed Plaintiff that she would reach a conclusion without his input if he did not attend. (Id. Ex. III.) Plaintiff did not attend the May 11 meeting. (Id. Ex. JJ at 116:2-9.) In or about mid-May, Sulner recommended to the superintendent that Plaintiff be placed on an "Ineligible Inquiry" list, (id. Ex. EEE at 3), and Superintendent Erber did so on May 24. (Id. Exs. JJJ, KKK.) As a result, Plaintiff was unable to obtain certain teaching jobs after he retired from 721X. (Pl.'s Supp. Ex., Pl's Dep. at 180:8-181:2.) At his deposition, Plaintiff testified that Sulner set up a false corporal punishment charge against him in retaliation for retiring (Grossberg Decl. Ex. JJ at 48:15-25), which had allegedly deprived Sulner of the pleasure of firing him. (Id. at 125:5-16.)

*Pension miscalculation*

Plaintiff testified that two years of his employment were improperly omitted in calculating his pension. (Pl.'s Br. Ex., Nov. [*18] 3, 2006 Pl.'s Dep. at 109:2-15.) When Plaintiff contacted an unspecified NYC DOE agent about the alleged calculation error, he was told something to the effect that the records for the omitted years had been placed in a basement and that the discrepancy "should be corrected." (Id. at 109:10-15, 110:13-17, 111:14-18, 112:2-8.) Plaintiff nonetheless feels that the pension issue is part of a "whole ball of wax [that] was a retaliation against me after a point."(Id. at 109:4-6.) Plaintiff does not, however, believe that the pension miscalculation was the product of sex discrimination. (Id. at 110:8-12; 111:1-3.)

*Additional testimony from Plaintiff*

The record contains additional proffers as to Sulner's management style generally and her attitude towards Plaintiff. Plaintiff testified that "as far as Dr. Sulner goes, . . . when she sees anybody . . . disagreeing with her, she right away gets very defensive and she starts to retaliate." (Grossberg Decl. Ex. JJ at 44:13-16.) In an unsworn statement by Plaintiff submitted to the Court, he noted that Jean Marie Chin ("Chin"), an assistant principal under Sulner, "has to be careful of Dr. Sulner," who allegedly had another assistant principal removed [*19] from the school after 30 years of service. (Id. Ex. VV.) Testifying that "a lot of people feared [Sulner]," Plaintiff said that a teacher named Ms. Giblin, "shaking like a leaf," once came up to Plaintiff and told him that Sulner would fire her even though Giblin was on tenure and had worked at 721X for 30 years. (Pl.'s Stipp. Ex. Pl's Dep. at 109:15-110:2.) Plaintiff asserted that Sulner exhibited clear favoritism by, for instance, putting favored guidance counselors in charge of running meetings. (See Oct.

30, 2006 Pl.'s Dep. at 52:1-5 (those in "Sulner's wing" placed in charge of meetings); id. at 53:1-3 ("she treated some people unfairly better than others like Ms. Huertas. Everybody knew who the ones that she liked. She made it known. Everybody knew.").) When asked whether the sexual harassment charges, the anger management workshop requirement, the corporal punishment charge, and the annual health fair incident led Plaintiff to believe Sulner disfavored him because he was a man, Plaintiff responded, "It may not have been -- the retaliation, it has nothing to do with whether I am a man or not." (Id. Ex. JJ at 126:9-20.) Plaintiff further testified that on four or five occasions [*20] over several years, Chin made statements to Plaintiff to the effect that "Sulner thinks shit of you," and that Sulner asked Chin to convey that sentiment to Plaintiff each time. (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. 72:20-73:16.; 73:21-24.)

On the basis of the foregoing facts, Plaintiff asserts claims of disparate treatment on the basis of his sex, hostile work environment and retaliation for his protected activity.

## DISCUSSION

Summary judgment shall be granted in favor of a moving party where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the summary judgment context, a fact is material "if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The non-moving party "must do more than simply show that there is some metaphysical [*21] doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (alteration in original)). "[M]ere conclusory allegations, speculation or conjecture" will not provide a sufficient basis for a non-moving party to resist summary judgment. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

### Hostile Work Environment

In his Second Amended Complaint, Plaintiff alleges that "Dr. Sulner felt authorized to discriminate, segregate, and create a hostile environment for me." (Second Am. Compl. P 8.) The Court construes this statement as

asserting a claim of hostile work environment, and construes all of Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judgment as the factual bases for Plaintiff's claim.

