# EXHIBIT 5

LEXSEE 2008 U.S. APP. LEXIS 8775

**NIRVA AUGUSTIN, Plaintiff-Appellant, v. THE YALE CLUB OF NEW YORK CITY, Defendant-Appellee.**

No. 06-5078-cv

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**2008 U.S. App. LEXIS 8775**

**April 23, 2008, Decided**

**NOTICE:**    PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Southern District of New York (Karas, J.).
Augustin v. Yale Club, 2006 U.S. Dist. LEXIS 67462 (S.D.N.Y., Sept. 15, 2006)

**COUNSEL:** For Plaintiff-Appellant: ANTONIA KOUSOULAS, Kousoulas & Associates, P.C., New York, N.Y.

For Defendant-Appellee: DIANE KREBS, Gordon & Rees LLP, New York, N.Y.

**JUDGES:** Present: HON. ROBERT A. KATZMANN, HON. DEBRA A. LIVINGSTON, Circuit Judges, HON. J. GARVAN MURTHA, District Judge. [1]

    1    The Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

**OPINION**

**SUMMARY ORDER**

**ON CONSIDERATION WHEREOF,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the judgment of the district court dated September 19, 2006, be and hereby is **AFFIRMED.**

The plaintiff Nirva Augustin appeals from the judgment entered September 19, 2006, granting the defendant Yale Club's motion for summary judgment. We assume the parties' familiarity with the facts, procedural history and specification of issues on appeal.

"We review a district court's grant of summary judgment *de novo.*" *NextG Networks of N.Y., Inc. v. City of New York*, 513 F.3d 49, 52 (2d Cir. 2008). In so doing, we construe the record in the light most favorable to the non-moving party, accepting that party's evidence as true [*2] and drawing all reasonable inferences in that party's favor. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). "We will affirm a grant of summary judgment where there is no genuine issue as to any material fact, and where the moving party is entitled to a judgment as a matter of law." *Id.* "Summary judgment is not appropriate where a review of the record reveals sufficient evidence for a rational trier of fact to find in the plaintiff's favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). But "reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

Augustin, a former waitress at the Yale Club, alleges that she was subjected to a hostile work environment. "A hostile work environment claim requires a showing (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). The plaintiff must [*3] demonstrate that, under the totality of the circumstances, "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* Moreover, generally the "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"*Id.* at 374 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). In this case, the allegedly discriminatory and mostly uncorroborated events were infrequent and sporadic, occurring a few times over

Augustin's five-year employment at the Club. The worst of the allegations against the Club involve episodes of name-calling, inappropriate behavior by a supervisor, and other perceived slights, which, however regrettable, do not constitute a hostile work environment even if taken as true. *Cf. Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 607-08 (2d Cir. 2006) (reversing district court grant of summary judgment when officer of defendant repeatedly touched plaintiff inappropriately and propositioned her for sex).

Augustin also contends that the numerous warnings the Club issued to her and her [*4] eventual firing were retaliation for the complaints she had made against her colleagues. In a retaliatory-discharge case, the plaintiff has the initial burden of establishing a prima facie case of discrimination. To meet this burden, a plaintiff must show: (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). Once the plaintiff has established all of the elements of a prima facie case, the burden shifts to the defendant to offer "a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Finally, at the third step, "once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* Assuming *arguendo* that Augustin has established a prima facie case, we affirm the district court on grounds that Augustin has not offered proof such that a rational trier of fact would [*5] find that retaliation was a substantial reason for the discharge. She faces the obstacle that an independent arbitrator has already ruled that her termination was justified, and that the Club had treated her fairly throughout her tenure at the Club. We have said that an adverse ruling by a neutral arbitrator will not preclude a Title VII action, but "the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact - e.g. new evidence not before the tribunal - or that the impartiality of the proceeding was somehow compromised." *Collins*, 305 F.3d at 119. There is no such evidence here. The arbitrator's decision was, in fact, consistent with the overwhelming weight of the evidence that the Club properly responded to and investigated Augustin's complaints, and that her firing was warranted.

We have considered all of Augustin's other arguments and find them to be without merit. Accordingly, for the foregoing reasons, the judgment of the district court is hereby **AFFIRMED**.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

Page 1

**c**
Cioffi v. Allen Products Co.
D.Conn.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Cherie CIOFFI, Plaintiff,
v.
THE ALLEN PRODUCTS COMPANY, Defendant.
**No. 3:98CV857(DJS).**

Sept. 29, 2000.

*MEMORANDUM OF DECISION*

SQUATRITO, J.
*1 The plaintiff, Cherie Cioffi, brings this action against the defendant, The Allen Products Company ("Allen Products"), alleging: (1) hostile work environment, constructive discharge and adverse retaliatory treatment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *etseq.;* (2) negligent hiring and/or retention; and (3) intentional and negligent infliction of emotional distress. The defendant now moves for summary judgment on all counts of the plaintiff's complaint pursuant to Fed.R.Civ.P. 56(c). For the reasons that follow, the defendant's motion is GRANTED with respect to the plaintiff's Title VII claims; the plaintiff's state law claims are dismissed.

I. FACTS

Examination of the memoranda, affidavits, and Local Rule 9 statement submitted in support of the motion for summary judgment and the responses thereto discloses the following.

In November, 1990, Ron Bailer, Allen Products' President, hired Cherie Cioffi to work in Allen Products' customer service department. Ron Martin, Allen Products' National Service Manager, was Ms.

Cioffi's direct supervisor until he resigned in April, 1994, at which point Gary Prushko became the plaintiff's supervisor. Mr. Martin and Mr. Prushko appear to have reported directly to Mr. Bailer. There were approximately five women and nine men working in the small office where Ms. Cioffi worked.

From 1990 to 1994, Ms. Cioffi maintained a good working relationship with most of her co-workers, including Joe Dowdell and Michael Slater. Ms. Cioffi has no complaints about her treatment by Mr. Martin. Ms. Cioffi received regular raises and two promotions during her employment, including a promotion with pay increase to Customer Service Administrator in April, 1994.

Ms. Cioffi alleges that she was subjected to sexual harassment throughout her employment with the defendant. The plaintiff cites to the following incidents in support of her sexual harassment claims:

(1) In 1991 or 1992, Mr. Bailer separately confronted Ms. Cioffi and a co-worker, Fran Connors, about a workplace rumor that they were having an affair. Mr. Bailer felt the rumor was disrupting the workplace. Later, in 1994, Mr. Bailer mentioned the alleged affair to Al Baccili, a district manager for Allen Products, at a luncheon meeting after Ms. Cioffi had discussed her concerns regarding her treatment by co-workers and company officials with Mr. Baccili. Ms. Cioffi asserts that Mr. Bailer also talked to other un-named employees about the alleged affair.

(2) During the winter of 1992-1993, Mr. Dowdell stated to the plaintiff that he would like to see her "run naked through the snow ." (Cioffi Dep. at 69-71, Def.'s App. Supp. Mot. Summ. J.) Ms. Cioffi complained to Mr. Martin about Mr. Dowdell's comment. Ms. Cioffi and Allen Products disagree as to whether Mr. Martin actually disciplined Mr. Dowdell for this incident.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

(3) On April 11, 1994, Ms. Cioffi caught Mr. Slater, who sat in a cubicle next to Ms. Cioffi throughout most of her employment, sliding a mirror under her desk.[FN1]Ms. Cioffi immediately complained to Mr. Martin, who conducted an investigation that day. Mr. Slater admitted the incident occurred and agreed to apologize to Ms. Cioffi in writing. Mr. Slater apologized in writing to Ms. Cioffi on the morning following the incident.

> FN1. At her deposition, Ms. Cioffi described the mirror incident as follows: "But I leaned back in my chair and ... just happened to stare down at the floor by the wall that was separating our two desks and saw the mirror coming underneath the desk."(Cioffi Dep. at 137, Def.'s App. Supp. Mot. Summ. J.)

*2 Mr. Prushko took responsibility for investigating Ms. Cioffi's complaint regarding the mirror incident on April 13, 1994, in light of Mr. Martin's upcoming departure from the company. Mr. Prushko met with Mr. Slater on April 13, 1994. During that meeting, Mr. Slater volunteered to seek psychiatric counseling. Mr. Prushko then met with Mr. Bailer specifically to discuss Mr. Slater's actions of April 11, 1994.

After meeting with Mr. Bailer, Mr. Prushko gave Mr. Slater oral and written warnings informing him that he would be terminated if any such conduct occurred in the future. On April 13, 1994, Mr. Prushko met with Ms. Cioffi to discuss the incident and the company's response.

When Mr. Martin left the defendant's employ, Ms. Cioffi requested that she be moved to Mr. Martin's previous workspace so that her work area would not be next to that of Mr. Slater. There was no other office space available to which Ms. Cioffi could move at that time. Ms. Cioffi moved to Mr. Martin's workspace approximately two weeks after he left the company.[FN2]Ms. Cioffi alleges that after she moved, Mr. Slater pushed back a partition of his cubicle and repositioned his desk in order to see her more readily. Also, Mr. Prushko did not move Mr. Slater's desk closer to him as promised so that Mr. Prushko could monitor Mr. Slater. The plaintiff and the defendant disagree as to whether Ms. Cioffi complained about Mr. Slater removing his partition or the defendant's failure to move Mr. Slater's desk.[FN3]

> FN2. The parties dispute the actual date upon which Ms. Cioffi switched workspaces. Ms. Cioffi alleges that her desk was moved two to three weeks after the mirror incident, sometime between April 25 and May 2, 1994. The defendant alleges that Ms. Cioffi was moved by April 28, 1994, within two weeks of Mr. Martin's last day of employment.

> FN3. In her affidavit dated March 21, 2000, the plaintiff states: "However, within a few days of my move Mr. Slater pushed back his partition and moved his desk and chair so that he could see me and my work are[a]. This totally circumvented the original move and the company did nothing about it despite my objection."(Cioffi Aff. ¶¶ 60-61, Pl.'s App. Supp. Obj. Mot. Summ. J., Ex. 1.) However, the defendant contends that between April 11, 1994, and Ms. Cioffi's last day of work on June 20, 1994. Ms. Cioffi gave no indication to anyone at Allen Products that she felt harassed or that she was dissatisfied in any way with Allen Products' response to her complaints about Mr. Slater or Mr. Dowdell. (*See* Bailer Aff. ¶ 15, Def.'s App. Supp. Mot. Summ. J.)

Mr. Slater attended psychiatric counseling following the mirror incident, and on April 25, 1994, gave Mr. Prushko a written statement indicating that he was receiving the treatment. In July, 1994, Mr. Prushko received a letter from Mr. Slater's psychiatrist which stated that Mr. Slater had pursued his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

Page 3

meetings with diligence and to maximum benefit. The plaintiff alleges that no one told her that Mr. Slater was receiving counseling and that Mr. Bailer refused to insist that Mr. Slater attend counseling, despite her request that Allen Products require him to do so.

In June, 1994, Mr. Slater laughed at a statement made to Ms. Cioffi by John Gomez, a co-worker, that had a sexual connotation/double-meaning.[FN4] No other incidents occurred between Ms. Cioffi and Mr. Slater.

> FN4. At her deposition, Ms. Cioffi described this incident as follows: "John Gomez had come in to empty the garbage in my cubicle. And he made a comment, 'Are you looking trashy?' ...I know he was joking. And then I hear this laughter coming from Mike's desk, so this made me angry; and so then I knew that he wasn't sincere at all about this. So I went over to his desk, and I says, you didn't mean that apology at all, did you? Because after what you did, you're laughing? I wasn't talking to you. I was talking to John.... And he says, I was laughing-at first he said, 'Well, I thought that was funny.'" (Cioffi Dep. at 147-148, Def.'s App. Supp. Mot. Summ. J.)

(4) On April 22, 1994, Mr. Dowdell allegedly said "eat me" to Ms. Cioffi after they argued over office procedure. Ms. Cioffi complained to Mr. Prushko in a letter dated April 25, 1994. Mr. Prushko interviewed Mr. Dowdell and another employee who had been nearby; both denied making or hearing the statement. No formal action was taken against Mr. Dowdell, but Mr. Prushko counseled Mr. Dowdell about Allen Products' policy against harassment of any kind and warned him not to use inappropriate language in the workplace. Mr. Prushko gave Ms. Cioffi a written report on the outcome of his investigation on June 8, 1994. Later, Mr. Dowdell often read the newspaper while leaning against a wall behind the plaintiff's cubicle.

*3 (5) In April, 1994, Carmen Colon, a co-worker, waved a page with sketches of penises on it in front of Ms. Cioffi. Ms. Colon sometimes left photocopies of off-color jokes on co-workers' desks. Ms. Cioffi claims that Ms. Colon waved the picture in front of her because Ms. Cioffi complained about Mr. Slater's actions noted above. Ms. Cioffi contends she complained about Ms. Colon the day she left Allen Products permanently. Allen Products asserts that Ms. Cioffi never complained about Ms. Colon during her employment and that they first became aware of Ms. Colon's alleged harassing actions when Ms. Cioffi filed her Affidavit of Illegal Discriminatory Practice before the Connecticut Commission on Human Rights and Opportunities ("CCHRO") on September 22, 1994.

