# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**KIMBERLY BACHIOCCHI,**          :
                                  :
     Plaintiff,              :
                                  :          Civil Action No.:  02-CV-908 (CFD)
    v.                      :
                                  :          August 4, 2008
**THE SOUTHERN NEW ENGLAND**      :
**TELEPHONE COMPANY,**            :
                                  :
     Defendant.              :
                                  :
                                  :
                                  :

## <u>DEFENDANT SNET'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

# **TABLE OF CONTENTS**

I.    SEXUAL HARASSMENT ............................................................... 1

    A.    Legal Standard................................................................. 1

        1.    Sexual Harassment Claims Under Title VII and the
Connecticut Fair Employment Practices Act
("CFEPA")........................................................................ 1

        2.    Standard for Rule 50 Motion for Judgment as a Matter
of Law................................................................................ 3

        3.    This Court's Gatekeeper Role:  On a Motion for Judgment,
the Court Must "Remove from the Equation at the Outset"
Each Incident That Does Not Support an Inference of
Mistreatment or for Which There Is Insufficient
Evidence That the Mistreatment Was Because of Sex.......... 3

            a.    The Alfano Court First Analyzed Each Incident Alleged
Individually to Remove From Consideration Any That
Did Not Support an Inference of Mistreatment............. 5

            b.    Of the Remaining Incidents, the Alfano Court Next
Removed From Consideration Any That Did Not
Support  An Inference of Mistreatment Based on
Gender ...................................................................... 6

            c.    The Alfano Court Then Analyzed the Remaining
Incidents and Concluded They Did Not Constitute
Severe and Pervasive Gender-Based Discriminatory
Intimidation and Ridicule .......................................... 8

    B.    The Evidence Presented at Trial in the Present Case Was Insufficient
To Establish Sexual Harassment ....................................... 9

        1.    Several of the Alleged Incidents Should be Removed From
Consideration Because They Do Not Support an Inference
Of Mistreatment................................................................ 11

        2.    Other Alleged Incidents Must Be Removed From
Consideration Because, Even if They Constituted
Mistreatment, They Do Not Support an Inference
That They Were Because of Plaintiff's Sex........................... 14

|  | a. | Richard Light | 15 |
|  | b. | Bob Vallario | 16 |
|  | c. | John Dunn | 20 |

3. No Reasonable Jury Could Conclude That Plaintiff Was Subjected to Sexual Harassment That Was So Severe and Pervasive That It Altered the Conditions of Her Working Environment ............... 21

4. Even If the Court Considered Purported Events Involving Other Employees, Plaintiff Was Not Subjected to Severe and Pervasive Sexual Harassment ............... 26

    a. Events Involving Kevin West ............... 26

       (1) References to Other Women Which Plaintiff Never Heard ............... 27

       (2) Fishing Trips ............... 28

       (3) Alleged Exclusion from Training Opportunity ............... 29

       (4) Denial of Overtime on One Occasion ............... 31

       (5) "New Requirement" To Have Her Work Reviewed ............... 31

       (6) Paper Incident ............... 33

    b. Alleged Events Involving Other Actor ............... 33

II. THE FARAGHER/ELLERTH AFFIRMATIVE DEFENSE ............... 34

    A. SNET Exercised Reasonable Care to Prevent and Promptly Correct Any Sexually Harassing Behavior ............... 34

    B. Plaintiff Unreasonably Failed to Take Advantage Of Any Of These Preventative Or Corrective Opportunities, Or Otherwise Avoid Harm ............... 36

III. PUNITIVE DAMAGES ............... 37

A.     Plaintiff Presented No Evidence That a Managerial Employee Of SNET Acted With Malice Or Reckless Indifference To Plaintiff's Federally Protected Rights.................................................................... 38

B.     Light and Vallario Did Not Serve In A "Managerial Capacity" For SNET...................................................................................... 39

C.     Neither West Nor Macri Acted With "Malice or Reckless Indifference" To Plaintiff's Federally Protected Rights..................... 44

D.     SNET Established That It Made Good Faith Efforts to Enforce Its Anti-Discrimination Policy............................................................ 47

III.     CONCLUSION ........................................................................................ 48

iii

Pursuant to Rules 50(a) and 50(b) of the Federal Rules of Civil Procedure, the defendant, Southern New England Telephone Company, Inc. ("SNET"), hereby renews and clarifies its Motion for Judgment as a Matter of Law and supplement thereto related to plaintiff's claim of sexual harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Connecticut Fair Employment Practices Act ("FEPA"), Conn. Gen. Stat. §46a-60 et seq. and also moves that judgment be entered in its favor on plaintiff's punitive damages claim.

At the close of the plaintiff's evidence, the Court denied SNET's Rule 50 Motion for Judgment as a Matter of Law. SNET renewed and supplemented the motion at the close of all the evidence in the case, and the Court deferred decision on the motion until after the jury verdict. Prior to the verdict, plaintiff withdrew her claim under the Equal Pay Act. The jury verdict was in favor of SNET on plaintiff's retaliation claim under Title VII and the FEPA, and in favor of the plaintiff on her sexual harassment claim. At this time, SNET renews its motion based on the facts and authority below, because no reasonable jury could have had a legally sufficient evidentiary basis to find in plaintiff's favor on her sexual harassment claim, and because the award of punitive damages was improper and grossly excessive.

## I.     SEXUAL HARASSMENT

### A.     LEGAL STANDARD

#### 1.     Sexual Harassment Claims Under Title VII and the Connecticut Fair Employment Practices Act ("CFEPA").

To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that she was a member of a protected group; (2) that she was subjected to harassment *based upon her*

1

*sex*; (3) that the harassment ***affected a term, condition, or privilege of employment***, and (4) a legal basis for imputing the supervisor or co-worker's actions to the employer. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993).

With regard to the third and fourth prongs, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002); see also Brennan v. Metro Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). In other words, the harassment "must be sufficiently severe or pervasive [so] as to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986); see also Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (same); Cosgrove v. Sears, Roebuck & Co., 9 F.3d at 1042 (same). Because of this high standard, as a general rule, incidents must be more than "episodic; they must be sufficiently ***continuous and concerted*** in order to be deemed pervasive." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (emphasis added) (internal quotation marks omitted). The United States Supreme Court has "made it clear that conduct must be ***extreme*** to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (emphasis added). In short, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), abrogated in part on other grounds by Swierkiewitz v. Sorema, 534 U.S. 506, 510 (2002).

The evidence presented at the trial in this matter does not come close to establishing that

the above standard of proof was met in this case.

### 2.    Standard for Rule 50 Motion for Judgment as a Matter of Law

Under Rule 50 of the Federal Rules of Civil Procedure, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149 (2000) (internal quotation marks omitted). When ruling on a Rule 50 motion, a court should consider "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. Overall, the court must "examine[ ] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. at 143).

### 3.    This Court's Gatekeeper Role:  On a Motion for Judgment, the Court Must "Remove from the Equation at the Outset" Each Incident That Does Not Support an Inference of Mistreatment or for Which There is Insufficient Evidence That the Mistreatment Was Because of Sex.

The Second Circuit's seminal decision in Alfano v. Costello, 294 F.3d 365, (2d Cir. 2002) sets the framework for District Courts in this Circuit to consider a post-verdict motion for judgment as a matter of law in a hostile work environment case.  In Alfano, the Second Circuit made clear that in ruling on a motion for judgment as a matter of law, District Courts must individually review the evidence presented *on each incident complained of* and then "remove[ ] from the equation at the outset" any incident that does not support an inference of mistreatment.

If any of the conduct supports an inference of **_mistreatment_**, the Court must also then consider the remaining conduct and remove any incident that does not support an inference that the **_mistreatment was because of gender_**. See id. at 376-77. The remaining incidents, if any, should be analyzed under the well-recognized "severe and pervasive" standard for hostile work environment claims. See id. at 378-79.

In Alfano, the Second Circuit reversed the District Court's denial of the defendant's post-trial motion for judgment as a matter of law because the evidence presented at trial on the incidents that remained after the improper incidents were removed was insufficient as a matter of law to establish a hostile work environment based on sex. See id. at 376. The Court held that the District Court had erred in denying the defendant's post-verdict motion for judgment as a matter of law. It reversed the judgment and remanded the case for entry of judgment dismissing the complaint. See id. at 382.

The Alfano case involved a plaintiff who presented evidence of twelve discrete incidents of alleged sexual harassment. The Second Circuit described the incidents as follows:

> Twelve incidents, between December 1989 and February 1994, were laid before the jury in connection with Alfano's claim that her work environment was permeated by hostility based on sex.
>
> Four of those incidents had an overtly sexual overtone; that is, a jury could conclude that she was made the object of some embarrassment or humiliation aimed at her as a woman:
>
> In the fall of 1991, Captain William Fenton told Alfano that she should not eat carrots, bananas, hot dogs or ice cream on the job because she did so in a "seductive" manner. Fenton explained that he had been told by Lieutenant Michael Brown about an incident — not witnessed by Brown — in which Alfano allegedly simulated oral sex with a carrot in the Midstate dining area.
>
> In December 1991, Alfano discovered in her workplace mailbox a carrot and two potatoes put there by someone who had the idea of arranging them to suggest male genitalia. Her discovery was made in the presence of ten to fifteen fellow

employees.   Alfano reported the incident to her watch commander (on that occasion either Lt. Brown or Lt. James Deering).   Deering testified that he laughed at the incident.

On February 9, 1992, a spurious notice was posted in the visiting room (and perhaps was handed to Alfano), purporting to be signed by Midstate's superintendent, stating that "Carrots will not be allowed in the visiting area due to Sgt. Alfano's strong liking for them.  If they are diced up, it will be okay.  Supt."

In February 1994, Alfano found in her mailbox a hand-drawn cartoon depicting an officer under her supervision, Anthony Farda, making vulgar sexual remarks.  Alfano had previously been investigated — and cleared — for allegedly inappropriate physical contact with Officer Farda while on duty.

The remaining eight incidents cited by Alfano are administrative and personnel decisions as to which she claims she was treated unfairly because she is a woman.

Alfano, 294 F.3d at 370.   After analyzing each incident individually, the Second Circuit held that "the twelve incidents, taken separately or together, cannot support a reasonable inference of sex discrimination that altered the terms and conditions of [plaintiff's] employment."   Id. at 375 n. 3.

Prior to reaching that conclusion, the Court carried out what it identified as the proper procedure for analyzing such claims.   The procedure was to initially "*remove from consideration*" all of the twelve incidents that either (1) did not support an inference that Alfano was mistreated, or (2) if they did involve mistreatment, did not support an inference that the treatment was because of Alfano's sex.   Id. at 376-77.

