# UNPUBLISHED
# AUTHORITY

LEXSEE 2008 U.S. DIST. LEXIS 41454

**JOSEPH MARTINEZ, Plaintiff, -v- NEW YORK CITY DEPARTMENT OF EDU-CATION, Defendant.**

**No. 04 Civ. 2728 (LTS)(DFE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 41454**

**May 27, 2008, Decided**
**May 27, 2008, Filed**

**PRIOR HISTORY:** Martinez v. Sulner, 2006 U.S. Dist. LEXIS 12448 (S.D.N.Y., Mar. 22, 2006)

**COUNSEL:** [*1] Joseph Martinez, Plaintiff, Pro se, New York, NY.

For Dr. Ilisa Sulner, Defendant: Amy Grossberg, Shiyani Soni, LEAD ATTORNEYS, New York City Law Department, Office of the Corporation Counsel, New York, NY.

For Department of Education, Chancellor Mr. Klein, Defendant: Ivan A. Mendez, Jr., Lisa Marie Griffith, NYC Law Department, Office of the Corporation Counsel, New York, NY.

For Mr. Klein, Defendant: Amy Grossberg, LEAD ATTORNEY, New York City Law Department, Office of the Corporation Counsel, New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

**OPINION AND ORDER**

Pro se Plaintiff Joseph Martinez ("Plaintiff") brings this action against Defendant New York City Department of Education ("NYC DOE" or "Defendant"), alleging that Defendant engaged in discriminatory employment practices based on Plaintiff's sex and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 296. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction of Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

Defendant's [*2] motion for summary judgment dismissing Plaintiff's complaint in its entirety is now before the Court. Defendant's motion papers were accompanied by a Statement entirety is now before the Court. Defendant's motion papers were accompanied by a Statement pursuant to S.D.N.Y. Local Civil Rule 56.1, as well as a Notice to Pro Se Litigant Opposing Motion for Summary Judgment as required by Local Civil Rule 56.2, and a number of evidentiary submissions. Plaintiff submitted a series of letters and evidentiary proffers in response, which the Court has construed as his opposition to Defendant's motion., (Docket Entries Nos. 45, 48.) The Court notes that, although Plaintiff has not submitted the required response to Defendant's Rule 56.1 Statement and Defendant's factual proffers could for that reason be taken as admitted under Local Civil Rule 56.1(c), the Court has examined carefully Plaintiff's letters and evidentiary proffers in determining whether there are genuine issues of material fact. The Court has also considered carefully Defendant's memoranda and accompanying affidavits and exhibits. For the following reasons, Defendant's motion is granted.

BACKGROUND

Unless otherwise stated, the following [*3] material facts are undisputed to the extent that both parties submitted the same underlying evidence, or to the extent that they are premised on proffers by one party that are unrefuted by any proffer from the other.

Plaintiff is a male who was employed as a guidance counselor for most of the relevant period. (Declaration of Amy Grossberg, dated Jan. 29, 2007 ("Grossberg Decl.")

Ex. H.) Dr. Ilisa Sulner ("Sulner"), the principal of P.S. 721X ("721X"), was Plaintiff's supervisor during his employment there.

*April 2003 - McTaggart's claim of sexual harassment; OEO investigation*

On April 15, 2003, Kim McTaggart ("McTaggart"), another guidance counselor at 721X, sent a letter to Sulner accusing Plaintiff of sexual harassment. (Grossberg Decl. Ex. K.) Sulner thereafter ordered Plaintiff to "cease and desist" from his efforts to establish a personal relationship with McTaggart and informed him that representatives from the Board of Education's Office of Equal Opportunity ("OEO") would discuss the charges of sexual harassment with Plaintiff on May 7. (Id. Exs. L-N; Pl.'s Br. Ex. 2.)

At his May 7 interview with OEO, Plaintiff disputed most of McTaggart's assertions. (Grossberg Decl. Ex. [*4] O; see also Pl.'s Br. Exs. 6, 8.) McTaggart repeated her allegations that she was being sexually harassed, and some witnesses, including another guidance counselor named Wanda Huertas ("Huertas"), corroborated McTaggart's factual claims. Sulner added that Plaintiff was contributing to "workplace disharmony," that he had not been keeping the incident quiet, and asked if Plaintiff could be transferred. (Grossberg Decl. Ex. O; Pl.'s Br. Ex. 5.) [1]

1

The record is not clear as to whether the OEO conducted a series of private interviews with the relevant parties, or whether the May 7 interviews were in the context of an informal hearing.

On May 22, the OEO issued a report finding that, while Plaintiff's actions did not constitute unlawful sexual harassment, they were "boorish, pestering, and insensitive," and that his conduct contributed to "workplace disharmony." (Grossberg Decl. Ex. O.) As a result, the OEO directed Plaintiff to attend sexual harassment training, to cease and desist conduct contributing to workplace disharmony, and to have no further personal contact with McTaggart. The OEO further recommended that Sulner issue a "cease and desist letter" to Plaintiff to be placed in his [*5] file and that the superintendent transfer Plaintiff as soon as reasonably possible "so as to minimize contact between the parties [Plaintiff and McTaggart]." (Id. Exs. O, R; Pl.'s Br. Ex. 1.) A few weeks later, Superintendent Susan Erber ("Erber") instructed Plaintiff to "cease and desist behavior which

contributes to workplace disharmony" and directed Plaintiff to attend sexual harassment training. (Grossberg Decl. Ex. U.)

Plaintiff asserted, and continues to assert, that the entire sexual harassment charge and resulting sanctions were purposefully orchestrated by Sulner and others because Sulner did not like Plaintiff. (Grossberg Decl. Ex. JJ at 83:13-24.) In a letter to OEO dated June 2, 2003, Plaintiff wrote:

The whole matter seems to have a tone of malicious intent. The situation seemed to be a set-up by the administrator and certain staff members of the school. It seems that certain teachers complaining of Ms. McTagg[a]rt's work and the meeting by Ms. Huertas precipitated sexual harassment charges. The union chapter chairman showed strong conflict of interest against me. I believe these factors show malicious intent and resulted in defamation of character.

(Id. Ex. S.) Plaintiff [*6] repeated these allegations in sum and substance to co-workers, who in turn reported these conversations to Sulner. (Id. Exs. T, Z.) On June 19, Plaintiff wrote to the OEO that "[i]f anything I felt there was reverse harassment" with respect to McTaggart's allegations. [2] (Id. Exs. V-W; Pl.'s Br. Ex.) On July 3, Sulner noted to Plaintiff that she had become aware that Plaintiff was continuing to "engage in harassing behavior" associated with McTaggart, noted that Plaintiff's alleged remarks about McTaggart following the May 22 OEO report could be characterized as retaliation against McTaggart, ordered that Plaintiff "cease and desist" from any future conversations regarding McTaggart, and warned that failure to comply with her order might result in Plaintiff's removal from his position. (Grossberg Decl. Ex. CC.) Plaintiff told OEO about Sulner's July 3 letter and reiterated that he had "always felt that Ms. McTaggart filed sexual harassment [charges] because she felt pressure from Dr. Sulner. Once again I feel that I am being harassed by Dr. Sulner." (Id. Ex. DD; Pl.'s Br. Ex.)

2

It is not clear whether he meant that McTaggart actually sexually harassed Plaintiff, as he appears to suggest [*7] elsewhere in the record, or that the allegedly false sexual harassment charge and re-

sulting sanctions themselves con-
stituted "reverse harassment."

On or about August 23, Plaintiff filed an employ-
ment discrimination charge with the EEOC. (Grossberg
Decl. Ex. JJ at 41.) In addition, Plaintiff wrote to the
EEOC [3] that, with regard to OEO decisions that find no
unlawful sexual harassment but nonetheless impose
sanctions, "[t]he overwhelming plaintiffs in a male-
female scenario are males with no hope of appeal," ap-
pearing to suggest that it is predominately males who are
sanctioned in some way by the NYC DOE as a result. of
alleged sexual harassment, even when no sexual harass-
ment violation is found. (Id. Ex. MMM.) Chancellor's
regulation A-830, which governs sexual harassment alle-
gation investigations, is silent as to whether OEO had the
authority to impose sanctions absent a finding that sexual
harassment occurred. [4] (Id. Ex. N.) When asked at his
deposition whether the alleged lack of an effective ap-
peal system for OEO sanctions (where no finding of sex-
ual harassment was made) was designed in such a way as
to have an impact on one sex only, Plaintiff responded:

> They should change article  [*8] A830
> and put a clause in there for an appeal sys-
> tem for a person that is accused. And I
> don't care if it is a man, a woman, two bi-
> sexual woman or anything, one woman to
> a straight woman or a gay woman to a
> straight woman, they have to have an ap-
> peal system for the person that is accused
> . . . .

(Id. Ex. JJ at 127:18-24.)

3

> It is not clear whether this letter
> was filed as part of Plaintiff's
> EEOC charge, or whether it was
> submitted separately.

4

> It is undisputed, however, that
> the superintendent had the author-
> ity to order Plaintiff to attend sex-
> ual harassment training and issue
> the "cease and desist" letter for his
> file. (Id. Ex. QQ.)

*May 2003 - transfer to 721M*

On May 20, 2003, Superintendent Erber's office sent
Plaintiff a letter indicating that Plaintiff would be tenta-
tively assigned to work at P 721M ("721M") for the
summer of 2003. (Pl.'s Supp. Ex.; Grossberg Decl. Ex.
Q.) On June 12, Erber sent Plaintiff a confirmation letter
expressing Erber's understanding that Plaintiff had
worked at 721M for the summer session in the previous
year, and that Plaintiff was accepting an assignment to
721 M again for the 2003 summer session. (Id. Ex. U.)
However, on July 1, Plaintiff filed a "Step II [*9] Griev-
ance" [5] with the OEO and asserted that he was not aware
of the 2003 summer assignment to 721 M until that day.
Plaintiff later testified, and in the grievance claimed, that
the transfer was not permissible because he had seniority
rights over Huertas, McTaggart, and Kennia Laucer
("Laucer") (another guidance counselor), none of whom
was transferred to 721M that summer. (Pl.'s Br. Ex., Oct.
26, 2006 Pl.'s Dep. at 166:18-19; Grossberg Decl. Ex.
BB.) The Step II Grievance did not allege discrimination
on the basis of sex. Sulner responded that Plaintiff's as-
signment was based on the OED's transfer recommenda-
tion and Sulner's assertion that Plaintiff's harassment
conduct was ongoing. (Id. Ex. EE.) On or about July 8,
the OEO concluded that Plaintiff failed to demonstrate
that the 721M transfer was "arbitrary or capricious." (Id.)
No copy of the union contract or any other written
agreement addressing seniority is included in the record.

5

> Based on the Step II Grievance
> complaint form, it appears to be a
> process whereby a complainant
> requests a conference with the su-
> perintendent to discuss alleged
> violations of union contract provi-
> sions. (Grossberg Decl. Ex. BB.)
> What follows such a  [*10] con-
> ference is not clear from the re-
> cord but is, in any case, not mate-
> rial to this action.

Plaintiff did not receive any cut in pay or benefits as
a result of the transfer to 721M and 721M was close to
Plaintiff's home, but he suffered emotionally because
several 721M employees asked Plaintiff why he was
transferred there. (Grossberg Decl. Ex. EE; Pl.'s Br. Ex.,
Oct. 26, 2006 Pl.'s Dep. at 169:1-14.) Plaintiff addition-
ally testified that rumors with negative connotations
about his transfer spread amongst guidance counselors

from different districts, though he did not specify the basis of his knowledge of the rumors. (Id. at 172:1-15.)

*September 2003 - transfer out of counselors' suite*

On or about September 2, 2003, Plaintiff returned to 721X and was asked to meet with Sulner in her office. Sulner said, with the door open and speaking in a voice loud enough for others to hear, that Plaintiff's office was to be moved from the suite where guidance counselors and service providers worked because the suite had "a lot of female staff" and/or that "there were too many females there." (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. at 178:11-12.) She added that Plaintiff needed to be careful with what [*11] he said, and ordered him out of her office. (Grossberg Decl. Ex. II.) Plaintiff reported this incident to the OEO as another example of "harassment." (Id.)

Plaintiff alleged that, as a result of his segregation from the counselors' suite, female employees gossiped about him and whether the transfer was related to the McTaggart charges. In his deposition, Plaintiff testified about two female employees, Nellie Stabile ("Stabile") and Ms. Jervis ("Jervis"), who were afraid to speak with him because they feared that employees were spying on them or that, in Stabile's case, employees would ask her whether she was dating Plaintiff. (Grossberg Decl. Ex. JJ at 83:2-6; 103:2-9; id. Ex. WW at 38:11-13; 103:20-25; Pl.'s Br. Ex., Oct. 30, 2006, Pl's Dep. at 41:22-42:10; 42:16-17; 43:9-10.) Plaintiff also testified, with respect to the office transfer, that "[Sulner] wanted to just retaliate against me because I was bringing up a lot of charges. She was making charges on me, I was making charges on her." (Grossberg Decl. Ex. WW at 31:13-15.)

*September 2003 - alleged offensive behavior*

On September 11, 2003, the payroll secretary asked Plaintiff whether counselors were supposed to arrive at work 20 [*12] minutes or 10 minutes earlier than teachers. Plaintiff answered that he wasn't sure but that he thought it was 10 minutes. At a meeting with the guidance counselors, Sulner queried Plaintiff about this incident. Plaintiff described the conversation with the payroll secretary, and Sulner angrily stated that she would not tolerate Plaintiff's talking back to Sulner. (Grossberg Decl. MM; Pl.'s Supp. Ex.)

On September 12, at a guidance counselor meeting, Plaintiff told an incoming guidance counselor that if she had any problems with sexual harassment from men at the workplace, that it would be taken care of. (Pl.'s Supp. Ex.) Several guidance counselors, interpreting Plaintiff's remark as sarcasm in light of the McTaggart incident (see id.), thereafter informed Sulner by letter that Plaintiff's remark "took us by surprise" and "caused a great level of distress in the group," and that "we don't want to continue feeling uncomf[or]table, intimidated and ex-

posed to an offensive work environment." (Grossberg Decl. Ex. KK.) Sulner asked Plaintiff to meet with her to discuss the incident (id. Ex. LL), and wrote in an e-mail to Superintendent Erber that Plaintiff was "defiant and clearly ill." [*13] (Pl.'s Supp. Ex.) The meeting did not occur, for disputed reasons not relevant to this motion practice.

Plaintiff immediately wrote a letter directly to the Chancellor of NYC DOE, alleging that Sulner's angry outburst on September 11 and her arranging of the disciplinary meeting in supposed response to the September 12 incident constituted retaliation for his August 23, 2003, EEOC charge. (Id. Ex. MM.) The OEO responded [6] that it did not have jurisdiction to review Plaintiff's accusation of retaliation. (Pl.'s Br. Ex.; Grossberg Decl. Ex. NN.)

    6

            It appears that Plaintiff's letter
            was forwarded from the Chancel-
            lor's office to the OEO.

*May 2004 - Sulner e-mail*

On May 26, 2004, Sulner asked Margo Levy ("Levy"), the district's school-based services coordinator, via e-mail whether counselors were required to keep updated logs of their students at the school, available for review. Sulner wrote, "I have Martinez but good now-- tell me please that you have a written directive that he is mandated to keep a log." (Pl.'s Br. Ex.) After Levy responded that logs were required to be kept, Sulner responded, "Yes -- he told me his log is too heavy to carry to school - this time I got him but good." (Id.) [*14] The record is not clear as to what, if anything, transpired after this exchange.

