## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KIMBERLY BACHIOCCHI,** | : | |
| Plaintiff, | : | |
| | : | Civil Action No.:  02-CV-908 (CFD) |
| v. | : | |
| | : | August 4, 2008 |
| **THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY,** | : | |
| Defendant. | : | |

## DEFENDANT SNET'S MEMORANDUM OF LAW IN SUPPORT OF MOTION IN THE ALTERNATIVE FOR REMITTITUR AND FOR A NEW TRIAL

SNET has filed on this same date a Motion for Judgment as a Matter of Law and an accompanying memorandum of law in support of the motion.  If that motion is not granted by the Court, in the alternative, SNET hereby moves for remittitur of the punitive damages award and for a new trial.

## I.    Legal Standard

A new trial may be granted under Rule 59(a) of the Federal Rules of Civil Procedure "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Unlike the standards applicable to a motion for judgment as a matter of law, "a motion for a new trial pursuant to Fed. R. Civ. P. 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice."  Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks

omitted).  See also Martin v. Moscowitz, No. 06-4624-CV, 2008 U.S. App. LEXIS 7097, at *9 (2d Cir. Apr. 2, 2008) (same).  Rule 59(a) "has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) 'may  be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'"  Manley v. Ambase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003) (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998)).

A new trial may be warranted for flawed jury instructions.  Where such instruction "misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous." Cobb v. Pozzi, 363 F.3d 89, 112 (2d Cir. 2003).  Jury instructions found to be erroneous "mandate[] a new trial unless the error is harmless."  Id; see also Plagianos v. Am. Airlines, Inc., 912 F.2d 57, 59 (2d Cir. 1990) ("A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law.")  A new trial must be ordered "if, considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party." Jacques v. DiMarzio, Inc. 386 F.3d 192, 200 (2d Cir. 2004).  Instructions that misconstrue the standard of liability require a new trial because such errors go to the heart of a plaintiff's claim.  See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 119 (2d Cir. 2000) (granting a new trial based on the District Court's failure to instruct jury on the correct legal standards); LNC Invs., Inc. v. First Fid. Bank, 173 F.3d 454, 463 (2d Cir. 1999) (finding an erroneous instruction on the standard of liability was not harmless error and required a new trial).

Here, all of the reasons supporting judgment as a matter of law discussed in

SNET's separately filed Motion for Judgment as a Matter of Law, together with the

excessive punitive damage award, the Court's instructions concerning punitive damages

and unlawful sexual harassment, the  evidentiary rulings at trial, and the omission of the

affirmative defense from the jury verdict form failed to adequately inform the jury on the

law and misconstrued the standard of liability, SNET's affirmative defense, and the

standard for awarding punitive damages.  Accordingly, defendant moves for remittitur

and for a new trial.

I.      **The Court Should Order a New Trial with Regard to Plaintiff's Claim for Punitive Damages.**

     A.      **The Punitive Damages Award Is Grossly Excessive Based on the Evidence Presented at Trial.**

The Supreme Court has instructed that "punitive damages should only be awarded

if the defendant's culpability, after having paid compensatory damages, is so

reprehensible as to warrant the imposition of further sanctions to achieve punishment or

deterrence." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).  In

this case, SNET respectfully submits that it is entitled to a remittitur on the basis of the

excessive nature of the punitive damages award, even if the Court disagrees with SNET's

argument that the entire punitive damages award lacks a legally sufficient basis in the

evidence. See Memorandum in Support of Motion for Judgment as a Matter of Law

being filed on this same date.  When viewed in light of the allegations and proof

presented at trial, the compensatory damages award, and the amount of punitive damage

awarded in similar cases, the eighty thousand dollar award is clearly extreme and

unreasonable.  In fact, it is not even clear to defendant what conduct led to the jury's

award of punitive damages, particularly in light of the relatively negligible compensatory

damage award to the plaintiff.

Because "punitive damages pose an acute danger of arbitrary deprivation of property," the Supreme Court has instructed courts to consider "three guideposts" in reviewing punitive damages awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the action or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id. at 417-18. In judging the reasonableness of a punitive damage award, the Supreme Court has emphasized that "the most important indicium . . . is the degree of reprehensibility of the defendant's conduct." Id. at 419.