In order to establish a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive [*22] to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The environment must be both subjectively and objectively hostile and abusive. Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003). Isolated instances of harassment ordinarily do not rise to the level necessary for an employee to survive summary judgment on a claim of hostile work environment harassment; rather, the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the conditions of his working environment. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d. Cir. 2000). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Supreme Court has set a demanding test in order to avoid construing Title VII as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). [*23] Moreover, "it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his] sex." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Lastly, the Court analyzes hostile work environment claims by evaluating the totality of the circumstances. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998).

Plaintiff's claim of hostile work environment fails, primarily because no rational fact-finder could conclude that any of the alleged mistreatment Plaintiff endured was inflicted on him because of his sex. See Alfano, 294 F.3d at 377 ("even though [the incidents] can support an inference that Alfano was mistreated, they do not support an inference that this was because of her sex"). Although facially-neutral incidents may be considered in a hostile work environment analysis, evidence must be proffered from which a "a reasonable fact-finder could conclude that [the incidents] were, in fact, based on sex. . . . [T]his requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Alfano, 294 F.3d at 378. Plaintiff [*24] proffers no evidence of sex-based animus, either from

Sulner or any other administrator or supervisor, in connection with any of the incidents described in the record. Nor is there any circumstantial evidence of sex-based mistreatment, such as examples of similarly situated males treated similarly, or similarly situated females treated differently. While the record certainly contains evidence suggesting that Sulner disliked Plaintiff personally, there is nothing in the record from which it can be inferred that such dislike was due to his sex and, if anything, Plaintiff's own testimony regarding two female employees who allegedly lived in constant fear of Sulner because they perceived that Sulner did not like them undermines Plaintiff's claim that Sulner was biased against men.

Although Plaintiff asserted in a letter to the OEO that the operation of the discipline system in connection with harassment claims disproportionately affected males, he has proffered no evidence that males charged with sexual harassment were treated differently than females charged with sexual harassment. Moreover, when specifically asked whether Plaintiff believed that the OEO withheld opportunities for appeal [*25] based on the accused's sex, Plaintiff avoided the question, and his response explicitly revealed his belief that the system was not unfair on the basis of sex. (Grossberg Decl. Ex. JJ at 127:18-24 ("I don't care if it is a man, a woman, . . . they have to have an appeal system for the person that is accused.").) When specifically asked whether Sulner disfavored him because he was a man with respect to the anger management course, sexual harassment training, and annual health fair incidents, Plaintiff responded, "It may not have been" and added that "it has nothing to do with whether I am a man or not." In light of the lack of any direct or circumstantial evidence that any of the treatment Plaintiff faced was because of sex, Plaintiff's own proffer that other female employees were similarly harassed by Sulner, and Plaintiff's disavowals during his deposition of any contention that certain incidents were the product of sex-based bias, the Court concludes that no rational fact-finder could determine that any of the treatment alleged by Plaintiff to have created a hostile work environment was motivated by sex-related bias.

Plaintiff repeatedly emphasizes the incident in which Sulner, in [*26] a voice allegedly loud enough for the guidance counselors to hear, ordered Plaintiff to move out of the counselors' suite because there were "too many females there" (or made a comment to the same effect). Interpreted in the light most favorable to Plaintiff, the comment could be construed as rude and as suggesting that Plaintiff was so dangerous or inappropriate that he could not be trusted around females, but Plaintiff proffers no basis from which it can be inferred that Sulner could not or would not have made the same comment to a female employee who had been accused of sexual harass-

ment towards females. [7] "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (male employee alleging humiliating harassment of a vulgar and sexual nature from other males did not have viable hostile work environment claim where there was no proffer that female employees would not have suffered similar type of harassment) (quotations omitted). There is nothing inherent [*27] in Sulner's comment itself to suggest that Sulner was motivated by hostility towards men, or that the comment could only be directed to one sex. See, e.g., id. ("A trier of fact might reasonably find such discrimination . . . if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."). Therefore, Plaintiff's transfer out of the counselors' suite cannot serve as a basis for any sex discrimination-based hostile work environment claim. [8]

7

The comment might also be read to suggest that Sulner was creating a sex-segregated work environment, but Plaintiff has never made this specific charge, nothing on the face of the comment suggests that Sulner was motivated to exclude males generally, and the record contains no information as to the numbers and types of people assigned to different areas of the office.