(6) Ms. Cioffi alleges that agents and employees of the company, including Mr. Bailer, told off-color jokes in her presence on numerous occasions during her employment. Ms. Cioffi points to one specific instance of a joke told to her over the phone by an Allen Products salesperson. The plaintiff thinks she told Mr. Martin that the joke was disgusting, although she "can't say positive [ly]." (Cioffi Dep. at 267, Def.'s App. Supp. Mot. Summ. J.)

Ms. Cioffi also alleges that several co-workers harassed her in retaliation for her complaints of sex discrimination to management and because Mr. Bailer told several employees about the rumors of Ms. Cioffi's affair with a co-worker.

Ms. Cioffi was absent from work for approximately nine days between April 15, 1994, and June 3, 1994, due to illness, back problems, stress and requested personal time. On June 9, 1994, the plaintiff presented a doctor's note to Mr. Prushko stating that she would be absent from work until June 20, 1994, because she was suffering from stress. On June 20, 1994, Ms. Cioffi returned to work and was asked to cross-train another employee. She became agitated, worked for half a day, and left. She never returned to work.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

Page 4

Mr. Bailer called Ms. Cioffi's home on June 27, 1994, and spoke to her husband. Mr. Cioffi told Mr. Bailer that Ms. Cioffi was not ready to return to work and asked for worker's compensation forms. Mr. Bailer sent the forms to Ms. Cioffi the next day, along with a letter asking for additional information concerning her status and a medical evaluation. After receiving no response to his inquiry, Mr. Bailer sent a similar letter to Ms. Cioffi on July 6, 1994. Still failing to receive a response, Mr. Bailer sent Ms. Cioffi a letter on July 13, 1994, stating that the company could not continue to keep her position open and would terminate her on July 18, 1994, if she did not explain her absence and provide medical proof of a disability. The plaintiff responded by sending a note from a psychiatrist to Mr. Bailer dated June 28, 1994, which stated that the psychiatrist advised Ms. Cioffi to stay away from work until the situation there was resolved and she felt comfortable returning. Ms. Cioffi did not communicate to anyone at Allen Products after sending the psychiatrist's note, and the defendant terminated Ms. Cioffi's employment, effective November 1, 1994. Allen Products asserts that it terminated Ms. Cioffi in compliance with its normal absence control and job abandonment policy.

*4 Ms. Cioffi filed a charge of discrimination with the CCHRO and the Equal Employment Opportunity Commission ("EEOC") on September 22, 1994. After receiving a right to sue letter from the EEOC, the plaintiff filed the instant action on May 8, 1998.

## II. STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994). The determination of what facts are material to a particular claim is made

based upon the substantive law upon which that claim rests. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In determining whether there is a genuine issue as to any material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255; Gallo, 22 F.3d at 1223; Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989); Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir.1983). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).). However, the nonmoving party "may not rest upon mere conclusory allegations or denials." See Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir.1997) (internal citations omitted).

On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. See Anderson, 477 U.S. at 255; Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). The function of the court at this stage is not to weigh the evidence and determine what is true, but rather to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Although "[a] trial court must be cautious about granting summary judgment to an employer [in a discrimination case] when ... its intent is at issue," Gallo, 22 F.3d at 1224, "it is fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998).

## III. DISCUSSION

The court will address Allen Products' motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

summary judgment with respect to the plaintiff's federal and state law claims separately.

A. Title VII Claims

**\*5** The defendant moves for summary judgment with respect to the plaintiff's Title VII claims of hostile work environment, retaliatory harassment, and constructive discharge. The court will address each claim seriatim.

1. *Hostile Work Environment*

To recover under her Title VII hostile work environment claim, Ms. Cioffi must "establish (1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.' " *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999) (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)).

Allen Products seeks summary judgment on Ms. Cioffi's hostile work environment claim on the grounds that her allegations are neither timely, attributable to Allen Products, nor gender related. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764-768 (2d Cir.1998) (affirming the district court's decision granting summary judgment in the defendant's favor on the plaintiff's Title VII hostile work environment claim where the district court found that the plaintiff's claims were either time-barred, not attributable to the employer, or not sufficiently severe or pervasive to create a hostile work environment). In the alternative, if the court does consider some or all of the plaintiff's allegations, Allen Products contends that the allegations are not so severe and pervasive as to have altered the conditions of her employment. *See id.* at 767-768.

Ms. Cioffi responds that summary judgment is in-

appropriate because genuine issues of material fact exist in that: 1) her claims are timely because the continuing violation doctrine saves those allegations otherwise subject to the statue of limitations; 2) Allen Products should be held liable because its response to the alleged harassment was neither prompt nor effective; and 3) all alleged incidents were gender related. Further, Ms. Cioffi contends that there is a genuine issue of material fact concerning whether the plaintiff's allegations, taken together, are sufficiently severe and pervasive as to have effected the conditions of her employment.

The court will address each argument below.

a. *Timeliness*

The defendant contends that the court is precluded from considering any incident relative to the plaintiff's Title VII claim that occurred more than 300 days prior to the filing of her claim with the CCHRO on September 22, 1994, i.e., November 26, 1993. *See* 42 U.S.C. § 2000e-5(e)(1).[FN5] Specifically, the defendant challenges the timeliness of two incidents which allegedly occurred before November 26, 1993, upon which the plaintiff relies in support of her hostile work environment claim: 1) in 1991 or 1992, Mr. Bailer called Ms. Cioffi into his office and asked her about a rumored affair with a co-worker, Fran Connors; and 2) during the winter of 1992-1993, Mr. Dowdell stated to the plaintiff that he would like to see her "run naked through the snow."

> FN5. 42 U.S.C. § 2000e-5(e)(1) states that a Title VII charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ..., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

aggrieved within three hundred days after the alleged unlawful employment practice occurred...."

**\*6** The plaintiff relies on the continuing violation doctrine to justify the court's consideration of incidents that occurred before November 26, 1993, contending that the aforementioned incidents are, in fact, timely because they are sufficiently related to each other and to the later, timely incidents as to be considered part of a continuing violation. The defendant argues that the continuing violation doctrine does not apply in this case because these two incidents do not bear a sufficient relationship to the alleged incidents occurring after November 26, 1993.

"[A] continuing violation may be found 'where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Quinn,* 159 F.3d at 766 (quoting *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994)); *see Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) (noting discriminatory seniority lists and discriminatory employment tests as examples of discriminatory policies or mechanisms), *cert. denied,* 511 U.S. 1052 (1994). However, " 'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism, do not amount to a continuing violation.'" *Quinn,* 159 F.3d at 765 (quoting *Lambert,* 10 F.3d at 53). No continuing violation may be found where alleged acts were "sufficiently isolated in time (usually from each other, and at least from the timely allegations) as to break the asserted continuum of discrimination." *Quinn,* 159 F.3d at 766.

In the instant case, the court concludes that the challenged incidents are "sufficiently isolated in time ... as to break the asserted continuum of discrimination," *id.,* because no reasonable jury could find that these two incidents were continuous in time with one another, or with the later, timely al-

legedly harassing acts. These incidents occurred at least a year apart, and the second incident occurred more than a year before the next timely incident alleged in the plaintiff's complaint. Therefore, these incidents are time-barred. *See Quinn,* 159 F.3d at 766 (finding no continuing violation where more than five alleged discriminatory incidents involving various co-workers and supervisors occurred during the five years prior to the timely incidents, with one of the untimely incidents occurring less than a year before the timely incidents); *Osier v. Broome County,* 47 F.Supp.2d 311, 318-319 (N.D.N.Y.1999) (finding no continuing violation where the plaintiff alleged six harassing acts by various co-workers during the two years before the alleged timely harassing acts).[FN6] As a result, the court will not consider these two untimely incidents when assessing the plaintiff's Title VII hostile work environment claim.

> FN6. Notwithstanding the plaintiff's assertion to the contrary, the fact that these incidents occurred in a work environment where co-workers and the president of the company often told off-color jokes does not constitute a continuing violation. Moreover, that Mr. Bailer and Mr. Dowdell were also involved in later, timely incidents does not necessitate the finding of a continuing violation in light of the time between the earlier, untimely incidents and the later, timely ones. *See Osier v. Broome County,* 47 F.Supp.2d 311, 318 (N.D.N.Y.1999) (finding no continuing violation where the untimely incidents were sufficiently isolated in time from one another and from other timely acts committed by the same alleged harasser).

*b. Allen Products' liability*

**\*7** The defendant contends that it cannot he held responsible for the mirror incident involving Mr. Slater and the "eat me" remark made by Mr. Dowdell because it responded to these incidents in a timely and effective manner. The defendant also

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

denies liability for the incident where Ms. Colon waived sketches of penises in front of the plaintiff and the off-color jokes told by employees of Allen Products on the grounds that Ms. Cioffi never complained about these incidents, thereby preventing Allen Products from addressing them.

Ms. Cioffi argues that summary judgment is not appropriate with respect to these incidents because there remains a genuine issue of material fact as to whether: 1) Allen Products' responses to the mirror incident and the "eat me" statement were timely or effective; and 2) Allen Products should have known about the penis sketches and off-color jokes and should therefore be held responsible for them.

To prevail on her hostile work environment claim against the defendant, the plaintiff "must establish that the conduct which created the hostile work environment should be imputed to the employer." *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992). "When a 'co-employee'-as distinct from a supervisor-is alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.' " *Quinn,* 159 F.3d at 766 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)). The sufficiency of the employer's response to complaints "has to be assessed from the totality of circumstances ... [including] the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2d Cir.1998). The effectiveness of the response should also be considered. *See Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999) (finding that relevant factors in assessing the reasonableness of remedial measures include whether the company's response was reasonably calculated to end the harassment and may include "whether or not the measures ended the harassment"). The court concludes that no reasonable jury could find Allen Products liable

for the mirror incident or Mr. Dowdell's alleged "eat me" statement because the record clearly demonstrates that Allen Products' responses to Ms. Cioffi's complaints were prompt, proportional to the seriousness and frequency of the incidents, and reasonably calculated to end the harassment.[FN7]

> FN7. To the extent that the plaintiff alleges she had no reasonable avenue of complaint for these incidents, the record clearly demonstrates otherwise, as she filed several written complaints with her employer during the relevant period.

With respect to the mirror incident, it is undisputed that Mr. Martin investigated Ms. Cioffi's complaint and spoke with Mr. Slater the day of the incident. Mr. Slater assured Mr. Martin that he would apologize in writing to Ms. Cioffi, and he did so the next morning. Two days after the incident, Mr. Prushko spoke with Ms. Cioffi and Mr. Bailer about the incident. Mr. Prushko then gave Mr. Slater oral and written warnings indicating that he would be fired if there were any other similar complaints against him. Mr. Slater also told Mr. Prushko that he would pursue psychological counseling, and provided the company with a letter from his psychologist confirming treatment .[FN8] In addition, when Ms. Cioffi asked to be moved to Mr. Martin's desk, which was at the opposite end of the work area from Mr. Slater, she moved within approximately two weeks of Mr. Martin's departure. Ms. Cioffi concedes that there was no other office space available for relocation.

> FN8. That the defendant did not inform Ms. Cioffi of Mr. Slater's psychological treatment does not detract from the reasonableness of the aforementioned remedial measures taken by the defendant.

**\*8** Reviewing the aforementioned facts in the totality of the circumstances, the court concludes that Allen Products' response to Ms. Cioffi's complaint was reasonable in light of the limited gravity of the harm inflicted upon the plaintiff due to the adoles-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 8
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

cent nature of the conduct and her immediate discovery thereof. *SeeBrooks v. City of San Mateo,* 214 F.3d 1082, 1090-1091 (9th Cir.2000) (affirming summary judgment for the defendant employer where a co-worker improperly touched the plaintiff's stomach and breast, because "[t]he conduct ..., while very offensive, does not rise to the level of harassment for which Title VII offers a remedy," especially given that the city took prompt steps to address the incident); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir.1995) (finding no sexual harassment where the employee's supervisor was a "man whose sense of humor took final shape in adolescence" and where, during a seven month period, he made several distasteful comments and gestures, including a gesture intended to suggest masturbation).

Ms. Cioffi also argues that Allen Products' response to the mirror incident was not effective because Mr. Slater's harassment continued in that: (1) he subsequently laughed at a statement made to Ms. Cioffi by a co-worker that had a sexual connotation/ double-meaning; (2) he pushed back a partition of his cubicle and repositioned his desk in order to see her more readily; and (3) his desk was not moved closer to Mr. Prushko so that Mr. Prushko could monitor him. However, as none of these subsequent incidents can fairly be viewed as actionable sexual harassment, the court concludes that the defendants' response to the mirror incident was both reasonable and effective, such that Allen Products may not be held liable for Mr. Slater's conduct. *SeeBlack v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.) (reversing jury verdict in favor of the plaintiff employee and finding no sexually hostile work environment where the plaintiff was subjected to sexually suggestive jokes and comments and was looked at in a suggestive manner, because the conduct was merely offensive), *cert. denied,*522 U.S. 865 (1997).