### a.     The Alfano Court First Analyzed Each Incident Alleged Individually to Remove From Consideration Any That Did Not Support an Inference of Mistreatment.

In the initial stage of its analysis, the Court held that, although evidence was presented at trial to support them, several incidents had to be "removed from the equation" on the  sexual harassment claim because they did not support an inference of mistreatment as a matter of law.

Id. at 376. These incidents included two "good" evaluations that plaintiff testified should have been "excellent" (although plaintiff testified that the rating was because of her sex "she has pointed to *no resulting disadvantage or adverse effect on her job performance*.") (emphasis added); her supervisor's failure in her view to react strongly enough when a visitor made an obscene gesture toward her ("there is nothing in the record to indicate that Brown's warning was intended to undermine Alfano" or "deviated from ordinary practice"); and a requirement that plaintiff fill out paperwork for maintenance requests while male employees could arrange for the services less formally (because plaintiff testified to this different treatment "in conclusory terms without corroborating detail," her testimony was "unsubstantiated"). Id. at 376. The Second Circuit found that the District Court, exercising its gatekeeper function, should have accorded these incidents "no weight whatsoever" to establish mistreatment in support of a hostile work environment claim and erred in denying DOC's post-verdict motion for judgment as to those incidents. Id. at 376-77.

### b. Of the Remaining Incidents, the Alfano Court Next Removed From Consideration Any That Did Not Support An Inference of Mistreatment Based on Gender.

Next, the Second Circuit considered whether any of the remaining incidents that were facially sex-neutral should be excluded from consideration because, although they could support mistreatment, they could not support an inference of mistreatment because of sex. Id. at 377. As the Court stated,

> at the close of her case, to the extent that the plaintiff relies on facially neutral incidents to create the quantum of proof necessary to survive a Rule 50 motion for judgment, *she must have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus.* That is the burden Alfano failed to carry with regard to a number of incidents here.

Id. (emphasis added).  Based on plaintiff's failure to present evidence from which a fact-finder could infer that individual incidents occurred *because of plaintiff's sex*, the Second Circuit concluded that the several other incidents had to be removed from consideration.[1]  Id. at 378. The eliminated incidents included plaintiff's lieutenant placing a memorandum detailing plaintiff's conduct in her personnel file in violation of the employer's policy, the lieutenant's formally counseling plaintiff although plaintiff claimed male employees were not formally counseled, the lieutenant's investigation of plaintiff for inappropriate physical contact with a male subordinate, and his conduct that plaintiff claimed made it difficult to get help with building maintenance issues.  The Court removed each of these incidents from consideration because, although there was evidence of sexual conduct by other employees, "there is nothing in the record to indicate that *Brown's* unfairness (if any) was motivated by Alfano's sex."  Id.  Each event concerning Lieutenant Brown was facially sex-neutral.  "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim," *but only so long as a reasonable fact-finder could conclude that the particular incident at issue by the particular actor was "based on sex*."  Id. (emphasis added). Such a conclusion requires evidence, either direct or circumstantial, that incidents that are sex-neutral on their face *were in fact motivated by sex*.  Id.  Since there was no evidence of sex-based conduct by Brown or other evidence of discriminatory animus based on sex, none of the incidents involving him could support plaintiff's claim.  As the Court in Alfano explained,

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases *to exclude from consideration* personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel

---

[1]  Contrary to plaintiff's suggestion, the Second Circuit specifically rejected the notion that evidence of discriminatory animus on the part of one actor could create an inference that sex-neutral conduct by another actor was, in fact, sex-based.  See id. at 378.

appeals.[2]

Id. at 377; see also Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) ("[the court's] role is to prevent unlawful hiring practices not to act as a superpersonnel department that second guesses employers' business judgments.") (internal quotation omitted); Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair.   Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision") (internal quotation marks omitted).   The mandatory process recognized by Alfano of considering each incident individually and eliminating those which cannot support a sexual harassment claim, has been followed by other courts in this Circuit.   See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 n.5 (2d Cir. 2006) (quoting extensively from Alfano and noting that "[w]hile it may be proper to deny summary judgment pre-trial to give the plaintiff a chance to connect the dots during his or her presentation of evidence, once the trial has completed, the plaintiff's claims must be evaluated according to the evidence he or she *actually presented to the jury*") (emphasis added); Martinez v. N.Y. City Dep't of Educ., No. 04 Civ. 2728, 2008 U.S. Dist. LEXIS 41454, at *23-29 (S.D.N.Y. May 28, 2008) (relying on Alfano and Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) to grant summary judgment on the plaintiff's sexual harassment claim).

---

[2]   The Second Circuit also recognized in Alfano that,

> Moreover, many personnel decisions can be ascribed to discrimination no matter what the supervisor does.   Thus, it is easy to claim animus whether a supervisor resorts to counseling (if this is seen as a form of discipline) or not (if lack of guidance is deemed to set up an employee for harsher discipline).   Similarly, it is easy to ascribe animus whether an employer prepares a memo after an event of discipline (if the memo is deemed an escalation in severity) or not (if the failure to prepare a memo is deemed a cover-up).   And an employer's investigation of an anonymous or disputed act of discrimination can be deemed to prolong and amplify the victim's humiliation, or the failure to investigate may be deemed a cover-up.

Id. at 377-78.

      **c.**      **The Alfano Court Then Analyzed the Remaining Incidents and Concluded They Did Not Constitute Severe and Pervasive Gender-Based Discriminatory Intimidation and Ridicule.**

Once the above incidents were also "excluded from consideration," the Second Circuit observed that "Alfano is left with five incidents in a span of more than four years: the three carrot incidents from late 1991 to early 1992, the graphic cartoon in February 1994, and the December 1993 informal counseling by Lt. Deering." Alfano, 294 F.3d at 378. Reviewing these remaining incidents in their totality, the Court concluded that, based on well established precedent in this Circuit, the District Court should have granted defendant's Rule 50 motion for judgment as a matter of law.

      **B.**      **The Evidence Presented at Trial in the Present Case Was Insufficient to Establish Sexual Harassment.**

"Harassment of *a woman* does not necessarily amount to *sexual* harassment; the plaintiff must show that the harassment was directed at her because of her sex." Brant v. County of Dutchess, No. 05-CV-10590, 2008 U.S. Dist. LEXIS 10941, at *16 (S.D.N.Y. Feb. 11, 2008) (internal quotation marks omitted); see also Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimination . . . because of . . . sex.'"). As instructed by Alfano, it is the role of the District Court to determine whether the evidence presented at trial is sufficient to raise an inference both that mistreatment occurred and that the mistreatment was because of plaintiff's sex.

Based on the evidence adduced at the trial in this case, there was no legally sufficient basis for a jury to find that plaintiff was subjected to unlawful harassment because of her sex. Plaintiff testified clearly that she believed she was sexually harassed by the conduct of three

people:   Richard Light (her supervisor), John Dunn (who plaintiff described as an outside

contractor who worked within their office), and Robert Vallario (the supervisor in charge of the

field supervisors).  The United States Supreme Court in <u>Harris v. Forklift Systems</u>, 510 U.S. 17

(1993) established that only conduct which is both objectively sexually harassing and which the

plaintiff *subjectively perceived* to be sexually harassing can form the basis for a claim of sexual

harassment.

> . . . Conduct that is not severe or pervasive enough to create an objectively hostile
> or abusive work environment — an environment that a reasonable person would
> find hostile or abusive — is beyond Title VII's purview.  Likewise, ***if the victim
> does not subjectively perceive the environment to be abusive, the conduct has
> not actually altered the conditions of the victim's employment, and there is no
> Title VII violation***.

<u>Harris</u>, 510 U.S. at 21-22 (emphasis added).  The standard of proof of sexual harassment "has

both objective and subjective elements:  the misconduct shown must be 'severe or pervasive

enough to create an objectively hostile or abusive work environment,' and the victim must also

***subjectively perceive*** that environment to be abusive."  <u>Alfano v. Costello</u>, 294 F.3d 265, 374 (2d

Cir. 2002) (quoting <u>Harris</u>, 510 U.S. at 21).  Because the plaintiff in this case testified

unambiguously that she only subjectively perceived conduct by Vallario, Light, and Dunn to be

sexually harassing, that is the only conduct that may be considered on her sexual harassment

claim.[3]  (As set forth below, at pp. 26-34, even if plaintiff had not limited her claim as she did

and the Court considered evidence involving other actors, the evidence presented at trial would

still fall far short of the severe and pervasive standard required to support a hostile work

environment claim.)

     With regard to the alleged conduct of the three individuals plaintiff identified, she

---

[3]  By her own admission, any conduct by other individuals was not subjectively perceived by her to be
sexually harassing and therefore plaintiff would be unable to establish an essential element of a claim based on such
conduct, i.e., that she subjectively perceived that the conduct was sexually harassing.

presented evidence of the following:

**Richard Light**: Plaintiff claimed she found a MapQuest printout of directions to her house on the printer at work and, when she asked who had printed them, Light indicated he had done so.

**John Dunn**: Nick Faiella testified that he heard co-worker John Dunn make jokes that were sexually "suggestive" in the workplace. In addition, plaintiff seems to claim that an email introduced as part of Pl. Exh. 19 was harassment of her as it states that the updated telephone list is being distributed by Mr. Dunn "with great pleasure."

**Bob Vallario**: In response to the question on direct examination, "And what perception did you have of Mr. Vallario's interactions with you after Nick got back to the job and you were occasionally going [out] to lunch?," plaintiff testified that Vallario "wasn't social, friendly, however you want to use the term. He kind of gave me the cold shoulder. And he would at times say to me, you know, what's with you and Nick. Come on, you can tell me. And he also said to me, if I were younger I would go for you myself. And he told me about Nick's wife, that she puts up with a lot. The man's sick, he's old. And at one point Bob had even made a comment that he can take Nick out with one punch to the stomach."[4] This is the sum total of plaintiff's testimony concerning Vallario's comments to her and implies she believed Vallario was jealous of her friendship with Faiella.

In addition to any comments plaintiff claims she heard, Faiella testified that Vallario asked him privately whether plaintiff was a "good lover" and once asked him whether plaintiff's breasts were real. Plaintiff did not hear these purported statements, Faiella never told plaintiff about them, and plaintiff did not testify she had any knowledge of the comments at any time she worked in the BCS group.

Last, plaintiff testified conclusorily that Vallario frequently critiqued her work and gave it back to her to make corrections.