*September 2004 - Huertas' allegations of bullying; anger management workshop*

On September 10, 2004, in a letter to Sulner, Huertas accused Plaintiff of having physically intimidated and threatened her at a meeting conducted by McTaggert. Huertas expressed a desire to file a formal complaint against Plaintiff of "psychological bullying and harassment." (Grossberg Decl. Ex. RR.) Plaintiff disputes Huertas' characterization of his conduct at the meeting.

Kevin McCormack ("McCormack"), a Local Instructional Superintendent, arranged a meeting with Huertas and Plaintiff to discuss the incident. (Grossberg Decl. Ex. UU.) On November 19, McCormack concluded that Huertas' account of the meeting was more credible than Plaintiff's, and he directed Plaintiff to enroll

in an anger management workshop on January 19, 2005. (Id. Ex. XX..) Plaintiff did not attend the anger management workshop. (Id. Ex. YY.) On March 11, 2005, McCormack found that Plaintiff's failure to attend the workshop constituted insubordination, directed him to attend an anger management workshop on March 16, and noted that further incidents of that  [*15] nature would result in disciplinary action. (Id. Ex. BBB.)

With respect to whether Plaintiff believed that McCormack, through his letters and his direction to take anger management class, was discriminating against Plaintiff because he was male, Plaintiff responded, "I imagine he was influenced by Dr. Sulner but I can't say that that is a sex bias no, not on his part. . . . He would probably support or be swayed by Dr. Sulner's opinion than mine but . . . I don't think it would be a sex bias on his part." (Grossberg Decl. Ex. WW at 30:17-20.)

*February 2005 - annual health fair*

In or about February 2005, Plaintiff was asked by Mary Tierney ("Tierney"), another guidance counselor, to run the annual health fair, which consisted of various groups from the community or city agencies gathering to educate students about health issues. (Pl.'s Br. Ex., Oct. 30, 2006 Dep. at 60:19-61:4.) In order to prepare for the health fair, the coordinator had to send faxes out to the various agencies or groups, requesting them to return a fax indicating whether they were willing to participate.(Id. at 62:4-7.) Sulner had instituted a rule that no faxes were to be sent out unless they went through her secretary.  [*16] (Id. at 63:19-64:5.) With about two weeks left before the fair, Tierney asked Plaintiff why they had not received any replies to their faxed invitations. (Id. at 63:12-14.) Plaintiff then asked Tierney who was preventing the faxes from going out, though the record is not clear as to what prompted him to ask this question. According to Plaintiff's testimony, Tierney replied that it was Sulner. The record does not shed any light on why Tierney asked Plaintiff about the lack of replies if she allegedly knew that Sulner prevented the invitations from going out. (Id. at 63:18, 66:3-8, 67:12-13.) Plaintiff did not ask Tierney why Sulner did that. (Id. at 68:14-17.) Shortly afterwards, on or about April 5, 2005, believing that Sulner was trying to sabotage his efforts and would try to fire him, Plaintiff retired. (Id. at 68:21-69:1; Grossberg Decl. Ex. FFF.)

*March 2005 - corporal punishment allegation*

On March 29, 2005, a parent alleged that Plaintiff had inflicted corporal punishment on a student, and Sulner met with the parent on March 31. (Grossberg Decl. Ex. EEE at 2.) On April 7, after Plaintiff had retired, Sulner scheduled a meeting with Plaintiff to take place on April 13 in order to  [*17] discuss the corporal punishment charge. (Id. Ex. GGG.) Plaintiff did not attend

the meeting. Sulner then sent him a letter rescheduling the meeting for April 19 (id. Ex. HHH), and Plaintiff also failed to attend that meeting. Sulner then rescheduled the meeting for May 11, and informed Plaintiff that she would reach a conclusion without his input if he did not attend. (Id. Ex. III.) Plaintiff did not attend the May 11 meeting. (Id. JJ at 116:2-9.) In or about mid-May, Sulner recommended to the superintendent that Plaintiff be placed on an "Ineligible Inquiry" list, (id. Ex. EEE at 3), and Superintendent Erber did so on May 24. (Id. Exs. JJJ, KKK.) As a result, Plaintiff was unable to obtain certain teaching jobs after he retired from 721X. (Pl.'s Supp. Ex., Pl's Dep. at 180:8-181:2.) At his deposition, Plaintiff testified that Sulner set up a false corporal punishment charge against him in retaliation for retiring (Grossberg Decl. Ex. JJ at 48:15-25), which had allegedly deprived Sulner of the pleasure of firing him. (Id. at 125:5-16.)

*Pension miscalculation*

Plaintiff testified that two years of his employment were improperly omitted in calculating his pension. (Pl.'s Br. Ex., Nov.  [*18] 3, 2006 Pl.'s Dep. at 109:2-15.) When Plaintiff contacted an unspecified NYC DOE agent about the alleged calculation error, he was told something to the effect that the records for the omitted years had been placed in a basement and that the discrepancy "should be corrected." (Id. at 109:10-15, 110:13-17, 111:14-18, 112:2-8.) Plaintiff nonetheless feels that the pension issue is part of a "whole ball of wax [that] was a retaliation against me after a point."(Id. at 109:4-6.) Plaintiff does not, however, believe that the pension miscalculation was the product of sex discrimination. (Id. at 110:8-12; 111:1-3.)

*Additional testimony from Plaintiff*

The record contains additional proffers as to Sulner's management style generally and her attitude towards Plaintiff. Plaintiff testified that "as far as Dr. Sulner goes, . . . when she sees anybody . . . disagreeing with her, she right away gets very defensive and she starts to retaliate." (Grossberg Decl. Ex. JJ at 44:13-16.) In an unsworn statement by Plaintiff submitted to the Court, he noted that Jean Marie Chin ("Chin"), an assistant principal under Sulner, "has to be careful of Dr. Sulner," who allegedly had another assistant principal removed  [*19] from the school after 30 years of service. (Id. Ex. VV.) Testifying that "a lot of people feared [Sulner]," Plaintiff said that a teacher named Ms. Giblin, "shaking like a leaf," once came up to Plaintiff and told him that Sulner would fire her even though Giblin was on tenure and had worked at 721X for 30 years. (Pl.'s Stipp. Ex. Pl's Dep. at 109:15-110:2.) Plaintiff asserted that Sulner exhibited clear favoritism by, for instance, putting favored guidance counselors in charge of running meetings. (See Oct.

30, 2006 Pl.'s Dep. at 52:1-5 (those in "Sulner's wing" placed in charge of meetings); id. at 53:1-3 ("she treated some people unfairly better than others like Ms. Huertas. Everybody knew who the ones that she liked. She made it known. Everybody knew.").) When asked whether the sexual harassment charges, the anger management work-shop requirement, the corporal punishment charge, and the annual health fair incident led Plaintiff to believe Sulner disfavored him because he was a man, Plaintiff responded, "It may not have been -- the retaliation, it has nothing to do with whether I am a man or not." (Id. Ex. JJ at 126:9-20.) Plaintiff further testified that on four or five occasions [*20] over several years, Chin made statements to Plaintiff to the effect that "Sulner thinks shit of you," and that Sulner asked Chin to convey that sentiment to Plaintiff each time. (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. 72:20-73:16.; 73:21-24.)

On the basis of the foregoing facts, Plaintiff asserts claims of disparate treatment on the basis of his sex, hos-tile work environment and retaliation for his protected activity.

## DISCUSSION

Summary judgment shall be granted in favor of a moving party where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the summary judgment context, a fact is material "if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quot-ing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The non-moving party "must do more than simply show that there is some metaphysical [*21] doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (alteration in original)). "[M]ere conclusory allegations, speculation or conjecture" will not provide a sufficient basis for a non-moving party to resist summary judgment. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

### Hostile Work Environment

In his Second Amended Complaint, Plaintiff alleges that "Dr. Sulner felt authorized to discriminate, segre-gate, and create a hostile environment for me." (Second Am. Compl. P 8.) The Court construes this statement as asserting a claim of hostile work environment, and con-strues all of Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judg-ment as the factual bases for Plaintiff's claim.

In order to establish a claim of hostile work envi-ronment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or perva-sive [*22] to alter the conditions of the victim's em-ployment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The environment must be both subjectively and objectively hostile and abusive. Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003). Isolated instances of harassment ordinarily do not rise to the level necessary for an employee to survive summary judgment on a claim of hostile work environ-ment harassment; rather, the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the conditions of his working environment. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d. Cir. 2000). Relevant factors include "the fre-quency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Supreme Court has set a demanding test in order to avoid construing Title VII as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). [*23] Moreover, "it is 'axiomatic' that in order to estab-lish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct oc-curred because of [his] sex." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Lastly, the Court analyzes hostile work environment claims by evaluating the total-ity of the circumstances. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998).

Plaintiff's claim of hostile work environment fails, primarily because no rational fact-finder could conclude that any of the alleged mistreatment Plaintiff endured was inflicted on him because of his sex. See Alfano, 294 F.3d at 377 ("even though [the incidents] can support an inference that Alfano was mistreated, they do not support an inference that this was because of her sex"). Although facially-neutral incidents may be considered in a hostile work environment analysis, evidence must be proffered from which a "a reasonable fact-finder could conclude that [the incidents] were, in fact, based on sex. . . . [T]his requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact dis-criminatory." Alfano, 294 F.3d at 378. Plaintiff [*24] proffers no evidence of sex-based animus, either from

Sulner or any other administrator or supervisor, in connection with any of the incidents described in the record. Nor is there any circumstantial evidence of sex-based mistreatment, such as examples of similarly situated males treated similarly, or similarly situated females treated differently. While the record certainly contains evidence suggesting that Sulner disliked Plaintiff personally, there is nothing in the record from which it can be inferred that such dislike was due to his sex and, if anything, Plaintiff's own testimony regarding two female employees who allegedly lived in constant fear of Sulner because they perceived that Sulner did not like them undermines Plaintiff's claim that Sulner was biased against men.

Although Plaintiff asserted in a letter to the OEO that the operation of the discipline system in connection with harassment claims disproportionately affected males, he has proffered no evidence that males charged with sexual harassment were treated differently than females charged with sexual harassment. Moreover, when specifically asked whether Plaintiff believed that the, OEO withheld opportunities for appeal [*25] based on the accused's sex, Plaintiff avoided the question, and his response explicitly revealed his belief that the system was not unfair on the basis of sex. (Grossberg Decl. Ex. JJ at 127:18-24 ("I don't care if it is a man, a woman, . . . they have to have an appeal system for the person that is accused.").) When specifically asked whether Sulner disfavored him because he was a man with respect to the anger management course, sexual harassment training, and annual health fair incidents, Plaintiff responded, "It may not have been" and added that "it has nothing to do with whether I am a man or not." In light of the lack of any direct or circumstantial evidence that any of the treatment Plaintiff faced was because of sex, Plaintiff's own proffer that other female employees were similarly harassed by Sulner, and Plaintiff's disavowals during his deposition of any contention that certain incidents were the product of sex-based bias, the Court concludes that no rational fact-finder could determine that any of the treatment alleged by Plaintiff to have created a hostile work environment was motivated by sex-related bias.

Plaintiff repeatedly emphasizes the incident in which Sulner, in [*26] a voice allegedly loud enough for the guidance counselors to hear, ordered Plaintiff to move out of the counselors' suite because there were "too many females there" (or made a comment to the same effect). Interpreted in the light most favorable to Plaintiff, the comment could be construed as rude and as suggesting that Plaintiff was so dangerous or inappropriate that he could not be trusted around females, but Plaintiff proffers no basis from which it can be inferred that Sulner could not or would not have made the same comment to a female employee who had been accused of sexual harass-

ment towards females. [7] "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (male employee alleging humiliating harassment of a vulgar and sexual nature from other males did not have viable hostile work environment claim where there was no proffer that female employees would not have suffered similar type of harassment) (quotations omitted). There is nothing inherent [*27] in Sulner's comment itself to suggest that Sulner was motivated by hostility towards men, or that the comment could only be directed to one sex. See, e.g., id. ("A trier of fact might reasonably find such discrimination . . . if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."). Therefore, Plaintiff's transfer out of the counselors' suite cannot serve as a basis for any sex discrimination-based hostile work environment claim. [8]

7

The comment might also be read to suggest that Sulner was creating a sex-segregated work environment, but Plaintiff has never made this specific charge, nothing on the face of the comment suggests that Sulner was motivated to exclude males generally, and the record contains no information as to the numbers and types of people assigned to different areas of the office.

8

Plaintiff, furthermore, proffers nothing to suggest that the ramifications of his transfer out of the counselors' suite, even if it were based on sex, were so great so as to alter the terms and conditions of his employment, or to impede Plaintiff's [*28] ability to function in the workplace. Compare Alfano, 294 F.3d at 381 ("Alfano has not pointed to any conduct that endangered her or her authority in

a way that would drive her from a perilous employment. She was simply embarrassed on a handful of occasions over a period of four years by the boorish behavior of one or more unidentified co-workers"); with Howley v. Town of Stratford, 217 F.3d 141, 154-55 (2d Cir. 2000) (viable hostile work environment claim where female firefighter subjected to sexually explicit and degrading barrage of insult delivered by subordinate firefighter in front of her other subordinates, where same subordinates later resisted orders from the plaintiff and spread rumors amongst themselves questioning her competence, directly impacting her ability to do her job). The only non-speculative harm alleged by Plaintiff as a result of the transfer was the fact that Stabile and Jervis were deterred from speaking with Plaintiff. However, nothing in the record indicates that Plaintiff's ability to perform his job was at all dependent on his interactions with Stabile or Jervis, there is nothing to suggest that the barriers placed between him and other female employees [*29] were of such a tangible and severe nature so as to alter the terms and conditions of his employment, and Plaintiff proffers no non-speculative evidence that he or any female employee who spoke with him after he was transferred was actually punished or harmed on account of such communication in any material way.

"It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Id., 294 F.3d at 377. After a careful and thorough review of all the evidentiary submissions in the record, and after weighing the nature, severity, and frequency of the complained-of conduct, with "particular sensitivity to the fact that evidence of [prohibited] discrimination is rarely overt," Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000), the Court concludes that Plaintiff's proffers are insufficient as a matter of law to raise a triable question as to the underlying motivation, or as to the severity or pervasiveness of misconduct required to establish, a sex-based hostile work environment claim. [*30] Therefore, Defendant's motion for summary judgment is granted as to Plaintiff's hostile work environment claim.

*Disparate Treatment*

Plaintiff asserts in his Second Amended Complaint that the McTaggart sexual harassment charge and resulting sanctions, the summer transfer to 721M, and the transfer out of the counselors' suite were the products of discrimination on the basis of sex. Because the pro se Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judgment not only describe these underlying events but also reference events not alluded to in the complaint, the Court has also considered whether any of the additional information is sufficient to raise a genuine issue of material fact as to whether Plaintiff was subjected to sex-based disparate treatment. [9]

[9]

The Court does not construe Plaintiff's complaint about an allegedly improper reduction of his pension benefit as a sex-based disparate treatment claim, because Plaintiff explicitly disclaimed any assertion that the pension benefit cut was imposed because of his sex. Plaintiff gave equivocal responses to questions specifically asking him whether he believed certain other acts were a result of [*31] sex discrimination, but given Plaintiff's pro se status, the Court does not construe Plaintiff's deposition statements as disclaiming a particular disparate treatment claim unless the statement was explicit and clear. (See, e.g., Pl.'s Br. Ex., Nov. 3, 2006 Pl.'s Dep. at 111:1-3 ("Q: You think that someone was discriminating because you are a man when they took two years from your pension? A: No . .").)