This case presents none of the "aggravating factors associated with particularly reprehensible conduct." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 581 (1996); see also State Farm Mut., 538 U.S. at 419 (instructing courts to assess reprehensibility by considering whether "the harm caused was physical as opposed to economic; the tortious conduct evidenced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident"). Here, there was clearly no assault or other physical aspect to the conduct complained of by the plaintiff. There was no danger to plaintiff's safety, nor did the evidence evince an indifference or reckless disregard for the health or safety of others. No "malice, trickery or deceit" was involved. Moreover, plaintiff was not financially vulnerable in either a relative or absolute sense. Overall, the

alleged conduct in this case could not be classified as reprehensible, outrageous, or egregious, especially when compared to other sexual harassment cases.

As for the second guidepost, the measure of punishment must be "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm Mut., 538 U.S. at 426. Given the circumstances, the eighty thousand dollar punitive damage is neither reasonable nor proportionate to the amount of actual harm or potential harm. The relatively low compensatory damage award suggests a finding by the jury that plaintiff was not seriously harmed, notwithstanding her claims of severe emotional distress at trial. Furthermore, the 4:1 ratio of punitive damages to compensatory damages is at the outermost end of the constitutional spectrum delineated by the U. S. Supreme Court. See id. at 425 (finding "instructive" the "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish"); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991) (noting that even though the case involved "intentional malicious, gross, or oppressive fraud," the punitive to compensatory damages ratio of more than 4:1 "may be close to the line").

In the District of Connecticut, courts have repeatedly approved the use of a 2:1 ratio of punitive damages to compensatory damages in discrimination cases. See, e.g., Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 215 (D. Conn. 2006) (noting in retaliation-constructive discharge case that "the ratio between the back pay damages, the sum of $125,000 and the punitive damages award of $195,000, is less than 2:1, and is therefore reasonable"); Oliver v. Cole Gift Ctrs., Inc., 85 F. Supp. 2d 109, 115 (D. Conn. 2000) (finding in pregnancy discrimination and retaliatory discharge case that "[t]he

punitive damage award [of $200,000], only twice the compensatory damages, is clearly

not disproportionate"). Both of those cases involved a finding of discriminatory

discharge by the defendant, and therefore involved much more serious harm to the

plaintiff than the harm that was caused in this case. Moreover, in keeping with those

cases, in a landmark decision, the U. S. Supreme Court held less than two months ago

that a 1:1 ratio between compensatory and punitive damages is "a fair upper limit" in

maritime cases that have "no earmarks of exceptional blameworthiness." Exxon

Shipping Co. v. Baker, No. 07-219, 2008 U.S. LEXIS 5263, at *75-76, 128 S. Ct. 2605

(June 25, 2008). Based on the above authority, the second guidepost also militates in

favor of finding the punitive damage award in this case to be excessive and unreasonable.

Finally, the third guidepost suggests that the punitive damage award should be

lowered to better reflect the low degree of reprehensibility of SNET's conduct. In cases

where the degree of reprehensibility is low, courts in this Circuit have routinely reduced

the amount of punitive damages to amounts well below eighty thousand dollars. See,

e.g., Lamberson v. Six West Retail Acquisition, Inc., No. 998 Civ. 8053, 2002 U.S. Dist.

LEXIS 478, at *19-23 (S.D.N.Y. Jan. 16, 2002) (reducing punitive damages award to

$30,000, or a 2:1 ratio, in retaliation case where the degree of reprehensibility was low,

the evidence of malice was "slight," and the defendants were "dealing with a difficult

employee"); Fernandez v. N. Shore Orthopedic Surgery & Sports Med., P.C., 79 F. Supp.

2d 197, 206-09 (E.D.N.Y. 2000) (reducing punitive damage award to $50,000 in

retaliation case where the degree of reprehensibility was low and no compensatory

damages were awarded); Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 415

(S.D.N.Y. 1996) (reducing punitive damage award from $250,000 to $50,000 where the

retaliatory conduct was "serious but not repugnant" and the amount, representing a 2:1 ratio, is "significant enough to deter even a company as large as [the defendant] from repeating such retaliation," and "more properly reflects the severity of this case in relation to the maximum available award for the full range of Title VII cases").