8

Plaintiff, furthermore, proffers nothing to suggest that the ramifications of his transfer out of the counselors' suite, even if it were based on sex, were so great so as to alter the terms and conditions of his employment, or to impede Plaintiff's [*28] ability to function in the workplace. Compare Alfano, 294 F.3d at 381 ("Alfano has not pointed to any conduct that endangered her or her authority in

a way that would drive her from a perilous employment. She was simply embarrassed on a handful of occasions over a period of four years by the boorish behavior of one or more unidentified co-workers"); with Howley v. Town of Stratford, 217 F.3d 141, 154-55 (2d Cir. 2000) (viable hostile work environment claim where female firefighter subjected to sexually explicit and degrading barrage of insult delivered by subordinate firefighter in front of her other subordinates, where same subordinates later resisted orders from the plaintiff and spread rumors amongst themselves questioning her competence, directly impacting her ability to do her job). The only non-speculative harm alleged by Plaintiff as a result of the transfer was the fact that Stabile and Jervis were deterred from speaking with Plaintiff. However, nothing in the record indicates that Plaintiff's ability to perform his job was at all dependent on his interactions with Stabile or Jervis, there is nothing to suggest that the barriers placed between him and other female employees [*29] were of such a tangible and severe nature so as to alter the terms and conditions of his employment, and Plaintiff proffers no non-speculative evidence that he or any female employee who spoke with him after he was transferred was actually punished or harmed on account of such communication in any material way.

"It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Id., 294 F.3d at 377. After a careful and thorough review of all the evidentiary submissions in the record, and after weighing the nature, severity, and frequency of the complained-of conduct, with "particular sensitivity to the fact that evidence of [prohibited] discrimination is rarely overt," Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250

(S.D.N.Y. 2000), the Court concludes that Plaintiff's proffers are insufficient as a matter of law to raise a triable question as to the underlying motivation, or as to the severity or pervasiveness of misconduct required to establish a sex-based hostile work environment claim. [*30] Therefore, Defendant's motion for summary judgment is granted as to Plaintiff's hostile work environment claim.

*Disparate Treatment*

Plaintiff asserts in his Second Amended Complaint that the McTaggart sexual harassment charge and resulting sanctions, the summer transfer to 721M, and the transfer out of the counselors' suite were the products of discrimination on the basis of sex. Because the pro se Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judgment not only describe these underlying events but also reference events not alluded to in the complaint, the Court has also considered whether any of the additional information is sufficient to raise a genuine issue of material fact as to whether Plaintiff was subjected to sex-based disparate treatment. [9]

9

The Court does not construe Plaintiff's complaint about an allegedly improper reduction of his pension benefit as a sex-based disparate treatment claim, because Plaintiff explicitly disclaimed any assertion that the pension benefit cut was imposed because of his sex. Plaintiff gave equivocal responses to questions specifically asking him whether he believed certain other acts were a result of [*31] sex discrimination, but given Plaintiff's pro se status, the Court does not construe Plaintiff's deposition statements as disclaiming a particular disparate treatment claim unless the statement was explicit and clear. (See, e.g., Pl.'s Br. Ex., Nov. 3, 2006 Pl.'s Dep. at 111:1-3 ("Q: You think that someone was discriminating because you are a man when they took two years from your pension? A: No . .").)

In the summary judgment context, disparate treatment claims brought under Title VII are analyzed under

the familiar three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). [10] A plaintiff must first establish a prima facie case of discrimination, which comprises four factors: 1) he belonged to a protected class, 2) he was qualified for the position, 3) he suffered an adverse employment action, and 4) there were circumstances giving rise to an inference of prohibited discrimination. Id., 411 U.S. at 802; Song v. Ives Labs., Inc., 957 F.2d 1041, 1045 (2d Cir. 1992); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985). Once a plaintiff has made out a prima facie case, the burden shifts to the employer to offer some legitimate, nondiscriminatory [*32] reason for its actions. McDonnell, 411 U.S. at 802. "This burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), and it can involve no credibility assessment of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). At this stage, the employer does not need to prove by a preponderance of the evidence that the rationale was not discriminatory, but must present a clear explanation for the action. Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989). If the employer meets its burden, the plaintiff is required to put forth evidence demonstrating a genuine issue of material fact as to whether the stated reasons are pretext for prohibited discrimination. Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

10

Plaintiff's discrimination claims under the NYSHRL are subject to the same standard of proof as claims under Title VII. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Selmanovic v. NYSE Group, Inc., No. 06 Civ. 3046 (DAB), 2007 U.S. Dist. LEXIS 94963, 2007 WL 4563431, at 4 (S.D.N.Y. Dec. 21, 2007).