Turning to Mr. Dowdell's alleged "eat me" comment on April 13, 1994, the court similarly concludes that no reasonable jury could find Allen

Products liable for this incident. Once again, it is undisputed that after Ms. Cioffi complained, Mr. Prushko interviewed Mr. Dowdell and another employee who had been nearby, though both denied making or hearing the statement. No formal action was taken against Mr. Dowdell, but Mr. Prushko counseled Mr. Dowdell about Allen Products' policy against harassment of any kind and warned him not to use inappropriate language in the workplace. Mr. Prushko also gave Ms. Cioffi a written report on the outcome of his investigation on June 8, 1994.

This response, viewed in the totality of the circumstances, was clearly reasonable and timely in light of the minimal gravity of the situation and the fact that Mr. Dowdell denied the plaintiff's uncorroborated allegation. *SeePhillips v. Merchants Ins. Corp .,* 3 F.Supp.2d 204, 206, 208 (N.D.N.Y.1998) (granting summary judgment in favor of the defendant employer on sexually hostile work environment claim where supervisor commented that "she did not care whether [the plaintiff] had to 'dance naked in the snow' to get business," asked the plaintiff "if he thought he was a 'big man on campus," 'directed profanity at him, and "called him names such as 'little boy,' 'tough son-of-a-bitch,' and 'dumb man," ' concluding that "[b]ehavior that is immature, nasty, or annoying, without more, is not actionable as sexual harassment").

**\*9** Ms. Cioffi again argues that Allen Products' response to the "eat me" incident was ineffective because Mr. Dowdell's harassment continued after the incident in that he often read the newspaper while leaning against a wall behind the plaintiff's cubicle. Once again, the court concludes that Mr. Dowdell's subsequent actions do not constitute actionable sexual harassment. *SeeBlack,* 104 F.3d at 826 (reversing jury verdict in favor of the plaintiff employee and finding no sexually hostile work environment where the plaintiff was, among other things, leered at in a suggestive manner, because the conduct was merely offensive). Accordingly, the defendant may not be held liable for the "eat

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

me" incident because its response was reasonable when viewed in the totality of the circumstances.FN9

> FN9. Ms. Cioffi also argues that Allen Products should be held liable for these incidents because it did not maintain a written policy and failed to conduct anti-harassment training for employees. However, the plaintiff cites to no authority indicating that the existence of a written sexual harassment policy and training, or the lack thereof, is dispositive in the case of co-worker harassment. Cf. *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999) (stating that, although not necessary, the existence of an anti-harassment policy is an important consideration in determining whether an employer has demonstrated that it exercised reasonable care in preventing and correcting a *supervisor's* sexually harassing conduct, as required for the employer to avoid liability) (emphasis added), *cert. denied,* 120 S.Ct. 1959 (2000).

With respect to the defendant's argument that it may not be held liable for the penis sketches and the off-color jokes told by employees because Ms. Cioffi never complained about these incidents,FN10 the court declines to address this argument because, as will be discussed below, these incidents, even when viewed in conjunction with the remaining, timely incidents, do not rise to the level of severity necessary to constitute a hostile work environment.

> FN10. The court notes that the plaintiff offers no evidence demonstrating the basis for the defendant's alleged constructive knowledge of these incidents.

*c. Gender related harassment*

The defendant also seeks to avoid liability for the "eat me" incident and the incident where Mr. Bailer asked the plaintiff about her relationship with a co-worker on the ground that these incidents were not based on gender-related animus. As the court has already precluded consideration of these incidents above, it need not address the defendant's alternative arguments that they were not gender-related.

The defendant also seeks to preclude from consideration the plaintiff's allegation that Ms. Colon showed Ms. Cioffi a picture with sketches of penises on it, arguing that there is no evidence demonstrating that Ms. Colon was harassing Ms. Cioffi because she is a woman. The court again declines to address this argument because, as will be discussed below, this incident, even when viewed in conjunction with the remaining, timely incidents, does not rise to the level of severity necessary to constitute a hostile working environment.

*d. Severe or pervasive discriminatory conduct*

The defendant next argues that the plaintiff's hostile work environment claim must fail because, even if the court were to consider some or all of the plaintiff's allegations, the alleged sexual harassment was not sufficiently severe or pervasive as to give rise to a cause of action. The plaintiff contends that there remains a genuine issue of material fact with respect to this issue.FN11

> FN11. Ms. Cioffi argues that findings by the CCHRO and the Social Security Administration ("SSA"), as well as her diagnosis by Dr. Kligfeld, provide further support for her hostile work environment claim. The plaintiff contends that if the CCHRO, SSA and Dr. Kligfeld could make the determination that she was harassed, then a reasonable jury could come to the same conclusion. This argument is misplaced because the SSA and Dr. Kligfeld were not asked to determine the existence of a Title VII violation, and the plaintiff offers no evidence documenting the CCHRO's finding in the plaintiff's favor.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

In fact, the defendant contends that the CCHRO failed to make any factual determinations in the plaintiff's case because the plaintiff withdrew her complaint before the CCHRO conducted an administrative hearing.

To establish the existence of a hostile work environment under Title VII, the plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). When analyzing the pervasiveness of the alleged harassment, " 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 768 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)); see*Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577-78 (2d Cir.1989) (stating that in order to be deemed pervasive, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted"); see also*Harris,* 510 U.S. at 21 ("[The] mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."). " 'Simple teasing', offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 82 (1998)). However, "where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition." *Quinn,* 159 F.3d at 768. In other words, Title VII is not to be used as "a general civility code," *Oncale,* 523 U.S. at 80; rather, alleged discriminatory conduct must be "extreme to amount to a change in the terms and conditions of employment." *Faragher,*

524 U.S. at 788.

**\*10** There is no precise test for determining what constitutes a hostile work environment. Instead, the court must focus on the totality of the circumstances. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff's work performance."*Harris,* 510 U.S. at 21. These factors must be evaluated from both a subjective and an objective viewpoint. *See id.* at 21-22;*Faragher,* 524 U.S. at 787 ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.").

As the court has determined above that several of the plaintiff's allegations are either untimely or not attributable to Allen Products, it must now determine whether the plaintiff's remaining allegations amount to actionable harassment. *See Quinn,* 159 F.3d at 765-768 (affirming summary judgment for the defendant where the district court first eliminated all untimely incidents and any incidents that could not be attributed to the employer, and then determined if the remaining incidents were sufficiently severe or pervasive as to alter the conditions of the plaintiff's employment). The plaintiff's allegations which are properly before the court are as follows: 1) in 1994, Mr. Bailer mentioned Ms. Cioffi's alleged affair to Mr. Baccili; 2) in April, 1994, Carmen Colon waved a page with sketches of penises on it in front of Ms. Cioffi and would often place photocopies of off-color jokes on co-workers' desks; 3) off-color jokes were told in Ms. Cioffi's presence on numerous occasions during her employment by agents and employees of the company, including Mr. Bailer; [FN12] 4) Mr. Dowdell often read the newspaper while leaning against a wall behind the plaintiff's cubicle; and 5) in June, 1994, Mr. Slater laughed at a statement made to Ms. Cioffi by a co-worker that had a sexual connotation/

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

double-meaning.

> FN12. The defendant argues that Allen Products cannot be liable for off-color jokes told in Ms. Cioffi's presence because she cannot remember who made the jokes, where or when they were made, or what they were about. The plaintiff contends that it is normal for her to suppress the memories of repulsive behavior and further, there was no mechanism for complaint because the joke-teller was most often the president of the company. The court declines to address this argument because the remaining incidents of harassment cited by the plaintiff, even including the joke-telling, are not sufficiently severe or pervasive as to constitute a hostile working environment, as explained below.

Viewing the above incidents in their totality, the court concludes that no reasonable jury could find that these five incidents created an actionable hostile work environment for the plaintiff. Ms. Cioffi has alleged sufficient facts to support the subjective portion of her hostile work environment claim, attesting that the alleged harassment caused her to be absent from work due to stress, to seek psychiatric help and, finally, to leave work permanently. See Brooks v. City of San Mateo, 214 F.3d 1082, 1088-89 (9th Cir.2000) (finding sufficient facts to support the subjective portion of the plaintiff's hostile work environment claim where the alleged harassing incident "pervaded her work environment to such a degree that she required psychological help and even then was unable to successfully return to her job"). However, when viewed objectively, the court concludes that these five incidents cannot be found to be severe or pervasive enough to alter the conditions of Ms. Cioffi's employment and create an abusive working environment.

*11 The five incidents are clearly offhand comments, "mere offensive utterances" and isolated incidents, which numerous courts have made clear do not amount to discriminatory changes in the terms and conditions of a plaintiff's employment. See, e.g., Faragher, 524 U.S. at 788 ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view."); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir.2000) (affirming summary judgment for the defendant employer where, over a seventeen month period, the plaintiff's supervisor frequently told jokes with sexual overtones, once referred to the female plaintiff as "Hot Lips," commented about the plaintiff's state of dress, and made a statement that could be construed as telling the plaintiff that she could get a better review if she performed sexual favors for him, concluding that the harassing supervisor's behavior was the "kind of simple teasing, offhand comments, and isolated incidents that Faragher made clear did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment"); Hartsell v. Duplex Products, Inc., 123 F.3d 766, 773 (4th Cir.1997) (affirming summary judgment for the defendant employer where male co-workers regularly made off-color statements to the plaintiff and other women employees, stating that "[t]here was no allegation that [the plaintiff] was inappropriately touched, propositioned, flirted with, taunted, or even ogled," that none of the alleged comments "were even vulgar, much less obscene," and that the co-worker's behavior "falls well short" of harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive). The court notes that most of the off-color jokes cited by the plaintiff were not directed toward Ms. Cioffi personally, but to the defendant's employees in general. See Morris, 201 F.3d at 790 (stating that, when allegedly offensive jokes frequently told by a supervisor were not aimed at the plaintiff, these circumstances "can be relied upon as part of a court's conclusion that a defendant's conduct was not severe enough to create an objectively hostile environment"); Sedotto v. Borg-Warner Protective Services Corp., 94 F.Supp.2d 251, 265 (D.Conn.2000) (finding no evidence that the plaintiff was harassed because of her sex where her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 12
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

supervisor criticized and ridiculed her, but he was that way with everyone and he never said anything of a sexual nature directly to the plaintiff). Finally, Ms. Cioffi was not physically touched, threatened or propositioned. *See Morris,* 201 F.3d at 790 (affirming district court's finding that a male supervisor's harassment was not sufficiently severe or pervasive as to create a hostile working environment where the supervisor made a statement that could be construed as telling the plaintiff that she could get a better review if she performed sexual favors for him because "[a]lthough [the supervisor's] purported sexual advance was truly offensive, it was the only advance that [he] allegedly made"); *Quinn,* 159 F.3d at 768 (affirming summary judgment for the defendant employer where the plaintiff's supervisor allegedly told her that she had been voted the "sleekest ass" in the office and touched her breasts with papers he was holding).

**\*12** In summary, Ms. Cioffi may have found her work environment unpleasant, and the sexual banter may have been boorish, but her workplace cannot be found to be hostile under Title VII. *See Faragher,* 524 U.S. at 788 ("[The] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' ") (quoting *Oncale,* 118 S.Ct. at 1002); *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998) ("The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute a violation of [Title VII].... 'On one side lie sexual assaults; ... physical contact ...; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures.... On the other side lays the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." ") (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995)). Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's hostile work environment claim contained in count one of the complaint is granted.

*2. Retaliatory Harassment*

Allen Products also seeks summary judgment with respect to Ms. Cioffi's retaliatory harassment claim on the ground that: 1) there is no evidence that the plaintiff was harassed because she engaged in a protected activity; 2) the alleged retaliatory harassment was not sufficiently severe or pervasive as to constitute an adverse employment action; and 3) Allen Products took reasonable actions to eliminate any conduct about which the plaintiff complained. While Ms. Cioffi does not respond to the defendant's motion on this count, the court analyzes the merits of her claim below.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [she] has opposed any practice made an unlawful employment practice by this title."42 U.S.C. § 2000e-3(a)."To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision."*Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 443 (2d Cir.1999). With respect to retaliation by co-workers, the Second Circuit Court of Appeals went on to state in *Richards:*

We adopt the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case.

...

Just as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate remedial action, so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 13
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))

**\*13** *Id.* at 446 (citations omitted).

There is no dispute that Ms. Cioffi participated in a protected activity when she complained to supervisors about alleged harassment. The parties' dispute presumably centers on whether Ms. Cioffi was subjected to any disadvantageous employment actions and, if so, what causal connection, if any, existed between those actions and her protected activity.