      **1.**    **Several of the Alleged Incidents Should be Removed From Consideration Because They Do Not Support an Inference of Mistreatment.**

As in <u>Alfano</u>, this Court should first consider whether each of the incidents alleged

individually supports an inference of mistreatment, i.e., whether plaintiff suffered a resulting

employment disadvantage or adverse effect on her job performance because of the conduct. <u>See</u>

---

[4] As of the time of filing this memorandum, defendant had only received a portion of the trial transcript in this matter. This testimony is directly quoted from plaintiff's direct examination at trial, from the portion of the transcript received from the court reporter prior to the filing of this memorandum.

Alfano, 294 F.3d at 376.  Several of the alleged incidents must be removed from consideration because they do not support an inference of mistreatment.  First, there is no evidence that Light's printing of the directions resulted in any job disadvantage or adverse effect on plaintiff's job performance.  Plaintiff testified that on one occasion, Light left directions to her house printed from the public website, MapQuest, in the shared office printer.  However, she acknowledged that Light told her that he had heard plaintiff had a nice house and wanted to see where it was.  The evidence was uncontroverted that Light told her he had printed the directions when she saw them on the printer, explained his reasoning to her, ripped up the directions and never used them, and never went by or near her house.[5]  Light also told his manager, Kevin West, about the incident and assured him that he would never go near plaintiff's house, a promise he kept.

The fact is that plaintiff claims the incident occurred in mid-December, 1999, months before she went out on a leave of absence, and presented no evidence that the incident affected the terms of her employment or her performance. In fact, nothing happened to plaintiff as a result of directions being printed out.  Because there were no job consequences for her, this incident may not be considered to support a hostile work environment claim because it was not mistreatment.

Second, Dunn's purported jokes in the office cannot be considered mistreatment of plaintiff, first because plaintiff did not testify that she ever heard any jokes — much less sexually "suggestive" jokes — by anyone in the office, including Dunn.  If there is no evidence that plaintiff was area of the alleged jokes, then the jokes could not have been part of any hostile work environment she claims she experienced.  In addition, Faiella's testimony that he heard unspecified "suggestive" jokes is far too vague to support a sexual harassment claim of anyone,

---

[5]  Although plaintiff offered hearsay testimony that a neighbor told her she once saw an SNET vehicle drive on her street, that fact alone is clearly insufficient for a reasonable jury to infer Light drove on her street, much less that he drove on street because she is a woman or that such an act would alter the terms of her employment.

much less sexual harassment of plaintiff.  Even if Dunn did tell unspecified jokes, plaintiff presented no testimony or other evidence that he said any such jokes in her presence or that she heard them.  For this reason, any such jokes could not have been made to mistreat plaintiff and could not have been made to mistreat her because of her sex.  Under Alfano, the alleged incidents of jokes must be removed from consideration on the sexual harassment claim because the evidence concerning them cannot create an inference of mistreatment of the plaintiff.

Third, the emails from outside contractor John Dunn that were introduced as Pl. Exh. 19 also cannot support a hostile work environment claim of plaintiff.  The final email in the exhibit, which states, "It is with great pleasure that I send these updated sheets" is far too ambiguous to create an inference of mistreatment of the plaintiff, or mistreatment based on sex.  Plaintiff chose not to call Mr. Dunn as a witness at trial; the jury therefore had no basis for evaluating why he expressed "pleasure" in the email (e.g., that this was possibly his last update because his temporary assignment was ending, that some other change from a prior update caused him "pleasure," or that he routinely made comments such as "I'm thrilled to announce" as an introduction to make fun of this menial job responsibility of updating phone lists.)  Even if the jury could infer that he took great pleasure in plaintiff's departure, it would be sheer speculation for the jury to conclude that Dunn took that pleasure because of plaintiff's sex. Moreover, the email is dated June 19, 2001, several weeks *after* plaintiff had left the BCS group and during a time when plaintiff does not even claim she was sexually harassed; the email, therefore, could not have been part of a hostile work environment experienced by plaintiff in the BCS group.

Fourth, the claimed comments by Vallario that "Nick's wife puts up with a lot," that Faiella was "old and sick," or that Vallario could "take Faiella out with one punch" were all

alleged comments that might be insulting to Faiella, but were not about plaintiff and could not constitute mistreatment or a job disadvantage to the plaintiff.  Nor can such comments relating solely to Faiella support a claim of sexual harassment of the plaintiff, since they were not about her, much less about her sex.

<strong>2.</strong>     <strong><u>Other Alleged Incidents Must Be Removed From Consideration<br>Because, Even if They Constituted Mistreatment, They Do Not<br>Support an Inference That They Were Because of Plaintiff's Sex.</u></strong>

"[T]o the extent that the plaintiff relies on facially neutral incidents to create the quantum of proof necessary to survive a Rule 50 motion for judgment, she must have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus." <u>Alfano v. Costello</u>, 294 F.3d 365, 377 (2d Cir. 2002).  In this case, to establish that a facially sex-neutral act was in fact discriminatory, the plaintiff must have presented circumstantial or other *evidence at trial* that would support an inference that the conduct was based on sex.  <u>Id</u>.  This may consist of evidence that the particular perpetrator of the act separately made sexually derogatory statements or slurs.  <u>Id</u>. However, such an inference *cannot be made* in the absence of other evidence of sexual animus by the person who committed the sex-neutral act at issue.   Facially neutral incidents may be used to establish sex-based discrimination only when there is evidence of *the same individual actor's* discriminatory animus toward women.  <u>See id</u>. at 375 ("There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination — for example, where *the same individual* is accused of multiple acts of harassment, some overtly sexual and some not."); <u>see also</u> <u>Raniola v. Bratton</u>, 243 F.3d 610, 622-23 (2d Cir. 2001); <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 154 (2d Cir. 2000)).  For example, simple evidence that an individual

14

"did not like" a plaintiff is not enough to infer that he disliked her because she was a woman. Alfano, 294 F.3d at 378.

In the present case, except for the alleged comments by Vallario, all of the purported incidents are facially sex-neutral. There is no legally sufficient basis for a jury to find that these incidents raise an inference of "mistreatment based on sex." Indeed, most of the incidents raise no inference of discrimination whatsoever. In fact, plaintiff testified during her direct examination at trial that she "got along well with everyone early on" and "[e]verything was fine"[6] at a time when she was clearly also a woman and worked in the BCS group. She further testified that "during that first year in the West group" "[e]verything was fine," "[t]here were no issues," and her work performance was "great" and "fine." Since plaintiff's gender never changed, plaintiff's own testimony refutes any claim of sex discrimination, which is why plaintiff presented these events to support her claim of retaliation, a claim that was rejected by the jury.

In fact, plaintiff testified repeatedly at trial that her only reason for believing any of the acts complained of were gender-related is the sheer fact that she is a woman. However, it is well established that gender discrimination cannot be established based solely on the fact that plaintiff is female, even where most of her coworkers were male. See Mulkey v. Hofstra Univ., No. 98-9304, 1999 U.S. App. LEXIS 12111, at *6 (2d Cir. June 10, 1999) (declaring it "irrelevant" that "males dominated" the plaintiff's workplace because "[m]en are not presumed to have a discriminatory animus against women, just as women are not presumed to be free of it"). In this case, the lack of evidence showing that these facially-neutral incidents were gender-motivated means that they must be removed from consideration on her sexual harassment claim.

---

[6]    These are direct quotations from that portion of plaintiff's direct testimony received from the Court reporter prior to the filing of this memorandum.

### a.     <u>Richard Light</u>

First, there was *no* testimony at the trial about sexual comments or conduct by Light in any respect.   Therefore, neither the MapQuest incident nor any other conduct by Light is sufficient to raise an inference of mistreatment based on gender.   In fact, no evidence was presented that Light acted with any motivation other than sheer curiosity because Carol Stanevich and Bob Vallario had visited plaintiff's house and remarked to Light how beautiful it was; more importantly, there is no evidence that Light's conduct was related to plaintiff's gender in any way.   Plaintiff herself testified that her concern about Light's printing of the directions was that she thought he might be checking up on her to find out whether she was going home during the work day.   That is not gender discrimination. Based on the evidence presented at trial, it would be sheer conjecture for the jury to have concluded that any incident involving Light was because of plaintiff's sex.[7]   <u>See</u> <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 448 (2d Cir. 1999) (warning district courts to "carefully distinguish between evidence that allows for a reasonable inference of discrimination, and evidence that gives rise to speculation and conjecture.").

---

[7]   Plaintiff's suggestion is incorrect that one can infer a sexual motivation by "Light's instruction to Plaintiff that she should refrain from speaking with contractors because 'it is not your place,' his apparently invented recollection of Plaintiff's reference to 'mass confusion,' and his reference to Plaintiff as having become 'aggressive.'"   <u>See</u> Plaintiff's Opposition to Defendant's Motion for Judgment as a Matter of Law dated July 29, 2008, at 3.   This characterization is not at all supported by the evidence or the law.   In 2000, Light wrote that Bachiocchi stated in an engineering meeting she was "tired of the mass confusion in the group."   Def. Exh. 100 at p. 1.   These were plaintiff's words, not Light's, and they have nothing whatsoever to do with gender.   As a matter of law, this comment cannot show a gender-based bias on the part of Light.   As for counsel's allegation that Light said "it is not your place" and reference to plaintiff as "aggressive," the sole evidence on this issue was that the following occurred in 2000:

> . . . I told her I have noticed that she is very aggressive, almost arrogant, and sharp when dealing with people.   Especially when she feels she is right."   I said, "you need [sic] talk to people as if they are your equal or the way you would like to be talked too."   I said, "I don't even think you know that you are coming on that strong but, you immediately put people on the defensive."   I said, "you come too much from a position of authority and not of someone who is a fellow team player trying to work together to solve a problem or get a job done."

Def. Exh. 100 at 4.   Telling a person, male or female, that they are being too aggressive is not a gender-based comment nor can it possibly be evidence of sexual harassment or an animus against women.   Only through speculation — not evidence — could a jury conclude that any conduct by Light toward plaintiff was sexual harassment.