In the summary judgment context, disparate treatment claims brought under Title VII are analyzed under

the familiar three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). [10] A plaintiff must first establish a prima facie case of discrimination, which comprises four factors: 1) he belonged to a protected class, 2) he was qualified for the position, 3) he suffered an adverse employment action, and 4) there were circumstances giving rise to an inference of prohibited discrimination. Id., 411 U.S. at 802; Song v. Ives Labs., Inc., 957 F.2d 1041, 1045 (2d Cir. 1992); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985). Once a plaintiff has made out a prima facie case, the burden shifts to the employer to offer some legitimate, nondiscriminatory [*32] reason for its actions. McDonnell, 411 U.S. at 802. "This burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), and it can involve no credibility assessment of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). At this stage, the employer does not need to prove by a preponderance of the evidence that the rationale was not discriminatory, but must present a clear explanation for the action. Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989). If the employer meets its burden, the plaintiff is required to put forth evidence demonstrating a genuine issue of material fact as to whether the stated reasons are pretext for prohibited discrimination. Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

10

Plaintiff's discrimination claims under the NYSHRL are subject to the same standard of proof as claims under Title VII. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Selmanovic v. NYSE Group, Inc., No. 06 Civ. 3046 (DAB), 2007 U.S. Dist. LEXIS 94963, 2007 WL 4563431, at 4 (S.D.N.Y. Dec. 21, 2007).

It is undisputed that Plaintiff [*33] belonged to a protected class (male) and that he possessed the basic skills necessary for performance of his job as a guidance counselor. However, as the Court has already explained in the hostile work environment section, Plaintiff has failed to proffer any evidence of circumstances giving rise to an inference of discrimination based on sex. As a result, he has failed to meet his burden of coming forward with sufficient facts to make his prima facie case as to any disparate treatment claim and Defendant is entitled to judgment as a matter of law on Plaintiff's disparate treatment claims. [11]

11

Plaintiff also proffers no evidence that he suffered any adverse employment action, with the exception of his placement on the Ineligible Inquiry list. See Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (an adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities"). Sulner's (as well as the OED's and Erber's) repeated written warnings to and meetings with Plaintiff do not constitute adverse employment actions, see Hill v. The Children's Village, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) [*34] (warning letters insufficient), and the perceived stigma and impaired social interactions, the only proffered harms arising from Plaintiff's temporary transfer to 721M and his transfer out of the counselors' suite, are too intangible to constitute a "materially significant disadvantage." Galabya v. NYC Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000); see Boyd v. Presbyterian Hospital in the City of New York, 160 F. Supp. 2d 522, 536-37 (S.D.N.Y. 2001) ("gossips, the false accusations, . . . and the hyperintensified observation" insufficient to constitute adverse employment action). Plaintiff proffers no evidence from which a rational fact-finder could conclude that the sexual harassment and anger management courses or the health fair fax incident were anything more than mere inconveniences for Plaintiff with no tangible effect on the terms and conditions of his employment. Lastly, no rational fact-

finder could conclude that the working conditions were so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign when he did, such that his retirement would be considered a constructive discharge. See Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) [*35] (constructive discharge standard); Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (evidence that supervisor loudly mentioned plaintiff was polygraphed and therefore suspected of wrongdoing, complained about plaintiff's attitude to co-workers, once gave plaintiff wrong combination to night deposit box, and twice required plaintiff to process deposits while serving customers contrary to bank policy, insufficient as a matter of law to establish constructive discharge).

### Retaliation

In Plaintiff's Second Amended Complaint, he alleges that the corporal punishment charge and the resulting Ineligible Inquiry list placement constituted retaliation, presumably for the various letters that had been filed by Plaintiff with the 0E0, the Step II Grievance, and Plaintiff's EEOC charge, evidence of which was appended to the complaint. Plaintiff later testified that Sulner took these actions in retaliation for his retirement, which allegedly deprived her of the pleasure of firing him. Plaintiff also appears to assert, based on the various comments given at his depositions, that much of the alleged mistreatment he faced was in retaliation for any and all the grievances he filed over the years. [*36] Therefore, the Court shall, as it did with Plaintiff's other claims, broadly construe Plaintiff's retaliation claims as asserting that all of Defendant's actions described in the record were taken in response to any or all of the grievances filed by Plaintiff during the relevant period, and/or in response to his retirement.

In this summary judgment context, retaliation claims brought under Title VII are also analyzed under a three-step burden shifting analysis. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying burden-shifting analysis to retaliation claims). In order to establish the basic prima facie case of retaliation under Title VII, Plaintiff must proffer evidence sufficient to demonstrate that: 1) he engaged in a protected

activity, 2) Defendant knew of the protected activity, 3) Defendant took adverse action against Plaintiff which might well have dissuaded a reasonable worker from engaging in protected activity; and 4) a causal connection between the protected activity and the adverse action. Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

Protected activity includes participation in any investigation, [*37] proceeding or hearing under Title VII as well as any opposition to any practice made unlawful by Title VII, and may include formal as well as informal complaints. See 42 U.S.C. § 2000e-3(a); Rodriguez v. Beechmont Bus Serv., Inc., 173 F. Supp. 2d 139, 149 (S.D.N.Y. 2001). Plaintiff alleges repeatedly that Sulner's corporal punishment charge was in retaliation for his retirement, but his retirement was in no way a communication of a complaint about activity made unlawful by Title VII, so his retirement cannot serve as a basis for alleging retaliatory conduct. Most of Plaintiff's letters to the OEO (e.g., the June 2, 2003, letter alleging "malicious intent") do not constitute protected activity because nothing in those submissions could be read to complain of discrimination on the basis of sex; rather, they complain of allegedly unfair treatment from Sulner on the basis of personal animosity. The Step II Grievance was not protected activity as a matter of law, because it alleged that his transfer to 721M was unwarranted solely based on his alleged seniority rights under a contract and did not allege sex discrimination.

Plaintiff has, however, proffered evidence of other activities which [*38] might be considered protected. Plaintiff's June 2003 letters to the OEO about "reverse harassment," [12] his EEOC charge filed in August 23, 2003, the August 23, 2003 letter to the OEO about the allegedly disproportionate impact of OEO decisions against males, his September 2003 letter to the OEO alleging Sulner's retaliation for the EEOC charge, and this lawsuit, which was commenced in April 2004, will all be construed for purposes of this analysis as raising complaints of discrimination based on sex or complaints of retaliation for protected activity, and therefore constituting protected activity for purposes of Plaintiff's prima facie case. [13]

12

Given the nature of McTaggart's original sexual harassment charge against Plaintiff, the Court construes Plaintiff's complaint of "reverse harassment" to also be an implicit allegation that, rather than being the perpetrator of sex discrimination through his own sex-

ual harassment, Plaintiff was the victim of sex discrimination through McTaggart's and/or Sulner's "reverse" harassment.

13

Defendant argues that none of the activities for which Plaintiff alleges retaliation should qualify as protected, because Plaintiff had no good faith, reasonable [*39] belief that any of the underlying challenged actions violated Title VII. See Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (in meeting the plaintiff's prima facie burden for a retaliation claim, while "the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII, . . . the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."). The Court need not address this specific argument, however, because the Court concludes ultimately that Plaintiff has failed to proffer any evidence rebutting Defendant's own proffers of legitimate, non-discriminatory reasons for its actions.

Plaintiff has also established that Defendant had knowledge of the aforementioned protected activities. Although Defendant correctly notes that Plaintiff has proffered no evidence that Sulner personally knew about Plaintiff's protected activity (see Grossberg Decl. Ex. JJ at 45-47), there is no dispute that the New York City Department of Education, as a corporate entity and Defendant in this case, knew about Plaintiff's protected activity. See Gordon v. NYC Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) [*40] ("[nothing] more is necessary than general corporate knowledge that the plaintiff engaged in a protected activity"). Therefore, Plaintiff has met the second element of his prima facie case with respect to his retaliation claim.

Under the third prong, Plaintiff must show that the retaliatory acts complained of might well have deterred a reasonable employee from engaging in protected activity. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Petty slights, minor annoyances, personality conflicts that generate antipathy, snubbing, the sporadic use of abusive language, or a simple lack of good manners, often experienced at work, do not rise to the level of actionable conduct in a Title VII retaliation claim. Id. at 2415. In this case, incidents where Sulner publicly yelled at Plaintiff for various reasons or called him "shit" through Chin constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable. Nor could a rational fact-finder conclude that a reasonable employee would be deterred from complaining of discrimination by an isolated incident in which a second-hand source informed him that his [*41] supervisor had blocked his faxes from being sent out, particularly when the employee did not even attempt to follow up on that assertion with the supervisor directly. The order to attend sexual harassment training and the order to transfer Plaintiff to 721M for the summer cannot support viable retaliation claims because those events occurred before any of Plaintiff's protected activities. A rational fact-finder could, however, conclude that the September 2003 transfer out of the counselors' suite, [14] the November 2004 order to attend the anger management workshop, the May 2005 placement on the Ineligible Inquiry list and the calculated cut in pension benefits could well dissuade a reasonable employee from engaging in protected activity.

14

Defendant cites Gamble v. Chertoff, No. 04 Civ 9410 (WHP), 2006 U.S. Dist. LEXIS 93645, 2006 WL 3794290, *8 (S.D.N.Y. Dec. 27, 2006) for the proposition that a mere transfer into another cubicle is trivial and would not rise to the level of an actionable retaliation claim, but a genuine issue does exist as to whether a transfer, not from one cubicle in the counselors' suite to another cubicle in the counselors' suite, but out of the counselors' suite entirely, separating the employee [*42] from the rest of his colleagues, would have a stigmatizing effect sufficient to deter a reasonable person from engaging in protected activity for purposes of

Plaintiff's retaliation claims, even if the stigmatizing effect does not constitute an adverse employment action for purposes of Plaintiff's disparate treatment claims. See Burlington, 126 S. Ct. at 2412-13 (anti-retaliatory provision of Title VII not limited to the adverse employment actions required for disparate treatment claims).

With respect to the fourth prong of his prima facie retaliation claim, "[a] plaintiff can demonstrate a causal connection (a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." See Carr v. West LB Admin., Inc., 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001) (citing DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)). There is no evidence of disparate treatment of other employees who engaged in similar conduct and no direct evidence of retaliatory animus. Nonetheless, [*43] the counselors' suite transfer and the anger management workshop order are sufficiently proximate in time to Plaintiff's protected activities to demonstrate a causal connection for prima facie case purposes, and the same applies for the Ineligible Inquiry list placement and pension cut, [15] albeit barely so. [16]

15

Although Plaintiff proffers no evidence as to when his pension payment was calculated, the Court resolves this ambiguity in favor of Plaintiff by reasonably assuming that the pension benefit was calculated on or around the time that Plaintiff retired.

16

See Spencer v. The Perrier Group of America, No. 95 Civ 8404 (JSR), 1997 U.S. Dist. LEXIS 7377, (S.D.N.Y. May 28, 1997) (without applying burden-shifting analysis, noting in dicta, "While an individual who complains of discrimination to the

[EEOC] enjoys protection against retaliation, the mere filing of such a complaint does not . . . create an automatic presumption that any subsequent employer action adverse to the employee is retaliatory in nature").

Defendant has met its burden of proffering legitimate, nondiscriminatory reasons for its actions. With respect to the transfer out of the counselors' suite, Defendant proffers that Sulner sought [*44] to prevent any further harassing behavior on the part of Plaintiff. Defendant proffers that the anger management workshop was ordered because McCormack found Huertas more credible in her complaints that Plaintiff had inappropriately intimidated her at a meeting in September 2004. Plaintiff was placed on the Ineligible Inquiry list allegedly because he turned down three opportunities to contest the charges of corporal punishment. Plaintiff testified to the NYC DOE's explanation that the pension discrepancy was the result of misplaced records and admission that the calculation "should be corrected." Therefore, the burden shifts back to Plaintiff to proffer some evidence sufficient to raise a genuine issue of fact as to whether these reasons were merely a pretext for retaliation.

Other than the temporal proximity between Plaintiff's protected activities and the alleged retaliatory actions, Plaintiff has failed to proffer any evidence, direct or circumstantial, that any of Defendant's explanations for its activities were merely pretext for retaliating against Plaintiff for his protected activities. There is no evidence, for example, of any statement by any supervisor with respect to Plaintiff's [*45] protected activities, and there is no evidence of retaliation against other employees engaged in protected activities. With respect to the counselors' suite transfer, Plaintiff proffers no evidence from which a rational fact-finder could infer, given OED's recommendation that Plaintiff be transferred away from 721X entirely, OED's order that Plaintiff cease all contact with McTaggart, OED's finding that he was contributing to "workplace disharmony," and Plaintiff's willingness to continue talking about the McTaggart incident with co-workers, that Defendant's proffered explanation was merely pretext for a retaliatory motive. In sum, there is nothing, beyond Plaintiff's bare conclusory allegations and mere temporal proximity, from which a rational fact-finder could conclude that the transfer constituted retaliation for protected activity. See Bell v. Rochester Gas & Elec. Corp., 540 F. Supp. 2d 421, 2008 WL 803652, *10 (W.D.N.Y. 2008) (although the "temporal proximity of these events [protected activity and termination] may be found to create an inference of retaliation for the pur-

poses of [plaintiff's] prima facie case, without more, such temporal proximity is insufficient [*46] to satisfy [plaintiff's] burden to bring forward some evidence of pretext") (quoting Simpson v. N.Y. State Dep't of Civil Servs., 166 Fed. Appx. 500, 2006 WL 93011, *2 (2d Cir. 2006)).

Plaintiff similarly proffers no additional evidence calling into question Defendant's proffered reasons for ordering Plaintiff to attend the anger management workshop, placing Plaintiff on the Ineligible Inquiry list, or miscalculating Plaintiff's pension, and there is no evidence, beyond mere temporal proximity, that would even suggest a retaliatory motivation for these actions. Therefore, no genuine issue as to pretext exists, Defendant is entitled to judgment as a matter of law dismissing Plaintiff's retaliation claims, and Defendant's motion for summary judgment is granted as to Plaintiff's claims for retaliation.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully requested to terminate all pending motions, enter judgment in favor of Defendant, and close this case.

Dated: New York, New York

May 27, 2008

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge

LEXSEE 2005 U.S. DIST. LEXIS 9319

**BARIE HAMILTON, Plaintiff, -against- BALLY OF SWITZERLAND, Defendant.**

**03 Civ. 5685 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 9319**

**May 12, 2005, Decided**
**May 17, 2005, Filed**

**PRIOR HISTORY:** Hamilton v. Wilson, 2004 U.S. Dist. LEXIS 957 (S.D.N.Y., Jan. 21, 2004)

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted, and plaintiff's motion denied. Plaintiff's remaining sex discrimination claims dismissed.

**COUNSEL:** Barie Hamilton, Pro se.

Bernard M. Plum and Amy B. Regan, Proskauer Rose LLP, New York, New York, for Defendant Bally.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Barie Hamilton, proceeding *pro se,* brings this employment discrimination action under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621 *et seq.,* and the American with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12112-12117, against her former employer, Bally North America ("Bally") and her supervisor, Alicia Wilson. [1] The Court previously dismissed plaintiff's age and pregnancy discrimination claims as against all defendants and dismissed the complaint in its entirety against defendant Wilson. [2] Hamilton v. Wilson, 2004 U.S. Dist. LEXIS 957, No. 03 Civ. 5685 (GEL), 2004 WL 169789

(S.D.N.Y. Jan. 28, 2004). [*2] Plaintiff's surviving sex discrimination claims against her former employer allege sexual harassment and retaliation. Defendant Bally now moves for summary judgment dismissing the remaining claims, and plaintiff cross-moves for summary judgment in her favor. Defendant's motion will be granted, and plaintiff's motion will be denied.

1    Throughout this litigation, plaintiff has referred to defendant Bally North America as "Bally of Switzerland." See Hamilton, 2004 U.S. Dist. LEXIS 957, 2004 WL 169789, at *1 n.1. Plaintiff explains that the name of the company was changed to Bally North America following bankruptcy proceedings that postdated her termination. (Hamilton 2/23/24 Aff., Hamilton Decl. Ex. 10, at 1.)