The Supreme Court noted in State Farm Mut., 538 U.S. at 419, that "the absence of all of [the guideposts] renders any award suspect." Id.  Furthermore, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damage award." Id. at 427; see also BMW of N. Am., 517 U.S. at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business."). Here, after analyzing the facts under Gore, it is apparent that all three guideposts weigh in favor of reducing the punitive damages award in this case to no more than $40,000, or a ratio of 2:1.  Such an award would serve the purpose of deterring future conduct, while also taking into account the low degree of reprehensibility and the relatively low awards in similar cases in this jurisdiction.

**B.**     **No Jury Instruction Should Have Been Given on Punitive Damages and Therefore Remittur is Warranted.**

As set forth in SNET's separately filed Memorandum of Law in Support of Motion for Judgment as a Matter of Law ("Motion for Judgment"), no jury instruction should have been given as to punitive damages because plaintiff produced no evidence that a supervisor serving in a "managerial capacity" for SNET acted with malice or reckless indifference to her federally protected rights, and because SNET established at trial that it made good faith efforts to enforce its anti-discrimination policies.  SNET

hereby incorporates by reference the facts and legal authority set forth in its Motion for Judgment on this issue.

**II.    The Court Should Order a New Trial on Plaintiff's Sexual Harassment Claim.**

SNET also requests a new trial on plaintiff's sexual harassment claim because of problems with the jury instructions, evidentiary rulings, and the use of a verdict form that did not allow the jury to find in SNET's favor on its affirmative defense.

**A.    The Court's Instructions to the Jury on Sexual Harassment Merit a New Trial.**

**1.    The Jury Instructions Erroneously Instructed the Jury to Apply a "Reasonable Woman" Standard, Creating a Likelihood That the Male Jurors Deferred to the Female Jurors on the Sexual Harassment Claim.**

It is well settled that to prove a claim of sexual harassment claim, the plaintiff must demonstrate that the allegedly sexually harassing environment was objectively hostile or abusive, not merely that the plaintiff subjectively perceived it as such. The Second Circuit has explained, "[a] work environment will be considered hostile if a ***reasonable person*** would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999); see also Harris v. Forklift Sys., 510 U.S. 17, 21-22 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview"). Thus, the appropriate standard for determining whether an environment is objectively hostile or abusive is "whether a ***reasonable person*** who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." Richardson v. New York State

Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (citing Harris v. Forklift Sys., 510

U.S. at 21 (emphasis added).

Here, however, the Court did not instruct the jury on the "reasonable person"

standard.  Instead,  over SNET's objection, the Court instructed the jury:

> You must look at all the circumstances surrounding the unwelcome
> conduct and determine: . . .  whether a *reasonable woman* in Ms.
> Bachiocchi's position would have found the working environment to be
> hostile or abusive.  That is you must evaluate all of the circumstances in
> this case and determine whether a *reasonable woman* in a similar working
> environment and under similar circumstances would have been offended
> by the unwelcome conduct in question.

Jury Instructions 17 (emphasis added).

The Second Circuit has rejected the view of some other circuits that look to the

perspective of the particular gender or ethnic group, e.g., a "reasonable African-

American" or a "reasonable Jew,'" as opposed to the "reasonable person" in determining

whether conduct is objectively hostile or abusive.   Richardson v. New York State Dep't

of Corr. Serv., 180 F. 3d at 436 n. 3.  The Second Circuit relied on  Harris v. Forklift

Systems in holding that the appropriate standard to determine whether the environment

is objectively hostile or abusive is the "reasonable person," and while recognizing the

existence of dicta in the circuit supporting a different approach, the Second Circuit

clarified that the "reasonable person" in the plaintiff's position is the proper approach.