It is undisputed that Plaintiff [*33] belonged to a protected class (male) and that he possessed the basic skills necessary for performance of his job as a guidance counselor. However, as the Court has already explained in the hostile work environment section, Plaintiff has failed to proffer any evidence of circumstances giving rise to an inference of discrimination based on sex. As a result, he has failed to meet his burden of coming forward with sufficient facts to make his prima facie case as to any disparate treatment claim and Defendant is entitled to judgment as a matter of law on Plaintiff's disparate treatment claims. [11]

11

Plaintiff also proffers no evidence that he suffered any adverse employment action, with the exception of his placement on the Ineligible Inquiry list. See Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (an adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities"). Sulner's (as well as the OED's and Erber's) repeated written warnings to and meetings with Plaintiff do not constitute adverse employment actions, see Hill v. The Children's Village, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) [*34] (warning letters insufficient), and the perceived stigma and impaired social interactions, the only proffered harms arising from Plaintiff's temporary transfer to 721M and his transfer out of the counselors' suite, are too intangible to constitute a "materially significant disadvantage." Galabya v. NYC Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000); see Boyd v. Presbyterian Hospital in the City of New York, 160 F. Supp. 2d 522, 536-37 (S.D.N.Y. 2001) ("gossips, the false accusations, . . . and the hyperintensified observation" insufficient to constitute adverse employment action). Plaintiff proffers no evidence from which a rational fact-finder could conclude that the sexual harassment and anger management courses or the health fair fax incident were anything more than mere inconveniences for Plaintiff with no tangible effect on the terms and conditions of his employment. Lastly, no rational fact-

finder could conclude that the working conditions were so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign when he did, such that his retirement would be considered a constructive discharge. See Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) [*35] (constructive discharge standard); Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (evidence that supervisor loudly mentioned plaintiff was polygraphed and therefore suspected of wrongdoing, complained about plaintiff's attitude to co-workers, once gave plaintiff wrong combination to night deposit box, and twice required plaintiff to process deposits while serving customers contrary to bank policy, insufficient as a matter of law to establish constructive discharge).

*Retaliation*

In Plaintiff's Second Amended Complaint, he alleges that the corporal punishment charge and the resulting Ineligible Inquiry list placement constituted retaliation, presumably for the various letters that had been filed by Plaintiff with the 0E0, the Step II Grievance, and Plaintiff's EEOC charge, evidence of which was appended to the complaint. Plaintiff later testified that Sulner took these actions in retaliation for his retirement, which allegedly deprived her of the pleasure of firing him. Plaintiff also appears to assert, based on the various comments given at his depositions, that much of the alleged mistreatment he faced was in retaliation for any and all the grievances he filed over the years. [*36] Therefore, the Court shall, as it did with Plaintiff's other claims, broadly construe Plaintiff's retaliation claims as asserting that all of Defendant's actions described in the record were taken in response to any or all of the grievances filed by Plaintiff during the relevant period, and/or in response to his retirement.

In this summary judgment context, retaliation claims brought under Title VII are also analyzed under a three-step burden shifting analysis. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying burden-shifting analysis to retaliation claims). In order to establish the basic prima facie case of retaliation under Title VII, Plaintiff must proffer evidence sufficient to demonstrate that: 1) he engaged in a protected activity, 2) Defendant knew of the protected activity, 3) Defendant took adverse action against Plaintiff which might well have dissuaded a reasonable worker from engaging in protected activity; and 4) a causal connection between the protected activity and the adverse action. Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

Protected activity includes participation in any investigation, [*37] proceeding or hearing under Title VII as well as any opposition to any practice made unlawful by Title VII, and may include formal as well as informal complaints. See 42 U.S.C. § 2000e-3(a); Rodriguez v. Beechmont Bus Serv., Inc., 173 F. Supp. 2d 139, 149 (S.D.N.Y. 2001). Plaintiff alleges repeatedly that Sulner's corporal punishment charge was in retaliation for his retirement, but his retirement was in no way a communication of a complaint about activity made unlawful by Title VII, so his retirement cannot serve as a basis for alleging retaliatory conduct. Most of Plaintiff's letters to the OEO (e.g., the June 2, 2003, letter alleging "malicious intent") do not constitute protected activity because nothing in those submissions could be read to complain of discrimination on the basis of sex; rather, they complain of allegedly unfair treatment from Sulner on the basis of personal animosity. The Step II Grievance was not protected activity as a matter of law, because it alleged that his transfer to 721M was unwarranted solely based on his alleged seniority rights under a contract and did not allege sex discrimination.