Although Ms. Cioffi fails to state in her complaint exactly which of the alleged incidents of sexual harassment were retaliatory in nature, the court gleans from her deposition and other exhibits submitted in connection with the instant motion eight possible incidents which Ms. Cioffi may claim were retaliatory because they occurred after she complained about the mirror incident: [FN13] 1) an unspecified incident with Carmen Colon; 2) Karen Bragdon, a co-worker, listened into a conversation between Ms. Cioffi and a customer; 3) the "eat me" incident; 4) sometime between the mirror incident and May 20, 1994, Mr. Bailer called Ms. Cioffi into his office and talked with her about "getting along" with others in the workplace; 5) incidents where male co-workers "accidently" bumped into Ms. Cioffi; 6) Ms. Cioffi walked into the coffee room one day and a co-worker stopped talking, stating that he could not continue his conversation because of "present company"; 7) Mr. Slater laughed at a joke that he heard between Ms. Cioffi and another co-worker; and 8) Ms. Colon waived the paper with sketches of penises in front of Ms. Cioffi.

> FN13. Ms. Cioffi stated at her deposition that she was also harassed by co-workers after Mr. Bailer spoke with un-named persons about the plaintiff's alleged affair with a co-worker. Because Ms. Cioffi did not complain to anyone about Mr. Bailer's inquiring about the affair, this is not a protected activity upon which she may base her retaliation claim.

For the same reasons iterated previously, these in-

cidents, even if they were somehow retaliatory in nature,[FN14] were either not attributable to Allen Products because it responded appropriately to the plaintiff's complaints, or were not severe or pervasive enough to constitute adverse employment actions.

> FN14. The court notes its reservations concerning the plaintiff's ability to establish the necessary causal connection between allegations of mistreatment at the hands of un-named co-workers and her complaints to her supervisor.

Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's retaliation claim contained in count two of the complaint is granted.

### 3. *Constructive Discharge*

Although not included in her original complaint, Ms. Cioffi raises a claim of constructive discharge in her response to the defendant's statement of undisputed facts. (*See* Pl.'s Resp. Def.'s Statement Undisputed Facts, ¶ 19 (stating "the fact that Mr. Slater underwent counseling would have no impact on [the plaintiff's] claim of constructive discharge").) The court will therefore examine the merits of such a claim below, notwithstanding the fact that neither party addressed this claim in their briefs.

"To establish a constructive discharge, a plaintiff must show that the employer deliberately [made her] working conditions so intolerable that [she was] forced into an involuntary resignation."*Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993) (internal citation and quotations omitted)." 'Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit." ' *Leson v. ARI of Connecticut, Inc.,* 51 F.Supp.2d 135, 143 (D.Conn.1999) (quoting *Lombardo v. Oppenheimer,* 701 F.Supp. 29, 30 (D.Conn.1987)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 14
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

"Intolerability is measured by a reasonable person standard and not by the employee's subjective feelings." *Id.*

**\*14** The Second Circuit has noted that "a constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant."*Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993); *seeStetson,* 995 F.2d at 360 ("A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments."). Indeed, the standard for constructive discharge is "a demanding one ." *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985) (determining that the plaintiff's resignation due to humiliation over her employer's loud mention of her having to take a polygraph test and her burdensome working conditions did not amount to a constructive discharge).

The court concludes from the pleadings that, in support of her constructive discharge claim, Ms. Cioffi would contend that Allen Products did not take her complaints seriously and that this lack of care created an intolerable working environment resulting in her constructive discharge when she left work on June 20, 1994, and was unable to return.[FN15]

> FN15. To the extent that Ms. Cioffi may rely on the fact that Allen Products requested that she train another employee on her last day of work in support of her constructive discharge claim, such a claim is unavailing because it is reasonable to believe that Allen Products was attempting to secure back-up for Ms. Cioffi's duties in light of her absences during the preceding two months. *SeeSedotto v. Borg-Warner Protective Services Corp.,* 94 F.Supp.2d 251, 261 (D.Conn.2000) (stating that if an employee is dissatisfied with the work as-

signments she received, this is not enough to show that an employer intended the employee to quit).

However, Ms. Cioffi has failed to allege any facts from which a reasonable jury could conclude that the defendant intentionally created an intolerable working atmosphere for the purpose of inducing her resignation. First, the court has already determined that Allen Products responded reasonably to Ms. Cioffi's actionable complaints. In addition, Ms. Cioffi was given new responsibilities, a promotion and a raise in pay in late April, 1994, after she had complained about several instances of alleged harassment including the "mirror incident." *SeeSedotto v. Borg-Warner Protective Services Corp.,* 94 F.Supp.2d 251, 261 (D.Conn.2000) (concluding that the plaintiff produced insufficient evidence of intent in support of her Title VII constructive discharge claim where the plaintiff was offered another district to manage, was given a raise, her performance was considered good, and she received a substantial bonus during the three months before she quit work). Finally, the court notes that Mr. Bailer held the plaintiff's job open for five months without receiving the requested medical documentation supporting her absence before terminating her employment. *SeeViera v. Olsten/Kimberly Quality Care,* 63 F.Supp.2d 413, 418 (S.D.N.Y.1999) (finding former employee was not actually or constructively discharged where she was offered a new position during company reorganization that provided same salary and benefits as she currently received, she was aware that her failure to accept position would be treated as voluntary resignation, and employer waited nearly two months before compelling her to decide).

**\*15** Therefore, the plaintiff has failed to produce sufficient facts to establish a prima facie case of constructive discharge, and the defendant's motion for summary judgment is granted with respect to this claim.

B. State Law Claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 15
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.))**

It is well settled that when all federal claims are eliminated, a federal court should decline to exercise jurisdiction over any remaining state law claims. *SeeCarnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1998) (holding that a federal court should decline to exercise jurisdiction over pendant state law claims absent federal claims); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) (holding that a federal court should hesitate to exercise jurisdiction over state claims absent federal claims); *DiLaura v. Power Auth. of New York,* 982 F.2d 73, 80 (2d Cir.1992) (holding that it is in the discretion of the court to relinquish jurisdiction over supplemental state claims absent federal claims). Accordingly, because there are no viable federal claims pending against the defendant, the court declines to exercise jurisdiction over the plaintiff's remaining state law claims of negligent hiring and/or retention and intentional infliction of emotional distress contained in counts three and four of her complaint, respectively. These claims are hereby dismissed without prejudice. As the plaintiff has withdrawn her claim of negligent infliction of emotional distress contained in count five of the complaint, this claim is dismissed with prejudice.

## IV. CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment (doc. # 32) is GRANTED with respect to the plaintiff's Title VII claims. The plaintiff's state law claims of negligent hiring and/or retention and intentional infliction of emotional distress are dismissed without prejudice. The plaintiff's claim of negligent infliction of emotional distress is dismissed with prejudice. The clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2000.
Cioffi v. Allen Products Co.
Not Reported in F.Supp.2d, 2000 WL 33180448

(D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

LEXSEE 2005 U.S. DIST. LEXIS 9319

**BARIE HAMILTON, Plaintiff, -against- BALLY OF SWITZERLAND, Defendant.**

**03 Civ. 5685 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 9319**

**May 12, 2005, Decided**
**May 17, 2005, Filed**

**PRIOR HISTORY:** Hamilton v. Wilson, 2004 U.S. Dist. LEXIS 957 (S.D.N.Y., Jan. 21, 2004)

**DISPOSITION:**    [*1] Defendant's motion for summary judgment granted, and plaintiff's motion denied. Plaintiff's remaining sex discrimination claims dismissed.

**COUNSEL:** Barie Hamilton, Pro se.

Bernard M. Plum and Amy B. Regan, Proskauer Rose LLP, New York, New York, for Defendant Bally.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Barie Hamilton, proceeding *pro se,* brings this employment discrimination action under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621 *et seq.,* and the American with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12112-12117, against her former employer, Bally North America ("Bally") and her supervisor, Alicia Wilson. [1] The Court previously dismissed plaintiff's age and pregnancy discrimination claims as against all defendants and dismissed the complaint in its entirety against defendant Wilson. [2] Hamilton v. Wilson, 2004 U.S. Dist. LEXIS 957, No. 03 Civ. 5685 (GEL), 2004 WL 169789 (S.D.N.Y. Jan. 28, 2004). [*2] Plaintiff's surviving sex discrimination claims against her former employer allege sexual harassment and retaliation. Defendant Bally now moves for summary judgment dismissing the remaining claims, and plaintiff cross-moves for summary judgment in her favor. Defendant's motion will be granted, and plaintiff's motion will be denied.

1    Throughout this litigation, plaintiff has referred to defendant Bally North America as "Bally of Switzerland." See Hamilton, 2004 U.S. Dist. LEXIS 957, 2004 WL 169789, at *1 n.1. Plaintiff explains that the name of the company was changed to Bally North America following bankruptcy proceedings that postdated her termination. (Hamilton 2/23/24 Aff., Hamilton Decl. Ex. 10, at 1.)

2    At the time of the motion to dismiss, plaintiff had not yet served defendant Wilson and sought permission from the Court for additional time to do so. The Court declined to enlarge plaintiff's time to perfect service, finding that plaintiff had failed to state a claim against Wilson. Instead, the Court granted plaintiff a short amount of time in which to replead facts which would state a claim against defendant Wilson. Hamilton, 2004 U.S. Dist. LEXIS 957, 2004 WL 169789, at *5. Plaintiff made additional submissions, but they were legally insufficient to state a claim against Wilson. Accordingly, by Order dated February 25, 2004, the Court dismissed Wilson from this case.

**[*3] BACKGROUND**

Plaintiff has failed to submit a Local Rule 56.1 counterstatement of undisputed facts responding to that submitted by defendant. Ordinarily, this might require the Court to deem admitted all facts set forth in defendant's 56.1 Statement, see Local Rule 56.1(c) ("Each

2005 U.S. Dist. LEXIS 9319, *

numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); D. Reply Mem. 2 n.2. But as a pro se litigant, plaintiff may have failed to understand the requirements of Local Rule 56.1. Plaintiff has submitted a declaration (later supplemented), an affidavit attached to the declaration as Exhibit 10 (captioned "Plantiff's Response to Opinion and Order of USDJ Gerard E. Linch [sic] dated 01-21-04" and cited herein as "Hamilton 2/23/04 Aff."), and a number of other exhibits in opposition to defendant's motion. [3] The Court will consider the totality of the parties' submissions in identifying disputed material facts, and will construe those disputed facts in plaintiff's [*4] favor as is appropriate on summary judgment.

> 3    Plaintiff makes repeated references in her submissions to audio tapes previously submitted to the Court as exhibits. No audiotapes were submitted with this motion, nor does the Court have audio tapes on file from any previous motions in this case. Accordingly, the Court has not had recourse to any such tapes, although it notes that some of these tapes were apparently played during various depositions according to the deposition transcripts.

The background facts of plaintiff's employment, in any event, are undisputed. During the relevant time period, defendant was a wholesale and retail purveyor of high-end men's and women's shoes and accessories. Defendant's own retail stores were grouped into regions, with the managers of individual stores within the region reporting to a regional manager. Defendant's flagship store in the United States was opened on Madison Avenue in Manhattan during the summer of 1995, and plaintiff was the store manager until she was fired on [*5] January 7, 1998. As store manager, she reported to the regional manager, Alicia Wilson, who, in turn, reported to Brad Wolfer, vice-president of retail in the United States, who, in turn, reported to Richard Wycherley, defendant's president.

Defendant claims that the decision to fire plaintiff was made in the midst of a "worldwide reorganization" directed by defendant's parent company, which required Wycherley "to suggest staff changes and business strategies within Bally's United States' [sic] retail stores that he felt would increase Bally's profitability." (Wycherley Decl. P5.) Defendant contends that, in accordance with this directive, Wycherley recommended plaintiff's termination in May 1997, following his own observations of her performance (including that the store was operating

at a more than $ 200,000 loss) and the input of Wilson and Wolfer. (Id. P6.) And indeed, a document described as "a high-level document that was only supposed to be viewed by senior management within Bally," prepared by Wycherley and dated May 30, 1997, indicates that the manager of the Madison Avenue store was to be replaced by August 1, 1997. (Id. P5 & Ex. 1.) Plaintiff received three [*6] written warnings from Wilson about a variety of aspects of her performance, dated May 9, 1997, June 17, 1997, and December 2, 1997, a negative midyear appraisal on September 23, 1997, was placed on a forty-five day probationary period by Wolfer on October 13, 1997, and her employment was finally terminated on January 7, 1998.

Plaintiff, however, claims that she was sexually harassed by Wilson throughout 1997. (Hamilton 2/23/04 Aff. 1.) Her specific allegations of sexual harassment will be discussed in further detail below, see infra Discussion Part II.A, but consist primarily of a conversation in which plaintiff alleges Wilson confided that she was gay, followed by numerous invitations for after-work drinks, compliments and conversations with sexual undertones, Wilson's leaving an undergarment behind in plaintiff's store, and one incident in June 1997 in which plaintiff claims Wilson touched her breast, over her objection, while feeling the material of plaintiff's bodysuit and stating that the bodysuit was "very sexy." (Id.; Hamilton Dep., Regan Decl. Ex. 5, at 62-63.) Plaintiff also asserts that Wilson tried to "make [her] jealous" by showing off in tight jeans to the employees [*7] attending a staff meeting at plaintiff's store. (Hamilton 2/23/04 Aff. 2.) Plaintiff's submissions and deposition contain further allegations of harassment that are sex-neutral at least on their face, such as Wilson's criticism of plaintiff's performance in front of other employees and Wilson's interfering with and undermining of plaintiff's management of her store and employees. (See, e.g., id. 3-4.) Wilson denies both that she made sexual advances toward plaintiff, and that she is sexually attracted to women. (Conte Decl. P13.)