### b.     Bob Vallario

As for conduct by Bob Vallario, even if there was sufficient evidence to conclude that Vallario's criticism of plaintiff's work was somehow unfair treatment of her, such alleged conduct must be removed from consideration because there is no evidence that this facially sex-neutral conduct was in fact based on plaintiff's sex, i.e., the fact that she is a woman and the evidence establishes that it was not.  Plaintiff's co-workers, Keith Casey, Frank Andrews, and Wayne Handfield, all testified that Vallario often criticized all the engineers' work.  Both Casey and Andrews, who were engineers, testified that Vallario frequently criticized their own work. Andrews testified that Vallario gave his work back to him to change many times and there was "lots of red pen" on his job scopes after Vallario finished with them.  Handfield testified that he saw Vallario giving back work to Ron Dursza (male engineer) "quite a bit," and that he gave back all the engineers' work.  Casey testified that Vallario often handed back his work to him and questioned him about why he did the job one way or another.  Light testified that Vallario would give work back to all the engineers.  Vallario himself testified that he gave back work to everyone, including engineering supervisor Richard Light.   He recalled, consistent with Handfield's testimony, that he probably gave the most amount of work back to Ron Dursza for correction, since Dursza "has his own way of doing things."  He also testified that he gave work back to Richard Greene, Yvan Boulet, and John Dunn.  Plaintiff did not present *any* evidence from which a reasonable jury could conclude that Vallario criticized plaintiff's work but not the work of her similarly situated male colleagues, or that any criticism of her work was any different because she was a woman.  Plaintiff's own conjecture and surmise is not a sufficient basis to establish gender-based harassment.  Given the evidence presented at trial, no reasonable

jury could conclude based on her "conclusory" testimony "without corroborating detail" that Vallario treated plaintiff differently because of her gender by criticizing her work. <u>See</u> <u>Alfano</u>, 294 F.3d at 376 (plaintiff's own "testimony that maintenance requests by male peers were more easily arranged — stated in conclusory terms without corroborating detail — is insufficient to support a finding that DOCS imposed a burden on her because she was a woman.").

Plaintiff also has claimed in this case that Vallario made certain statements to her insinuating that she was having an affair with Faiella and that these constituted sexual harassment. There are multiple problems with this claim. First, the alleged comments do not support mistreatment. Asking an employee, "What's up with you and Nick?" or even stating, "You're not so bad, I'd go out with you myself if I were younger," is not mistreatment at all, particularly where, as here, both contractors and co-workers were complaining about the behavior of the two of them at work. The evidence was uncontroverted that Vallario was concerned that four outside contractors complained that Mr. Faiella was overly defensive of Ms. Bachiocchi and one said that because of this, he would no longer accept jobs from SNET if they were assigned to them together. Co-workers complained of inappropriate physical touching between the two of them at work, resulting in an investigation by the company. Under these circumstances, it was legitimate — certainly not sexually harassing — for Vallario to ask both Faiella and plaintiff about their relationship.

Second, although plaintiff has pointed to SNET's policies which prohibit spreading rumors or lies about an employee's personal life, her own testimony definitively establishes that plaintiff herself did not perceive that (i.e., experienced) any comments by Vallario about her were lies or rumors about her sex life or personal life. She testified as follows:

Q. Wrong question. Did you hear anything that you believe constituted a rumor

or lie about your personal life, especially your sex life?
A. No.

As stated above, she did testify that Vallerio asked her, "what's up with you and Nick?"; stated that, "If I were younger, I would go for you myself."

Third, the law is clear that commenting about an actual or perceived affair is not, by itself, sexual harassment. It is well settled that "[e]ven if embarrassing or even humiliating, a statement that an employee is having a consensual relationship with a co-worker cannot be construed as discrimination or harassment on the basis of sex *absent some additional showing*, such as that the plaintiff was singled out for such comments because of his or her gender." Dellafave v. Access Temporaries, Inc., 2001 U.S. Dist. LEXIS 97, at *19 (emphasis added) (Exh. 3, attached); Brant v. County of Dutchess, No. 05-CV-10590, 2008 U.S. Dist. LEXIS 10941, at * (S.D.N.Y. Feb. 11, 2008) ("Comments by coworkers about an extramarital affair do not inherently constitute conduct motivated by gender animus."). See Brown v. Henderson, 257 F.3d 246, 255-56 (2d Cir. 2001) (affirming grant of summary judgment because "behavior touch[ing] on matters of sexuality, i.e. [the plaintiff's] purported sexual relationship with [a co-worker]" is not harassment "because of sex"); DeCintio v. Westchester County Med. Ctr., 807 F.2d 304, 306-07 (2d Cir. 1986) (noting that sex discrimination claims under Title VII must be "based on a person's sex, not on his or her sexual affiliations"); Dellefave v. Access Temps., Inc., No. 99 Civ. 6098, 2001 U.S. Dist. LEXIS 97, at *16-17 (S.D.N.Y. Jan. 11, 2001) ("Courts have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations.") (internal quotation marks omitted).

Here, Faiella, plaintiff's male co-worker, also testified Vallario made the same kinds of

comments to him that implied he was having an affair with plaintiff. Because the same kinds of comments were allegedly made to both a man and a woman, even if the comments constituted harassment, as opposed to legitimate inquiry given multiple contractor complaints about plaintiff and Faiella among other facts, they cannot support a claim of harassment *based on gender.* Because the same comments were allegedly made to Faiella and plaintiff, such comments about a possible affair must be removed from consideration on the sexual harassment claim because — even if made — they cannot support a claim of gender discrimination.[8] As the Seventh Circuit observed in affirming a grant of summary judgment against a plaintiff who claimed he was sexually harassed by virtue of rumors of an office affair, "[s]uch rumors spread, irrespective of the truth, for any number of reasons having nothing to do with gender discrimination." Pasqua v. Metro. Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996).

The final category of conduct plaintiff's counsel presented at trial were comments allegedly made by Vallario to Faiella outside of plaintiff's hearing and which *she undisputedly never knew about.* Faiella testified that Vallario asked him if he was having an affair with plaintiff, asked him whether plaintiff was a good lover, and asked him once if her breasts were real. Because plaintiff did not know about these alleged comments, they could not have been part of any hostile work environment she may claim to have experienced and must be removed from consideration on this claim.

### c.    **John Dunn**

As set forth above, the John Dunn emails are far too ambiguous to support an inference of mistreatment, much less an inference of mistreatment based on sex. It is well settled that even rudeness does not constitute unlawful harassment. See Sardina v. United Parcel Serv., Inc., 254

---

[8] Similarly, even if Carl Lorentzen was assigned by someone to "break up the Nick and Kim thing," that action would apply equally to plaintiff and Faiella. Therefore, it does not evidence intent to discriminate based on sex.

Fed. Appx. 108, 110 (2d Cir. 2007) ("Title VII aims to eradicate discrimination on the basis of sex, not enact a general civility code on the American workplace.") (internal quotation marks omitted); Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex if the employee, to be classified as discriminatory.").[9] Even if these emails somehow created an inference that Dunn did not personally like the plaintiff — which they do not do on their face — the law is clear in t his Circuit that evidence suggesting dislike for a plaintiff, without evidence that the dislike was due to her sex, is insufficient to support a claim of gender-based harassment. Martinez v. N. Y. Dept. of Educ., No. 04 Civ. 2728, 2008 U.S. Dist. LEXIS 41454 at *7 (copy attached) (finding that "no rational fact-finder could determine that any of the treatment by Plaintiff to have created a hostile work environment was motivated by sex-related bias."). Moreover, to show different conduct because of sex, plaintiff must offer evidence from which a reasonable fact-finder could infer that Dunn would not have made the same comment but-for the fact that plaintiff is a woman. Id.

**3.    No Reasonable Jury Could Conclude That Plaintiff Was Subjected to Sexual Harassment That Was So Severe and Pervasive That It Altered the Conditions of Her Working Environment.**

Following the teachings in Alfano, once the MapQuest incident, the purported jokes by Dunn, the email by Dunn, Vallerio's alleged criticism of plaintiff's work, Vallario's alleged comments which plaintiff did not know about, and Vallario's comments about Faiella and a possible affair are excluded from consideration, the Court must determine whether the remaining incidents are sufficient to support a finding of hostile work environment based on sex. The only

---

[9] Since plaintiff offered absolutely no information — much less evidence — to assist the jury in interpreting the document, any motivation attributed to Dunn by the jury with respect to the email would be sheer speculation.

remaining incident for consideration is Vallario's alleged comments to plaintiff that, "You're not so bad, if I were younger, I'd go out with you myself." This comment is clearly not sufficient to establish a sexual harassment claim.

To establish a "hostile" work environment, a plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). In effect, the plaintiff must demonstrate that her work environment was "permeated with discriminatory intimidation, ridicule, and insult" based on sex.  Id. at 21 (internal quotation marks omitted).

After excluding the clearly gender-neutral incidents listed above as required by Alfano, the entirety of plaintiff's sexual harassment claim rests on Vallario's alleged comment that "I would go for you myself if I were younger." There is no dispute that plaintiff worked with Vallario from July, 1998, when she joined the BCS Group, until she left for a medical leave of absence in May 2000. This single comment could not have created the type of workplace "permeated with discriminatory intimidation, ridicule, and insult" that is required to support a claim of sexual harassment in this Circuit. Harris, 510 U.S. at 21. As a matter of law, the comment was simply not "sufficiently severe or pervasive [so] as to alter the conditions of the

[plaintiff's] employment and create an abusive working environment." Id. (internal quotation marks omitted). Moreover, even if the Court should disagree with SNET's analysis of the excludability of all the other events, SNET submits that the incidents about which plaintiff complains — even if they all constituted mistreatment and even if they were all because of plaintiff's gender, which is denied — combined, they cannot rise to the level of an unlawfully hostile work environment based on sex during the three-year period plaintiff acknowledged in her direct examination was the period of time she worked in the BCS group.[10]

The propriety of granting judgment as a matter of law for SNET in this case is underscored by the many cases from various Courts of Appeal, some of which are cited in Alfano, that routinely dismiss hostile work environment claims for insufficiency of evidence even though the conduct involved was much more egregious than even what is *alleged* in this case. See, e.g., Sardina v. United Parcel Serv., Inc., 254 Fed. Appx. 108, 110 (2d Cir. 2007) ("[A] few off-color comments including references to 'office bitches' and 'Brooklyn bimbettes' by [the plaintiff's] supervisor and sexually suggestive comments by coworkers with whom she would tell jokes. . . do not rise to the level of an objectively hostile work environment."); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), abrogated in part on other grounds by AMTRAK v. Morgan, 536 U.S. 101 (2002) (a comment about plaintiff's buttocks and a deliberate touching of her breasts); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 354 (5th Cir. 2001) (in a twenty-five month period, eight incidents of alleged racial harassment); Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-75 (5th Cir. 1999) (in a two-year period, co-worker made impertinent and intimate observations about plaintiff's anatomy,

---

[10]   For example, even if the Court should find that Vallario's criticism of plaintiff's work should be considered mistreatment because of sex, it is undisputed that plaintiff never received any discipline nor was she demoted, suspended, or otherwise penalized because of such alleged criticism. Thus, even this alleged incident combined with Vallario's hypothetical compliment about dating plaintiff if he were younger would not constitute the kind of pervasive discriminatory intimidation and ridicule that Title VII and the FEPA were meant to prevent.