2    At the time of the motion to dismiss, plaintiff had not yet served defendant Wilson and sought permission from the Court for additional time to do so. The Court declined to enlarge plaintiff's time to perfect service, finding that plaintiff had failed to state a claim against Wilson. Instead, the Court granted plaintiff a short amount of time in which to replead facts which would state a claim against defendant Wilson. Hamilton, 2004 U.S. Dist. LEXIS 957, 2004 WL 169789, at *5. Plaintiff made additional submissions, but they were legally insufficient to state a claim against Wilson. Accordingly, by Order dated February 25, 2004, the Court dismissed Wilson from this case.

**[*3] BACKGROUND**

Plaintiff has failed to submit a Local Rule 56.1 counterstatement of undisputed facts responding to that submitted by defendant. Ordinarily, this might require the Court to deem admitted all facts set forth in defendant's 56.1 Statement, see Local Rule 56.1(c) ("Each

2005 U.S. Dist. LEXIS 9319, *

numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); D. Reply Mem. 2 n.2. But as a pro se litigant, plaintiff may have failed to understand the requirements of Local Rule 56.1. Plaintiff has submitted a declaration (later supplemented), an affidavit attached to the declaration as Exhibit 10 (captioned "Plantiff's Response to Opinion and Order of USDJ Gerard E. Linch [sic] dated 01-21-04" and cited herein as "Hamilton 2/23/04 Aff."), and a number of other exhibits in opposition to defendant's motion. [3] The Court will consider the totality of the parties' submissions in identifying disputed material facts, and will construe those disputed facts in plaintiff's [*4] favor as is appropriate on summary judgment.

> 3   Plaintiff makes repeated references in her submissions to audio tapes previously submitted to the Court as exhibits. No audiotapes were submitted with this motion, nor does the Court have audio tapes on file from any previous motions in this case. Accordingly, the Court has not had recourse to any such tapes, although it notes that some of these tapes were apparently played during various depositions according to the deposition transcripts.

The background facts of plaintiff's employment, in any event, are undisputed. During the relevant time period, defendant was a wholesale and retail purveyor of high-end men's and women's shoes and accessories. Defendant's own retail stores were grouped into regions, with the managers of individual stores within the region reporting to a regional manager. Defendant's flagship store in the United States was opened on Madison Avenue in Manhattan during the summer of 1995, and plaintiff was the store manager until she was fired on [*5] January 7, 1998. As store manager, she reported to the regional manager, Alicia Wilson, who, in turn, reported to Brad Wolfer, vice-president of retail in the United States, who, in turn, reported to Richard Wycherley, defendant's president.

Defendant claims that the decision to fire plaintiff was made in the midst of a "worldwide reorganization" directed by defendant's parent company, which required Wycherley "to suggest staff changes and business strategies within Bally's United States' [sic] retail stores that he felt would increase Bally's profitability." (Wycherley Decl. P5.) Defendant contends that, in accordance with this directive, Wycherley recommended plaintiff's termination in May 1997, following his own observations of her performance (including that the store was operating

at a more than $ 200,000 loss) and the input of Wilson and Wolfer. (Id. P6.) And indeed, a document described as "a high-level document that was only supposed to be viewed by senior management within Bally," prepared by Wycherley and dated May 30, 1997, indicates that the manager of the Madison Avenue store was to be replaced by August 1, 1997. (Id. P5 & Ex. 1.) Plaintiff received three [*6] written warnings from Wilson about a variety of aspects of her performance, dated May 9, 1997, June 17, 1997, and December 2, 1997, a negative midyear appraisal on September 23, 1997, was placed on a forty-five day probationary period by Wolfer on October 13, 1997, and her employment was finally terminated on January 7, 1998.

Plaintiff, however, claims that she was sexually harassed by Wilson throughout 1997. (Hamilton 2/23/04 Aff. 1.) Her specific allegations of sexual harassment will be discussed in further detail below, see infra Discussion Part II.A, but consist primarily of a conversation in which plaintiff alleges Wilson confided that she was gay, followed by numerous invitations for after-work drinks, compliments and conversations with sexual undertones, Wilson's leaving an undergarment behind in plaintiff's store, and one incident in June 1997 in which plaintiff claims Wilson touched her breast, over her objection, while feeling the material of plaintiff's bodysuit and stating that the bodysuit was "very sexy." (Id.; Hamilton Dep., Regan Decl. Ex. 5, at 62-63.) Plaintiff also asserts that Wilson tried to "make [her] jealous" by showing off in tight jeans to the employees [*7] attending a staff meeting at plaintiff's store. (Hamilton 2/23/04 Aff. 2.) Plaintiff's submissions and deposition contain further allegations of harassment that are sex-neutral at least on their face, such as Wilson's criticism of plaintiff's performance in front of other employees and Wilson's interfering with and undermining of plaintiff's management of her store and employees. (See, e.g., id. 3-4.) Wilson denies both that she made sexual advances toward plaintiff, and that she is sexually attracted to women. (Conte Decl. P13.)

Plaintiff claims that she reported the alleged harassment to Bally's vice president of human resources, Karen O'Mara, on May 13, 1997, and that she asked Wilson to attend the meeting with O'Mara, but that Wilson did not show up. (Hamilton 2/23/04 Aff. 2.) O'Mara's testimony, however, is that while plaintiff made a variety of complaints, none of her complaints were about sexually harassing behavior. Instead, O'Mara claims plaintiff's complaints consisted of the following: "that she had not been appropriately paid for work she had performed; that she had been criticized for her appearance at work and the way that her clothes were fitting after she returned [*8] from maternity leave by Bally managers Mike Shields and Susan Jones; that she was unhappy with a warning

notice that she had received from her Regional Manager, Alicia Wilson, for permitting unauthorized personnel to close her retail store; and that she did not feel that Ms. Wilson had worn appropriate pants to a store meeting (i.e., Ms. Hamilton complained that Ms. Wilson had shown up in tight jeans and sat in a casual manner that was not appropriate for a business meeting)." (O'Mara Decl. P2.) O'Mara claims she addressed these complaints by inter alia procuring backpay for plaintiff and speaking to Wilson about her attire, but, not interpreting any of them to concern "illegal harassment, discrimination, or retaliation," she did not report complaints of sexual harassment to anyone at Bally. (Id. P2-3.)

Plaintiff claims that Wilson's sexual advances continued after her meeting with O'Mara (including the June 1997 incident in which Wilson touched plaintiff's breast, and which she claims she reported to O'Mara in a telephone conversation the same day, Hamilton Dep. 157-59), and that the warning notices and disparaging remarks she received from Wilson about her performance in the [*9] following months reflected Wilson's anger at having had those advances rejected, rather than plaintiff's actual job performance. (Hamilton 2/23/04 Aff. 1.) Plaintiff initiated a complaint with the New York City Commission on Human Rights ("CHR") on December 1, 1997 (CHR Intake Form, Hamilton Decl. Ex. 11, at 1), but the complaint was not served on defendant until January 20, 1998. (Letter of John McCormick, Investigator, Law Enforcement Bureau, CHR, to Director of Human Resources, Bally, Inc., dated Dec. 12, 2000, Hamilton Decl. Ex. 5, at 1.) Plaintiff alleges that following her termination, she was placed on a "black list" and given negative employment references. (Hamilton Decl. P12.)

Following an investigation, CHR found no probable cause that defendant had engaged in unlawful discrimination, concluding that plaintiff had been fired because of her store's operating losses and "complaints about complainant's abrasive manner in dealing with the stores [sic] customers." (CHR Determination and Order After Investigation, Regan Decl. Ex. 2, at 3.) Hamilton sought review of that determination, and CHR affirmed its prior findings on appeal on December 31, 2002. (CHR Determination [*10] and Order After Review, Regan Decl. Ex. 3, at 1.) Hamilton then sought review by the EEOC, which adopted CHR's findings and issued a right-to-sue letter dated April 8, 2003. (EEOC Dismissal and Notice of Rights, Regan Decl. Ex. 4, at 1.)

Plaintiff filed the instant complaint on July 31, 2003, asserting various age, pregnancy, and sex discrimination claims against Bally and Wilson. As stated above, plaintiff's age and pregnancy discrimination claims were dismissed (and Wilson was dismissed entirely from the case) by the Court. Defendant now moves for summary judgment in its favor as to the surviving sex discrimina-

tion claims (sexual harassment and retaliation), and plaintiff cross-moves for summary judgment in her favor.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Ordinarily, a "genuine issue as to any material [*11] fact" is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "It is the movant's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the non-movant's favor." Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (internal citations omitted); see United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962). In determining the existence of disputed facts, "conclusory allegations or unsubstantiated speculation" will not suffice. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

Here, however, defendant has agreed to accept plaintiff's version of disputed material facts as true for purposes of this motion (D. Mem. 2 n.2) --which the Court understands to include plaintiff's characterization [*12] of Wilson's sexual orientation and behavior--shifting the focus on summary judgment away from the existence of disputed material facts, and toward whether, even if all disputed facts are construed in plaintiff's favor, a "reasonable jury could return a verdict" for plaintiff. The Court finds that the record developed by plaintiff is insufficient to support a jury verdict of sex discrimination and, therefore, defendant is entitled to judgment as a matter of law.

#### B. Title VII Standards

##### 1. Sexual Harassment Claim

Plaintiffs making sexual harassment claims under Title VII have two alternative theories available: (1) hostile work environment and (2) quid pro quo. Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994).

To make out a prima facie case of hostile work environment, plaintiff must establish that (1) she was subjected to harassment based on a prohibited ground of discrimination; (2) the harassment was so severe as to alter the terms and conditions of her employment, and (3) there is a basis for imputing the harassing conduct to the employer. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998). To meet the severity requirement [*13] (the second prong of this test), plaintiff must establish that the harassment was severe or pervasive enough to create an objectively hostile environment, and that she subjectively perceived the environment to be abusive. Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002). In general, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," and "isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Id. at 374. In determining whether allegations of abusive conduct are sufficient to meet the threshold for an objectively hostile environment, courts examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, [*14] noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Terry v. Ashcroft, 336 F.3d 128, 148 (1993) (internal citations, quotation marks, and alteration omitted).

By contrast, "quid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" Karibian, 14 F.3d at 777 (quoting EEOC Guidelines, 29 C.F.R. § 1604.11(a)(2) (1993)). [4] Thus, to present a prima facie case of quid pro quo harassment, "plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Id. Simply put, the question is whether plaintiff's supervisor "linked tangible job benefits to the acceptance or rejection of sexual advances." Id. at 778. The term [*15] "job benefits," however, does not necessarily imply promotion or positive advancement; the mere retention of employment will suffice. Id.

4   The EEOC Guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank, FSB v. Vinson 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citations omitted).

2. Retaliation Claim

In deciding a summary judgment motion with respect to Title VII retaliation claims, the Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Terry, 336 F.3d at 140-41. The first question is whether the plaintiff has established a "minimal" prima facie case. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-69 (2d Cir. 1998); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998). "To establish a prima facie case [*16] of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Terry, 336 F.3d at 141 (internal citations, quotation marks, and emphasis omitted); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). "Title VII is violated when a 'retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" Terry, 336 F.3d at 140-41 (quoting Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

If the plaintiff has established her prima facie case, a presumption of discrimination or retaliation is established which "places the burden of production on the employer to proffer a [non-retaliatory] reason for its action." James v. New York Racing Assoc., 233 F.3d 149, 154 (2d Cir. 2000). If the employer fails to present such a reason, plaintiff prevails. But, "the employer can rebut that presumption by offering [*17] legitimate, non-retaliatory reasons for the contested actions; if it succeeds, the burden reverts to the plaintiff to demonstrate that those reasons are merely pretextual." Myrick v. New York City Employees Ret. Sys., 2002 U.S. Dist. LEXIS 8032, 99 Civ. 4308 (GEL), 2002 WL 868469, at *5 (S.D.N.Y. May 3, 2002) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); James, 233 F.3d at 154; Fisher v. Vassar Coll., 114 F.3d 1332, 1333-35 (2d Cir. 1997)).

An employer acting for legitimate, non-retaliatory reasons would be entitled to summary judgment, "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited" retaliation. James, 233 F.3d at 154 (citations omitted); see also Gallagher, 139 F.3d at

2005 U.S. Dist. LEXIS 9319, *

349-50. Evidence casting doubt on the employer's prof-fered justification "may--or may not--be sufficient" to provide this support. Fisher, 114 F.3d at 1333. Thus, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsi-bility is to "examine the entire record to determine whether the plaintiff could satisfy [*18] his 'ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)).

## II. The Legal Standards Applied

### A. Sexual Harrassment

#### 1. Hostile Work Environment

Plaintiff claims she was subjected to a hostile work environment on the basis of her gender, relying on the alleged incidents of sexual harassment committed by Wilson. Defendant moves for summary judgment, argu-ing that "any allegedly hostile conduct she experienced was [not] sufficiently 'severe or pervasive,' [nor was it] based on her gender." (D. Mem. 10.)

As stated above, a claim of hostile work environ-ment requires the plaintiff to show that the complained-of conducted was sufficiently severe or pervasive to cre-ate an objectively hostile environment, and that she sub-jectively perceived the environment to be abusive. Al-fano, 294 F. 3d at 373-74. Plaintiff's submissions are not in the form of legal argument, and it is difficult to distill her precise allegations of sexual [*19] harassment. Plaintiff's deposition, verifying and elaborating on those allegations contained in her affidavit of February 23, 2004, however, shows that her allegations of sexual ha-rassment amount to the following: (1) a conversation be-tween Wilson and plaintiff in which Wilson confided to plaintiff she was gay (Hamilton 2/23/04 Aff. 1-2); (2) repeated visits to plaintiff's store and invitations to join Wilson for drinks after work, including one incident in April 1997 in which Wilson allegedly propositioned plaintiff (id. at 2; Hamilton Dep. 60, 76); (3) Wilson's numerous compliments on plaintiff's "elegant and sexy" appearance (Hamilton 2/23/04 Aff. 2) and her "sexy" tone in speaking to plaintiff during her final evaluation (Hamilton Dep. 112); (4) an undergarment (bodysuit) Wilson left behind in plaintiff's store (Hamilton 2/23/04 Aff. 2); (5) Wilson's inappropriate dressing and showing off during a staff meeting in plaintiff's store, which plain-tiff perceived as trying to "make [plaintiff] jealous" (id.); and (6) Wilson's touching of plaintiff's breast in June 1997, over plaintiff's objection, while feeling the material of a bodysuit plaintiff was wearing, and which Wilson

[*20] told plaintiff was "very sexy." (Hamilton Dep. 62-63.)

As a preliminary matter, Wilson's sexual orientation is not material on summary judgment. Plaintiff perceived Wilson's comments disparaging men during one conver-sation as indicating her sexual attraction to women (id. 67-69) and submits a notarized letter from a former co-worker, Clarissa Green, testifying she also believed Wil-son was gay and that Wilson made things difficult for straight female employees (Letter of Clarissa Green, dated Aug. 3, 1999, Hamilton Decl. Ex. 17, at 1). Wilson insists she has never been sexually attracted to women. (Conte Decl. P13.) Although at trial a jury might credit Wilson's testimony about her sexual orientation over that of plaintiff, and accordingly, be more skeptical about plaintiff's allegations, such credibility determinations and factfinding are inappropriate on summary judgment. Plaintiff's allegations are what they are vis-a-vis Wilson's behavior, and it is that behavior--a series of alleged un-welcome sexual advances--which plaintiff claims sub-jected her to a hostile work environment. Nonetheless, no reasonable jury could find that the alleged harassment was so severe or pervasive [*21] as to be actionable under Title VII.