Id.  In rejecting the standard of the particular ethnic or gender group as appropriate, the

Second Circuit further explained that the "reasonable person" standard:

> makes clear that triers of fact are not to determine whether some ethnic or
> gender groups are more thin skinned than others.  Such an inquiry would
> at best concern largely indeterminate and fluid matters according to
> location, time, and current events.  It might also lead to evidence,
> argument, and deliberations regarding supposed group characteristics and
> to undesirable, even ugly, jury and courtroom scenes.

Id.  It could also lead jurors who are not members of the protected group to defer to jurors in the protected group.  Since Richardson, courts in the Second Circuit have specifically rejected the "reasonable woman" standard,  just as a Court should reject instructing a jury to apply a "reasonable black woman" standard, or a "reasonable disabled person" or "reasonable homosexual" standard. See, e.g., Hasbrouck v. BankAmerica Hous. Servs., Inc, 105 F. Supp.2d 31, 37 n.10 (N.D.N.Y. 2000) (rejecting the plaintiff's argument that the Court use a "reasonable woman" standard because "[t]he Second Circuit specifically rejected this approach in Richardson").

SNET's research has uncovered no decision applying the "reasonable woman" standard under Connecticut law.   In fact, the Connecticut Superior Court recently rejected a plaintiff's attempt to rely upon the Ninth Circuit's decision that adopted the "reasonable woman" standard, noting that "no Connecticut court . . .has adopted such a standard."   Dichello v. Marlin Firearms Co., CV-065002796S, 2007 Conn. Super. LEXIS 223 at *11 n.2  (Conn. Super. Ct. Jan. 22, 2007).

SNET was prejudiced by the Court's use of the incorrect standard for determining whether the conduct alleged was objectively hostile or abusive.  First, it is an inaccurate statement of the law.  Secondly, such a standard would likely cause the male jurors to defer to the female jurors in determining whether the conduct alleged constituted sexual harassment, which is impermissible.

**B.      The Jury Instructions Failed to Inform the Jury that Any Conduct Considered to Support Plaintiff's Claim of Sexual Harassment Must be "Because of Her Gender."**

In order to maintain a sexual harassment claim, it is not enough that the plaintiff was subjected to harassment.  The plaintiff must prove that the harassment was *because*

*of her gender*.  Title VII specifically states that "[i]t shall be an unlawful employment

practice for an employer . . . to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, *because of* such individual's race, color,

religion, sex, or national origin."  42 U.S.C. §2000e(2)(a)(1) (emphasis added).  Relying

on the United States Supreme Court's decision in <u>Oncale v. Sundowner Offshore Servs.</u>

<u>Inc</u>., 523 U.S. 75 (1998), the Second Circuit explained, "[i]t is axiomatic that

mistreatment at work . . . through subjection to a hostile environment  . . .  is actionable

under Title VII only when it occurs because of an employee's sex, or other protected

characteristic. "  <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001) (upholding grant

of summary judgment where the plaintiff had not carried her burden of showing that the

highly cruel and vulgar harassment she faced was because of her sex, as opposed to being

related to her purported affair with a co-worker as well as a union related conflict).

Based upon this well established law, SNET's proposed  jury instructions stated

that plaintiff must prove she was harassed because of her sex.  First, the defendant's

definition of sexual harassment  included as an element that Ms. Bachiocchi must prove

the supervisor's unwelcome harassment "was motivated by Ms. Bachiocchi's sex, that is,

the fact that she is a woman" to sustain her claim.  Def.'s Proposed Jury Instructions 19.

Second, SNET also proposed a jury instruction that elaborated on that element which

stated:

> . . . In order to prevail on a claim of an unlawful hostile work
> environment, a plaintiff must show that the environment was hostile
> because of a protected trait, in this case plaintiff's sex.  "[W]hile the
> harassment complained of need not take the form of sexual advances or
> explicitly sexual conduct in order to be actionable under Title VII, the
> plaintiff is required to establish that the conduct was based on her gender."

You must decide whether the conduct about which Ms. Bachiocchi complains was because of her gender or for some other reason.

In essence, in determining plaintiff's hostile work environment claim, if you find that Ms. Bachiocchi was subjected to an environment that was permeated with discriminatory intimidation and ridicule because she was a woman, then you must find in her favor on the hostile work environment claim. If, on the other hand, you decide that SNET's treatment of Ms. Bachiocchi was a non-discriminatory response to the quality of her work, or otherwise did not rise to the level of an unlawful hostile work environment based on sex, then you must find in favor of SNET on the hostile work environment claim.