Plaintiff has, however, proffered evidence of other activities which [*38] might be considered protected. Plaintiff's June 2003 letters to the OEO about "reverse harassment," [12] his EEOC charge filed in August 23, 2003, the August 23, 2003 letter to the OEO about the allegedly disproportionate impact of OEO decisions against males, his September 2003 letter to the OEO alleging Sulner's retaliation for the EEOC charge, and this lawsuit, which was commenced in April 2004, will all be construed for purposes of this analysis as raising complaints of discrimination based on sex or complaints of retaliation for protected activity, and therefore constituting protected activity for purposes of Plaintiff's prima facie case. [13]

12

Given the nature of McTaggart's original sexual harassment charge against Plaintiff, the Court construes Plaintiff's complaint of "reverse harassment" to also be an implicit allegation that, rather than being the perpetrator of sex discrimination through his own sex-

ual harassment, Plaintiff was the victim of sex discrimination through McTaggart's and/or Sulner's "reverse" harassment.

13

Defendant argues that none of the activities for which Plaintiff alleges retaliation should qualify as protected, because Plaintiff had no good faith, reasonable [*39] belief that any of the underlying challenged actions violated Title VII. See Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (in meeting the plaintiff's prima facie burden for a retaliation claim, while "the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII, . . . the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."). The Court need not address this specific argument, however, because the Court concludes ultimately that Plaintiff has failed to proffer any evidence rebutting Defendant's own proffers of legitimate, non-discriminatory reasons for its actions.

Plaintiff has also established that Defendant had knowledge of the aforementioned protected activities. Although Defendant correctly notes that Plaintiff has proffered no evidence that Sulner personally knew about Plaintiff's protected activity (see Grossberg Decl. Ex. JJ at 45-47), there is no dispute that the New York City Department of Education, as a corporate entity and Defendant in this case, knew about Plaintiff's protected activity. See Gordon v. NYC Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) [*40] ("[nothing] more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity"). Therefore, Plaintiff has met the second element of his prima facie case with respect to his retaliation claim.

Under the third prong, Plaintiff must show that the retaliatory acts complained of might well have deterred a reasonable employee from engaging in protected activity. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Petty slights, minor annoyances, personality conflicts that generate antipathy, snubbing, the sporadic use of abusive language, or a simple lack of good manners, often experienced at work, do not rise to the level of actionable conduct in a Title VII retaliation claim. Id. at 2415. In this case, incidents where Sulner publicly yelled at Plaintiff for various reasons or called him "shit" through Chin constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable. Nor could a rational fact-finder conclude that a reasonable employee would be deterred from complaining of discrimination by an isolated incident in which a second-hand source informed him that his [*41] supervisor had blocked his faxes from being sent out, particularly when the employee did not even attempt to follow up on that assertion with the supervisor directly. The order to attend sexual harassment training and the order to transfer Plaintiff to 721M for the summer cannot support viable retaliation claims because those events occurred before any of Plaintiff's protected activities. A rational fact-finder could, however, conclude that the September 2003 transfer out of the counselors' suite, [14] the November 2004 order to attend the anger management workshop, the May 2005 placement on the Ineligible Inquiry list and the calculated cut in pension benefits could well dissuade a reasonable employee from engaging in protected activity.

14

Defendant cites Gamble v. Chertoff, No. 04 Civ 9410 (WHP), 2006 U.S. Dist. LEXIS 93645, 2006 WL 3794290, *8 (S.D.N.Y. Dec. 27, 2006) for the proposition that a mere transfer into another cubicle is trivial and would not rise to the level of an actionable retaliation claim, but a genuine issue does exist as to whether a transfer, not from one cubicle in the counselors' suite to another cubicle in the counselors' suite, but out of the counselors' suite entirely, separating the employee [*42] from the rest of his colleagues, would have a stigmatizing effect sufficient to deter a reasonable person from engaging in protected activity for purposes of

2008 U.S. Dist. LEXIS 41454, *

Plaintiff's retaliation claims, even if the stigmatizing effect does not constitute an adverse employment action for purposes of Plaintiff's disparate treatment claims. See Burlington, 126 S. Ct. at 2412-13 (anti-retaliatory provision of Title VII not limited to the adverse employment actions required for disparate treatment claims).