Plaintiff claims that she reported the alleged harassment to Bally's vice president of human resources, Karen O'Mara, on May 13, 1997, and that she asked Wilson to attend the meeting with O'Mara, but that Wilson did not show up. (Hamilton 2/23/04 Aff. 2.) O'Mara's testimony, however, is that while plaintiff made a variety of complaints, none of her complaints were about sexually harassing behavior. Instead, O'Mara claims plaintiff's complaints consisted of the following: "that she had not been appropriately paid for work she had performed; that she had been criticized for her appearance at work and the way that her clothes were fitting after she returned [*8] from maternity leave by Bally managers Mike Shields and Susan Jones; that she was unhappy with a warning

notice that she had received from her Regional Manager, Alicia Wilson, for permitting unauthorized personnel to close her retail store; and that she did not feel that Ms. Wilson had worn appropriate pants to a store meeting (i.e., Ms. Hamilton complained that Ms. Wilson had shown up in tight jeans and sat in a casual manner that was not appropriate for a business meeting)." (O'Mara Decl. P2.) O'Mara claims she addressed these complaints by inter alia procuring backpay for plaintiff and speaking to Wilson about her attire, but, not interpreting any of them to concern "illegal harassment, discrimination, or retaliation," she did not report complaints of sexual harassment to anyone at Bally. (Id. P2-3.)

Plaintiff claims that Wilson's sexual advances continued after her meeting with O'Mara (including the June 1997 incident in which Wilson touched plaintiff's breast, and which she claims she reported to O'Mara in a telephone conversation the same day, Hamilton Dep. 157-59), and that the warning notices and disparaging remarks she received from Wilson about her performance in the [*9] following months reflected Wilson's anger at having had those advances rejected, rather than plaintiff's actual job performance. (Hamilton 2/23/04 Aff. 1.) Plaintiff initiated a complaint with the New York City Commission on Human Rights ("CHR") on December 1, 1997 (CHR Intake Form, Hamilton Decl. Ex. 11, at 1), but the complaint was not served on defendant until January 20, 1998. (Letter of John McCormick, Investigator, Law Enforcement Bureau, CHR, to Director of Human Resources, Bally, Inc., dated Dec. 12, 2000, Hamilton Decl. Ex. 5, at 1.) Plaintiff alleges that following her termination, she was placed on a "black list" and given negative employment references. (Hamilton Decl. P12.)

Following an investigation, CHR found no probable cause that defendant had engaged in unlawful discrimination, concluding that plaintiff had been fired because of her store's operating losses and "complaints about complainant's abrasive manner in dealing with the stores [sic] customers." (CHR Determination and Order After Investigation, Regan Decl. Ex. 2, at 3.) Hamilton sought review of that determination, and CHR affirmed its prior findings on appeal on December 31, 2002. (CHR Determination [*10] and Order After Review, Regan Decl. Ex. 3, at 1.) Hamilton then sought review by the EEOC, which adopted CHR's findings and issued a right-to-sue letter dated April 8, 2003. (EEOC Dismissal and Notice of Rights, Regan Decl. Ex. 4, at 1.)

Plaintiff filed the instant complaint on July 31, 2003, asserting various age, pregnancy, and sex discrimination claims against Bally and Wilson. As stated above, plaintiff's age and pregnancy discrimination claims were dismissed (and Wilson was dismissed entirely from the case) by the Court. Defendant now moves for summary judgment in its favor as to the surviving sex discrimination claims (sexual harassment and retaliation), and plaintiff cross-moves for summary judgment in her favor.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Ordinarily, a "genuine issue as to any material [*11] fact" is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "It is the movant's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the non-movant's favor." Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (internal citations omitted); see United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962). In determining the existence of disputed facts, "conclusory allegations or unsubstantiated speculation" will not suffice. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

Here, however, defendant has agreed to accept plaintiff's version of disputed material facts as true for purposes of this motion (D. Mem. 2 n.2) --which the Court understands to include plaintiff's characterization [*12] of Wilson's sexual orientation and behavior--shifting the focus on summary judgment away from the existence of disputed material facts, and toward whether, even if all disputed facts are construed in plaintiff's favor, a "reasonable jury could return a verdict" for plaintiff. The Court finds that the record developed by plaintiff is insufficient to support a jury verdict of sex discrimination and, therefore, defendant is entitled to judgment as a matter of law.

#### B. Title VII Standards

##### 1. Sexual Harassment Claim

Plaintiffs making sexual harassment claims under Title VII have two alternative theories available: (1) hostile work environment and (2) quid pro quo. Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994).

To make out a prima facie case of hostile work environment, plaintiff must establish that (1) she was subjected to harassment based on a prohibited ground of discrimination; (2) the harassment was so severe as to alter the terms and conditions of her employment, and (3) there is a basis for imputing the harassing conduct to the employer. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998). To meet the severity requirement [*13] (the second prong of this test), plaintiff must establish that the harassment was severe or pervasive enough to create an objectively hostile environment, and that she subjectively perceived the environment to be abusive. Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002). In general, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," and "isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Id. at 374. In determining whether allegations of abusive conduct are sufficient to meet the threshold for an objectively hostile work environment, courts examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, [*14] noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Terry v. Ashcroft, 336 F.3d 128, 148 (1993) (internal citations, quotation marks, and alteration omitted).

By contrast, "quid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" Karibian, 14 F.3d at 777 (quoting EEOC Guidelines, 29 C.F.R. § 1604.11(a)(2) (1993)). [4] Thus, to present a prima facie case of quid pro quo harassment, "plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Id. Simply put, the question is whether plaintiff's supervisor "linked tangible job benefits to the acceptance or rejection of sexual advances." Id. at 778. The term [*15] "job benefits," however, does not necessarily imply promotion or positive advancement; the mere retention of employment will suffice. Id.

[4] The EEOC Guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank, FSB v. Vinson 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citations omitted).

## 2. Retaliation Claim

In deciding a summary judgment motion with respect to Title VII retaliation claims, the Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Terry, 336 F.3d at 140-41. The first question is whether the plaintiff has established a "minimal" prima facie case. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-69 (2d Cir. 1998); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998). "To establish a prima facie case [*16] of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Terry, 336 F.3d at 141 (internal citations, quotation marks, and emphasis omitted); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). "Title VII is violated when a 'retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" Terry, 336 F.3d at 140-41 (quoting Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

If the plaintiff has established her prima facie case, a presumption of discrimination or retaliation is established which "places the burden of production on the employer to proffer a [non-retaliatory] reason for its action." James v. New York Racing Assoc., 233 F.3d 149, 154 (2d Cir. 2000). If the employer fails to present such a reason, plaintiff prevails. But, "the employer can rebut that presumption by offering [*17] legitimate, non-retaliatory reasons for the contested actions; if it succeeds, the burden reverts to the plaintiff to demonstrate that those reasons are merely pretextual." Myrick v. New York City Employees Ret. Sys., 2002 U.S. Dist. LEXIS 8032, 99 Civ. 4308 (GEL), 2002 WL 868469, at *5 (S.D.N.Y. May 3, 2002) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); James, 233 F.3d at 154; Fisher v. Vassar Coll., 114 F.3d 1332, 1333-35 (2d Cir. 1997)).

An employer acting for legitimate, non-retaliatory reasons will be entitled to summary judgment, "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited" retaliation. James, 233 F.3d at 154 (citations omitted); see also Gallagher, 139 F.3d at

349-50. Evidence casting doubt on the employer's proffered justification "may--or may not--be sufficient" to provide this support. Fisher, 114 F.3d at 1333. Thus, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to "examine the entire record to determine whether the plaintiff could satisfy [*18] his 'ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)).

## II. The Legal Standards Applied

### A. Sexual Harrassment

#### 1. Hostile Work Environment

Plaintiff claims she was subjected to a hostile work environment on the basis of her gender, relying on the alleged incidents of sexual harassment committed by Wilson. Defendant moves for summary judgment, arguing that "any allegedly hostile conduct she experienced was [not] sufficiently 'severe or pervasive,' [nor was it] based on her gender." (D. Mem. 10.)

As stated above, a claim of hostile work environment requires the plaintiff to show that the complained-of conducted was sufficiently severe or pervasive to create an objectively hostile environment, and that she subjectively perceived the environment to be abusive. Alfano, 294 F. 3d at 373-74. Plaintiff's submissions are not in the form of legal argument, and it is difficult to distill her precise allegations of sexual [*19] harassment. Plaintiff's deposition, verifying and elaborating on those allegations contained in her affidavit of February 23, 2004, however, shows that her allegations of sexual harassment amount to the following: (1) a conversation between Wilson and plaintiff in which Wilson confided to plaintiff she was gay (Hamilton 2/23/04 Aff. 1-2); (2) repeated visits to plaintiff's store and invitations to join Wilson for drinks after work, including one incident in April 1997 in which Wilson allegedly propositioned plaintiff (id. at 2; Hamilton Dep. 60, 76); (3) Wilson's numerous compliments on plaintiff's "elegant and sexy" appearance (Hamilton 2/23/04 Aff. 2) and her "sexy" tone in speaking to plaintiff during her final evaluation (Hamilton Dep. 112); (4) an undergarment (bodysuit) Wilson left behind in plaintiff's store (Hamilton 2/23/04 Aff. 2); (5) Wilson's inappropriate dressing and showing off during a staff meeting in plaintiff's store, which plaintiff perceived as trying to "make [plaintiff] jealous" (id.); and (6) Wilson's touching of plaintiff's breast in June 1997, over plaintiff's objection, while feeling the material of a bodysuit plaintiff was wearing, and which Wilson [*20] told plaintiff was "very sexy." (Hamilton Dep. 62-63.)

As a preliminary matter, Wilson's sexual orientation is not material on summary judgment. Plaintiff perceived Wilson's comments disparaging men during one conversation as indicating her sexual attraction to women (id. 67-69) and submits a notarized letter from a former co-worker, Clarissa Green, testifying she also believed Wilson was gay and that Wilson made things difficult for straight female employees (Letter of Clarissa Green, dated Aug. 3, 1999, Hamilton Decl. Ex. 17, at 1). Wilson insists she has never been sexually attracted to women. (Conte Decl. P13.) Although at trial a jury might credit Wilson's testimony about her sexual orientation over that of plaintiff, and accordingly, be more skeptical about plaintiff's allegations, such credibility determinations and factfinding are inappropriate on summary judgment. Plaintiff's allegations are what they are vis-a-vis Wilson's behavior, and it is that behavior--a series of alleged unwelcome sexual advances--which plaintiff claims subjected her to a hostile work environment. Nonetheless, no reasonable jury could find that the alleged harassment was so severe or pervasive [*21] as to be actionable under Title VII.

Indeed, few of these alleged incidents merit serious attention because plaintiff's own testimony does not indicate that she subjectively perceived them as objectionable. Plaintiff's present allegations that Wilson's positive compliments about her appearance (i.e., that plaintiff's clothing and appearance were "elegant and sexy" and that Wilson's sister thought plaintiff was "the most glamorous woman she ever met") constituted sexual harassment are undercut by her testimony that she did not find the comments offensive at the time and that positive comments about appearance would have been normal in the context of a high-end fashion retail store. (Hamilton Dep. 75-76, 81.) [5] Likewise, although plaintiff described Wilson's tone of voice as "sexual" in a conversation they had at the end of the forty-five day probationary period put in place by Wolfer following plaintiff's negative midyear appraisal, plaintiff's testimony clearly indicates that the content of the conversation was not at all sexual, nor did she perceive it as such. (Id. 112-14.) Moreover, plaintiff's testimony indicates that she found the conversation inappropriate because Wilson [*22] was carrying on too much in delivering the review, when "all she had to do was state the facts, questions, answers and goodbye. No theatrical act." (Id. 114.) This does not amount to testimony of a perception of sexual harassment.

5    To the extent that plaintiff clarifies this testimony in her supplemental affidavit that she was not initially offended, but that she "became more and more frustrated with Wilson's compliments,

as they took the form of sexual harassment" (Hamilton Supp. Aff. P15), these compliments, as vaguely described by plaintiff in her submissions ("Wilson made numerous compliments about [plaintiff's] looks, how elegant and sexy her suits, shoes, and general looks were." (Hamilton 2/23/04 Aff. 2)), are not objectively offensive. In any event, an affidavit that attempts to revoke admissions made in a deposition cannot create a genuine issue of material fact on summary judgment. Hayes v. City of New York Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

Nor did plaintiff perceive [*23] Wilson's numerous invitations (approximately ten) to join her for drinks after work as subjectively contributing to a hostile work environment; instead, her testimony was that she thought "Wilson had no life so she wanted me to socialize with her" with no particular sexual implication behind the invitations (id. 72 ("Q: [Did Wilson want you to socialize with her] as a friend?; A: She didn't mention in what position.")), and that she rejected those invitations because she and Wilson had a "hostile relationship." (Id.) Similarly, although plaintiff complained that Wilson left behind an undergarment--a bodysuit--in plaintiff's store, plaintiff testified that employees sometimes brought changes of clothes ("jeans, shirts") to perform manual work after hours (id. 105-06), and she was not sure whether Wilson had done so intentionally "so people can see [her undergarments]" (id. 106), or simply because "she was in a rush." (Id. 110.) Plaintiff offers no reason whatsoever for believing that this conduct, even if intentional, was directed at her in any way. And while "evidence of a general work atmosphere--as well as evidence of specific hostility directed toward the [*24] plaintiff" may be relevant to assessing the environment to which plaintiff was subjected, see Penn v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)), no reasonable person would regard this as sexual harassment, and plaintiff herself did not. [6]

> 6 Plaintiff testifies in detail that she and at least one of her employees were disgusted that a dirty undergarment was left in the store (Hamilton Dep. 108-109, Hamilton 2/23/04 Aff. 2), but like plaintiff's testimony about the conversation she and Wilson had at the end of her forty-five day probationary period, her testimony about this incident cannot be read to evince a perception of sexual harassment, even drawing all reasonable inferences in favor of plaintiff.

Plaintiff further alleges that Wilson deliberately dressed in tight jeans and displayed her crotch area to the mostly-male employees in attendance at a staff meeting

on a Saturday morning to "make [*25] [her] jealous." (Hamilton 2/23/04 Aff. 2.) But in her testimony about this incident, plaintiff reveals that she did not have a view of Wilson's behavior during the meeting, and that it was only brought to her attention by the comments of her male employees after the meeting, who were mocking Wilson's behavior. (Hamilton Dep. 88.) Indeed, plaintiff's characterization of arguably sexual behavior addressed to male workers out of her view as part of a campaign of sexual harassment of her is idiosyncratic, to say the least. Aside from grouping this incident under the general category of Wilson's harassing behavior, plaintiff does not claim to have perceived Wilson's attire or behavior as abusive, rather than inappropriate, and neither does she make any allegation that it was the comments of her male employees that gave rise to a hostile or abusive environment.

Plaintiff's remaining two allegations are potentially more serious because her testimony can fairly be read to evince plaintiff's subjective perception of harassment. On one occasion plaintiff alleges that Wilson kept her late at the store, and then "took her jacket off, had a tight T-shirt and pants and no shoes. [Wilson] again [*26] invited me for a drink with sparkling eyes fixed on me and a manly, dominant position with one leg raised on a stool, and I told her I had a family to go home to." (Hamilton 2/23/04 Aff. 2.) [7] Plaintiff also claims that, on a different occasion, Wilson touched plaintiff's breast, over her objection, while touching the material of plaintiff's bodysuit, which Wilson had described as "very sexy." (Hamilton Dep. 62-63.) A reasonable person in plaintiff's position might very well have perceived these two incidents as unwelcome and offensive sexual advances.

> 7 For purposes of summary judgment, giving the benefit of all reasonable inferences to the plaintiff, and recognizing that a jury must be given wide scope to assess the intent and significance of subtly ambiguous actions, the Court assumes that this episode could be found to constitute a sexual advance, and treats it as such. At the same time, for purposes of assessing whether a reasonable factfinder could determine that plaintiff was subjected to "severe and pervasive" harassment, it must be noted that this incident involved no objectively improper action by Wilson at all, and that the characterization of the episode as sexual rests heavily on plaintiff's subjective assessment, as expressed in her choice of adjectives (e.g., "sparkling" eyes; "manly, dominant" posture).

[*27] Isolated incidents are generally insufficient to demonstrate that the harassment was pervasive enough to transform the conditions of employment. See Tomka v.

Seiler Corp., 66 F.3d 1295, at 1305 n.5 ("Isolated re-marks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."). At the same time, there is neither a magic number of inci-dents above which harassment is actionable, and below which it is not. Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993) (cited in Richard-son v. New York State Dep't of Correctional Serv., 180 F.3d 426, 439 (2d Cir. 1999)). It is the clearly established law of this Circuit that isolated incidents may be action-able, provided they are of sufficient severity. See Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (summary judgment on hostile environment claim in favor of defendant inappropriate where plaintiff was subject to long, lewd public tirade about her work per-formance in front of her employees because, even with-out regard [*28] to plaintiff's additional allegations of subsequent harassment, "a rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of plaintiff's working conditions") The touch-stone of the inquiry is, therefore, whether a "reasonable person could find [plaintiff's] working conditions altered for the worse." Richardson, 180 F.3d at 439.

Although egregious conduct alleged in previous cases does not "mark the boundary of what is action-able," Harris, 510 U.S. at 22, the incidents alleged here are clearly not of sufficient severity to have transformed plaintiff's working conditions in light of existing case law. This Circuit has affirmed grants of summary judg-ment in favor of defendants or reversed jury verdicts in favor of plaintiffs where the alleged behavior, although equally infrequent, was more overtly sexual and severe than that alleged here. See, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004) (affirm-ing summary judgment where within a period of about a month, supervisor claimed he would not approve plain-tiff's vacation request if she did not sleep with him, of-fered various [*29] job benefits if she slept with him, and threatened to reassign her to another department when she refused his offer); Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002) (reversing jury verdict where only cognizable allegations involved three comments or pranks involving carrots and intimating plaintiff's sexual practices and a vulgar cartoon depicting a subordinate with whom plaintiff had allegedly had inappropriate physical contact); Quinn, 159 F.3d at 768 (2d Cir. 1998) (affirming summary judgment where supervisor told plaintiff she had been voted the "sleekest ass" in the of-fice and supervisor "deliberately touched plaintiff's breasts with some papers he was holding in his hand").

The Court must be careful, however, to consider the totality of the circumstances, keeping in mind that "a

jury, in assessing whether there was impermissible [har-assment], would be entitled to view the evidence as a whole." Howley, 217 F.3d 141, 151 (2d Cir. 2000). The circumstances here include not just the alleged incidents of sexual harassment, but also plaintiff's litany of allega-tions about harassment of a more general nature, includ-ing Wilson's [*30] criticism of plaintiff's performance in front of other employees and interfering with and un-dermining plaintiff's management of her store and em-ployees on numerous occasions. (Hamilton 2/23/04 Aff. 2-4). [8] Defendant argues that these general allegations of harassment are not actionable because inter alia they concern Wilson's management of plaintiff--business judgments plaintiff may not challenge. (D. Mem. 12 n.11-12). See Spina v. Our Lady of Mercy Med. Ctr., 2003 U.S. Dist. LEXIS 19091, No. 97 Civ. 4661 (RCC), 2003 WL 22434143, at *4 (S.D.N.Y. Oct. 23, 2003) (Ti-tle VII is "not meant as a general civility code and may not be used for turning otherwise ordinary disputes with a superior into a claim for sexual harassment"). How-ever, "incidents that are facially sex-neutral may some-times be used to establish a course of sex-based dis-crimination--for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano, 294 F.3d at 375.

> [8] To the extent that some of plaintiff's submis-sions appear to allege that she was subject to dis-parate treatment because she was not gay (see, e.g., Hamilton 2/23/04 Aff. 4 ("Wilson always sided with gay people"), the Court notes only that under existing Second Circuit case law discrimi-nation on the basis of sexual orientation is not ac-tionable under Title VII. Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000).

[*31]  Nonetheless, even on the broadest view of her evidence--where the two perceived incidents of sex-ual harassment represent Wilson's most concerted sexual advances, against a background of low-level enticements consisting of compliments and social invitations, fol-lowed by occasional, harassing criticism because those advances were rejected--plaintiff falls short of identify-ing harassment sufficiently pervasive to have trans-formed plaintiff's working conditions. Wilson, as a re-gional manager with responsibility for several stores, was not present in plaintiff's store every day and, more-over, all of these incidents were both episodic and com-paratively mild. Cf. Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) (summary judgment inappropriate where plaintiff testified supervisor "'grabbed' and 'placed his hand on [her] hand' on a 'daily' basis, 'constantly,' 'whenever he had the opportunity,' and that he 'used to touch [her] hair a lot.' This conduct 'was ongoing over months and months.'"); Carrero v. New York City Hous-ing Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("constant[]

2005 U.S. Dist. LEXIS 9319, *

touching" and attempted bestowal of "unasked for and unacceptable [*32] kisses" over two week period, when coupled with supervisor's position of power, was tantamount to coercion and established hostile work environment). Finally, a series of ambiguous incidents, the vast majority of which plaintiff herself did not regard as offensive at the time, cannot be magically transformed into a pattern of abusive behavior, simply by viewing them in the aggregate.

Plaintiff has not created a genuine issue of material fact as to the existence of sexual harassment of sufficient severity or pervasiveness to be actionable under Title VII and, accordingly, there is no need to consider defendant's alternative argument that the challenged conduct was not directed at plaintiff because of her gender.

2. Quid Pro Quo Sexual Harassment

Although not addressed by defendant in its briefing, plaintiff at least appears to advance a theory of quid pro quo sexual harassment, in that she claims that after rejecting Wilson's advances, she was subjected to "increased scrutiny and discipline," and that her eventual termination reflected that rejection, not her actual performance. [9] Under the standards outlined above, termination for failure to submit to the unwelcome sexual advances [*33] of a supervisor constitutes quintessential quid pro quo sexual harassment. But even accepting plaintiff's characterization of Wilson's sexual orientation and behavior, plaintiff must still show that "her reaction to [unwelcome sexual advances] was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Karibian, 14 F.3d at 777.

> 9   The Court does not interpret plaintiff's submissions to advance an independent theory that she was terminated on the basis of her gender, and aside from two cursory footnotes (D. Mem. 22 n.10-11) and some general language in its reply briefing (D. Reply Mem. 4-5), defendant has not addressed such a theory. Accordingly, the Court notes only in passing that such a theory would not appear to be available to plaintiff in any event, because she conceded that she believes only Wilson, and not Wycherley or Wolfer, discriminated against her on the basis of her gender (Hamilton Dep. 133), because plaintiff does not dispute that Wilson had a role in firing four store managers, two of whom were male, and both of whom were replaced by women, and closed two stores with male managers for poor performance (Conte Decl. P12), and because plaintiff would be unable to rebut defendant's offered rationale for

her termination as pretextual, as discussed at length in this section.

[*34]   Plaintiff has failed to create a genuine issue of material fact as to any linkage between her rejection of Wilson's perceived sexual advances and either the negative evaluations she received in 1997 or the ultimate termination of her employment in January 1998. First, plaintiff has neither alleged nor testified that the perceived advances described above, or any accompanying behavior, were threatening or suggestive to plaintiff that her continued employment depended on submitting to these advances. And second, she has brought forward no evidence, apart from speculation, that the negative evaluations she received from Wilson were the pretextual actions of a woman scorned. Indeed, plaintiff's 1996 year-end evaluation, completed by Wilson after she took over from plaintiff's previous manager and reflecting criticisms which would be amplified over the course of the warning notices plaintiff received throughout 1997, pre-dated plaintiff's allegations of sexual harassment and was issued at a time when plaintiff claims she and Wilson were on friendly terms. (Hamilton Dep. 343; D. Reply Mem. 4 n.6.) By the time of the warning notice in June 1997, plaintiff's store was operating at a $ 210,000 [*35] loss. (Conte Decl. P7 & Ex. 2.) This trend continued, and by her midyear review in September 1997, plaintiff's store was operating at a $ 269,000 loss. (Id. P8 & Ex. 3.) At the time of the December 1997 warning notice, plaintiff's store had missed its sales target for the month of October by $ 105,000, and was performing below average compared to defendant's other stores. (Id. P9 & Ex. 4.)

Plaintiff disputes not these figures themselves, but rather their significance (Hamilton Decl. P10), and submits alternative indicators of her store's performance in the form of weekly sales reports showing that her store was highly ranked in May, June, and December 1997 and that some of her employees were among the company's top performers (Hamilton Decl. Exs. 13-16.) Similarly, plaintiff claims the criticisms recorded in the warning notices she received throughout 1997 were unfounded, pointing inter alia to more than twenty letters and memoranda written since she began her employment with Bally to show that she had good customer relations skills, and that she was a valuable asset. (Hamilton Supp. Aff. Ex. 20.) Some of these letters do speak to positive interactions between plaintiff and [*36] her customers, and plaintiff is free to believe that her supervisors' assessment of her performance and that of the store under her management were erroneous.

But, while allegations of facially neutral harassment by a supervisor may be relevant to determining whether plaintiff was subjected to a hostile work environment, where that supervisor has also engaged in alleged overtly

sexual harassment, courts and juries do not ultimately sit to second-guess the business judgment of Wilson, Wolfer, Wycherley or any one else employed by defendant. As discussed by courts in the context of the burden-shifting framework applicable to discrimination and retaliation claims, while employers cannot shield themselves by inventing reasons, a truthful, but poor, business decision will not subject the employer to Title VII liability. See Dister v. Cont'l Group, Inc., 859 F.2d 1108 (2d Cir. 1988); Hansen v. Dean Witter Reynolds, Inc., 887 F. Supp. 669, 673 (S.D.N.Y. 1995) ("The court is not to second-guess the defendant's judgment; the fact finder should not assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were [*37] not taken for a discriminatory reason.") (internal quotation marks and citation omitted). Defendants have brought forward ample evidence, unrefuted apart from conclusory allegations in plaintiff's affidavits and deposition, that the termination of plaintiff's employment was nothing more than a legitimate business decision, unconnected to the alleged sexual harassment.

After all, it was Wycherley, and not Wilson, who recommended plaintiff's termination in May 1997. (Wycherley Decl. P6.) While that decision was based in part on the observations of Wilson, and plaintiff could be understood to argue that Wilson's observations were tainted by plaintiff's rejection of Wilson's advances, he relied as well on his own personal observations and those of Wilson's supervisor, Brad Wolfer. (Id.) In addition, Wycherley's recommendation to terminate plaintiff was made pursuant to a directive by defendant's parent company to take steps to increase profitability. (Id. P5.) Plaintiff has not produced any evidence that Wycherley knew anything about Wilson's alleged behavior when he decided to recommend plaintiff's termination (or at any subsequent time). Although plaintiff asserts she complained [*38] to human resources about Wilson's behavior on May 13, 1997 (and again in June 1997), vice president of human resources Karen O'Mara did not interpret her complaint as one about sexual harassment, and did not report allegations of sexual harassment to anyone employed by defendant. (O'Mara Decl. P2-3.) While plaintiff claims that Wilson knew about her meeting with O'Mara (Hamilton 2/23/04 Aff. 2), plaintiff does not claim any way in which *Wycherley* would have known about Wilson's behavior, aside from her unsubstantiated refusal to believe that O'Mara did not notify anyone employed by defendant about her claim. (Hamilton Supp. Aff. P18.) Accordingly, aside from the simple fact that plaintiff's complaint to human resources and Wycherley's initial recommendation that plaintiff be terminated were made in the same month, plaintiff has produced no evidence creating a genuine issue of material fact as to whether Wycherley's recommendation was connected to the alleged sexual harassment. Nor has

plaintiff provided the Court with any other evidence that either her termination, or the negative evaluations that preceded it, were in any way connected to her rejection of what she perceived to [*39] be Wilson's sexual advances. Accordingly, plaintiff may not proceed on a quid pro quo theory of sexual harassment. [10]

> 10  Plaintiff may reasonably complain that the written warnings and negative midyear appraisal she received were "pretextual," in the sense that the decision to terminate her *for business reasons alone* was already final in May 1997, and, accordingly, that she had no hope of redeeming herself in the eyes of her supervisors. (Hamilton Decl. P9; Hamilton 2/23/04 Aff. 3-4.) But that sort of "pretext" is not actionable under Title VII as sexual harassment or any other form of discrimination.

### B. Retaliation

Finally, plaintiff alleges that Bally violated Title VII by retaliating against her because she complained about Wilson's behavior to human resources and CHR. She alleges that this retaliation took the form of her termination, followed by placement on defendant's "black list" and provision to would-be employers of negative recommendations. (Hamilton 2/23/04 Aff. 2.)

Plaintiff's retaliation [*40] claim founders for a number of reasons. First, recall that "to establish a prima facie case of retaliation, an employee must show [inter alia] participation in a protected activity known to the defendant." Terry, 336 F.3d at 141. Even accepting plaintiff's testimony that she did complain to human resources about sexual harassment and was thus engaged in protected activity, [11] her complaints were not interpreted as such and were not made known to those individuals (primarily Wycherley and Wilson) responsible for her termination (O'Mara Decl. P2-3), thus eliminating the possibility that a retaliatory motive played any role in her firing. While plaintiff "does not trust [O'Mara's declaration] to be true" (Hamilton Supp. Aff. P18), she does not introduce any evidence that O'Mara did in fact inform anyone employed by defendant about plaintiff's sexual harassment complaints. Similarly, although plaintiff made a complaint to CHR on December 1, 1997, the complaint was not served on defendant until January 20, 1998, a few weeks *after* her termination.

> 11  The statute provides in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hear-

ing under this subchapter." 42 U.S.C. § 2000e-3(a).

[*41] Second, plaintiff has brought forward no admissible evidence that she was "black listed" by defendant. In a letter to CHR, she details her difficulties in finding employment after her termination and speculates that she "has no doubt . . . that [her] failure [to secure new employment] was a result of Bally's retaliation." (Letter of Barie Hamilton, to Rhoda Sutine, CHR, dated July 26, 1999, Hamilton Decl. Ex. 18, at 2.) But in support of this and similar speculation in her submissions she offers only the notarized letter of her former co-worker Clarissa Green, who claims that she attempted to get plaintiff a job with her employer, only to be told that plaintiff had received a negative recommendation from defendant because of the difficulties she had had with Wilson. (Letter of Clarissa Green 1.) But this inadmissible hearsay evidence of what Green's employer told her about the reference plaintiff received from defendant (even assuming that the reference was made at some point after defendant was made aware of plaintiff's complaint to CHR) cannot serve to create a genuine issue of material fact on summary judgment as to the existence of either a "black list" or negative employment [*42] recommendations made by defendant.

On this record, plaintiff has not demonstrated a genuine issue of material fact either as to knowledge about her complaints of sexual harassment on the part of those responsible for her termination or that any post-termination retaliation took place. Accordingly, she cannot make out a prima facie case of retaliation, whether in the form of her termination or negative employment references provided after her termination.

**CONCLUSION**

For the reasons stated, defendant's motion for summary judgment is granted, and plaintiff's motion is denied. Plaintiff's remaining sex discrimination claims are thus dismissed.

SO ORDERED.

Dated: New York, New York

May 12, 2005

GERARD E. LYNCH

United States District Judge

# EXHIBIT 8

LEXSEE 2008 U.S. DIST. LEXIS 43207

**JACOB ANCHERIL, Plaintiff, v. STATE OF CONNECTICUT, DEPARTMENT OF MENTAL RETARDATION, Defendant.**

**CIVIL ACTION NO. 3:06-cv-1019 (JCH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**2008 U.S. Dist. LEXIS 43207**

**May 30, 2008, Decided**

**COUNSEL:** [*1] For Jacob Ancheril, Plaintiff: Michelle N. Holmes, LEAD ATTORNEY, Law Office of Michelle N. Holmes, Waterbury, CT.

For Dept of Mental Retardation, State of CT, Defendant: Jane B. Emons, LEAD ATTORNEY, Attorney General's Office, Hartford, CT.

**JUDGES:** Janet C. Hall, United States District Judge.

**OPINION BY:** Janet C. Hall

**OPINION**

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 18) AND PLAINTIFF'S MOTION TO STRIKE (DOC. NO. 21)**

**I. INTRODUCTION**

Plaintiff, Jacob Ancheril, brings this claim against the defendant, Connecticut Department of Mental Retardation ("DMR"), alleging violation of his rights pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* Plaintiffs was not promoted and was also put on administrative leave, and eventually terminated from his employment with DMR. He alleges that these actions were taken because of his race or national origin, or alternatively in retaliation for complaints he made of discrimination. DMR moves for summary judgment on all of Ancheril's claims.

**II. FACTS**

In January 2003, Jacob Ancheril began working at the Business Office of the Connecticut Department of Mental Retardation ("DMR") in Farmington, CT as [*2] a Financial Clerk. [1] On November 9, 2003, Ancheril submitted a resume and application for two open positions as a Fiscal Administrative Assistant at DMR. He was not promoted to either position.

1 Ancheril denies that he began at this office in January, asserting in his Rule 56(a)(2) statement that he was transferred in July 2003. See Pl.'s Rule 56(a)(2) Statement of Facts ("Pl.'s 56(a)(2) Stat.") at P 3. However, Ancheril supplies no cite to any evidence in the record to support his denial. Local Rule of Civil Procedure 56(a)(2) requires that "the papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)(2) Statement,' which states in separately numbered paragraphs . . . whether each of the facts asserted by the moving party is admitted or denied." Loc. R. Civ. P. 56(a)(2). Local Rule 56(a)(3) provides that,

> Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the evidence admitted in accordance with Rule 56(a)(1) or in the Court imposing sanctions, including . . . when the opponent fails to comply, an order granting the motion if the undisputed [*3] facts show that the movant is entitled to judgment as a matter of law.

Loc. R. Civ. P. 56(a)(3). Given that plaintiff has failed to provide "specific citations" to support almost all of the factual assertions in his Rule 56(a)(2) Statement, any facts asserted by DMR in its Rule 56(a)(1) Statement that are supported by

evidence, and the denial of which is not supported by citations to evidence in the record in Ancheril's Rule 56(a)(2) Statement, will be deemed admitted by the court.

On March 23, 2004, Ancheril filed a written complaint with the DMR Affirmative Action Office claiming that between July and December of 2003 his co-workers created a hostile, work environment for him based on his race, sex, and national origin, and that they sexually harassed him. In that complaint, Ancheril made several allegations about his coworkers including that: he overheard one of them refer to him as "the Indian man;" that he overheard two coworkers joke in a hallway that he should marry his co-worker named Kathy; that his co-workers gave him a chocolate muffin on December 19, 2003 that caused him to have stomach cramps, trouble urinating, and passing a bowel movement; that he overheard his coworker [*4] say on December 19, 2003, "We have to nail this man;" that on Monday December 22, 2003, he noticed that his work area was very "moist" and found that someone had unlocked his desk drawer, and put in a tube of petroleum jelly which had been refilled with something else; also on December 22, 2003, he ate a cookie offered to him by a coworker, which he later overheard his coworkers say contained "s.k.," which would cause him not to have "any more sex life;" later that same day he had a cough, breathing trouble, sneezing, and numbness in his chest and hands and went to the emergency room where he was treated for high blood pressure; on January 21, 2004 he overheard a co-worker say, "Did Jacob know that he has been poisoned by Bonnie?;" on February 18, 2004, he overheard a co-worker say, "yes, he is here, none of us talk to him any more;" and at some other point he overheard a coworker explain to a visitor that, "we gave him sex killer, so he won't be able to make love with [his wife] any more. So let's see how long they will stay married." Affirmative Action Complaint Form, Ex. 6 to Def.'s Mem. in Supp. of Motion for Summ. Judg. ("Def.'s Mem.") (Doc. No. 18).

On March 31, 2004, Ancheril [*5] reported to police that someone had put a substance on his fan and that he had smelled chemical odors in his office the previous day. The police evacuated the building and eventually determined that it was a false alarm. As a result of the March 31, 2004 incident, Ancheril's supervisor, Gerald Daley, filled out a "Report of Occupational Injury" to the Connecticut Department of Administrative Services Personnel Division reporting Ancheril's claim of a burning sensation his hands and face. *See* Report of Occupational Injury, Ex. 9 to Def.'s Mem. In that report, Daley noted that the cause of the injury was "paranoid ideations," based on the Farmington Police Report of the incident. *Id.*

The next day, April 1, 2004, Ancheril reported a suspicious white substance on an office chair to his managers, who notified the police. Ancheril reported that his right hand began to burn prior to discovering the substance. A police investigation was undertaken of plaintiff's coworkers based on Ancheril's allegations. Ancheril was taken to the hospital, where a social worker reported to the police that Ancheril was, "suffering the beginnings of Paranoid Schizophrenia and has some paranoid ideations and possible [*6] auditory hallucinations . . . ." Farmington Police Incident Report at 3, Ex. 11 to Def.'s Mem.

On April 5, 2004, the manager of DMR's Affirmative Action Program informed Ancheril that he had reviewed his complaint and was referring it to the Human Resources Office. On May 27, 2004, Ancheril filed a complaint with the Connecticut Commission on Human Rights & Opportunities ("CCHRO"), alleging that he was sexually harassed on March 31, 2004, retaliated against for filing a civil rights complaint on April 1, 2004, and harassed on April 1, 2004 because of his national origin, sex, and previous complaint about discriminatory conduct. In this new complaint, Ancheril reiterated his previous allegations and added that he coworkers had started to retaliate against him for filing the Affirmative Action Complaint. Specifically, he complained that his coworkers sang happy birthday to him and another coworker on the same day even though his birthday had already passed, and added allegations about the powders on his fan and office chair.

Ancheril was out of work between July 21, 2004 and August 23, 2004. His complaints started again on October 21, 2004, when he warned a coworker, out of concern for [*7] her safety, that there was "ground glass on his mouse." That same day, the DMR placed Ancheril on administrative leave because "in recent weeks [Ancheril had] made several reports alleging harassing and potentially physically harmful actions directed toward [him] by fellow employees." Letter from Gerald Daley to Jacob Ancheril at 1, Ex. 19 to Def.'s Mem. The DMR placed Ancheril on administrative leave pending investigation of his allegations by the Farmington Police and DMR. DMR made an appointment for Ancheril to see Dr. Jay Lasser at the Center for Work Stress Reduction in Farmington on November 16, 2004, for a mandatory medical and physical evaluation to determine if he was fit to return to duty. On November 29, 2004, Dr. Lasser issued a "Fitness for Duty Evaluation" in which he concluded that Ancheril posed no physical threat to his coworkers but that he was "clearly unable to perform the duties of his occupation . . . [as] a direct result of his worsening illness." Fitness for Duty Evaluation, Ex. 21 to Def.'s Mem.

On December 22, 2004, Daley notified Ancheril of Lasser's report and informed him that, in order to be eli-

gible to return to work, he was required to enter and continue [*8] psychiatric treatment for a minimum of two months until his doctor and Lasser found him fit for duty. On January 26, 2005, Daley wrote to Ancheril again, warning him that he would be dismissed if he did not request medical leave and begin treatment. Ancheril never requested medical leave or indicated that he was seeking treatment. Daley wrote to Ancheril again on February 9, 2005, informing him that he was on unauthorized leave and notifying him that a Loudermill hearing would be held on February 18, 2005. On March 23, 2005, Ancheril was terminated. He grieved his termination; the grievance was denied. He appealed the denial of his grievance to arbitration; the arbitrator found that he had been terminated for just cause. On September 30, 2005, Ancheril's CCHRO complaint was dismissed for lack of reasonable cause.

## III. DISCUSSION

A. Ancheril's Motion to Strike

As a preliminary matter, the court turns to an evidentiary issue. Ancheril moves to strike defendant's Exhibits 3-5, 7-12, 15, 15a, 18, 20, 21, and 30-34 because these exhibits "contain inadmissible hearsay, are not authenticated, and are more prejudicial than probative." Pl.'s Mem. in Supp. of Mot. to Strike at 1 (Doc. No. 22). [*9] DMR argues that every exhibit Ancheril moves to strike, with the exception of the newspaper article that is DMR's Exhibit 10, is a business record and thus admissible as an exception to the general prohibition on hearsay. See Def.'s Mem. in Opp. of Mot. to Strike at 2 (Doc. No. 26). DMR agrees to withdraw Exhibit 10. DMR also argues that Ancheril identified the letter that is DMR's Exhibit 4 at his deposition (see Depo. of Ancheril at 29) and admitted in his 56(a)(2) statement that he wrote the letter which is DMR's Exhibit 34. Id. at 1. In support of its contention that these exhibits are business records, DMR supplies the Affidavit of Gerald Daley, who attests that "DMR did indeed, maintain each and every one of these records in its files. More, specifically each document and perhaps, copies were maintained by DMR as records kept in the ordinary course of business." Daley Affidavit at P 6, Ex. 1 to Def.'s Mem. in Opp. to Pl.'s Mot. to Strike.

Hearsay, as defined by the Federal Rules of Evidence, is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The court [*10] finds that the contents of the documents Ancheril moves to strike are submitted to show the state of mind of Ancheril's supervisors in making the decisions to put him on administrative leave and ultimately to terminate his employment. There-

fore, the exhibits Ancheril moves to strike were not submitted to prove the truth of the matters asserted therein and are not inadmissible hearsay. Ancheril's Motion to Strike is denied.

B. Ancheril's Title VII Race and National Origin Discrimination Claim

Analyzing whether DMR subjected Ancheril to intentional discrimination must be done under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001). The plaintiff is first required to establish a prima facie case of discrimination. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). A prima facie case for disparate treatment is established by showing that: 1) the plaintiff is a member of a protected class; 2) the plaintiff was qualified for his job; 3) the plaintiff suffered an adverse employment action; and 4) that the adverse employment action occurred under conditions giving rise to [*11] an inference of discrimination. McDonnell Douglas, 411 U.S. at 802; see also Burdine, 450 U.S. at 254.

Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. See id. Upon the employer's articulation of a nondiscriminatory reason for the employment action, the presumption of discrimination drops out. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The burden then shifts back to the plaintiff to fulfill his ultimate burden of proving that the defendant intentionally discriminated against him in the employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105, (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Id.

Ancheril's claim to intentional discrimination under Title VII fails because he does not demonstrate a prima facie case for race or national origin discrimination under McDonnell Douglas. Specifically, Ancheril fails to show [*12] that there is a disputed issue of material fact on which a reasonable jury could conclude that any adverse action he suffered was "under conditions giving rise to an inference of discrimination." McDonnell Douglas, 411 U.S. at 802; see also Burdine, 450 U.S. at 254. Ancheril argues that such an inference can be drawn because "all reasonable persons of plaintiff's background" would find "comments about sex and females offensive," and plaintiff's supervisors and coworkers were "well aware of his race and value system." Pl.'s Mem. in Opp.

to Mot. for Summ. Judg. at 4 (Doc. No. 23). However, at no point, in his Memorandum in Opposition to the instant motion or in his Statement of Material Facts pursuant to Local Rule of Civil Procedure 56(a)(2), did Ancheril direct the court to a single piece of evidence in the record to support either the claim that people of Ancheril's background are particularly sensitive to sexual comments or that his supervisors and coworkers were aware of this sensitivity. [2] Similarly, Ancheril offers the court not a single cite to evidence in the record to support his claim that he "was counseled when a Caucasian female complained about him, while no other employee [*13] for the department received any counseling for their behavior." Pl.'s Mem. in Opp. at 5. Absent any factual basis, no reasonable trier of fact could make an inference that Ancheril was discriminated against because of his race or national origin on the basis of this assertion.

> 2   See discussion of requirements under Local Rule 56 *infra* at page one, footnote one.

Ancheril further argues that an inference that he was discriminated against based on his race and/or national origin could be drawn from the fact that he was "referred to as the "Indian man" and questioned about what his national origin was repeatedly." Pl.'s Mem. in Opp. at 4. Again, at no point in his memorandum or Rule 56(a)(2) Statement does Ancheril point the court to any evidence in the record to support his assertion that anyone ever questioned what his national origin was, much less that they did so repeatedly. Though Ancheril never cited the record to the court, the court is aware that in his Affirmative Action Complaint, Ancheril complained that he overheard a caseworker in his department refer to him as "the Indian man." Affirmative Action Complaint at 2, Ex. 6 to Def.'s Mem. Even drawing all inferences in favor of Ancheril, [*14] the court finds that no reasonable trier of fact could conclude on the basis of this one isolated comment by a coworker that any adverse actions that Ancheril suffered were due to his race or national origin. See e.g. Kirsch v. Fleet Street, Ltd. 148 F.3d 149, 162 (2d Cir.1998)("'stray' remarks in the workplace by persons who are not involved in the pertinent decision-making process" do not suffice to establish inference of discriminatory animus). Therefore, DMR's Motion for Summary Judgment as to Ancheril's claim for intentional discrimination under Title VII on the basis of his race or national origin is granted.

## C. Ancheril's Hostile Work Environment Claim

To prevail on a hostile work environment claim under Title VII, a plaintiff must show that the complained of conduct "(1) is objectively severe or pervasive - that is, . . . creates an environment that a reasonable person

would fine hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race or national origin.]" Patane v. Clark, 508 F.3d 106, 113 (2007) (internal quotations omitted). Determining whether the work [*15] environment was objectively hostile is accomplished by examining the totality of the circumstances. Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999).

Ancheril's argument in support of his hostile work environment claim is exactly the same as his argument that he was intentionally discriminated against because of his race or national origin. See Pl's Mem. at 9 ("Plaintiff relies on his arguments set forth above in requesting that summary judgment also be denied as to this claim."). Therefore, Ancheril's claim that DMR caused or allowed him to work in a hostile work environment because of his race or national origin fails because no reasonable trier of fact could conclude that any conduct Ancheril complained of was related to his race or national origin. As such, DMR's Motion for Summary Judgment as to Ancheril's hostile work environment claim is granted.

## D. Ancheril's Retaliation Claim

The McDonnell Douglas burden-shifting analysis applies to a plaintiff's claim of retaliation. See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir.2003). Under this framework, a plaintiff makes a prima facie showing of retaliation by establishing "participation in a protected activity known [*16] to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)). Within the context of Title VII claims, a "'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir.2000) (citing 42 U.S.C. § 2000e-3). Once a plaintiff has satisfied his prima facie burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. See Feingold v. New York, 366 F.3d 138, 157 (2d Cir.2004). The burden then shifts back to the plaintiff "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

For the purposes of deciding this motion, DMR concedes that the DMR Affirmative Action Complaint Ancheril filed on March 23, 2004 and the CCHRO complaint filed on May 27, 2004, constitute protected [*17] activity. See Def.'s Mem. at 13.

2008 U.S. Dist. LEXIS 43207, *

Ancheril claims that in retaliation for these protected acts, he was denied a promotion, placed on administrative leave, forced to undergo a psychiatric evaluation, and terminated from his employment. Assuming, *arguendo*, that each of these constitutes an adverse employment action, Ancheril's claim for retaliation fails because he fails to demonstrate that there was a causal connection between his complaints and the adverse actions taken against him.

Ancheril argues that a causal connection between his protected acts and the actions taken against him is demonstrated by their temporal proximity. *See* Pl.'s Mem. at 8. A plaintiff can show a causal connection by demonstrating that his termination occurred soon after the protected activity. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). In order to prove a causal connection in this manner, the temporal proximity must be "very close." *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (citing cases holding that gaps between protected activity and adverse employment action as short as three or four months are insufficiently close to prove causation).

Reviewing the undisputed [*18] time line of events in this case, the court concludes that no reasonable trier of fact could find that temporal proximity would support a conclusion that DMR retaliated against Ancheril. Starting with one of the positions Ancheril did not receive in promotion, there is evidence before the court that the position was filled December 26, 2003, *see* email from Daimar Ramos confirming 12/26/03 start date, Ex. 34 to Def.'s Mem., before either of Ancheril's protected acts occurred. Therefore, the denial of that position could not have been in retaliation. Next in the sequence of Ancheril's claimed adverse actions was DMR placing Ancheril on administrative leave on October 21, 2004. That was followed by Ancheril's termination on March 23, 2005. Finally, DMR asserts that it did not fill the second position Ancheril applied for until 2006, after his termination. [3] Ancheril's protected acts took place on March 23, 2004, and May 27, 2004. No reasonable trier of fact could conclude that a five month gap between Ancheril's last protected activity and his being put on administrative leave could support an inference that there was a causal connection between his complaints and the subsequent complained [*19] of actions. [4]

> 3   The court notes that DMR's only evidence to support its claim is its own answer to a Request for Interrogatories, *see* Ex. 35 at 8, to Def.'s Mem., and the print out of personnel pages showing that two different employees were assigned to position 18975 in 2006, *see* Ex. 34 to Def.'s Mem. Although this evidence is admittedly

sparse, the court finds that it is sufficient to support DMR's contention that the second position Ancheril applied for was not filled until 2006. The court also notes that Ancheril does not in any way deny DMR's claim that this position was not filled until 2006 (*see* Pl.'s Stat. of Mat. Facts at 57 and Disputed Issues of Material Fact), nor does he offer any evidence to the contrary.

> 4   Ancheril argues that DMR "admits" that "the reason for the administrative leave is because plaintiff complained about harassment by co-workers," based on the contents of the letter informing Ancheril that he was being placed on Administrative leave. *See* Pl.'s Mem. at 8; Letter from DMR, Ex. 19 to Def.'s Mem. The letter states that, "the reason for [putting Ancheril on administrative leave] was that in recent weeks you have made several reports alleging harassing and potentially [*20] physically harmful actions directed toward you by fellow employees." Letter from DMR, Ex. 19 to Def.'s Mem. At no point does Ancheril argue that these complaints constituted protected activity. Furthermore, at no point does Ancheril argue that these complaints were taken to "protest or oppose statutorily prohibited discrimination." *Cruz* 202 F.3d at 566. The court concludes that Ancheril's complaints about his co-workers, which caused him to be put on administrative leave, were not protected activity.

Additionally, DMR has demonstrated that it had a legitimate, non-discriminatory reasons for putting Ancheril on administrative leave and eventually terminating him. The record before the court shows that Ancheril twice called the police to his place of employment causing it to be evacuated, alleging that he had been harmed by co-workers; in both instances his claims were unsubstantiated. On one of those instances, DMR received the police report relating that a medical professional found him delusional. Furthermore, Ancheril was eventually terminated after being repeatedly put on notice and affording the opportunity to be heard. No reasonable trier of fact could conclude, based on the evidence [*21] before the court, that DMR has failed to demonstrate a legitimate, non-discriminatory basis for suspending, and then terminating, Ancheril's employment. As such, DMR's Motion for Summary Judgement as to Ancheril's claim for retaliation under Title VII is granted.

## IV. CONCLUSION

For the forgoing reasons, Plaintiff's Motion to Strike (Doc. No. 21) is DENIED and Defendant's Motion for Summary Judgment (Doc. No. 18) is GRANTED. The clerk is directed to close the case.

2008 U.S. Dist. LEXIS 43207, *

**SO ORDERED**

Dated at Bridgeport, Connecticut this 30th day of May, 2008.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2008, a copy of the foregoing was hand-delivered to all

parties to this action, and filed electronically.   Notice of this filing will be sent by e-mail to all

parties by operation of the court's electronic filing system.   Parties may access this filing through

the court's CM/ECF System.

**Plaintiff's Counsel**
Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880


Jennai S. Williams
Federal Bar No.: CT27762

20.