attempted to look down her shirt, and touched her multiple times); Black v. Zaring Homes, Inc.,

104 F.3d 822, 823-24 (6th Cir. 1997) (in a four-month period, repeated sexual jokes, and at least

five other sexually offensive remarks); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31

(7th Cir. 1995) (in a seven-month period, nine sexually offensive incidents, including repeated

references to plaintiff as a "pretty girl," grunting noises when she wore a leather skirt, and one

episode of simulated masturbation); Hocevar v. Purdue Frederick Co., 223 F.3d 721, 735-36, 738

(8th Cir. 2000) (in a three-year period, several sexually derogatory remarks about women by one

or more men, a sexual advance at a company dance, disruption of plaintiff's presentation by

talking followed by comment on her legs, and a lascivious remark in a group setting by a

company official predicting his sexual conquest of three female employees); Sprague v. Thorn

Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (in a sixteen-month period, five

sexually offensive statements, including one made while harasser had his arm around the

plaintiff and was peering down her dress); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d

1257, 1261-63 (10th Cir. 1998) (in a three-year period, harasser made remarks concerning

plaintiff's bra strap, her underclothing, and whether she had sexual dreams; claimed sexual

conquest of another woman employee; made a pornographic architectural analogy; and took the

plaintiff to a Hooter's restaurant on business travel (total of six incidents)); Mendoza v. Borden,

Inc., 195 F.3d 1238, 1248-49 (11th Cir. 1999) in an eleven-month period, harasser once made

inappropriate physical contact, made one arguably offensive statement, and several times made

sniffing noises while staring impertinently, cert. denied, 529 U.S. 1068 (2000); Guerrero v.

Lowe's Home Ctrs., Inc., 254 Fed. Appx. 865, 867 (2d Cir. 2007) ("[W]here the sex-related

conduct complained of was principally name calling . . . the alleged harassment [was not]

sufficiently severe to meet the threshold for a hostile work environment."); Baron v. Winthrop Univ. Hosp., 211 Fed. Appx. 16, 17 (2d Cir. 2006) (holding a "series of remarks about women" that showed gender bias on the part of the plaintiff's supervisor were not sufficiently severe and pervasive); Augustin v. Yale Club, No. 06-5078-cv, 2008 U.S. App. LEXIS 8775, at *3-4 (2d Cir. Apr. 23, 2008) (affirming summary judgment where plaintiff allegedly endured "episodes of name-calling [including 'black bitch' and 'f--ing negrita'], inappropriate behavior by a supervisor, and other perceived slights" over five years); Cioffi v. Allen Prods. Co., No. 3:98CV857, 2000 WL 33180448, *10-12 (D. Conn. Sept. 29, 2000) (granting summary judgment for employer where over three and a half years, president allegedly spread rumors of an affair between plaintiff and a coworker; a coworker waved a page containing sketches of male genitalia in front of plaintiff and frequently left off-color jokes on co-workers' desks; managers and co-workers told off-color jokes "on numerous occasions;" a coworker often read the newspaper while leaning against the wall behind plaintiff's desk; and a coworker laughed at another co-worker's statement to plaintiff that had a sexual connotation/double meaning) (copy attached); Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004); Hamilton v. Bally of Switz., No. 03 Civ, 5685, 2005 U.S. Dist. LEXIS 9319, at *18-32 (S.D.N.Y. May 17, 2005) (copy attached).

On the other hand, given sufficiently egregious facts — which are not present here — both the Second Circuit and others have recognized the legal sufficiency of claims for gender-based hostile work environment. See Schwapp v. Town of Avon, 118 F.3d 106, 112 (2d Cir. 1997) (plaintiff created a triable issue of fact based on ten to twelve instances of explicitly racist conduct in twenty months, where most of the incidents were supported by specific testimony

concerning racial jokes and epithets that insulted blacks, Puerto Ricans, and people of Middle Eastern origin); Cruz v. Coach Stores, Inc., 202 F.3d 560, 571-72 (2d Cir. 2000) (triable issue as to whether a workplace was racially and sexually hostile, where plaintiff presented evidence that supervisor "subjected her and others to blatant racial epithets on a regular if not constant basis," repeatedly stated that women should not work, and physically harassed plaintiff and other women by standing very close when he spoke to them, backing them into walls, and looking them "up and down in a way that's very uncomfortable"); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 70, 75-76 (2d Cir. 2001) (finding a triable issue where harasser touched plaintiff in unwelcome manner on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (plaintiff presented evidence she was subjected to "offensive sex-based remarks," one serious public threat of physical  harm, "workplace sabotage," and unfair work assignments); see Alfano, 294 F.3d at 380 (calling the above cited cases a "rough template" of the types of cases for which the evidence *is* sufficient to go to the jury on a hostile work environment claim in the Second Circuit).  All of the cases cited above, and the "template" they have created for hostile work environment case in this Circuit, make clear that judgment as a matter of law should be granted for SNET in this case.

### 4.    Even If the Court Considered Purported Events Involving Other Employees, Plaintiff Was Not Subjected to Severe and Pervasive Sexual Harassment.

#### a.    Events Involving Kevin West

As set forth above, plaintiff did not testify that she perceived any event involving Kevin West as sexually harassing.  Because one essential element of a claim of sexual harassment is

that the victim subjectively perceived the conduct to be sexually harassing, plaintiff's lack of proof of this element is fatal to any claim of hostile work environment based on any conduct by Kevin West.[11]

However, even if this Court were to consider events involving Mr. West that plaintiff has argued in her Opposition constituted sexual harassment, even those events, combined with the isolated comments by Vallario that plaintiff claims she heard and were thus part of her work environment, are far too sex-neutral and sporadic to rise to the level of an environment permeated with discriminatory intimidation and ridicule as a matter of law.

The alleged conduct by West that plaintiff's counsel argues in his Opposition were part of plaintiff's hostile work environment claim are the following:

"references to women as `broads,' `bitches,' and `knuckleheads'"

"Plaintiff's exclusion from the fishing trip being arranged at the time of her return from medical leave"

"her exclusion from a training opportunity"

"her assignment to geographically diverse projects of significant complexity while she was being refused overtime"

"a newly imposed requirement that her work had to be reviewed"

alleged fact "that Mr. West grabbed her wrist and ripped a paper from her hand"

See Plaintiff's Opposition to Motion for Judgment as a Matter of Law.  As described below, these events do not support an inference of mistreatment based on gender, and, even in the aggregate cannot establish a workplace permeated with discriminatory intimidation and ridicule based on sex.

First, these claims concerning West must be viewed in light of the fact that West testified,

---

[11] Plaintiff's trial testimony indicated her claim concerning West was that he retaliated against her for filing a complaint of discrimination, not that he sexually harassed her.

and plaintiff acknowledged, that West had to approve plaintiff's hiring, that West knew she was a woman prior to her hiring, and that there were male applicants for the job who were rejected while plaintiff was hired. Thus, the record is clear that if West had wanted a male in the job, he could have overridden Light's recommendation and hired a male to fill the position of Analyst Technical Sales rather than plaintiff.

### (1)    References to Other Women Which Plaintiff Never Heard

The sole evidence plaintiff presented of references to women as a "broads," "bitches," or "knuckleheads" was Nick Faiella's testimony that he heard West use such references but could not recall when, under what circumstances, or how frequently such words were used. What is clear is that plaintiff offered *no* testimony or other evidence that West directed any such comments to the plaintiff. Notably, neither plaintiff nor any of the other *eleven fact witness* who testified at the trial in this matter testified that he/she heard West use any such words. Since no evidence was presented that West ever directed such comments to plaintiff, or that plaintiff ever heard such words used in the workplace, these comments cannot be the basis for a claim that plaintiff's work environment was unlawfully hostile based on gender or that West had a bias against women working as engineers.

### (2)    Fishing Trips

As for allegedly being excluded from fishing trips, plaintiff's own testimony made clear that she believed she was "excluded from fishing trips" in retaliation for having complained of discrimination, not because of her gender. Specifically, she testified she did attend at least one fishing trip in 1998, and Carol Stanevich, the other female employee in her work group, testified she attended several fishing trips. Therefore, the record is undisputed that plaintiff herself and

her only other female co-worker both attended fishing trips. In light of this testimony and the fact that plaintiff produced no evidence she was excluded from any fishing trip *because of her gender*, no reasonable jury could conclude she was *mistreated because of her gender* by being excluded from fishing trips. In addition, at one point in her testimony, plaintiff admitted she believed she was excluded from unidentified fishing trips in retaliation for complaining about discrimination ("I was excluded based on the fact of my charges and what took place . . . "); since subjective perception of sexual harassment is a required element for any such claim, the lack of proof that plaintiff was excluded from any fishing trips because of her gender is also fatal to her position that this event can support her gender-based hostile work environment claim.

In addition to there being insufficient evidence that plaintiff was excluded from fishing trips because of her gender, no reasonable jury could conclude that plaintiff *was mistreated at all* by being excluded from fishing trips based on the evidence presented. Again, plaintiff herself testified that she *did not know* whether there were any fishing trips that occurred while she was actually in the workplace and available for which she was not included while she was in the BCS group.[12] At one point, plaintiff even testified that between 1998 and her leave of absence in May 2000, there were no additional fishing trips. To the extent she relies on Chris Manouse's testimony about the possibility that a fishing trip occurred in the summer of 2001, Manouse testified that if there was one then "everyone was included," and he did not testify that any fishing trip actually occurred or was planned before plaintiff left the BCS group in early June, 2001.

### (3)    Alleged Exclusion from Training Opportunity

As for plaintiff's claim in her Opposition about a "newly imposed requirement" that her

---

[12] Plaintiff testified she went in a fishing trip in 1998; she admits that during the spring and fall of 2000 she was out on a leave of absence and would not have been able to attend; and she did not work in the BCS group after June 4, 2001.

work must be reviewed, the evidence at trial was undisputed that *everyone's* work was reviewed, and therefore there is no basis upon which a reasonable jury could conclude that plaintiff's work was reviewed because of her sex. In addition, plaintiff claims this "new requirement" occurred when she returned to work in May, 2001. At that time, two of the three persons she claims sexually harassed her had left the company so they could not have been the source of this alleged discrimination based on sex. As for the one who was still with the company, John Dunn, there is no evidence at all to tie Dunn to any decision to review plaintiff's work.[13]

The fact is that plaintiff presented no evidence that she was excluded from any training opportunity because of her sex. To the contrary, the evidence was undisputed that she attended two training seminars with her co-workers in Massachusetts in early May, 2000. It was at these training sessions that Faiella was seen rubbing plaintiff's shoulders and thighs, and it was in driving to these seminars that Faiella and plaintiff joked about going to her camper together rather than attend the seminar.[14]

Although plaintiff's Opposition cites nothing in the record to support plaintiff's conclusory claim that she was denied a training opportunity, to the extent she relies on Plaintiff's Exh. 16, which is a "Structured Cabling Symposium and Product Fair" flyer, such evidence is wholly inadequate to support a claim of sex discrimination based on a deprivation of training opportunities. Plaintiff identified Plaintiff's Exh. 16 as a document she received at some point but she testified she did not "recall how [she] came in possession of this." She testified that

---

[13]  In fact, such a connection would be ridiculous, since Dunn was only a temporary, part-time employee in the BCS group and as such had no decision-making power at all with respect to the terms and conditions of plaintiff's employment.

[14]  Notably, plaintiff's sexual harassment claim does not rely on any conduct by Faiella. In fact, the company investigated Faiella's conduct toward plaintiff and warned him that physical touching between them must stop immediately. Plaintiff's position throughout this litigation has been that Faiella, who appeared as a witness on her behalf at trial, never engaged in any physical conduct toward her that was unwelcome and that she did not consider any of his conduct toward her to be at all harassing. In fact, plaintiff even found it amusing that Faiella placed a picture of his own face over her husband's face in a photo of the two of them on her desk for all to see.

when training opportunities arose, generally documents were circulated among the staff who would then sign up for the ones they wanted to attend. The fact that plaintiff admits she received the document proves that it was not hidden from her and, if it creates any inference at all, creates an inference she received it and could have signed up for the training. Second, the training was scheduled for June 27, 2001, almost a month *after* plaintiff had left the BCS group. The RSVP date on the fact of the document was June 20, 2001, also after her departure from the group. Plaintiff was only at work in the BCS group for a total of 15 days in 2001.[15] Without some evidence that she was available at work but excluded from signing up because of her gender rather than (1) because she was still out on her year-long leave of absence at the time the flyer was circulated (if it was circulated), (2) that she had already left the group and moved to another department, (3) that she was not qualified to attend, or (4) that she didn't sign up for some other reason, it would be sheer speculation for a fact-finder to conclude she was "deprived of a training opportunity" because of her gender. This is particularly true since plaintiff did not even minimally present evidence that any particular person made any particular decisions about who would and would not attend, rather than circulating a voluntary sign-up document as plaintiff herself described the usual practice in her testimony.

### (4)     Denial of Overtime on One Occasion

As for overtime, the evidence showed that West only denied plaintiff's request to work overtime once after he let her use company time as opposed to her personal time the previous day to attend a funeral that did not fall under SNET's bereavement policy,[16] and then plaintiff subsequently went to lunch and an appointment after returning only briefly to the office.

---

[15]  Plaintiff's attendance record shows that she was at work on May 14, 15, 16, 17, 18, 21, 22, 23, 24, 25 (half day), 30, 31, and June 1 (partial day) and 4 (half day). See Defendant's Exh. 6 at p. 2.
[16]  Plaintiff admitted in her direct examination that West gave her permission to attend the funeral of the parent of a friend stating to her, "just go ahead, do what you have to."

Plaintiff then called West and said she'd like to work overtime on Saturday (at overtime rates) to catch up because it was going to rain on Saturday anyway.   There is absolutely no basis for any reasonable fact-finder to hold this incident constituted anything other than a legitimate business decision that allowing plaintiff to work overtime at higher rates after she took extra time off the day before would be irresponsible.  It is certainly not evidence of mistreatment of plaintiff based on plaintiff's sex.  In addition, as set forth above, the decisionmaker with respect to overtime was Kevin West, and plaintiff has admitted she subjectively perceived only the conduct of Vallario, Light, and Dunn (not West) to be sexually harassing.

### (5)    "New Requirement" To Have Her Worked Reviewed

As for plaintiff's claim that she had a newly imposed requirement that her work had to be reviewed, *every witness* who testified on the subject at the trial (Casey, Andrews, Light, Handefield, and Vallario) testified that *everyone's* work was reviewed.  Plaintiff's sole evidence to support such a claim was her own testimony that Kevin West and Chris Manouse "told me that I needed to have all my work approved prior to it leaving the office" and did not tell her this was a new general office policy.  This self-serving and vague "evidence" simply cannot support an inference of mistreatment, let alone mistreatment because of gender.  It is undisputed that both Vallario and Light, the key people plaintiff claims sexually harassed her, had retired from the company months before in November, 2000 and were no longer supervisors in the BCS group by the time she returned in May, 2001.  If plaintiff's work was reviewed, it was reviewed by Chris Manouse, who plaintiff testified on direct was supervised her work after her leave of absence, who plaintiff has *not* claimed sexually harassed her in any complaint or at trial.  In addition, as a matter of law, an employer's decision to simply review someone's work cannot

form the basis of a claim of discrimination.

Moreover, since plaintiff did not present even a shred of evidence that she was treated differently than the male employees with respect to her work being reviewed, this alleged incident must be removed under <u>Alfano</u> because there is no reasonable basis to infer mistreatment or mistreatment based on gender.

### (6)    Paper Incident

As for the paper incident involving West, again plaintiff offered this incident at trial to support her claim of retaliation for complaining about discrimination, not her claim of sexual harassment.  Plaintiff's attempt now to characterize this a gender discrimination is unavailing. Based on the testimony presented at trial, no matter the details of the dispute, there is no evidentiary basis from which to conclude this incident occurred because plaintiff was a woman, i.e., it would not have occurred if plaintiff was a man.  By plaintiff's own testimony, the incident occurred in response to her creating a form for West to sign to document that he had reviewed her work.  By her own testimony, West told her that "nothing of this nature would be signed in this office or be done in that way" and then pulled the paper out of her hand.  There is nothing in this gender-neutral event to infer that it occurred because of plaintiff's gender rather than her behavior.  Even if it were, such an event, which the police concluded did not warrant an investigation or any action, does not support a claim that her work environment was permeated with discriminatory ridicule based on gender.

### b.    Alleged Events Involving Other Actor.

In her Opposition, plaintiff states that other "facially neutral" conduct should be considered to support her sexual harassment claim.  Plaintiff states,

A few examples of the testimony offered on these `facially neutral' subjects

would include: Vallario examining Plaintiff's work more stringently and more frequently than he did for other male employees; Mr. Lorentzen being assigned to "check up on Kim's work," as Ms. Peterson testified; Plaintiff's exclusion from the fishing trip being arranged at the time of her return from medical leave; her exclusion from a training opportunity; her assignment to geographically diverse projects of significant complexity while she was being refused overtime; and a newly imposed requirement that her work had to be reviewed.

Pl. Opp. at 3. As for the incident not addressed previously above, Ms. Peterson did not and could not testify that Lorentzen was assigned to "check up on Kim's work." Lorentzen testified that he went to the site of a job he was assigned to with Bachiocchi, just as he did with his other jobs. The fact that Peterson testified she was surprised to see him does nothing to establish unfair treatment of Bachiocchi based on her sex. Even if Lorentzen had been checking up on Bachiocchi's work, plaintiff testified that it is "typical" for a field supervisor to check up on work to which he is assigned. In her own affidavit she introduced as evidence at trial, plaintiff admitted Lorentzen "suddenly replaced [Faiella] on all the projects we worked on together" by May 15, 2000, before her conversation with Lorentzen at Wendy's which caused her to believe he was checking up on her. Plaintiff's Exh. 11 at ¶ 12. Because Lorentzen was checking on a job he was assigned to by plaintiff's own admission, his conduct was "typical" and thus cannot be conduct based on her gender as a matter of law. Moreover, Bachiocchi does not include Lorentzen as a person she subjectively believed sexually harassed her, so her sexual harassment claim fails on the subjective element as it relates to Lorentzen.

## II.    THE FARAGHER/ELLERTH AFFIRMATIVE DEFENSE

SNET established at trial its affirmative defense that "(1) [it] exercised reasonable care to prevent and promptly correct any sexual harassment by . . . a supervisor, and (2) [Plaintiff] unreasonably failed to avail herself of any corrective or preventative opportunities provided by

the employer or to avoid harm otherwise." Bakalova v. Maimonides Med. Ctr., 83 Fed. Appx.

372, 374-75 (2d Cir. 2003) (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765

(1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)).

**A.     SNET Exercised Reasonable Care To Prevent And Promptly Correct Any Sexually Harassing Behavior.**

SNET has a strong anti-discrimination and harassment policy that is published in its Code

of Business Conduct. See Pl.'s Exh. 4. Included in that policy are specific directions for filing

internal complaints with SNET. Those directions state that "[a]ll employees should report any

incident of discrimination/harassment to a manager, higher management, Human Resources

Personnel or directly to the **EEO Information Line**." The policy lists the numbers for the EEO

Information Line, and states that callers may remain anonymous. Moreover, the policy protects

employees from any acts of retaliation that they fear may result from reporting acts of

discrimination or harassment. The evidence showed that SNET provided this policy to all

employees and had them sign statements every year verifying that they had read and understood

both the EEO policy and the sexual harassment policy contained in the Standards of Business

Conduct. Plaintiff signed such a statement, acknowledging receipt of the SNET EEO policies,

including the complaint procedure, in 1999 when she claims the alleged harassment occurred.

In addition to distributing and verifying receipt of the above policies, SNET required that

all of its employees receive training on unlawful discrimination and harassment, and understand

its company policy prohibiting any and all acts of the same. Consistent with that mandate, both

plaintiff and West testified that they attended SNET's EEO training programs. West also

confirmed that the program indeed was mandatory for all company employees.

Accordingly, SNET has shown that its anti-discrimination and harassment policy and

complaint procedures are reasonable and comprehensive.  See Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001) ("Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense.").  Moreover, the evidence shows that the complaint procedure was effective in preventing and correcting incidents of discrimination and harassment.

Plaintiff testified that she spoke with Chris Macri at SNET EEO about "the happenings" in the office, but asked her not to take any action.  Plaintiff also told West that Lorentzen had been assigned to follow her and report back to Vallario regarding her work and whereabouts.  These are the only two people to whom she claims she complained.  West promptly investigated plaintiff's allegation, and then informed plaintiff of his conclusion that Lorentzen was not following her, and no one had instructed Lorentzen to do so.  Plaintiff has not claimed, and the evidence does not show, that Lorentzen's alleged conduct continued after West's investigation.[17] Accordingly, SNET has satisfied its burden of proving the first element of the defense.

**B.    Plaintiff Unreasonably Failed To Take Advantage Of Any Of These Preventative Or Corrective Opportunities, Or Otherwise Avoid Harm.**

It is undisputed that plaintiff knew about SNET's anti-harassment policy during the time she was employed in the BCS group.  She attended an SNET-mandated training program, and signed an acknowledgement stating that she had carefully reviewed the materials and understood the policy.  See Def.'s Exh. 48.

Nevertheless, the undisputed evidence shows that plaintiff waited almost two years before attempting to avail herself of SNET's internal complaint procedure.  She took no action

---

[17] SNET also responded immediately to the incident that occurred on June 4, 2001 by relocating West and promoting plaintiff.  SNET's prompt and effective response to that situation further evidences its exercise of reasonable care to prevent harassment of any sort.

during the summer and fall of 1999 when West and Vallario allegedly told her not to call people outside the BCS group, and warned her that doing so would jeopardize her compensation and other incentives. She did nothing after Vallario allegedly told her that he would go out with her himself if he were younger.[18]

Title VII's "primary objective," as the Supreme Court recognized in <u>Faragher</u>, is to avoid harm to employees, not provide them with redress. <u>See Faragher v. City of Boca Raton</u>, 524 U.S. 775, 805-806 (1998). In this case, by waiting more than a year to make any sort of complaint about alleged harassment, plaintiff deprived SNET of the opportunity to address and remedy the situation. Given her knowledge of SNET's policy and procedure for filing complaints, her delay was unreasonable as a matter of law. <u>See Eicler v. Am. Int'l Group, Inc.</u>, No. 05 Civ. 5167, 2007 U.S. Dist. LEXIS 23445, at *31-32 (S.D.N.Y. Mar. 30, 2007) (delay of more than one year in complaining about the harassment was unreasonable as a matter of law); <u>Schmidt v. State Univ.</u>, No. 02CV6083, 2006 U.S. Dist. LEXIS 27663, at *44 (E.D.N.Y. May 5, 2006) (same); <u>O'Dell v. Trans World Entm't Corp.</u>, 153 F. Supp. 2d 378, 391 (S.D.N.Y. 2001) (delay of nearly one year is unreasonable as a matter of law); <u>Dayes v. Pace Univ.</u>, No. 98 Civ. 3675, 2000 U.S. Dist. LEXIS 3698, at *16 (S.D.N.Y. Mar. 24, 2000) ("Plaintiff's one-year delay in bringing her complaint to the attention of management was unreasonable as a matter of law."); <u>see also Williams v. Mo. Dep't of Mental Health</u>, 407 F.3d 972, 976-77 (8th Cir. 2005) (affirming that employer established the <u>Faragher/Ellerth</u> defense where the plaintiffs waited more than four months to report the harassing conduct); <u>Gawley v. Ind. Univ.</u>, 276 F.3d 301, 312 (7th Cir. 2001) (affirming that employer established the <u>Faragher/Ellerth</u> defense where the plaintiff "waited seven months before availing herself of the formal complaint procedures

---

[18] Plaintiff admitted on cross-examination that Vallario said he'd go out with her himself if he were younger, as she alleged in her original complaint in this case, rather than that he'd "go for her" himself.

available").

Because SNET has established both elements of the <u>Faragher/Ellerth</u> affirmative defense, it cannot be held vicariously liable for any of the allegedly harassing conduct at issue in this case. Accordingly, it respectfully requests that judgment be entered in its favor as a matter of law on plaintiff's sexual harassment claim.

## III.    <u>PUNITIVE DAMAGES</u>

Plaintiff presented insufficient evidence at trial to support a finding that an SNET employee acted with malice or with reckless indifference to her federally protected rights while serving in a "managerial capacity." Moreover, when measured under the guideposts set forth in <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 581 (1996), the amount of punitive damages awarded exceeds the outer limits of Constitutional Due Process. Therefore, SNET requests that the Court vacate the punitive damage award in this case.

### A.    <u>Plaintiff Presented No Evidence That a Managerial Employee Of SNET Acted With Malice Or Reckless Indifference To Plaintiff's Federally Protected Rights.</u>

Title VII authorizes the recovery of punitive damages "in only a subset of cases" where the plaintiff demonstrates that the defendant "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 534 (1999); <u>see</u> 42 U.S.C. § 1981a(b)(1). To satisfy this standard, plaintiff must prove that an SNET employee acted with "malice or reckless indifference" by "at least discriminat[ing] in the face of a perceived risk that its actions will violate federal law." <u>Cush-Crawford v. Adchem Corp.</u>, 271 F.3d 352, 356 (2d Cir. 2001). Plaintiff must also establish a basis for imposing punitive damages liability upon SNET by

showing that an employee "serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'" Kolstad, 527 U.S. at 543. Even after plaintiff makes that showing, SNET would still not be subject to an award of punitive damages if it demonstrates that the actions of the managerial employees were "contrary to [its] good-faith efforts to comply with Title VII." Id. at 545 (internal quotation marks omitted).

In this case, the jury should not have been instructed on punitive damages, and no punitive damages should have been awarded because there was no evidence that any employee serving in a "managerial capacity" acted with malice or reckless disregard for plaintiff's federally protected rights. Additionally, the evidence presented at trial conclusively established that SNET engaged in a good-faith effort to comply with Title VII, thereby entitling it to the affirmative defense against liability for punitive damages.

## B.    Light and Vallario Did Not Serve In A "Managerial Capacity" For SNET.

The mere fact that an employee holds the title of "supervisor" does not establish that he or she served the company in a "managerial capacity." See Bailey v. USF Holland, Inc., No. 3:05-0435, 2007 U.S. Dist. LEXIS 9631, at *46 (M.D. Tenn. Feb. 8, 2007), aff'd, 526 F.3d 880 (6th Cir. 2008) ("It is not enough that an employee holds the title of supervisor. Instead, the court must review the type of authority that the employer has given to the employee."); see also Kolstad, 527 U.S. at 545-46 (remanding for a determination as to whether the acting head of the plaintiff's office "was serving in a 'managerial capacity,' and whether he behaved with malice or reckless indifference to [the plaintiff's] rights"). Instead, "determining whether an employee meets this standard requires a fact-intensive inquiry," and ultimately compels the court to assess "the type of authority that the employer has given to the employee, [and] the amount of

discretion that the employee has in what is done and how it is accomplished." Id. at 543. "[A]n employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'" Id.

As set forth above, plaintiff claims that she was sexually harassed by Light, Vallario, and Dunn. Dunn was a temporary contractor and not a supervisor at all. Although Light and Vallario were supervisors in the BCS group, the evidence does not support a finding that either of them served in a "managerial capacity." Light's testimony and notes (see Def.'s Exh. 100a) reveal that he spent the majority of his time doing the same work as the other engineers. In a similar vein, Vallario testified that during the course of his time in the BCS group, he moved from a manager position to an engineering position, and then back to the position of manager. The lack of separation between the work performed by the managers and their subordinates, coupled with the ease by which one could move from one position to the other, underscores the lack of substantive difference between the two.

Light and Vallario's duties as supervisors were primarily limited to assigning jobs to employees within their respective departments, and reviewing finished work product. Yet, the evidence shows that West had the ultimate authority even with regard to decisions relating to work assignments. Notably, West conducted an independent investigation into the contractor complaints before he approved Vallario's decision to not assign Faiella to jobs that were engineered by the plaintiff. West also exercised his judgment in deciding not to reassign plaintiff to the Cingular Wireless account following her leave of absence.

There is no evidence that Light or Vallario had authority to hire or fire employees. Although Light interviewed plaintiff and recommended her hire, he could not make that decision

himself. Instead, plaintiff acknowledged at trial that West "approved" Light's recommendation to hire her as an engineer.

There is also no evidence that Light or Vallario had disciplinary authority over the employees in their department. Vallario testified that he spoke with Faiella regarding the driver complaint and the contractor complaints. However, the evidence does not show that the conversations were disciplinary in any way but only consisted of informal counseling.

Although Light and Vallario signed the employee evaluations with West, there is no evidence that they had any discretion with regard to raises or other compensation-related decisions. Notably, Vallario testified that he did not know anything about the compensation of plaintiff, Faiella, or any other BCS employee.

Moreover, there is no evidence that Light or Vallario had any discretion with regard to employee scheduling, or the granting of vacation time, leave time, overtime, or time off. In fact, plaintiff's testimony, as well as that of the other employees in the BCS group, evidences a general understanding that West had sole discretion and authority over all employment-related matters in the group. West granted plaintiff a week of paid time off in lieu of returning to work on May 7, 2001. Upon her return to work the following week, West instructed plaintiff to complete her request for vacation time. The employees' complaints concerning the inappropriate touching and conduct in the workplace were sent only to West. Wayne Handfield called West to request permission to go home early due to the snowstorm. Plaintiff spoke with West regarding her desire to return to work on May 7, 2001. Plaintiff directed her requests for overtime and time off to West.

All of this evidence could establish, at most, that Light and Vallario had authority to

allocate and review work assignments within their respective departments, and make suggestions to West about hiring decisions. However, that limited discretion is insufficient as a matter of law to establish that they acted within a "managerial capacity" for purposes of awarding punitive damage based on any conduct by these individuals.

Although the Second Circuit not yet spoken on the issue, decisions from other Circuits are instructive as to what constitutes service in a "managerial capacity." In Williams v. Trader Publ'g Co., 218 F.3d 481, 487 (5th Cir. 2000), for example, the Fifth Circuit found that the full-time general manager was not acting in a managerial capacity for purposes of imputing liability to the defendant employer. Id. Of particular importance to the court was the fact that the manager did not have authority to terminate the plaintiff, and that the company decisionmaker acted on the basis of an independent investigation and not simply on the manager's recommendation. Id. Similarly, other Courts of Appeal have focused on whether the supervisors in question had discretion to hire, fire, or discipline their subordinates in evaluating whether they meet the legal threshold of serving in a "managerial capacity." See, e.g., Tisdale v. Fed. Express Corp., 415 F.3d 516, 531-32 (6th Cir. 2005) (holding that mid-level managers with "significant authority and discretion," including authority to suspend and terminate employees, served in a managerial capacity); Anderson v. G.D.C., Inc., 281 F.3d 452, 461 (4th Cir. 2002) (holding supervisor who engaged in sexual harassment was "unquestionably a managerial employee" because he possessed authority to hire and fire his subordinates and impose lesser forms of discipline, including docking their wages); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 444 (4th Cir. 2000) (holding that a manager who had sole discretion with regard to hiring decisions and the organization of the department served in a managerial capacity).

Plaintiff has not presented any evidence of similar indicia of authority with regard to Light and Vallario. In fact, the evidence at trial conclusively showed that West had authority over hiring and firing decisions and matters relating to employee discipline.[19] West set compensation rates for all employees in the group,[20] and had the sole discretion to grant requests for overtime, vacation time, and time off.

Light and Vallario's responsibilities as first-level managers are clearly analogous to cases in which the supervisors were found *not* to have served in a managerial capacity. For instance, in Miller v. Rockford Register Star, No. 98 C 50139, 2001 U.S. Dist. LEXIS 7586, at *10 (N.D. Ill. June 8, 2001), the court found that the supervisor at issue was not a "managerial employee" for the purpose of imposing liability on the issue of punitive damages. Id. at *10. In applying the criteria set forth in Kolstad, the court observed:

> [The supervisor] interviewed applicants and made recommendations regarding who to hire, but did not have the authority to hire. He evaluated employees but did not have the authority to fire them. These facts show that [the supervisor] had a limited amount of discretion and was not a 'managerial employee' within Kolstad's meaning. Thus, his knowledge of his own harassing conduct cannot be imputed to the [defendant employer]."

Id. at *10-11; see also Bailey v. USF Holland, Inc., No. 3:05-0435, 2007 U.S. Dist. LEXIS 9631, at *46 (M.D. Tenn. Feb. 8, 2007), aff'd, 526 F.3d 880 (6th Cir. 2008) (refusing to award punitive damages because the plaintiffs failed to show that the supervisor involved had "discretion to change policies, to determine what is done and how it is accomplished," as required to show that he served in a managerial capacity).

Based on the above clear case law, plaintiff in this case could not as a matter of law

---

[19] For instance, West testified that he counseled Faiella concerning his interactions with the other employees. West also was present when Faiella was placed on a performance plan in December 2000.

[20] Notably, Moffett testified that West would decide every year how to allocate raises among the employees in the BCS group. West testified that he rated plaintiff as "meets expectations" on her evaluation. Moreover, plaintiff offered into evidence a yellow note from West that contained information relating to plaintiff's salary.

sustain her burden of showing that Light and Vallario were serving in a "managerial capacity" for purposes of an award of punitive damages. In the absence of such a showing, there is no basis for imposing punitive damages upon SNET for their conduct.

**C.** **Neither West Nor Macri Acted With "Malice Or Reckless Indifference" To Plaintiff's Federally Protected Rights.**

A showing of "malice or reckless indifference" requires proof that an employee serving in a managerial capacity "at least discriminat[ed] in the face of a perceived risk that its actions will violate federal law." Cush-Crawford, 271 F.3d at 356 (quoting Kolstad, 527 U.S. at 536). As the Supreme Court noted in Kolstad, "[t]he terms 'malice' and 'reckless' ultimately focus on the actor's state of mind." Kolstad, 527 U.S. at 535.

In establishing "the requisite 'evil motive'"; id. at 538; plaintiff may only rely on conduct that relates to her claim of sexual harassment. See State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408, 422-23 (2003) ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."); see also Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 236 (2d Cir. 2000) (noting that an award of punitive damages cannot be based on the defendant's trial strategy). Because neither Light's nor Vallario's actions can serve as a basis for awarding punitive damages against SNET, plaintiff is left with the burden of showing either that Kevin West or Chris Macri acted with the necessary mental state.[21]

Plaintiff testified vaguely that she spoke with Chris Macri in mid-May 2000 about "the ongoings that were happening."[22] According to plaintiff, she asked Macri "not to take any action

---

[21] For purposes of this motion only, SNET will assume that West and Macri served within a "managerial capacity."

[22] It is impossible to know based on the Verdict Form utilized by the Court over SNET's objection whose

because I was fearful that they would take away from me more than they had already or were threatening me with the awards and pay." Those statements are the only evidence in the record concerning Chris Macri. Notably, plaintiff did not relay what she said to Macri that was her complaint or what if anything Macri said during the conversation. Plaintiff also failed to state whether Macri took any subsequent action based on their conversation.

Overall, plaintiff offered no evidence from which a jury could evaluate Macri's state of mind either at the time of their conversation or thereafter. Without any evidence relating to Macri's state of mind or what she did, plaintiff cannot sustain her burden of establishing that Macri acted "with malice or with reckless disregard" for plaintiff's federally protected rights.[23]

With regard to West, plaintiff's testimony is clear that West was not one of the employees that plaintiff perceived as sexually harassing her. Accordingly, for West's actions to have created punitive damage liability for SNET, plaintiff had to present sufficient evidence to support a finding that West acted recklessly with regard to his handling of a complaints of sexual

---

conduct was the basis for the jury's award of punitive damages in this case.

[23] Importantly, plaintiff was careful to distinguish between her "speaking" with Macri, and her "reporting" and "complaining" about the alleged harassment to West. In recounting her actions following her conversation with Carl Lorentzen in mid-May 2000, plaintiff testified as follows (based on counsel's notes of the testimony):

> Q: Did you ever complain to anyone about this?
> A: I did.
> Q: *To whom did you complain?*
> A: I went to Kevin West.
>      .......
> Q: Did you reach out to anyone at SNET, at the company?
> A: I reached out to – *well, I went* to Kevin West. I reached out to – I believe at one point *I spoke* with Chris Macri, who was in the EEOC, and told her of the ongoings that were happening and asked that she not take any action because I was fearful that they would take away from me more than they had already or were threatening me with the awards and pay.

Later during her direct examination, Plaintiff testified as follows:

> Q: All right. And in the third paragraph [of SNET's sexual harassment policy] it says: All employees should report any incident of sexual harassment immediately to a manager, higher management, and then it goes on. *Did you report any of these instances to a manager?*
> A. Yes, I did.
> Q: Who?
> A: *I reported them to Kevin West.*
> Q: Did you report them to anyone else at SNET?
> A: *I spoke* with Chris Macri, *but I reported* them to Kevin West."

Plaintiff's testimony makes it clear that even she did not consider her conversation with Macri to have been a "complaint" about sexual harassment.

harassment. That evidence simply does not exist in the record.

Plaintiff first complained to West about her belief that her co-worker Lorentzen was checking on her work in mid-May 2000. As an initial matter, this is not a complaint of sexual harassment at all and therefore cannot support a punitive damage award on a sexual harassment claim. In addition, West immediately investigated the allegations by speaking with both Bachiocchi and Lorentzen and concluded that there was no basis for believing either that Lorentzen was following her, or that Vallario had assigned him to do so. West then met with plaintiff on May 18, 2000, and informed her that Lorentzen had not been instructed to follow her or check up on her.

According to plaintiff's own testimony, West then suggested that she call EAP or his own manager, and gave her their phone numbers. As a matter of law, these actions do not evince any sort of "evil motive" or reckless indifference to plaintiff's federally protected rights. To the extent plaintiff claims that West should have allowed her to interrogate Lorentzen in the office, this claim has no merit. Any claim that West should have done more is a claim of negligence on his part. However, there was no time for West to have done anything more given that the day after their conversation, plaintiff began a yearlong leave of absence.

In that regard, this case is akin to Dobrich v. General Dynamics Corp., 106 F. Supp. 2d 386 (D. Conn. 2000), wherein the court concluded that the employer's good-faith efforts to respond to the plaintiff's complaints of sexual harassment negated any possibility of a punitive damage award under Kolstad. There, the plaintiff alleged that the defendant should have taken more drastic action, notwithstanding the fact that it promptly investigated most of the incidents of alleged sexual harassment. Dobrich, 106 F. Supp.2d at 393. In granting the defendant's

motion for judgment as a matter of law on the issue of punitive damages, the court observed that "[w]hile the Defendant's actions may not have been effective in eliminating the harassment . . . **there is no indication** that the Defendant was consciously acting in derogation of federal law." Id. at 395 (emphasis added).

Similarly, here, plaintiff presented no evidence that West consciously acted in derogation of federal law.  He investigated plaintiff' sole complaint about Lorentzen — which was not a complaint of sexual harassment at all, since she admits she did not believe Lorentzen sexually harassed her — reported his findings to plaintiff, and voluntarily gave her the phone numbers for EAP and his own manager if she was not satisfied and wished to escalate the matter further. These actions negate any claim that West acted recklessly, or "discriminated in the face of a perceived risk that [his] actions [would] violate federal law."   Cush-Crawford, 271 at 356. Accordingly, West's actions or inactions provide no basis for holding SNET vicariously liable on the issue of punitive damages.

### D.    SNET Established That It Made Good Faith Efforts To Enforce Its Anti-Discrimination Policy.

The Second Circuit has stated that an employer will be insulated from punitive damages liability if it establishes, as an affirmative defense, that it made "good faith efforts to enforce an anti-discrimination policy." Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001) (quoting Kolstad, 527 U.S. at 546).  To establish this defense, an employer must show it had an anti-discrimination policy and made a good faith effort to enforce it. Id.

Here, SNET established at trial both elements of the defense.  Both plaintiff and SNET offered the company's written anti-discrimination and harassment policy into evidence.  Not only did the company have a policy, but it acted diligently to enforce it by requiring all of its

employees to receive training on unlawful discrimination and harassment, and understand its company policy prohibiting any and all acts of the same. All of SNET's policies are available to employees through the human resources website.

As plaintiff herself testified, SNET "would often have training sessions that would review the documentations of company policies." During the seminar, attendees would receive written materials on the topic similar to Plaintiff's Exhibit 5. Moreover, as plaintiff noted during her testimony, SNET "would review certain policies on occasion if there was a reason behind it."

Based on this evidence, there is more than adequate basis to find, as a matter of law, that SNET "made good faith efforts to enforce an anti-discrimination policy." The undisputed existence of those efforts should have precluded any jury instruction on the issue of punitive damages and warrant this Court's vacating the jury's award of punitive damages.

## IV.    CONCLUSION

For all of the aforementioned reasons, SNET respectfully requests that the Court enter judgment as a matter of law in its favor on plaintiff's sexual harassment claim, or, in the alternative, vacate and grant judgment as a matter of law for defendant on the claim for punitive damages.

Dated at New Haven, Connecticut this 4th day of August, 2008.

THE DEFENDANT,

SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By: _____
Lori B. Alexander (Federal Bar No. CT08970)
Jennai S. Williams (Federal Bar No. CT27762)
LITTLER MENDELSON, P.C.
One Century Tower, Suite 300
265 Church Street
North Haven, CT 06510
Tel:  203.974.8700
Fax:  203.974.8799
lalexander@littler.com
JSWilliams@littler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2008, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic

filing system. Parties may access this filing through the court's CM/ECF System.

**Plaintiff's Counsel**

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880



Lori B. Alexander
Federal Bar No.: CT27762