Indeed, few of these alleged incidents merit serious attention because plaintiff's own testimony does not indi-cate that she subjectively perceived them as objection-able. Plaintiff's present allegations that Wilson's positive compliments about her appearance (i.e., that plaintiff's clothing and appearance were "elegant and sexy" and that Wilson's sister thought plaintiff was "the most glam-orous woman she ever met") constituted sexual harass-ment are undercut by her testimony that she did not find the comments offensive at the time and that positive comments about appearance would have been normal in the context of a high-end fashion retail store. (Hamilton Dep. 75-76, 81.) [5] Likewise, although plaintiff described Wilson's tone of voice as "sexual" in a conversation they had at the end of the forty-five day probationary period put in place by Wolfer following plaintiff's negative midyear appraisal, plaintiff's testimony clearly indicates that the content of the conversation was not at all sexual, nor did she perceive it as such. (Id. 112-14.) Moreover, plaintiff's testimony indicates that she found the conver-sation inappropriate because Wilson [*22] was carrying on too much in delivering the review, when "all she had to do was state the facts, questions, answers and good-bye. No theatrical act." (Id. 114.) This does not amount to testimony of a perception of sexual harassment.

5   To the extent that plaintiff clarifies this testi-mony in her supplemental affidavit that she was not initially offended, but that she "became more and more frustrated with Wilson's compliments,

as they took the form of sexual harassment" (Hamilton Supp. Aff. P15), these compliments, as vaguely described by plaintiff in her submissions ("Wilson made numerous compliments about [plaintiff's] looks, how elegant and sexy her suits, shoes, and general looks were." (Hamilton 2/23/04 Aff. 2)), are not objectively offensive. In any event, an affidavit that attempts to revoke admissions made in a deposition cannot create a genuine issue of material fact on summary judgment. Hayes v. City of New York Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

Nor did plaintiff perceive [*23] Wilson's numerous invitations (approximately ten) to join her for drinks after work as subjectively contributing to a hostile work environment; instead, her testimony was that she thought "Wilson had no life so she wanted me to socialize with her" with no particular sexual implication behind the invitations (id. 72 ("Q: [Did Wilson want you to socialize with her] as a friend?; A: She didn't mention in what position.")), and that she rejected those invitations because she and Wilson had a "hostile relationship." (Id.) Similarly, although plaintiff complained that Wilson left behind an undergarment--a bodysuit--in plaintiff's store, plaintiff testified that employees sometimes brought changes of clothes ("jeans, shirts") to perform manual work after hours (id. 105-06), and she was not sure whether Wilson had done so intentionally "so people can see [her undergarments]" (id. 106), or simply because "she was in a rush. (Id. 110.) Plaintiff offers no reason whatsoever for believing that this conduct, even if intentional, was directed at her in any way. And while "evidence of a general work atmosphere--as well as evidence of specific hostility directed toward the [*24] plaintiff" may be relevant to assessing the environment to which plaintiff was subjected, see Penn v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)), no reasonable person would regard this as sexual harassment, and plaintiff herself did not. [6]

6 Plaintiff testifies in detail that she and at least one of her employees were disgusted that a dirty undergarment was left in the store (Hamilton Dep. 108-109, Hamilton 2/23/04 Aff. 2), but like plaintiff's testimony about the conversation she and Wilson had at the end of her forty-five day probationary period, her testimony about this incident cannot be read to evince a perception of sexual harassment, even drawing all reasonable inferences in favor of plaintiff.

Plaintiff further alleges that Wilson deliberately dressed in tight jeans and displayed her crotch area to the mostly-male employees in attendance at a staff meeting on a Saturday morning to "make [*25] [her] jealous." (Hamilton 2/23/04 Aff. 2.) But in her testimony about this incident, plaintiff reveals that she did not have a view of Wilson's behavior during the meeting, and that it was only brought to her attention by the comments of her male employees after the meeting, who were mocking Wilson's behavior. (Hamilton Dep. 88.) Indeed, plaintiff's characterization of arguably sexual behavior addressed to male workers out of her view as part of a campaign of sexual harassment of her is idiosyncratic, to say the least. Aside from grouping this incident under the general category of Wilson's harassing behavior, plaintiff does not claim to have perceived Wilson's attire or behavior as abusive, rather than inappropriate, and neither does she make any allegation that it was the comments of her male employees that gave rise to a hostile or abusive environment.

Plaintiff's remaining two allegations are potentially more serious because her testimony can fairly be read to evince plaintiff's subjective perception of harassment. On one occasion plaintiff alleges that Wilson kept her late at the store, and then "took her jacket off, had a tight T-shirt and pants and no shoes. [Wilson] again [*26] invited me for a drink with sparkling eyes fixed on me and a manly, dominant position with one leg raised on a stool, and I told her I had a family to go home to." (Hamilton 2/23/04 Aff. 2.) [7] Plaintiff also claims that, on a different occasion, Wilson touched plaintiff's breast, over her objection, while touching the material of plaintiff's bodysuit, which Wilson had described as "very sexy." (Hamilton Dep. 62-63.) A reasonable person in plaintiff's position might very well have perceived these two incidents as unwelcome and offensive sexual advances.

7 For purposes of summary judgment, giving the benefit of all reasonable inferences to the plaintiff, and recognizing that a jury must be given wide scope to assess the intent and significance of subtly ambiguous actions, the Court assumes that this episode could be found to constitute a sexual advance, and treats it as such. At the same time, for purposes of assessing whether a reasonable factfinder could determine that plaintiff was subjected to "severe and pervasive" harassment, it must be noted that this incident involved no objectively improper action by Wilson at all, and that the characterization of the episode as sexual rests heavily on plaintiff's subjective assessment, as expressed in her choice of adjectives (e.g., "sparkling" eyes; "manly, dominant" posture).

[*27] Isolated incidents are generally insufficient to demonstrate that the harassment was pervasive enough to transform the conditions of employment. See Tomka v.

Seiler Corp., 66 F.3d 1295, at 1305 n.5 ("Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."). At the same time, there is neither a magic number of incidents above which harassment is actionable, and below which it is not. Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993) (cited in Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 439 (2d Cir. 1999)). It is the clearly established law of this Circuit that isolated incidents may be actionable, provided they are of sufficient severity. See Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (summary judgment on hostile environment claim in favor of defendant inappropriate where plaintiff was subject to long, lewd public tirade about her work performance in front of her employees because, even without regard [*28] to plaintiff's additional allegations of subsequent harassment, "a rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of plaintiff's working conditions") The touchstone of the inquiry is, therefore, whether a "reasonable person could find [plaintiff's] working conditions altered for the worse." Richardson, 180 F.3d at 439.

Although egregious conduct alleged in previous cases does not "mark the boundary of what is actionable," Harris, 510 U.S. at 22, the incidents alleged here are clearly not of sufficient severity to have transformed plaintiff's working conditions in light of existing case law. This Circuit has affirmed grants of summary judgment in favor of defendants or reversed jury verdicts in favor of plaintiffs where the alleged behavior, although equally infrequent, was more overtly sexual and severe than that alleged here. See, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004) (affirming summary judgment where within a period of about a month, supervisor claimed he would not approve plaintiff's vacation request if she did not sleep with him, offered various [*29] job benefits if she slept with him, and threatened to reassign her to another department when she refused his offer); Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002) (reversing jury verdict where only cognizable allegations involved three comments or pranks involving carrots and intimating plaintiff's sexual practices and a vulgar cartoon depicting a subordinate with whom plaintiff had allegedly had inappropriate physical contact); Quinn, 159 F.3d at 768 (2d Cir. 1998) (affirming summary judgment where supervisor told plaintiff she had been voted the "sleekest ass" in the office and supervisor "deliberately touched plaintiff's breasts with some papers he was holding in his hand").

The Court must be careful, however, to consider the totality of the circumstances, keeping in mind that "a

jury, in assessing whether there was impermissible [harassment], would be entitled to view the evidence as a whole." Howley, 217 F.3d 141, 151 (2d Cir. 2000). The circumstances here include not just the alleged incidents of sexual harassment, but also plaintiff's litany of allegations about harassment of a more general nature, including Wilson's [*30] criticism of plaintiff's performance in front of other employees and interfering with and undermining plaintiff's management of her store and employees on numerous occasions. (Hamilton 2/23/04 Aff. 2-4). [8] Defendant argues that these general allegations of harassment are not actionable because inter alia they concern Wilson's management of plaintiff--business judgments plaintiff may not challenge. (D. Mem. 12 n.11-12). See Spina v. Our Lady of Mercy Med. Ctr., 2003 U.S. Dist. LEXIS 19091, No. 97 Civ. 4661 (RCC), 2003 WL 22434143, at *4 (S.D.N.Y. Oct. 23, 2003) (Title VII is "not meant as a general civility code and may not be used for turning otherwise ordinary disputes with a superior into a claim for sexual harassment"). However, "incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination--for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano, 294 F.3d at 375.

> 8   To the extent that some of plaintiff's submissions appear to allege that she was subject to disparate treatment because she was not gay (see, e.g., Hamilton 2/23/04 Aff. 4 ("Wilson always sided with gay people"), the Court notes only that under existing Second Circuit case law discrimination on the basis of sexual orientation is not actionable under Title VII. Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000).

[*31] Nonetheless, even on the broadest view of her evidence--where the two perceived incidents of sexual harassment represent Wilson's most concerted sexual advances, against a background of low-level enticements consisting of compliments and social invitations, followed by occasional, harassing criticism because those advances were rejected--plaintiff falls short of identifying harassment sufficiently pervasive to have transformed plaintiff's working conditions. Wilson, as a regional manager with responsibility for several stores, was not present in plaintiff's store every day and, moreover, all of these incidents were both episodic and comparatively mild. Cf. Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) (summary judgment inappropriate where plaintiff testified supervisor "'grabbed' and 'placed his hand on [her] hand' on a 'daily' basis, 'constantly,' 'whenever he had the opportunity,' and that he 'used to touch [her] hair a lot.' This conduct 'was ongoing over months and months.'"); Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("constant[]

touching" and attempted bestowal of "unasked for and unacceptable [*32] kisses" over two week period, when coupled with supervisor's position of power, was tantamount to coercion and established hostile work environment). Finally, a series of ambiguous incidents, the vast majority of which plaintiff herself did not regard as offensive at the time, cannot be magically transformed into a pattern of abusive behavior, simply by viewing them in the aggregate.

Plaintiff has not created a genuine issue of material fact as to the existence of sexual harassment of sufficient severity or pervasiveness to be actionable under Title VII and, accordingly, there is no need to consider defendant's alternative argument that the challenged conduct was not directed at plaintiff because of her gender.

2. Quid Pro Quo Sexual Harassment

Although not addressed by defendant in its briefing, plaintiff at least appears to advance a theory of quid pro quo sexual harassment, in that she claims that after rejecting Wilson's advances, she was subjected to "increased scrutiny and discipline," and that her eventual termination reflected that rejection, not her actual performance. [9] Under the standards outlined above, termination for failure to submit to the unwelcome sexual advances [*33] of a supervisor constitutes quintessential quid pro quo sexual harassment. But even accepting plaintiff's characterization of Wilson's sexual orientation and behavior, plaintiff must still show that "her reaction to [unwelcome sexual advances] was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Karibian, 14 F.3d at 777.

[9]  The Court does not interpret plaintiff's submissions to advance an independent theory that she was terminated on the basis of her gender, and aside from two cursory footnotes (D. Mem. 22 n.10-11) and some general language in its reply briefing (D. Reply Mem. 4-5), defendant has not addressed such a theory. Accordingly, the Court notes only in passing that such a theory would not appear to be available to plaintiff in any event, because she conceded that she believes only Wilson, and not Wycherley or Wolfer, discriminated against her on the basis of her gender (Hamilton Dep. 133), because plaintiff does not dispute that Wilson had a role in firing four store managers, two of whom were male, and both of whom were replaced by women, and closed two stores with male managers for poor performance (Conte Decl. P12), and because plaintiff would be unable to rebut defendant's offered rationale for

her termination as pretextual, as discussed at length in this section.

[*34]  Plaintiff has failed to create a genuine issue of material fact as to any linkage between her rejection of Wilson's perceived sexual advances and either the negative evaluations she received in 1997 or the ultimate termination of her employment in January 1998. First, plaintiff has neither alleged nor testified that the perceived advances described above, or any accompanying behavior, were threatening or suggestive to plaintiff that her continued employment depended on submitting to these advances. And second, she has brought forward no evidence, apart from speculation, that the negative evaluations she received from Wilson were the pretextual actions of a woman scorned. Indeed, plaintiff's 1996 year-end evaluation, completed by Wilson after she took over from plaintiff's previous manager and reflecting criticisms which would be amplified over the course of the warning notices plaintiff received throughout 1997, pre-dated plaintiff's allegations of sexual harassment and was issued at a time when plaintiff claims she and Wilson were on friendly terms. (Hamilton Dep. 343; D. Reply Mem. 4 n.6.) By the time of the warning notice in June 1997, plaintiff's store was operating at a $ 210,000 [*35] loss. (Conte Decl. P7 & Ex. 2.) This trend continued, and by her midyear review in September 1997, plaintiff's store was operating at a $ 269,000 loss. (Id. P8 & Ex. 3.) At the time of the December 1997 warning notice, plaintiff's store had missed its sales target for the month of October by $ 105,000, and was performing below average compared to defendant's other stores. (Id. P9 & Ex. 4.)

Plaintiff disputes not these figures themselves, but rather their significance (Hamilton Decl. P10), and submits alternative indicators of her store's performance in the form of weekly sales reports showing that her store was highly ranked in May, June, and December 1997 and that some of her employees were among the company's top performers (Hamilton Decl. Exs. 13-16.) Similarly, plaintiff claims the criticisms recorded in the warning notices she received throughout 1997 were unfounded, pointing inter alia to more than twenty letters and memoranda written since she began her employment with Bally to show that she had good customer relations skills, and that she was a valuable asset. (Hamilton Supp. Aff. Ex. 20.) Some of these letters do speak to positive interactions between plaintiff and [*36] her customers, and plaintiff is free to believe that her supervisors' assessment of her performance and that of the store under her management were erroneous.

But, while allegations of facially neutral harassment by a supervisor may be relevant to determining whether plaintiff was subjected to a hostile work environment, where that supervisor has also engaged in alleged overtly

sexual harassment, courts and juries do not ultimately sit to second-guess the business judgment of Wilson, Wolfer, Wycherley or any one else employed by defendant. As discussed by courts in the context of the burden-shifting framework applicable to discrimination and retaliation claims, while employers cannot shield themselves by inventing reasons, a truthful, but poor, business decision will not subject the employer to Title VII liability. See Dister v. Cont'l Group, Inc., 859 F.2d 1108 (2d Cir. 1988); Hansen v. Dean Witter Reynolds, Inc., 887 F. Supp. 669, 673 (S.D.N.Y. 1995) ("The court is not to second-guess the defendant's judgment; the fact finder should not assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were [*37] not taken for a discriminatory reason.") (internal quotation marks and citation omitted). Defendants have brought forward ample evidence, unrefuted apart from conclusory allegations in plaintiff's affidavits and deposition, that the termination of plaintiff's employment was nothing more than a legitimate business decision, unconnected to the alleged sexual harassment.

After all, it was Wycherley, and not Wilson, who recommended plaintiff's termination in May 1997. (Wycherley Decl. P6.) While that decision was based in part on the observations of Wilson, and plaintiff could be understood to argue that Wilson's observations were tainted by plaintiff's rejection of Wilson's advances, he relied as well on his own personal observations and those of Wilson's supervisor, Brad Wolfer. (Id.) In addition, Wycherley's recommendation to terminate plaintiff was made pursuant to a directive by defendant's parent company to take steps to increase profitability. (Id. P5.) Plaintiff has not produced any evidence that Wycherley knew anything about Wilson's alleged behavior when he decided to recommend plaintiff's termination (or at any subsequent time). Although plaintiff asserts she complained [*38] to human resources about Wilson's behavior on May 13, 1997 (and again in June 1997), vice president of human resources Karen O'Mara did not interpret her complaint as one about sexual harassment, and did not report allegations of sexual harassment to anyone employed by defendant. (O'Mara Decl. P2-3.) While plaintiff claims that Wilson knew about her meeting with O'Mara (Hamilton 2/23/04 Aff. 2), plaintiff does not claim any way in which *Wycherley* would have known about Wilson's behavior, aside from her unsubstantiated refusal to believe that O'Mara did not notify anyone employed by defendant about her claims. (Hamilton Supp. Aff. P18.) Accordingly, aside from the simple fact that plaintiff's complaint to human resources and Wycherley's initial recommendation that plaintiff be terminated were made in the same month, plaintiff has produced no evidence creating a genuine issue of material fact as to whether Wycherley's recommendation was connected to the alleged sexual harassment. Nor has

plaintiff provided the Court with any other evidence that either her termination, or the negative evaluations that preceded it, were in any way connected to her rejection of what she perceived to [*39] be Wilson's sexual advances. Accordingly, plaintiff may not proceed on a quid pro quo theory of sexual harassment. [10]

> 10   Plaintiff may reasonably complain that the written warnings and negative midyear appraisal she received were "pretextual," in the sense that the decision to terminate her *for business reasons alone* was already final in May 1997, and, accordingly, that she had no hope of redeeming herself in the eyes of her supervisors. (Hamilton Decl. P9; Hamilton 2/23/04 Aff. 3-4.) But that sort of "pretext" is not actionable under Title VII as sexual harassment or any other form of discrimination.

### B. Retaliation

Finally, plaintiff alleges that Bally violated Title VII by retaliating against her because she complained about Wilson's behavior to human resources and CHR. She alleges that this retaliation took the form of her termination, followed by placement on defendant's "black list" and provision to would-be employers of negative recommendations. (Hamilton 2/23/04 Aff. 2.)

Plaintiff's retaliation [*40] claim founders for a number of reasons. First, recall that "to establish a prima facie case of retaliation, an employee must show [inter alia] participation in a protected activity known to the defendant." Terry, 336 F.3d at 141. Even accepting plaintiff's testimony that she did complain to human resources about sexual harassment and was thus engaged in protected activity, [11] her complaints were not interpreted as such and were not made known to those individuals (primarily Wycherley and Wilson) responsible for her termination (O'Mara Decl. P2-3), thus eliminating the possibility that a retaliatory motive played any role in her firing. While plaintiff "does not trust [O'Mara's declaration] to be true" (Hamilton Supp. Aff. P18), she does not introduce any evidence that O'Mara did in fact inform anyone employed by defendant about plaintiff's sexual harassment complaints. Similarly, although plaintiff made a complaint to CHR on December 1, 1997, the complaint was not served on defendant until January 20, 1998, a few weeks *after* her termination.

> 11   The statute provides in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hear-

ing under this subchapter." 42 U.S.C. § 2000e-3(a).

[*41] Second, plaintiff has brought forward no admissible evidence that she was "black listed" by defendant. In a letter to CHR, she details her difficulties in finding employment after her termination and speculates that she "has no doubt . . . that [her] failure [to secure new employment] was a result of Bally's retaliation." (Letter of Barie Hamilton, to Rhoda Sutine, CHR, dated July 26, 1999, Hamilton Decl. Ex. 18, at 2.) But in support of this and similar speculation in her submissions she offers only the notarized letter of her former co-worker Clarissa Green, who claims that she attempted to get plaintiff a job with her employer, only to be told that plaintiff had received a negative recommendation from defendant because of the difficulties she had had with Wilson. (Letter of Clarissa Green 1.) But this inadmissible hearsay evidence of what Green's employer told her about the reference plaintiff received from defendant (even assuming that the reference was made at some point after defendant was made aware of plaintiff's complaint to CHR) cannot serve to create a genuine issue of material fact on summary judgment as to the existence of either a "black list" or negative employment [*42] recommendations made by defendant.

On this record, plaintiff has not demonstrated a genuine issue of material fact either as to knowledge about her complaints of sexual harassment on the part of those responsible for her termination or that any post-termination retaliation took place. Accordingly, she cannot make out a prima facie case of retaliation, whether in the form of her termination or negative employment references provided after her termination.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted, and plaintiff's motion is denied. Plaintiff's remaining sex discrimination claims are thus dismissed.

SO ORDERED.

Dated: New York, New York

May 12, 2005

GERARD E. LYNCH

United States District Judge

Westlaw.

Not Reported in F.Supp.2d                                            Page 1
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

C
Cioffi v. Allen Products Co.
D.Conn.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Cherie CIOFFI, Plaintiff,
v.
THE ALLEN PRODUCTS COMPANY, Defend-
ant.
**No. 3:98CV857(DJS).**

Sept. 29, 2000.

*MEMORANDUM OF DECISION*

SQUATRITO, J.
**\*1** The plaintiff, Cherie Cioffi, brings this action
against the defendant, The Allen Products Com-
pany ("Allen Products"), alleging: (1) hostile work
environment, constructive discharge and adverse
retaliatory treatment in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), as amended,
42 U.S.C. § 2000e, *etseq.;* (2) negligent hiring and/
or retention; and (3) intentional and negligent in-
fliction of emotional distress. The defendant now
moves for summary judgment on all counts of the
plaintiff's complaint pursuant to Fed.R.Civ.P. 56(c).
For the reasons that follow, the defendant's motion
is GRANTED with respect to the plaintiff's Title
VII claims; the plaintiff's state law claims are dis-
missed.

I. FACTS

Examination of the memoranda, affidavits, and
Local Rule 9 statement submitted in support of the
motion for summary judgment and the responses
thereto discloses the following.

In November, 1990, Ron Bailer, Allen Products'
President, hired Cherie Cioffi to work in Allen
Products' customer service department. Ron Martin,
Allen Products' National Service Manager, was Ms.

Cioffi's direct supervisor until he resigned in April,
1994, at which point Gary Prushko became the
plaintiff's supervisor. Mr. Martin and Mr. Prushko
appear to have reported directly to Mr. Bailer.
There are approximately five women and nine
men working in the small office where Ms. Cioffi
worked.

From 1990 to 1994, Ms. Cioffi maintained a good
working relationship with most of her co-workers,
including Joe Dowdell and Michael Slater. Ms.
Cioffi has no complaints about her treatment by Mr.
Martin. Ms. Cioffi received regular raises and two
promotions during her employment, including a
promotion with pay increase to Customer Service
Administrator in April, 1994.

Ms. Cioffi alleges that she was subjected to sexual
harassment throughout her employment with the
defendant. The plaintiff cites to the following incid-
ents in support of her sexual harassment claims:

(1) In 1991 or 1992, Mr. Bailer separately confron-
ted Ms. Cioffi and a co-worker, Fran Connors,
about a workplace rumor that they were having an
affair. Mr. Bailer felt the rumor was disrupting the
workplace. Later, in 1994, Mr. Bailer mentioned
the alleged affair to Al Baccili, a district manager
for Allen Products, at a luncheon meeting after Ms.
Cioffi had discussed her concerns regarding her
treatment by co-workers and company officials
with Mr. Baccili. Ms. Cioffi asserts that Mr. Bailer
also talked to other un-named employees about the
alleged affair.

(2) During the winter of 1992-1993, Mr. Dowdell
stated to the plaintiff that he would like to see her
"run naked through the snow ." (Cioffi Dep. at
69-71, Def.'s App. Supp. Mot. Summ. J.) Ms. Cioffi
complained to Mr. Martin about Mr. Dowdell's
comment. Ms. Cioffi and Allen Products disagree
as to whether Mr. Martin actually disciplined Mr.
Dowdell for this incident.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

Page 2

(3) On April 11, 1994, Ms. Cioffi caught Mr. Slater, who sat in a cubicle next to Ms. Cioffi throughout most of her employment, sliding a mirror under her desk.[FN1]Ms. Cioffi immediately complained to Mr. Martin, who conducted an investigation that day. Mr. Slater admitted the incident occurred and agreed to apologize to Ms. Cioffi in writing. Mr. Slater apologized in writing to Ms. Cioffi on the morning following the incident.

> FN1. At her deposition, Ms. Cioffi described the mirror incident as follows: "But I leaned back in my chair and ... just happened to stare down at the floor by the wall that was separating our two desks and saw the mirror coming underneath the desk."(Cioffi Dep. at 137, Def.'s App. Supp. Mot. Summ. J.)

*2 Mr. Prushko took responsibility for investigating Ms. Cioffi's complaint regarding the mirror incident on April 13, 1994, in light of Mr. Martin's upcoming departure from the company. Mr. Prushko met with Mr. Slater on April 13, 1994. During that meeting, Mr. Slater volunteered to seek psychiatric counseling. Mr. Prushko then met with Mr. Bailer specifically to discuss Mr. Slater's actions of April 11, 1994.

After meeting with Mr. Bailer, Mr. Prushko gave Mr. Slater oral and written warnings informing him that he would be terminated if any such conduct occurred in the future. On April 13, 1994, Mr. Prushko met with Ms. Cioffi to discuss the incident and the company's response.

When Mr. Martin left the defendant's employ, Ms. Cioffi requested that she be moved to Mr. Martin's previous workspace so that her work area would not be next to that of Mr. Slater. There was no other office space available to which Ms. Cioffi could move at that time. Ms. Cioffi moved to Mr. Martin's workspace approximately two weeks after he left the company.[FN2]Ms. Cioffi alleges that after she moved, Mr. Slater pushed back a partition of his cubicle and repositioned his desk in order to see her more readily. Also, Mr. Prushko did not move Mr. Slater's desk closer to him as promised so that Mr. Prushko could monitor Mr. Slater. The plaintiff and the defendant disagree as to whether Ms. Cioffi complained about Mr. Slater removing his partition or the defendant's failure to move Mr. Slater's desk.FN3

> FN2. The parties dispute the actual date upon which Ms. Cioffi switched workspaces. Ms. Cioffi alleges that her desk was moved two to three weeks after the mirror incident, sometime between April 25 and May 2, 1994. The defendant alleges that Ms. Cioffi was moved by April 28, 1994, within two weeks of Mr. Martin's last day of employment.

> FN3. In her affidavit dated March 21, 2000, the plaintiff states: "However, within a few days of my move Mr. Slater pushed back his partition and moved his desk and chair so that he could see me and my work are[a]. This totally circumvented the original move and the company did nothing about it despite my objection."(Cioffi Aff. ¶¶ 60-61, Pl.'s App. Supp. Obj. Mot. Summ. J., Ex. 1.) However, the defendant contends that between April 11, 1994, and Ms. Cioffi's last day of work on June 20, 1994. Ms. Cioffi gave no indication to anyone at Allen Products that she felt harassed or that she was dissatisfied in any way with Allen Products' response to her complaints about Mr. Slater or Mr. Dowdell. (See Bailer Aff. ¶ 15, Def.'s App. Supp. Mot. Summ. J.)

Mr. Slater attended psychiatric counseling following the mirror incident, and on April 25, 1994, gave Mr. Prushko a written statement indicating that he was receiving the treatment. In July, 1994, Mr. Prushko received a letter from Mr. Slater's psychiatrist which stated that Mr. Slater had pursued his

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

meetings with diligence and to maximum benefit. The plaintiff alleges that no one told her that Mr. Slater was receiving counseling and that Mr. Bailer refused to insist that Mr. Slater attend counseling, despite her request that Allen Products require him to do so.

In June, 1994, Mr. Slater laughed at a statement made to Ms. Cioffi by John Gomez, a co-worker, that had a sexual connotation/double-meaning.[FN4] No other incidents occurred between Ms. Cioffi and Mr. Slater.

> FN4. At her deposition, Ms. Cioffi described this incident as follows: "John Gomez had come in to empty the garbage in my cubicle. And he made a comment, 'Are you looking trashy?' ...I know he was joking. And then I hear this laughter coming from Mike's desk, so this made me angry; and so then I knew that he wasn't sincere at all about this. So I went over to his desk, and I says, you didn't mean that apology at all, did you? Because after what you did, you're laughing? I wasn't talking to you. I was talking to John.... And he says, I was laughing-at first he said, 'Well, I thought that was funny.'" (Cioffi Dep. at 147-148, Def.'s App. Supp. Mot. Summ. J.)

(4) On April 22, 1994, Mr. Dowdell allegedly said "eat me" to Ms. Cioffi after they argued over office procedure. Ms. Cioffi complained to Mr. Prushko in a letter dated April 25, 1994. Mr. Prushko interviewed Mr. Dowdell and another employee who had been nearby; both denied making or hearing the statement. No formal action was taken against Mr. Dowdell, but Mr. Prushko counseled Mr. Dowdell about Allen Products' policy against harassment of any kind and warned him not to use inappropriate language in the workplace. Mr. Prushko gave Ms. Cioffi a written report on the outcome of his investigation on June 8, 1994. Later, Mr. Dowdell often read the newspaper while leaning against a wall behind the plaintiff's cubicle.

*3 (5) In April, 1994, Carmen Colon, a co-worker, waved a page with sketches of penises on it in front of Ms. Cioffi. Ms. Colon sometimes left photocopies of off-color jokes on co-workers' desks. Ms. Cioffi claims that Ms. Colon waved the picture in front of her because Ms. Cioffi complained about Mr. Slater's actions noted above. Ms. Cioffi contends she complained about Ms. Colon the day she left Allen Products permanently. Allen Products asserts that Ms. Cioffi never complained about Ms. Colon during her employment and that they first became aware of Ms. Colon's alleged harassing actions when Ms. Cioffi filed her Affidavit of Illegal Discriminatory Practice before the Connecticut Commission on Human Rights and Opportunities ("CCHRO") on September 22, 1994.

(6) Ms. Cioffi alleges that agents and employees of the company, including Mr. Bailer, told off-color jokes in her presence on numerous occasions during her employment. Ms. Cioffi points to one specific instance of a joke told to her over the phone by an Allen Products salesperson. The plaintiff thinks she told Mr. Martin that the joke was disgusting, although she "can't say positive [ly]." (Cioffi Dep. at 267, Def.'s App. Supp. Mot. Summ. J.)

Ms. Cioffi also alleges that several co-workers harassed her in retaliation for her complaints of sex discrimination to management and because Mr. Bailer told several employees about the rumors of Ms. Cioffi's affair with a co-worker.

Ms. Cioffi was absent from work for approximately nine days between April 15, 1994, and June 3, 1994, due to illness, back problems, stress and requested personal time. On June 9, 1994, the plaintiff presented a doctor's note to Mr. Prushko stating that she would be absent from work until June 20, 1994, because she was suffering from stress. On June 20, 1994, Ms. Cioffi returned to work and was asked to cross-train another employee. She became agitated, worked for half a day, and left. She never returned to work.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

Mr. Bailer called Ms. Cioffi's home on June 27, 1994, and spoke to her husband. Mr. Cioffi told Mr. Bailer that Ms. Cioffi was not ready to return to work and asked for worker's compensation forms. Mr. Bailer sent the forms to Ms. Cioffi the next day, along with a letter asking for additional information concerning her status and a medical evaluation. After receiving no response to his inquiry, Mr. Bailer sent a similar letter to Ms. Cioffi on July 6, 1994. Still failing to receive a response, Mr. Bailer sent Ms. Cioffi a letter on July 13, 1994, stating that the company could not continue to keep her position open and would terminate her on July 18, 1994, if she did not explain her absence and provide medical proof of a disability. The plaintiff responded by sending a note from a psychiatrist to Mr. Bailer dated June 28, 1994, which stated that the psychiatrist advised Ms. Cioffi to stay away from work until the situation there was resolved and she felt comfortable returning. Ms. Cioffi did not communicate to anyone at Allen Products after sending the psychiatrist's note, and the defendant terminated Ms. Cioffi's employment, effective November 1, 1994. Allen Products asserts that it terminated Ms. Cioffi in compliance with its normal absence control and job abandonment policy.

*4 Ms. Cioffi filed a charge of discrimination with the CCHRO and the Equal Employment Opportunity Commission ("EEOC") on September 22, 1994. After receiving a right to sue letter from the EEOC, the plaintiff filed the instant action on May 8, 1998.

## II. STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See*Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The determination of what facts are material to a particular claim is made

based upon the substantive law upon which that claim rests. *See*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."*Anderson,* 477 U.S. at 248.

In determining whether there is a genuine issue as to any material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *See*Anderson, 477 U.S. at 255;*Gallo,* 22 F.3d at 1223;*Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See*Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).). However, the non-moving party "may not rest upon mere conclusory allegations or denials."*See*Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir.1997) (internal citations omitted).

On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. *See*Anderson, 477 U.S. at 255;*Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The function of the court at this stage is not to weigh the evidence and determine what is true, but rather to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Although "[a] trial court must be cautious about granting summary judgment to an employer [in a discrimination case] when ... its intent is at issue,"*Gallo,* 22 F.3d at 1224,"it is fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case."*Distasio v . P erkin E lmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998).

## III. DISCUSSION

The court will address Allen Products' motion for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 5
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

summary judgment with respect to the plaintiff's federal and state law claims separately.

## A. Title VII Claims

**\*5** The defendant moves for summary judgment with respect to the plaintiff's Title VII claims of hostile work environment, retaliatory harassment, and constructive discharge. The court will address each claim seriatim.

### 1. Hostile Work Environment

To recover under her Title VII hostile work environment claim, Ms. Cioffi must "establish (1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." ' *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999) (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)).

Allen Products seeks summary judgment on Ms. Cioffi's hostile work environment claim on the grounds that her allegations are neither timely, attributable to Allen Products, nor gender related. *See* *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764-768 (2d Cir.1998) (affirming the district court's decision granting summary judgment in the defendant's favor on the plaintiff's Title VII hostile work environment claim where the district court found that the plaintiff's claims were either time-barred, not attributable to the employer, or not sufficiently severe or pervasive to create a hostile work environment). In the alternative, if the court does consider some or all of the plaintiff's allegations, Allen Products contends that the allegations are not so severe and pervasive as to have altered the conditions of the plaintiff's employment. *See* *id.* at 767-768.

Ms. Cioffi responds that summary judgment is in-

appropriate because genuine issues of material fact exist in that: 1) her claims are timely because the continuing violation doctrine saves those allegations otherwise subject to the statue of limitations; 2) Allen Products should be held liable because its response to the alleged harassment was neither prompt nor effective; and 3) all alleged incidents were gender related. Further, Ms. Cioffi contends that there is a genuine issue of material fact concerning whether the plaintiff's allegations, taken together, are sufficiently severe and pervasive as to have effected the conditions of her employment.

The court will address each argument below.

### a. Timeliness

The defendant contends that the court is precluded from considering any incident relative to the plaintiff's Title VII claim that occurred more than 300 days prior to the filing of her claim with the CCHRO on September 22, 1994, i.e., November 26, 1993. *See* 42 U.S.C. § 2000e-5(e)(1).[FN5] Specifically, the defendant challenges the timeliness of two incidents which allegedly occurred before November 26, 1993, upon which the plaintiff relies in support of her hostile work environment claim: 1) in 1991 or 1992, Mr. Bailer called Ms. Cioffi into his office and asked her about a rumored affair with a co-worker, Fran Connors; and 2) during the winter of 1992-1993, Mr. Dowdell stated to the plaintiff that he would like to see her "run naked through the snow."

> FN5. 42 U.S.C. § 2000e-5(e)(1) states that a Title VII charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ..., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

aggrieved within three hundred days after the alleged unlawful employment practice occurred...."

*6 The plaintiff relies on the continuing violation doctrine to justify the court's consideration of incidents that occurred before November 26, 1993, contending that the aforementioned incidents are, in fact, timely because they are sufficiently related to each other and to the later, timely incidents as to be considered part of a continuing violation. The defendant argues that the continuing violation doctrine does not apply in this case because these two incidents do not bear a sufficient relationship to the alleged incidents occurring after November 26, 1993.

"[A] continuing violation may be found 'where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." ' *Quinn,* 159 F.3d at 766 (quoting *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994)); *see Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) (noting discriminatory seniority lists and discriminatory employment tests as examples of discriminatory policies or mechanisms); *cert. denied,*511 U.S. 1052 (1994). However, " 'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism, do not amount to a continuing violation." ' *Quinn,* 159 F.3d at 765 (quoting *Lambert,* 10 F.3d at 53). No continuing violation may be found where alleged acts were "sufficiently isolated in time (usually from each other, and at least from the timely allegations) as to break the asserted continuum of discrimination." *Quinn,* 159 F.3d at 766.

In the instant case, the court concludes that the challenged incidents are "sufficiently isolated in time ... as to break the asserted continuum of discrimination,"*id.,* because no reasonable jury could find that these two incidents were continuous in time with one another, or with the later, timely al-

legedly harassing acts. These incidents occurred at least a year apart, and the second incident occurred more than a year before the next timely incident alleged in the plaintiff's complaint. Therefore, these incidents are time-barred. *See Quinn,* 159 F.3d at 766 (finding no continuing violation where more than five alleged discriminatory incidents involving various co-workers and supervisors occurred during the five years prior to the timely incidents, with one of the untimely incidents occurring less than a year before the timely incidents); *Osier v. Broome County,* 47 F.Supp.2d 311, 318-319 (N.D.N.Y.1999) (finding no continuing violation where the plaintiff alleged six harassing acts by various co-workers during the two years before the alleged timely harassing acts).[FN6] As a result, the court will not consider these two untimely incidents when assessing the plaintiff's Title VII hostile work environment claim.

> FN6. Notwithstanding the plaintiff's assertion to the contrary, the fact that these incidents occurred in a work environment where co-workers and the president of the company often told off-color jokes does not constitute a continuing violation. Moreover, that Mr. Bailer and Mr. Dowdell were also involved in later, timely incidents does not necessitate the finding of a continuing violation in light of the time between the earlier, untimely incidents and the later, timely ones. *See Osier v. Broome County,* 47 F.Supp.2d 311, 318 (N.D.N.Y.1999) (finding no continuing violation where the untimely incidents were sufficiently isolated in time from one another and from other timely acts committed by the same alleged harasser).

*b. Allen Products' liability*

*7 The defendant contends that it cannot he held responsible for the mirror incident involving Mr. Slater and the "eat me" remark made by Mr. Dowdell because it responded to these incidents in a timely and effective manner. The defendant also

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

denies liability for the incident where Ms. Colon waived sketches of penises in front of the plaintiff and the off-color jokes told by employees of Allen Products on the grounds that Ms. Cioffi never complained about these incidents, thereby preventing Allen Products from addressing them.

Ms. Cioffi argues that summary judgment is not appropriate with respect to these incidents because there remains a genuine issue of material fact as to whether: 1) Allen Products' responses to the mirror incident and the "eat me" statement were timely or effective; and 2) Allen Products should have known about the penis sketches and off-color jokes and should therefore be held responsible for them.

To prevail on her hostile work environment claim against the defendant, the plaintiff "must establish that the conduct which created the hostile environment should be imputed to the employer."*Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992)."When a 'co-employee'-as distinct from a supervisor-is alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." ' *Quinn,* 159 F.3d at 766 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)). The sufficiency of the employer's response to complaints "has to be assessed from the totality of circumstances ... [including] the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2d Cir.1998). The effectiveness of the response should also be considered. *SeeCarter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999) (finding that relevant factors in assessing the reasonableness of remedial measures include whether the company's response was reasonably calculated to end the harassment and may include "whether or not the measures ended the harassment"). The court concludes that no reasonable jury could find Allen

Products liable for the mirror incident or Mr. Dowdell's alleged "eat me" statement because the record clearly demonstrates that Allen Products' responses to Ms. Cioffi's complaints were prompt, proportional to the seriousness and frequency of the incidents, and reasonably calculated to end the harassment.[FN7]

> FN7. To the extent that the plaintiff alleges she had no reasonable avenue of complaint for these incidents, the record clearly demonstrates otherwise, as she filed several written complaints with her employer during the relevant period.

With respect to the mirror incident, it is undisputed that Mr. Martin investigated Ms. Cioffi's complaint and spoke with Mr. Slater the day of the incident. Mr. Slater assured Mr. Martin that he would apologize in writing to Ms. Cioffi, and he did so the next morning. Two days after the incident, Mr. Prushko spoke with Ms. Cioffi and Mr. Bailer about the incident. Mr. Prushko then gave Mr. Slater oral and written warnings indicating that he would be fired if there were any other similar complaints against him. Mr. Slater also told Mr. Prushko that he would pursue psychological counseling, and provided the company with a letter from his psychologist confirming treatment .[FN8]In addition, when Ms. Cioffi asked to be moved to Mr. Martin's desk, which was at the opposite end of the work area from Mr. Slater, she moved within approximately two weeks of Mr. Martin's departure. Ms. Cioffi concedes that there was no other office space available for relocation.

> FN8. That the defendant did not inform Ms. Cioffi of Mr. Slater's psychological treatment does not detract from the reasonableness of the aforementioned remedial measures taken by the defendant.

**\*8** Reviewing the aforementioned facts in the totality of the circumstances, the court concludes that Allen Products' response to Ms. Cioffi's complaint was reasonable in light of the limited gravity of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 8
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

harm inflicted upon the plaintiff due to the adoles-
cent nature of the conduct and her immediate dis-
covery thereof. *SeeBrooks v. City of San Mateo,*
214 F.3d 1082, 1090-1091 (9th Cir.2000)
(affirming summary judgment for the defendant
employer where a co-worker improperly touched
the plaintiff's stomach and breast, because "[t]he
conduct ..., while very offensive, does not rise to
the level of harassment for which Title VII offers a
remedy," especially given that the city took prompt
steps to address the incident); *Baskerville v. Cul-
ligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir.1995)
(finding no sexual harassment where the employ-
ee's supervisor was a "man whose sense of humor
took final shape in adolescence" and where, during
a seven month period, he made several distasteful
comments and gestures, including a gesture inten-
ded to suggest masturbation).

Ms. Cioffi also argues that Allen Products' response
to the mirror incident was not effective because Mr.
Slater's harassment continued in that: (1) he sub-
sequently laughed at a statement made to Ms. Cioffi
by a co-worker that had a sexual connotation/
double-meaning; (2) he pushed back a partition of
his cubicle and repositioned his desk in order to see
her more readily; and (3) his desk was not moved
closer to Mr. Prushko so that Mr. Prushko could
monitor him. However, as none of these subsequent
incidents can fairly be viewed as actionable sexual
harassment, the court concludes that the defendants'
response to the mirror incident was both reasonable
and effective, such that Allen Products may not be
held liable for Mr. Slater's conduct. *SeeBlack v. Za-
ring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.)
(reversing jury verdict in favor of the plaintiff em-
ployee and finding no sexually hostile work envir-
onment where the plaintiff was subjected to sexu-
ally suggestive jokes and comments and was looked
at in a suggestive manner, because the conduct was
merely offensive), *cert. denied,* 522 U.S. 865 (1997).

Turning to Mr. Dowdell's alleged "eat me" com-
ment on April 13, 1994, the court similarly con-

cludes that no reasonable jury could find Allen
Products liable for this incident. Once again, it is
undisputed that after Ms. Cioffi complained, Mr.
Prushko interviewed Mr. Dowdell and another em-
ployee who had been nearby, though both denied
making or hearing the statement. No formal action
was taken against Mr. Dowdell, but Mr. Prushko
counseled Mr. Dowdell about Allen Products'
policy against harassment of any kind and warned
him not to use inappropriate language in the work-
place. Mr. Prushko also gave Ms. Cioffi a written
report on the outcome of his investigation on June
8, 1994.

This response, viewed in the totality of the circum-
stances, was clearly reasonable and timely in light
of the minimal gravity of the situation and the fact
that Mr. Dowdell denied the plaintiff's uncorrobor-
ated allegation. *SeePhillips v. Merchants Ins. Corp
.,* 3 F.Supp.2d 204, 206, 208 (N.D.N.Y.1998)
(granting summary judgment in favor of the de-
fendant employer on sexually hostile work environ-
ment claim where supervisor commented that "she
did not care whether [the plaintiff] had to 'dance
naked in the snow' to get business," asked the
plaintiff "if he thought he was a 'big man on cam-
pus,'" 'directed profanity at him, and "called him
names such as 'little boy,' 'tough son-of-a-bitch,'
and 'dumb man,' ' concluding that "[b]ehavior that
is immature, nasty, or annoying, without more, is
not actionable as sexual harassment").

**\*9** Ms. Cioffi again argues that Allen Products' re-
sponse to the "eat me" incident was ineffective be-
cause Mr. Dowdell's harassment continued after the
incident in that he often read the newspaper while
leaning against a wall behind the plaintiff's cubicle.
Once again, the court concludes that Mr. Dowdell's
subsequent actions do not constitute actionable
sexual harassment. *SeeBlack,* 104 F.3d at 826
(reversing jury verdict in favor of the plaintiff em-
ployee and finding no sexually hostile work envir-
onment where the plaintiff was, among other
things, leered at in a suggestive manner, because
the conduct was merely offensive). Accordingly,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

the defendant may not be held liable for the "eat me" incident because its response was reasonable when viewed in the totality of the circumstances.FN9

> FN9. Ms. Cioffi also argues that Allen Products should be held liable for these incidents because it did not maintain a written policy and failed to conduct anti-harassment training for employees. However, the plaintiff cites to no authority indicating that the existence of a written sexual harassment policy and training, or the lack thereof, is dispositive in the case of co-worker harassment. *Cf.Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999) (stating that, although not necessary, the existence of an anti-harassment policy is an important consideration in determining whether an employer has demonstrated that it exercised reasonable care in preventing and correcting a *supervisor's* sexually harassing conduct, as required for the employer to avoid liability) (emphasis added), *cert. denied,*120 S.Ct. 1959 (2000).

With respect to the defendant's argument that it may not be held liable for the penis sketches and the off-color jokes told by employees because Ms. Cioffi never complained about these incidents,FN10 the court declines to address this argument because, as will be discussed below, these incidents, even when viewed in conjunction with the remaining, timely incidents, do not rise to the level of severity necessary to constitute a hostile work environment.

> FN10. The court notes that the plaintiff offers no evidence demonstrating the basis for the defendant's alleged constructive knowledge of these incidents.

*c. Gender related harassment*

The defendant also seeks to avoid liability for the "eat me" incident and the incident where Mr. Bailer asked the plaintiff about her relationship with a co-worker on the ground that these incidents were not based on gender-related animus. As the court has already precluded consideration of these incidents above, it need not address the defendant's alternative arguments that they were not gender-related.

The defendant also seeks to preclude from consideration the plaintiff's allegation that Ms. Colon showed Ms. Cioffi a picture with sketches of penises on it, arguing that there is no evidence demonstrating that Ms. Colon was harassing Ms. Cioffi because she is a woman. The court again declines to address this argument because, as will be discussed below, this incident, even when viewed in conjunction with the remaining, timely incidents, does not rise to the level of severity necessary to constitute a hostile working environment.

*d. Severe or pervasive discriminatory conduct*

The defendant next argues that the plaintiff's hostile work environment claim must fail because, even if the court were to consider some or all of the plaintiff's allegations, the alleged sexual harassment was not sufficiently severe or pervasive as to give rise to a cause of action. The plaintiff contends that there remains a genuine issue of material fact with respect to this issue.FN11

> FN11. Ms. Cioffi argues that findings by the CCHRO and the Social Security Administration ("SSA"), as well as her diagnosis by Dr. Kligfeld, provide further support for her hostile work environment claim. The plaintiff contends that if the CCHRO, SSA and Dr. Kligfeld could make the determination that she was harassed, then a reasonable jury could come to the same conclusion. This argument is misplaced because the SSA and Dr. Kligfeld were not asked to determine the existence of a Title VII violation, and the plaintiff offers no evidence documenting the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 10
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

CCHRO's finding in the plaintiff's favor. In fact, the defendant contends that the CCHRO failed to make any factual determinations in the plaintiff's case because the plaintiff withdrew her complaint before the CCHRO conducted an administrative hearing.

To establish the existence of a hostile work environment under Title VII, the plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). When analyzing the pervasiveness of the alleged harassment, " 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 768 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)); see*Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577-78 (2d Cir.1989) (stating that in order to be deemed pervasive, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted"); see also*Harris,* 510 U.S. at 21 ("[The] mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."). " 'Simple teasing', offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 82 (1998)). However, "where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition." *Quinn,* 159 F.3d at 768. In other words, Title VII is not to be used as "a general civility code," *Oncale,* 523 U.S. at 80; rather, alleged discriminatory conduct must

be "extreme to amount to a change in the terms and conditions of employment." *Faragher,* 524 U.S. at 788.

*10 There is no precise test for determining what constitutes a hostile work environment. Instead, the court must focus on the totality of the circumstances. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff's work performance."*Harris,* 510 U.S. at 21. These factors must be evaluated from both a subjective and an objective viewpoint. See*id.* at 21-22;*Faragher,* 524 U.S. at 787 ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.").

As the court has determined above that several of the plaintiff's allegations are either untimely or not attributable to Allen Products, it must now determine whether the plaintiff's remaining allegations amount to actionable harassment. See*Quinn,* 159 F.3d at 765-768 (affirming summary judgment for the defendant where the district court first eliminated all untimely incidents and any incidents that could not be attributed to the employer, and then determined if the remaining incidents were sufficiently severe or pervasive as to alter the conditions of the plaintiff's employment). The plaintiff's allegations which are properly before the court are as follows: 1) in 1994, Mr. Bailer mentioned Ms. Cioffi's alleged affair to Mr. Baccili; 2) in April, 1994, Carmen Colon waved a page with sketches of penises on it in front of Ms. Cioffi and would often place photocopies of off-color jokes on co-workers' desks; 3) off-color jokes were told in Ms. Cioffi's presence on numerous occasions during her employment by agents and employees of the company, including Mr. Bailer; [FN12] 4) Mr. Dowdell often read the newspaper while leaning against a wall behind the plaintiff's cubicle; and 5) in June, 1994,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

Mr. Slater laughed at a statement made to Ms. Ciof-fi by a co-worker that had a sexual connotation/ double-meaning.

> FN12. The defendant argues that Allen Products cannot be liable for off-color jokes told in Ms. Cioffi's presence because she cannot remember who made the jokes, where or when they were made, or what they were about. The plaintiff contends that it is normal for her to suppress the memories of repulsive behavior and fur-ther, there was no mechanism for com-plaint because the joke-teller was most of-ten the president of the company. The court declines to address this argument be-cause the remaining incidents of harass-ment cited by the plaintiff, even including the joke-telling, are not sufficiently severe or pervasive as to constitute a hostile working environment, as explained below.

Viewing the above incidents in their totality, the court concludes that no reasonable jury could find that these five incidents created an actionable hos-tile work environment for the plaintiff. Ms. Cioffi has alleged sufficient facts to support the subjective portion of her hostile work environment claim, at-testing that the alleged harassment caused her to be absent from work due to stress, to seek psychiatric help and, finally, to leave work permanently. *See Brooks v. City of San Mateo,* 214 F.3d 1082, 1088-89 (9th Cir.2000) (finding sufficient facts to support the subjective portion of the plaintiff's hos-tile work environment claim where the alleged har-assing incident "pervaded her work environment to such a degree that she required psychological help and even then was unable to successfully return to her job"). However, when viewed objectively, the court concludes that these five incidents cannot be found to be severe or pervasive enough to alter the conditions of Ms. Cioffi's employment and create an abusive working environment.

**\*11** The five incidents are clearly offhand com-ments, "mere offensive utterances" and isolated in-cidents, which numerous courts have made clear do not amount to discriminatory changes in the terms and conditions of a plaintiff's employment. *See, e.g.,Faragher,* 524 U.S. at 788 ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view."); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000) (affirming summary judg-ment for the defendant employer where, over a sev-enteen month period, the plaintiff's supervisor fre-quently told jokes with sexual overtones, once re-ferred to the female plaintiff as "Hot Lips," c om-mented about the plaintiff's state of dress, and made a statement that could be construed as telling the plaintiff that she could get a better review if she performed sexual favors for him, concluding that the harassing supervisor's behavior was the "kind of simple teasing, offhand comments, and isolated in-cidents that *Faragher* made clear did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment"); *Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 773 (4th Cir.1997) (affirming summary judgment for the defendant employer where male co-workers regularly made off-color statements to the plaintiff and other wo-men employees, stating that "[t]here was no allega-tion that [the plaintiff] was inappropriately touched, propositioned, flirted with, taunted, or even ogled," that none of the alleged comments "were even vul-gar, much less obscene," and that the co-worker's behavior "falls well short" of harassing behavior that is so severe or pervasive as to render the work-place objectively hostile or abusive). The court notes that most of the off-color jokes cited by the plaintiff were not directed toward Ms. Cioffi per-sonally, but to the defendant's employees in gener-al. *SeeMorris,* 201 F.3d at 790 (stating that, when allegedly offensive jokes frequently told by a su-pervisor were not aimed at the plaintiff, these cir-cumstances "can be relied upon as part of a court's conclusion that a defendant's conduct was not severe enough to create an objectively hostile en-vironment"); *Sedotto v. Borg-Warner Protective Services Corp.,* 94 F.Supp.2d 251, 265

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

(D.Conn.2000) (finding no evidence that the plaintiff was harassed because of her sex where her supervisor criticized and ridiculed her, but he was that way with everyone and he never said anything of a sexual nature directly to the plaintiff). Finally, Ms. Cioffi was not physically touched, threatened or propositioned. See Morris, 201 F.3d at 790 (affirming district court's finding that a male supervisor's harassment was not sufficiently severe or pervasive as to create a hostile working environment where the supervisor made a statement that could be construed as telling the plaintiff that she could get a better review if she performed sexual favors for him because "[a]lthough [the supervisor's] purported sexual advance was truly offensive, it was the only advance that [he] allegedly made"); Quinn, 159 F.3d at 768 (affirming summary judgment for the defendant employer where the plaintiff's supervisor allegedly told her that she had been voted the "sleekest ass" in the office and touched her breasts with papers he was holding).

**\*12** In summary, Ms. Cioffi may have found her work environment unpleasant, and the sexual banter may have been boorish, but her workplace cannot be found to be hostile under Title VII. See Faragher, 524 U.S. at 788 ("[The] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' ") (quoting Oncale, 118 S.Ct. at 1002); Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir.1998) ("The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute a violation of [Title VII].... 'On one side lie sexual assaults; ... physical contact ...; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures.... On the other side lays the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." ') (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995)). Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's hostile work environment claim contained in count one of the complaint is

granted.

*2. Retaliatory Harassment*

Allen Products also seeks summary judgment with respect to Ms. Cioffi's retaliatory harassment claim on the ground that: 1) there is no evidence that the plaintiff was harassed because she engaged in a protected activity; 2) the alleged retaliatory harassment was not sufficiently severe or pervasive as to constitute an adverse employment action; and 3) Allen Products took reasonable actions to eliminate any conduct about which the plaintiff complained. While Ms. Cioffi does not respond to the defendant's motion on this count, the court analyzes the merits of her claim below.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [she] has opposed any practice made an unlawful employment practice by this title."42 U.S.C. § 2000e-3(a)."To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision."Richardson v. New York State Dept. of Correctional Serv., 180 F.3d 426, 443 (2d Cir.1999). With respect to retaliation by co-workers, the Second Circuit Court of Appeals went on to state in Richards:

We adopt the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case.

...

Just as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate re-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

medial action, so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it.

***13** *Id.* at 446 (citations omitted).

There is no dispute that Ms. Cioffi participated in a protected activity when she complained to supervisors about alleged harassment. The parties' dispute presumably centers on whether Ms. Cioffi was subjected to any disadvantageous employment actions and, if so, what causal connection, if any, existed between those actions and her protected activity.

Although Ms. Cioffi fails to state in her complaint exactly which of the alleged incidents of sexual harassment were retaliatory in nature, the court gleans from her deposition and other exhibits submitted in connection with the instant motion eight possible incidents which Ms. Cioffi may claim were retaliatory because they occurred after she complained about the mirror incident: [FN13] 1) an unspecified incident with Carmen Colon; 2) Karen Bragdon, a co-worker, listened into a conversation between Ms. Cioffi and a customer; 3) the "eat me" incident; 4) sometime between the mirror incident and May 20, 1994, Mr. Bailer called Ms. Cioffi into his office and talked with her about "getting along" with others in the workplace; 5) incidents where male co-workers "accidently" bumped into Ms. Cioffi; 6) Ms. Cioffi walked into the coffee room one day and a co-worker stopped talking, stating that he could not continue his conversation because of "present company"; 7) Mr. Slater laughed at a joke that he heard between Ms. Cioffi and another co-worker; and 8) Ms. Colon waived the paper with sketches of penises in front of Ms. Cioffi.

> FN13. Ms. Cioffi stated at her deposition that she was also harassed by co-workers after Mr. Bailer spoke with un-named persons about the plaintiff's alleged affair with a co-worker. Because Ms. Cioffi did not complain to anyone about Mr. Bailer's in-

quiring about the affair, this is not a protected activity upon which she may base her retaliation claim.

For the same reasons iterated previously, these incidents, even if they were somehow retaliatory in nature,[FN14] were either not attributable to Allen Products because it responded appropriately to the plaintiff's complaints, or were not severe or pervasive enough to constitute adverse employment actions.

> FN14. The court notes its reservations concerning the plaintiff's ability to establish the necessary causal connection between allegations of mistreatment at the hands of un-named co-workers and her complaints to her supervisor.

Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's retaliation claim contained in count two of the complaint is granted.

### 3. Constructive Discharge

Although not included in her original complaint, Ms. Cioffi raises a claim of constructive discharge in her response to the defendant's statement of undisputed facts. (*See* Pl.'s Resp. Def.'s Statement Undisputed Facts, ¶ 19 (stating "the fact that Mr. Slater underwent counseling would have no impact on [the plaintiff's] claim of constructive discharge").) The court will therefore examine the merits of such a claim below, notwithstanding the fact that neither party addressed this claim in their briefs.

"To establish a constructive discharge, a plaintiff must show that the employer deliberately [made her] working conditions so intolerable that [she was] forced into an involuntary resignation."*Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993) (internal citation and quotations omitted)." 'Deliberateness exists only if the actions complained of were intended by the employer as an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

effort to force the employee to quit." ' *Leson v. ARI of Connecticut, Inc.,* 51 F.Supp.2d 135, 143 (D.Conn.1999) (quoting *Lombardo v. Oppenheimer,* 701 F.Supp. 29, 30 (D.Conn.1987)). "Intolerability is measured by a reasonable person standard and not by the employee's subjective feelings." *Id.*

**\*14** The Second Circuit has noted that "a constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant."*Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993); *seeStetson,* 995 F.2d at 360 ("A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments."). Indeed, the standard for constructive discharge is "a demanding one ." *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985) (determining that the plaintiff's resignation due to humiliation over her employer's loud mention of her having to take a polygraph test and her burdensome working conditions did not amount to a constructive discharge).

The court concludes from the pleadings that, in support of her constructive discharge claim, Ms. Cioffi would contend that Allen Products did not take her complaints seriously and that this lack of care created an intolerable working environment resulting in her constructive discharge when she left work on June 20, 1994, and was unable to return.[FN15]

> FN15. To the extent that Ms. Cioffi may rely on the fact that Allen Products requested that she train another employee on her last day of work in support of her constructive discharge claim, such a claim is unavailing because it is reasonable to believe that Allen Products was attempting to secure back-up for Ms. Cioffi's duties in light of her absences during the preceding

two months. *SeeSedotto v. Borg-Warner Protective Services Corp.,* 94 F.Supp.2d 251, 261 (D.Conn.2000) (stating that if an employee is dissatisfied with the work assignments she received, this is not enough to show that an employer intended the employee to quit).

However, Ms. Cioffi has failed to allege any facts from which a reasonable jury could conclude that the defendant intentionally created an intolerable working atmosphere for the purpose of inducing her resignation. First, the court has already determined that Allen Products responded reasonably to Ms. Cioffi's actionable complaints. In addition, Ms. Cioffi was given new responsibilities, a promotion and a raise in pay in late April, 1994, after she had complained about several instances of alleged harassment including the "mirror incident." *SeeSedotto v. Borg-Warner Protective Services Corp.,* 94 F.Supp.2d 251, 261 (D.Conn.2000) (concluding that the plaintiff produced insufficient evidence of intent in support of her Title VII constructive discharge claim where the plaintiff was offered another district to manage, was given a raise, her performance was considered good, and she received a substantial bonus during the three months before she quit work). Finally, the court notes that Mr. Bailer held the plaintiff's job open for five months without receiving the requested medical documentation supporting her absence before terminating her employment. *SeeViera v. Olsten/Kimberly Quality Care,* 63 F.Supp.2d 413, 418 (S.D.N.Y.1999) (finding former employee was not actually or constructively discharged where she was offered a new position during company reorganization that provided same salary and benefits as she currently received, she was aware that her failure to accept position would be treated as voluntary resignation, and employer waited nearly two months before compelling her to decide).

**\*15** Therefore, the plaintiff has failed to produce sufficient facts to establish a prima facie case of constructive discharge, and the defendant's motion

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)
**2000 WL 33180448 (D.Conn.)**

for summary judgment is granted with respect to this claim.

## B. State Law Claims

It is well settled that when all federal claims are eliminated, a federal court should decline to exercise jurisdiction over any remaining state law claims. *SeeCarnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1998) (holding that a federal court should decline to exercise jurisdiction over pendant state law claims absent federal claims); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) (holding that a federal court should hesitate to exercise jurisdiction over state claims absent federal claims); *DiLaura v. Power Auth. of New York,* 982 F.2d 73, 80 (2d Cir.1992) (holding that it is in the discretion of the court to relinquish jurisdiction over supplemental state claims absent federal claims). Accordingly, because there are no viable federal claims pending against the defendant, the court declines to exercise jurisdiction over the plaintiff's remaining state law claims of negligent hiring and/or retention and intentional infliction of emotional distress contained in counts three and four of her complaint, respectively. These claims are hereby dismissed without prejudice. As the plaintiff has withdrawn her claim of negligent infliction of emotional distress contained in count five of the complaint, this claim is dismissed with prejudice.

## IV. CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment (doc. # 32) is GRANTED with respect to the plaintiff's Title VII claims. The plaintiff's state law claims of negligent hiring and/or retention and intentional infliction of emotional distress are dismissed without prejudice. The plaintiff's claim of negligent infliction of emotional distress is dismissed with prejudice. The clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2000.
Cioffi v. Allen Products Co.
Not Reported in F.Supp.2d, 2000 WL 33180448 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.