Def.'s Supplement to Joint Trial Mem. 7.

In addition, given that most of the conduct plaintiff relied upon at trial was gender-neutral, and the Second Circuit's direction that "to the extent that the plaintiff relies on facially neutral incidents . . . she must have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus;" Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002); SNET's proposed a jury instruction directed the jury that in determining whether the alleged gender-neutral conduct constituted a violation of Title VII or CFEPA, the jury must find that each event was not actually gender-neutral, but instead occurred because of plaintiff's gender. Otherwise, such conduct could not form the basis for a state or federal law violation. Specifically, SNET proposed the following jury charge:

You have heard testimony concerning many events that Ms. Bachiocchi claims occurred during her employment at BCS. Some of the events are gender-neutral on their face, and some of them are not. Before you consider any gender-neutral events, you must first find that each event was not, in fact, gender-neutral and instead occurred because Ms. Bachiocchi is a woman. In deciding whether Ms. Bachiocchi's work environment was hostile, you may rely only on those incidents, circumstances, and events that you find occurred because Ms. Bachiocchi is a woman.

Def.'s Supplemental Proposed Jury Instructions 5.

The Court, however, did not include any of the defendant's jury instructions on this issue and instead instructed the jury that to prevail, the plaintiff need only show "the abusive conduct was motivated, *at least in part*, by Ms. Bachiocchi's gender – that is, the fact that she is a woman." Jury Instructions 15 (emphasis added). This instruction did not explain to what extent the conduct must be motivated by gender, did not explain what the term "because of gender" means or how to address the gender-neutral conduct alleged by plaintiff. The instruction likely caused the jury to be misled as to the standard of liability on the sexual harassment claim.

### C.    The Court Failed to Instruct the Jury as to Events That Could Not be Considered in Determining Whether Plaintiff's Work Environment was Hostile.

In its jury instructions, the Court failed to address conduct that could not be considered by the jury in determining whether plaintiff's work environment was hostile or abusive.

First, the court failed instruct the jury that sexual harassment cannot include conduct of which Ms. Bachiochi was not aware while in the BCS Group. See Def.'s Proposed Jury Instructions 22; see also Def.'s Supplemental Proposed Jury Instructions 1-2. It is axiomatic that if the plaintiff was not aware of some alleged conduct, then the conduct could not have been part of a hostile or abusive work environment she experienced, nor could it have altered the terms and conditions of her employment as required for a hostile work environment claim under Title VII and CFEPA. See Harris v. Forklift Sys., 510 U.S. 17, 21-22 (1993) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."); Cottrill v. MFA, Inc., 443

F.3d 629, 636 (8th Cir. 2006), <u>cert</u>. <u>denied</u>, 127 S.Ct. 394 (2006) ("A Title VII plaintiff

may only rely on evidence relating to harassment of which she was aware during the time

that she was allegedly subject to a hostile work environment.") (internal quotation marks

omitted); <u>Mason v. S. Ill. Univ. at Carbondale</u>, 233 F.3d 1036, 1046 (7th Cir. 2000)

("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never

experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other).  Thus, for

alleged incidents of harassment to be relevant for showing the severity or pervasiveness

of the plaintiff's hostile work environment, ***the plaintiff must know of them***. See also

<u>Burnett v. Tyco Corp.</u>, 203 F.3d 980, 981 (6th Cir. 2000) (disregarding affidavits about

harassing behavior submitted by other employees because there was no evidence that

plaintiff was aware of that behavior at the time of the alleged harassment); <u>Hirase-Doi v.</u>

<u>U.S. West Commc'ns, Inc.</u>, 61 F.3d 777, 782 (10th Cir. 1995), <u>abrogated in part on other</u>

<u>grounds by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998) and <u>Faragher v. City</u>

<u>of Boca Raton</u>, 524 U.S. 775 (1998) (plaintiff could rely only on evidence relating to

harassment of which she was aware).

Furthermore, the comments alleged to have been made by Vallario to Faiella (of

which plaintiff was admittedly not aware), inquiring whether her breasts were real and if

she were a good lover were overtly sexual and of a wholly different character than the

comments plaintiff alleged Vallario actually said to her.[1]  Thus, the inclusion of the

alleged comments whether her breasts were real and whether she was a good lover by

Vallario to Faiella were highly prejudicial to SNET, changed entirely the character of the

---

[1]    Plaintiff claims Vallario said to her, "what's with you and Nick," and "you're not so bad,  if I were younger, I would go for you himself," that Nick's wife put up with a lot, and that Nick was old and sick and Vallario could "take him out with one punch."  These comments are much less sexually offensive on their face than those alleged to have been directed to Faiella and not heard by plaintiff.

alleged comments in the case, and were likely considered by the jury to be part of plaintiff's environment even though such consideration was contrary to law. They were not part of plaintiff's Complaint in this case, were not part of any hostile work environment plaintiff may have been subjected to, and should not have been placed before the jury on plaintiff's sexual harassment claim.

Second, the Court failed to instruct the jury that they could not consider events that happened after plaintiff left the BCS Group. As with the conduct of which plaintiff was not even aware, conduct that occurred in the BCS Group <u>after</u> plaintiff left the group to work in another department could not have led her to believe that the environment was hostile or abusive. <u>See</u> Def.'s Proposed Jury Instructions 23.

Third, the Court denied SNET's request for a jury instruction that conduct plaintiff did not believe was sexually offensive, such as the actions by Faiella or West, could not be considered in determining whether a hostile work environment existed, and thus, the evidence to be considered on her sexual harassment claim was limited to that conduct plaintiff testified she did find offensive, by John Dunn, Bob Vallario and Richard Light. As set forth herein, it is well settled that the determination as to whether an environment is hostile or abusive has both subjective and objective elements. Both elements must be satisfied. As the Supreme Court stated, "[i]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21-22 (1993). Plaintiff testified that she believed she was sexually harassed by Light, Vallario, and Dunn only. Therefore, the Court's failure to instruct the jury to limit its consideration to the conduct of those three individuals

erroneously led the jury to believe they could include conduct that plaintiff did not subjectively perceive to be hostile or abusive.

Fourth, the Court included a misleading instruction that "rude" behavior could constitute sexual harassment. However, it is settled that rudeness is not the legal equivalent of harassment. See Sardina v. United Parcel Serv., Inc., 254 Fed. Appx. 108, 110 (2d Cir. 2007) ("Title VII aims to eradicate discrimination on the basis of sex, not enact a general civility code on the American workplace.") (internal quotation marks omitted); Minor v. Ivy Tech State Coll., 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex if the employee, to be classified as discriminatory."); see also Joens v. John Morrell & Co., 354 F.3d 938, 941 (8th Cir. 2004) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.") (internal quotation marks omitted).

In conclusion, when viewed in their totality, the Court's improper instructions concerning the sexual harassment claim, including the implication that the jury should defer to what a "reasonable woman" as opposed to a "reasonable person" would consider abusive, that the conduct need only be motivated *at least in part* due to plaintiff's gender, omitting the proposed instructions that explained how to evaluate the gender-neutral conduct, and omitting instructions concerning conduct that cannot, as a matter of law, be considered in determining whether the work environment was hostile or abusive,

confused and/or misled the jury as to the standard of liability in this case and merits a new trial.[2]

**D.**     **The Jury Verdict Form Did Not Allow the Jury to Find in Defendant's Favor on its Faragher/Ellerth Affirmative Defense**

The United States Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998) established the standard of liability for sexual harassment by supervisors where no tangible employment action has been taken.  There, the Court held that even if the employee  proves the elements of a hostile work environment claim, the employer may raise an affirmative defense to liability and damages if the employer proves that: (1) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the defendant or to avoid harm otherwise.  Id.

Based on the Faragher/Ellerth affirmative defense, SNET proposed interrogatories for the jury to answer in order to assist them in understanding the affirmative defense as well as jury instructions that explained the two pronged defense, what SNET needed to do to establish each prong, the required content of any complaint by the plaintiff that could be deemed to place the defendant on notice that a complaint of sexual harassment had been made, and an explanation of how a delay in making a complaint  would, as a matter of law,  satisfy the second prong of the defense.  See Def.'s Proposed Jury

---

[2]  These errors, in combination with plaintiff's counsel's misleading statement in closing arguments that punitive damages "were a matter between the jury and the defendant" and did not involve the plaintiff, likely mislead the jury into finding for the plaintiff on her sexual harassment claim and awarding punitive damages on the claim as a result of believing that such a punitive damage award would not go to the plaintiff but would be in the nature of a fine paid into the Court.

Interrogatories 3; Def.'s Proposed Jury Instructions 26-28; Def.'s Supplemental Proposed Jury Instructions 8-9.

The Court, however, did not include the proposed jury interrogatories concerning the affirmative defense on its verdict form.  In fact, nothing on the verdict form allowed the jury to find whether the defendant had or had not proven its affirmative defense. Instead, the verdict form contained no place for the jury to find on SNET's affirmative defense and allowed it to skip over the affirmative defense entirely in the event that they found in favor of the plaintiff on the hostile work environment claim, and then go straight to damages. This was highly prejudicial.

"A verdict form must be reasonably capable of an interpretation that would allow the jury to address all factual issues essential to the judgment." Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004) (internal quotation marks omitted). Under very similar facts, the First Circuit held that the omission of an affirmative defense from the jury verdict form, coupled with the failure to give another jury instruction, may have led to jury confusion and justified vacating the award in favor of the plaintiff. Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004) (internal quotation marks omitted).  In Sanchez, a political affiliation discrimination case, the District Court denied the defendant's request to add to the verdict form a question explicitly addressing the Mt. Healthy affirmative defense.  In refusing the request, the Court relied on its repeated jury instructions concerning Mt. Healthy, and its belief that the affirmative defense was subsumed in another question on the verdict form, which asked whether the plaintiff's political activity was a "substantial or motivating factor" in the employment decision. Id. at 138.

The Court rejected both rationales, finding that the District Court's instruction concerning the Mt. Healthy defense "was at odds with the jury form, which did not provide any question addressed to whether defendants had carried their burden." Id. at 137. The Court also concluded that it could not "say with any assurance" that either the jury form itself or the District Court's instructions on the form "adequately corrected for the significant jury confusion that could have arisen from the misstatements and omissions." Id. at 139.

Overall, the Court observed, "[h]ad the court's instruction been accompanied by a separate Mt. Healthy question on the jury form, the potential confusion most likely would have been avoided." Id. at 139. In light of this observation, the Court specifically advised that "[w]here a Mt. Healthy defense has been presented we suggest that, to the extent it may not be a common practice, district courts use a verdict form that has at least one question explicitly addressed to that defense." Id. at 135.

Similarly, in Armstrong v. Brookdale Univ. Hosp. & Med. Ctr., 425 F.3d 126, 136-37 (2d Cir. 2005), the Second Circuit ordered a new trial based on the jury's failure to answer all of the questions on the verdict form relating to plaintiff's battery claim. According to the Court, once the jury found that the defendants touched the plaintiff without permission, "it was fundamental error to prevent the jury from answering questions that would have completed its consideration of the battery claim." Id.at 137. Notwithstanding the plaintiffs' failure to raise the issue on appeal, the Court stated: "[W]e direct a new trial because we believe the jury's failure to consider the battery claim was a miscarriage of justice." Id. at 137.

In the present case, in addition to the omission of SNET's affirmative defense from the jury verdict form, the Court's instruction to the jury on the affirmative defense did not adequately explain the standard of liability, what the jury needed to find in order for the affirmative defense to be established, what type of complaint plaintiff was required to make in order to rebut the second prong of the affirmative defense,[3] or that a delay in making a complaint would, as a matter of law, constitute a finding that the plaintiff had not established the second prong of the defense.[4]

### E.    The Court Permitted Dr. Zachariah to Offer Unreliable and Prejudicial Opinion Testimony.

On May 5, 2008, SNET filed a Motion in Limine to Preclude Certain Testimony From Plaintiff's Expert Witness, Gary Zachariah.  Following a <u>Daubert</u> hearing on the motion, the Court denied the motion except as to Dr. Zachariah's personal emotions

---

[3]    See Duviella v. Counseling Serv. Of The E. Dist. of N.Y., 52 Fed. Appx. 152, 153-54 (2d Cir. 2002)(agreeing that employer established the Faragher/Ellerth defense where "no reasonable fact-finder could conclude that plaintiff's initial complaints to [one of her supervisors] was sufficient to alert [the defendant] that plaintiff was being harassed"); Eichler v. Am. Int'l Group, Inc., No. 05 Civ. 5167, 2007 U.S. Dist. LEXIS 23445, at *28-29 (S.D.N.Y. Mar. 30, 2007) (concluding employer established the Faragher/Ellerth defense where the employee's complaints made no mention of sexual harassment and stated only that her supervisor "had an 'outburst' and repeatedly shouted that [the plaintiff] should `shut the f--- up and get the f--- out of his office,'" and "was being disrespectful, 'nasty,' and not constructive, and that she and he were 'going at it' in a manner that was disruptive to their co-workers."); Smith v. Niagara Frontier Transp. Auth., No. 03-CV-0548E, 2007 U.S. Dist. LEXIS 28029 at *28-31 (W.D.N.Y. Apr. 16, 2007) (finding that the plaintiff failed to take advantage of preventative and corrective opportunities where he complained of one incident of harassment, but did not complain about any of the other sexually harassing behavior).

[4]    See e.g., Eichler v. Am. Int'l Group, Inc., 2007 U.S. Dist. LEXIS 23445, at *31-33 (delay of more than one year in complaining about the harassment was unreasonable as a matter of law); Schmidt v. State Univ. of N.Y., No. 02CV6083, 2006 U.S. Dist. LEXIS 27663, at *44 (E.D.N.Y. May 5, 2006) (same) O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 391 (S.D.N.Y. 2001) (delay of nearly one year is unreasonable); Dayes v. Pace Univ., No. 98 Civ. 3675, 2000 U.S. Dist. LEXIS 3698, at *15-16 (S.D.N.Y. Mar. 24, 2000) ("Plaintiff's one-year delay in bringing her complaint to the attention of management was unreasonable as a matter of law."); see also Williams v. Mo. Dep't of Mental Health, 407 F.3d 972, 976-77 (8th Cir. 2005) (affirming that employer established the Faragher/Ellerth defense where the plaintiffs waited more than four months to report the harassing conduct); Gawley v. Ind. Univ., 276 F.3d 301, 312 (7th Cir. 2001) (affirming that employer established the Faragher/Ellerth defense where the plaintiff "waited seven months before availing herself of the formal complaint procedures available through the [defendant]").

concerning SNET.  SNET hereby incorporates by reference the arguments and legal

authority it previously presented to the Court in the motion in limine and states that the

admission of Dr. Zachariah's expert testimony concerning causation of plaintiff's

emotional distress, his perception of plaintiff's mental state prior to joining the BCS

group, and his view of whether "harassment, "sexual harassment," or "discrimination"

occurred, was improper and warrants a new trial.

Dated at New Haven, Connecticut this 4th day of August, 2008.

THE DEFENDANT,

SOUTHERN NEW ENGLAND TELEPHONE
COMPANY


By: _Lori B Alford_____
        Lori B. Alexander (Federal Bar No. CT08970)
        Deborah DeHart Cannavino (Federal Bar No.
        CT08144)
        LITTLER MENDELSON, P.C.
        One Century Tower, Suite 300
        265 Church Street
        North Haven, CT 06510
        Tel:  203.974.8700
        Fax:  203.974.8799
        lalexander@littler.com
        dcannavino@littler.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2008, a copy of the foregoing was filed

electronically.   Notice of this filing will be sent by e-mail to all parties by operation of

the court's electronic filing system.  Parties may access this filing through the court's

CM/ECF System.

**Plaintiff's Counsel**

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880


Lori B. Alexander
Federal Bar No.: CT08970