With respect to the fourth prong of his prima facie retaliation claim, "[a] plaintiff can demonstrate a causal connection (a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." See Carr v. West LB Admin., Inc., 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001) (citing DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)). There is no evidence of disparate treatment of other employees who engaged in similar conduct and no direct evidence of retaliatory animus. Nonetheless, [*43] the counselors' suite transfer and the anger management workshop order are sufficiently proximate in time to Plaintiff's protected activities to demonstrate a causal connection for prima facie case purposes, and the same applies for the Ineligible Inquiry list placement and pension cut, [15] albeit barely so. [16]

15

Although Plaintiff proffers no evidence as to when his pension payment was calculated, the Court resolves this ambiguity in favor of Plaintiff by reasonably assuming that the pension benefit was calculated on or around the time that Plaintiff retired.

16

See Spencer v. The Perrier Group of America, No. 95 Civ 8404 (JSR), 1997 U.S. Dist. LEXIS 7377, (S.D.N.Y. May 28, 1997) (without applying burden-shifting analysis, noting in dicta, "While an individual who complains of discrimination to the

[EEOC] enjoys protection against retaliation, the mere filing of such a complaint does not . . . create an automatic presumption that any subsequent employer action adverse to the employee is retaliatory in nature").

Defendant has met its burden of proffering legitimate, nondiscriminatory reasons for its actions. With respect to the transfer out of the counselors' suite, Defendant proffers that Sulner sought [*44] to prevent any further harassing behavior on the part of Plaintiff. Defendant proffers that the anger management workshop was ordered because McCormack found Huertas more credible in her complaints that Plaintiff had inappropriately intimidated her at a meeting in September 2004. Plaintiff was placed on the Ineligible Inquiry list allegedly because he turned down three opportunities to contest the charges of corporal punishment. Plaintiff testified to the NYC DOE's explanation that the pension discrepancy was the result of misplaced records and admission that the calculation "should be corrected." Therefore, the burden shifts back to Plaintiff to proffer some evidence sufficient to raise a genuine issue of fact as to whether these reasons were merely a pretext for retaliation.

Other than the temporal proximity between Plaintiff's protected activities and the alleged retaliatory actions, Plaintiff has failed to proffer any evidence, direct or circumstantial, that any of Defendant's explanations for its activities were merely pretext for retaliating against Plaintiff for his protected activities. There is no evidence, for example, of any statement by any supervisor with respect to Plaintiff's [*45] protected activities, and there is no evidence of retaliation against other employees engaged in protected activities. With respect to the counselors' suite transfer, Plaintiff proffers no evidence from which a rational fact-finder could infer, given OED's recommendation that Plaintiff be transferred away from 721X entirely, OED's order that Plaintiff cease all contact with McTaggart, OED's finding that he was contributing to "workplace disharmony," and Plaintiff's willingness to continue talking about the McTaggart incident with co-workers, that Defendant's proffered explanation was merely pretext for a retaliatory motive. In sum, there is nothing, beyond Plaintiff's bare conclusory allegations and mere temporal proximity, from which a rational fact-finder could conclude that the transfer constituted retaliation for protected activity. See Bell v. Rochester Gas & Elec. Corp., 540 F. Supp. 2d 421, 2008 WL 803652, *10 (W.D.N.Y. 2008) (although the "temporal proximity of these events [protected activity and termination] may be found to create an inference of retaliation for the pur-

2008 U.S. Dist. LEXIS 41454, *

poses of [plaintiff's] prima facie case, without more, such temporal proximity is insufficient [*46] to satisfy [plaintiff's] burden to bring forward some evidence of pretext") (quoting Simpson v. N.Y. State Dep't of Civil Servs., 166 Fed. Appx. 500, 2006 WL 93011, *2 (2d Cir. 2006)).

Plaintiff similarly proffers no additional evidence calling into question Defendant's proffered reasons for ordering Plaintiff to attend the anger management workshop, placing Plaintiff on the Ineligible Inquiry list, or miscalculating Plaintiff's pension, and there is no evidence, beyond mere temporal proximity, that would even suggest a retaliatory motivation for these actions. Therefore, no genuine issue as to pretext exists, Defendant is entitled to judgment as a matter of law dismissing Plaintiff's retaliation claims, and Defendant's motion for

summary judgment is granted as to Plaintiff's claims for retaliation.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully requested to terminate all pending motions, enter judgment in favor of Defendant, and close this case.

Dated: New York, New York

May 27, 2008

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge