**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **KIMBERLY BACHIOCCHI,** | : | |
| Plaintiff, | : | |
| | : | Civil Action No.:  02-CV-908 (CFD) |
| v. | : | |
| | : | |
| **THE SOUTHERN NEW ENGLAND** | : | August 22, 2008 |
| **TELEPHONE COMPANY,** | : | |
| Defendant. | : | |
| | : | |
| | : | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS**

**I.    INTRODUCTION**

The defendant, Southern New England Telephone Company ("SNET"), hereby submits this Memorandum In Opposition To Plaintiff's Motion For Attorney's Fees And Costs, filed on August 1, 2008 ("Plaintiff's Motion"). As explained herein, plaintiff's request improperly seeks compensation for time that was wholly devoted to her failed retaliation and Equal Pay Act claims, for which she was not a "prevailing party." Furthermore, her request is facially unreasonable given its inclusion of the time plaintiff spent filing discovery motions that this Court has previously found to have been frivolous, time spent resisting lawful discovery requests, and otherwise abusing the discovery process. In addition, "[b]ecause a fee-shifting clause can produce perverse incentives for a litigant (and his attorneys) . . . courts must scrutinize fee requests to ascertain whether they are reasonable." Diamond D Enters. USA, Inc. v. Steinsvaag, 979 F.2d 14, 19 (2d Cir. 1992), cert. denied, 508 U.S. 951 (1993) (internal citation omitted); Electro-Methods, Inc. v. Adolf Meller Co., 473 F. Supp. 2d 281, 304 (D. Conn. 2007)

(same).  It is apparent from a review of plaintiff's billing records that they contain numerous vague and block-billed entries.  They also include items that are compensated in this Circuit at reduced hourly rates, such as travel time, clerical tasks and activities that could have been performed by a secretary or paralegal.

Given these obvious deficiencies and the apparent failure of plaintiff's counsel's to keep detailed billing records, SNET respectfully requests that the Court issue an order requiring the parties to work collaboratively to determine and adjust plaintiff's requested attorneys' fees award as follows:  (1) eliminate the entries related to plaintiff's improper conduct during discovery, including but not limited to, filing discovery motions that were denied by the Court and opposing SNET's successful discovery motions, (2) identify the entries for clerical tasks and related activities and bill them at a lower hourly rate, as is customary in this Circuit, (3) reduce the entries for attendance at depositions, hearings, and other appearances by one hour each for travel time, (4) eliminate the entries that represent impermissible block billing or which are too vague to be compensable, *and then* (5) either reduce the entire remaining attorneys' fee by 40% because plaintiff was the prevailing party on only one of her three claims, and therefore achieved limited success in this case, or, alternatively, eliminate all entries for activities related to plaintiff's unsuccessful claims for retaliation and for unequal pay.  A reduction in the overall amount of attorney's fees is also warranted on account of plaintiff's vague and aggregated time entries.

## II.    ARGUMENT

In Hensley v. Eckerhart, 461 U.S. 424, 436 (1983), the Supreme Court established a framework for setting a reasonable attorney's fee when the "prevailing party" succeeds on some, but not all of her claims.  The first step is to calculate the total attorneys' fees by multiplying the

number of hours reasonably expended on the litigation by a reasonable hourly rate. Id. at 433. If the successful and unsuccessful claims are inextricably intertwined, making allocation of hours impossible, then the court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id. at 435. However, if the failed claims and successful claims are distinctly different from one another, then the failed claims must be treated as if they had been raised in a separate lawsuit and excluded from the attorneys' fees calculation. See id. at 434-35; Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999) ("In determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims."); see also Green v. Torres, 361 F.3d 96, 98 (2d Cir. 2004) (same); LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437.

Once the calculation of the total claimed attorneys' fees is complete, the Court may make an upward or downward adjustment so as to "award only that amount of fees that is reasonable in relation to the results obtained." Id. at 440. In determining what constitutes a "reasonable" attorney's fee, "*the most critical factor is the degree of success obtained.*" Id. at 436 (emphasis added). The Court may choose between either "attempt[ing] to identify specific hours that should be eliminated, or . . . simply reduc[ing] the award to account for the limited success." Id. at 436-37. Either way, "attorney's fees are to be awarded with an 'eye to moderation,' seeking to avoid either the reality or the appearance of awarding 'windfall fees.'" N.Y. State Ass'n For Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1139 (2d Cir. 1983) (internal quotation marks omitted).

A.     **Plaintiff Must Exclude The Hours She Spent On Her Unsuccessful Retaliation and Equal Pay Act Claims.**

In the Affidavit of Counsel In Support Of Plaintiff's Motion For Attorney's Fees And Costs ("Affidavit"), plaintiff's counsel requests compensation for all of the hours he expended on this matter, including time that was spent exclusively on plaintiff's unsuccessful retaliation and Equal Pay Act claims. Notwithstanding plaintiff's position, the law is clear that counsel may not receive attorney fees for unsuccessful claims that were based on different facts and legal theories than the claim upon which plaintiff prevailed. As the Supreme Court explained, "[t]he congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits . . . ." Hensley, 461 U.S. at 435; see also LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 762 (2d Cir. 1998) ("No fees should be awarded for time spent pursuing a failed claim if it was 'unrelated' to the plaintiff's successful claims in the sense that it was 'based on different facts and legal theories.").

In this case, plaintiff's sexual harassment claim was factually and legally distinct from her failed claims of retaliation and unequal pay, and must be treated separately for the purpose of awarding attorney's fees. There is a clear legal distinction between plaintiff's successful sexual harassment claim, and her unsuccessful claims of retaliation and unequal pay. Sexual harassment requires proof of gender-based harassment that was sufficiently severe and pervasive to affect a term, condition, or privilege of employment. See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993). Claims of retaliation or unequal pay do not require proof of any of those elements. See Sardina v. United Parcel Serv., Inc., 254 Fed. Appx. 108, 110 (2d Cir. 2007) (retaliation requires proof that a materially adverse action was taken against the plaintiff because he or she engaged in a protected activity); Ryduchowski v. Port Auth. of N.Y.

& N.J., 203 F.3d 135, 142 (2d Cir. 2000) (Equal Pay Act claim requires proof that an employer

paid members of the opposite gender unequal compensation for equal work; "unlike Title VII,

the EPA does not require a plaintiff to establish an employer's discriminatory intent").

Plaintiff's sexual harassment claim was not only legally distinct in this case; it was also

factually very distinct. Plaintiff voluntarily withdrew her Equal Pay Act claim during

defendant's case-in-chief, after presenting no probative evidence to support this claim. Her

withdrawal was an explicit acknowledgement that there was no evidentiary basis for finding that

she was paid less than her male counterparts. None of the persons implicated in the alleged

sexual harassment played any part in plaintiff's compensation, or the compensation of other

employees.

Likewise, there was no factual overlap between plaintiff's sexual harassment and

retaliation claims. Plaintiff testified at trial that she claimed Bob Vallario, John Dunn, and

Richard Light sexually harassed her. She never claimed that Kevin West was guilty of similar

misconduct; her claims involving West were for retaliation and violation of the Equal Pay Act.

Moreover, Light and Vallario retired in November 2000, well before the occurrence of the first

alleged act of retaliation. Plaintiff's retaliation claim, as presented at trial, involved many

alleged incidents that were not — and could not have been — part of her sexual harassment

claim. On her retaliation claim, plaintiff claimed that her co-workers intentionally avoided being

in the office when she returned to work for one day on January 18, 2001; that West allegedly

ripped a paper out of her hand on June 4, 2001; that West allegedly refused to give back her

Cingular account upon her return from her leave; that West denied her overtime on one occasion;

that West reduced her performance rating during her leave of absence; that West allegedly told

her "the needs of the business" would be considered in granting her vacation requests; that West

allegedly did not tell her who her supervisor was when she returned to work; and that she would say good morning to her co-workers but none of them would respond to her after her leave of absence. All of these purported events that plaintiff alleged supported her retaliation claim were explored in discovery — as was her Equal Pay Act claim, which was eventually withdrawn at trial — and extensively briefed in defendant's summary judgment motion and discovery motions in this case. For example, there was a lengthy dispute, resulting in significant legal expense to SNET, in which plaintiff refused to provide a readable copy of the videotape she and a friend secretly made of SNET's parking lot in February 2001. This was not part of a sexual harassment claim but was created to support her claim that she was retaliated against when few co-workers were in the office on January 18, 2001, when she visited the workplace for a single day during her leave of absence.

The Second Circuit has consistently reaffirmed the principle that distinct claims should be severed for the purpose of awarding attorney's fees. Recently, in Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006), the Second Circuit affirmed the severance of the plaintiff's successful intentional infliction of emotional distress and racially hostile work environment claims from his failed racially hostile work environment and racially motivated discharge claims against other defendants. Id. at 123. The Court noted: "While many of the claims alleged racial discrimination in the workplace, they rested on distinct factual bases. There was little factual overlap in the allegations against Balsamico and those made against [the other defendants] who were granted summary judgment." Id. at 123; see LeBlanc-Sternberg, 143 F.3d at 762 ("No fees should be awarded for time spent pursuing a failed claim if it was 'unrelated' to the plaintiff's successful claims in the sense that it was 'based on different facts and legal theories."); Pollis v. New Sch. For Soc. Research, 930 F. Supp. 899, 905-06 (S.D.N.Y. 1996), rev'd in part on other

grounds, 132 F.3d 115 (2d Cir. 1997) (separating the plaintiff's failed ADEA claim from her successful gender discrimination and Equal Pay Act claims); Cowan v. Prudential Life Ins. Co. of Am., 935 F.2d 522, 523-24 (2d Cir. 1991) (separating the plaintiff's failed racially motivated discharge claim from his successful claim that the defendant engaged in racial discrimination by denying him three promotions).

The present case is akin to those cases in that plaintiff's failed retaliation and Equal Pay Act claims were based on different facts and legal theories than her sexual harassment claim. They occurred later in time, involved entirely different actors, and did not require proof of any of the necessary elements of sexual harassment. Accordingly, compensating plaintiff for the hours expended on those claims would conflict with the Supreme Court's pronouncement in Hensley that "[t]he congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." Hensley, 461 U.S. at 435. It would also be inconsistent with the Second Circuit's warning that "attorney's fees are to be awarded with an 'eye to moderation,' seeking to avoid either the reality or the appearance of awarding 'windfall fees.'" N.Y. State Ass'n For Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1139 (2d Cir. 1983) (internal quotation marks omitted).

Counsel's failure to keep task-specific billing records makes it nearly impossible for the Court to tell which tasks related to which claims. Nevertheless, it remains the Court's duty to ensure that "no fee [is] awarded for services on the unsuccessful claim[s]." Hensley, 461 U.S. at 435. SNET proposes that its counsel work with plaintiff's counsel to attempt to reach agreement as to the fees associated with plaintiff's sexual harassment claims, and eliminate fees for tasks

related to plaintiff's unsuccessful claims.[1]  By consulting its own records, SNET could assist counsel in isolating the hours that were devoted entirely to plaintiff's failed retaliation and Equal Pay Act claims.  Indeed, such a task would be less difficult given the specificity of SNET's own billing records, and the fact that the claims were clearly distinct from one another.

For the above reasons, SNET respectfully requests that the Court order that plaintiff's counsel may not recover attorneys' fees related to plaintiff's distinct claims for retaliation and unequal pay, and that the parties to work together to mutually agree on which hours were not related to plaintiff's sexual harassment claim.  Alternatively, in light of plaintiff's failure to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims;" Hensley, 461 U.S. at 437; SNET asks that the Court reduce the total number of compensable hours by 40% to account for these unsuccessful claims.  A reduction of 40% is more than reasonable, given that the Equal Pay Act claim was withdrawn midway through the trial, and the retaliation claim included substantially more (and different) factual claims than the sexual harassment claim in terms of its size and importance in the litigation.  Moreover, to the extent the Court finds plaintiff's counsel's billing record to be too vague to identify the claims to which the tasks relate, not applying a sizeable percentage reduction would reward counsel for keeping vague billing records and give "either the reality or the appearance of awarding 'windfall fees.'" Carey, 711 F.2d at 1139 (internal quotation marks omitted).

**B.    Plaintiff Must Exclude The Hours Relating To Her Discovery Abuses.**

Besides failing to segregate the hours spent on unsuccessful claims, plaintiff completely ignores the fact that the Court awarded attorney's fees to SNET on several discovery-related

---

[1]  In the interests of brevity, SNET has not attempted here to make separate arguments about each line item of plaintiff's attorneys' fee affidavit.  It respectfully suggests that the more efficient way of addressing the issue is for the Court to order that fees related to plaintiff's unsuccessful claims must be eliminated from the attorneys' fee award in this case, and that either a 40% fee reduction be applied across the board or that counsel confer to make a joint proposal as to the reduction amount based on a line-by line analysis of the attorneys' fee affidavit.

matters after finding plaintiff's positions in the discovery disputes to be meritless. Plaintiff's counsel cannot recover his attorneys' fees for activities that the Court has held were unjustified and in some cases resulted in an award of attorneys' fees for SNET. Instead of respecting those orders and excluding billing entries that relate to matters in which SNET was awarded fees, plaintiff brazenly asks the Court to make SNET pay for plaintiff's counsel's time spent on frivolous motions. This request is clearly improper, especially considering counsel's failure to keep task-specific billing records which would have aided the Court in isolating the time he spent on those tasks.

SNET will not here offer a detailed recitation of plaintiff's improper conduct during discovery. It will be filing a separate Motion for Enforcement of the Court's prior discovery orders within a few days of filing this motion. However, by way of example, in its June 2, 2004 ruling on "Plaintiff's Motion To Limit Continued Deposition On June 1" (Dkt. #88), the Court denied plaintiff's discovery motion "substantially for the reasons set forth in defendant's opposition papers," and stated: "The imposition of *any* time limitation is inappropriate in the circumstances of this case, as is the instant motion itself. If conduct such as the filing of this motion persists, at the conclusion of all proceedings in this case, the court will entertain an application for an imposition of attorney's fees against plaintiff's counsel personally pursuant to 28 U.S.C. sec. 1927." In the Court's June 17, 2004 Order granting Defendant's "Motion To Compel A Copy Of The Videotape" (Dkt. #95), it ordered plaintiff to produce the videotape and any other visual depictions or "face the imposition of drastic sanctions, including possible dismissal of her case." The Court then stated that it "[did] not credit the representations of plaintiff's counsel . . . that copies have already been provided" and "agree[d] with SNET that no party 'should be required to undergo' what SNET has had to endure at the hands of plaintiff's

9.

counsel in order to obtain legitimate discovery." In its September 22, 2004 "Ruling On Motion To Compel (Dkt. #62)" (Dkt. #132), the Court reviewed the "variety of reasons" why the document was not privileged, as plaintiff had claimed, and noted that its unprivileged nature was "rather clear from the face of the document itself." On the basis of these facts, the Court concluded: "Plaintiff's claim of attorney-client privilege is, in short, utterly baseless. An award of attorney's fees is wholly appropriate." Similarly, in a September 26, 2004 "Ruling On Motion To Compel (Dkt. 122)" (Dkt. #135), the Court, clearly frustrated with plaintiff's obstructionist behavior throughout discovery, noted in yet another ruling that:

> This is the latest in a series of discovery motions that the plaintiff's unjustified recalcitrance has necessitated. Prior warnings have been unavailing. Plaintiff continues to skirt the rules, imposing unnecessary costs on the defendant.

Finding plaintiff's discovery objections wholly "unmeritorious," the Court declared that "[t]he defendant should never have had to file this motion, the fifteen page memorandum that accompanies it, or the eighty pages of exhibits that the court has had to wallow through in an attempt to fathom why plaintiff has acted as she has." Furthermore, after reviewing materials plaintiff had claimed without any basis were "privileged" and not subject to disclosure, the Court stated that it "believe[d] plaintiff's counsel was improperly attempting to conceal discoverable documents." It added that "[p]laintiff's attempt to portray herself as the victim of unfair or oppressive conduct on defendant's part is simply not true." (emphasis added).

In fact, the record reflects that between April and August 2004, SNET was forced file five motions to compel the production of documents and other tangible items that it was clearly entitled to receive under the discovery rules (Dkt. Nos. 35, 50, 55, 62, and 122) because of plaintiff's refusal to provide responses to proper discovery requests. All five motions were granted, with the Court awarding attorney's fees and costs to SNET in connection with several of

the later ones. During that same period, plaintiff filed six discovery-related motions, almost all of which were denied.[2] Moreover, following plaintiff's decision to walk out of her decision of her June 1, 2004 deposition, SNET successfully moved for an award of attorney's fees (Dkt. #90) for that conduct as well.

Because of plaintiff's failure to keep task-specific billing entries, it is difficult for SNET to tell exactly which of the hours related to plaintiff's improper filings and motions, and which may have pertained to legitimate areas of discovery. However, plaintiff's counsel should not be allowed to nullify the Court's repeated awards of attorney's fees to SNET by keeping his billing records in this fashion. Nor may he obfuscate the Court's analysis through the use of vague entries, many of which are lumped together into large blocks.

As the moving party, plaintiff "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). That burden includes "maintain[ing] billing time records in a manner that [would] enable a reviewing court to identify distinct claims;" id.; and "present[ing] records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required." P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 114 (D. Conn. 2007). Here, plaintiff's counsel has done neither of these things, and has not even attempted to use "billing judgment" to account for the Court's repeated rulings in its favor on the many discovery disputes in this case and the award of attorneys' fees and costs to SNET. See Hensley, 461 U.S. at 437 ("The applicant should exercise 'billing judgment' with respect to hours worked . . . and should maintain billing time records in a manner that will enable a reviewing court to

---

[2] The Court granted plaintiff's first motion to compel (Dkt. #41) and apparently never ruled on plaintiff's last motion entitled "Objection to 131 Order Denying Motion To Seal Exhibit A, 132 Ruling Granting Motion To Compel" (Dkt. #136). That last motion, filed on October 4, 2004, essentially repeated the arguments that were made in opposition to SNET's successful motion to compel several documents and a copy of plaintiff's statement – which the Court found to be "utterly baseless" and deserving of an award of attorney's fees to SNET.

identify distinct claims." (internal quotation marks omitted)).

According to plaintiff's billing records, her counsel worked on this case for a total of 339.7 hours from 2002 through the end of 2004.[3]  Of these, 148.75 or nearly 44% were worked between April and October 2004, the same period that the plaintiff was found to have repeatedly flaunted the discovery rules.  Counsel's billing entries confirm that the vast majority of his work between April and October 2004 related to his improper filings and oppositions to SNET's motions.  Accordingly, nearly 44% of the hours worked between 2002 and 2004 most likely related to motions, filings, and other activities which the Court found to have been so baseless as to warrant awards of attorney's fees in SNET's favor.[4]

Under the circumstances, plaintiff should be ordered to work collaboratively with SNET to separate the hours that were properly billed from the hours that were expended on discovery

---

[3] Counsel's monthly total for March 2004 erroneously states that he worked 4.75 hours instead of the .25 hours actually recorded.

[4] On June 22, 2004, the Court awarded SNET its attorney's fees incurred in securing a copy of the plaintiff's draft statement in discovery.  Therefore plaintiff should not be entitled to recover her attorney's fees and costs in withholding that draft statement.  These activities include: opposing SNET's Motion to Compel a Copy of the Plaintiff's Statement dated May 3, 2004 (entitled "Plaintiff's Memorandum in Opposition to Defendant's Outstanding Motions to Compel" and supporting Affidavit dated May 18, 2004), plaintiff's motion for in camera review of the draft statement dated July 1, 2004, plaintiff's supporting affidavit dated July 1, 2004, the supplemental affidavit of July 26 or the motion to seal that affidavit, and Objection to Ruling of the Magistrate Judge Concerning Plaintiff's Claim of Lawyer-Client Privilege dated October 4, 2004.  Plaintiff's counsel's billing records indicate that he spent 12.25 hours in April, 15 hours in May, 8.25 in July and 5.75 hours in October on those activities.  At the rate of $225 a hour which plaintiff seeks, these fees total $11,056.25.  At a bare minimum, plaintiff should not be entitled to receive reimbursement for her improper conduct in withholding her draft statement.

In addition, plaintiff should not be entitled to receive her attorney's fees or costs relating to her conduct which resulted in the Court's grant of SNET's Motion for Attorney's Fees. On September 23, 2004, the Court granted SNET's Motion for Attorney's Fees in connection with the conduct of plaintiff and her counsel when they walked out of the plaintiff's deposition on June 1, 2004 before it was concluded, and for their conduct thereafter in filing a Motion for a Protective Order related to that same deposition.  Specifically, plaintiff filed a Motion for Protective Order on June 2, 2004, and a Reply on June 29, 2004.  Plaintiff's billing records indicate that counsel spent 21 hours in June 2004 on those activities.  In addition, due to plaintiff's untimely departure from her deposition on June 1, 2004, plaintiff had to be redeposed on December 14, 2004.  Plaintiff's billing records indicate counsel billed 6 hours for that continued deposition.  Plaintiff's conduct also caused SNET to file a Motion for Order and Attorney's Fees and Costs on June 8, 2004.  Plaintiff filed an opposition on June 30, 2004.  Plaintiff's billing records indicate her counsel spent 6 hours in June on that opposition.  At the rate of $225 an hours which plaintiff seeks, the attorney's fees for these activities total $7,425.00.

disputes that the Court found should never have been created by the plaintiff. See Luciano v. Olsten Corp., 109 F.3d 111, 117 (2d Cir. 1997) (affirming reduction in the number of compensable hours "because of unnecessary contentious conduct"). By consulting its own records, SNET will be able to assist in clarifying the precise nature of the tasks reflected in the billing records, including counsel's repeated vague entries for "correspondence" with SNET attorneys. Alternatively, the Court should apply a 40% reduction to the number of attorney hours worked from 2002 to 2004 as a reasonable estimate of the amount of time expended on discovery-related abuses. The 40% figure is generous, given that the actual figure may be as high as 44%. Furthermore, plaintiff's counsel is not entitled to any benefit of the doubt given that it was his burden to "document[] the appropriate hours expended;" Hensley, 461 U.S. at 437; and "present records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required." P. v. Newington Bd. of Educ., 512 F. Supp. 2d at 114.

## C. A Reduction Is Warranted Due To Plaintiff's Failure To Maintain Proper Billing Records.

### 1. Several Of Counsel's Billing Entries Are Too Vague To Be Compensable.

Over twenty-five years ago, the Second Circuit definitively announced the governing standard for attorney's fee applications in this Circuit. See N.Y. State Ass'n For Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). The Court stated:

> Hereafter, any attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the application with contemporaneous time records. These records should *specify, for each attorney, the date, the hours expended, and the nature of the work done.*

Id. at 1148 (emphasis added). In the decades following that initial pronouncement, it has become clearly established in the Circuit that, to receive a fee award, an attorney must "keep and present

records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required." P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 114 (D. Conn. 2007); see Green Party of N.Y. State v. N.Y. State Bd. Of Elections, No. 02-CV-6465, 2006 U.S. Dist. LEXIS 30014, at *6 (E.D.N.Y. Feb. 7, 2006) ("A fee application must be supported by contemporaneous time records that describe *with specificity*, by attorney, *the nature of the work done*, the hours expended, and the dates on which the work was performed.") (emphasis added).

As previously identified, counsel's billing records reveal numerous instances where he failed to "identify the general subject matter of his time expenditures;" Hensley, 461 U.S. at 437 n.12; thereby impeding any effort to determine their reasonableness in relation to the task performed. A prime example of this is counsel's frequent entries for unidentified "correspondence," "telephone conferences," and "letters."[5] Between October 30, 2002 and November 16, 2004 alone, plaintiff's counsel recorded 17.45 hours of "correspondence" to SNET's attorneys, with no mention of their subject matter.[6] That 17.45 hours does not include the references to other "correspondence" noted as part of several large block-billed entries.[7]

---

[5] See, e.g., the billing entries for June 3, 2003 ("Telephone conference with Ms. Cannavino concerning discovery issues continued over three sessions." - 4.50 hrs.), Feb. 26, 2004 ("Telephone conferences with Dr. Sarfey [sic] and Ms. Cannavino." - .50 hrs.), and Aug. 17, 2004 ("Several letters to Ms. Alexander on a variety of topics."- 1.25 hrs.).

[6] Those dates and time increments are as follows: Oct. 30, 2002 (.25); Apr. 2, 2003 (.25); Apr. 30, 2003 (1.50); May 27, 2003 (1.50); May 31, 2003 (.75); June 27, 2003 (2.25), July 23, 2003 (.25), Sept. 15, 2003 (.50); Oct. 2, 2003 (.50); Nov. 24, 2003 (.25); Jan. 14, 2004 (.50); Mar. 31, 2004 (.25); Apr. 7, 2004 (.75); Apr. 9, 2004 (.25); Apr. 30, 2004 (1.50); May 19, 2004 (.25); May 24, 2004 (.50); June 7, 2004 (.50); June 9, 2004 (.25); June 10, 2004 (.25); June 22, 2004 (.25); July 30, 2004 (.50); Aug. 4, 2004 (.25); Aug. 6, 2004 (.25); Sept. 10, 2004 (.50); Sept. 16, 2004 (.25 and .50); Sept. 22, 2004 (.50); Oct. 19, 2004 (.75), Oct. 20, 2004 (.25); Oct. 28, 2004 (.25); Nov. 5, 2004 (.10); and Nov. 16, 2004 (.10).

[7] See, e.g., the billing entries for Sept. 4, 2003 ("Correspondence to Ms. Alexander and re-notices of depositions." - .75 hrs.), Feb. 25, 2004 ("Review subpoenae issued to four doctors by Defendant; Prepare a draft motion for a protective order; Multiple telephone calls with Ms. Cannavino; Resolution of this issue and confirming correspondence to Ms. Cannavino." - 5.50 hrs.); Feb. 26, 2004 ("Telephone conferences with Dr. Sarfey [sic] and Ms. Cannavino." - .50 hrs.); Apr. 28, 2004 ("Legal research concerning the disclosure of experts; Correspondence to Ms. Cannavino; Correspondence to Ms. Alexander." - 5.50 hrs.); May 17, 2004 ("Preparation of a motion for a short extension of time to respond to Defendant's three pending motions to compel; Correspondence to Ms. Cannavino." -

Moreover, there are several entries similar that of March 28, 2003, which lists two hours but states simply "Work on responses."

In the Second Circuit and the District of Connecticut especially, time entries for unidentified "letters," "telephone calls," and "correspondence" are too vague to be compensable. As one court recently explained, "such entries have been rejected by courts in this district because they do not provide an adequate basis for the court to evaluate the reasonableness of the services and hours expended by the attorney." P. v. Newington Bd. of Educ., 512 F. Supp. 2d at 115 (excluding 16.4 hours recorded as "preparation for a hearing"); see United States Football League v. Nat'l Football League, 887 F.2d 408, 415 (2d Cir. 1989) (affirming 10% reduction in attorney's fee award due to "vagueness in the documentation of certain time entries"); Electro-Methods, Inc. v. Adolf Meller Co., 473 F. Supp. 2d 281, 306 (D. Conn. 2007) (excluding 14.8 hours recorded as "Work on documents and chart," "Work on various items," and "Work on documents" because the entries are "vague and not compensable"). Accordingly, all time entries which employ this sort of vague and non-specific language must be excluded from counsel's total number of compensable hours. Again, SNET requests that the Court order the parties to meet and confer about the entries which should be eliminated based on such vague and non-specific descriptions. In the alternative, SNET requests that the Court apply an across-the-board percent reduction to the attorneys' fees requested by plaintiff. See Luciano v. Olsten Corp., 109 F.3d 111, 117 (2d Cir. 1997) ("[A] district court can exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours."); Carey, 711 F.2d at 1146 (approving the usage of percentage cuts "as a practical means of trimming fat from a fee application").

---

2.25 hrs.); and June 14, 2004 ("Correspondence to Attorney Cannavino; Preparation of a receipt for the videotape." - .50 hrs.).

## 2.    Chunks Of Time That Were "Block-Billed" Are Not Compensable.

The billing records contain numerous entries that are not only vague but are comprised of various unrelated activities, thereby preventing the Court from determining the number of hours reasonably expended on each task and "the need for and the amount of time reasonably required." P. v. Newington Bd. of Educ., 512 F. Supp. 2d at 114. Because the "block-billing" method precludes an assessment of the number of hours reasonably expended, it is well settled that its utilization warrants some sort of percentage reduction by the court. See Green Party of N.Y. State v. N.Y. State Bd. Of Elections, No. 02-CV-6465, 2006 U.S. Dist. LEXIS 30041, at *15-18 (E.D.N.Y. Feb. 7, 2006) (recommending a 40% reduction in number of claimed hours where the attorney's Affirmation was "replete with vague billing entries for 'conferences' or 'calls,'" and the attorney grouped multiple tasks into one 8.1 hour entry); Klimbach v. Spherion Corp., 467 F. Supp. 2d 323, 332 (W.D.N.Y. 2006) (applying 10% reduction in attorney's fees for vague entries and block-billing, including large block entries recorded as "work on motion for summary judgment"); Comm'n Express Nat'l, Inc. v. Rikhy, No. CV-03-4050, 2006 U.S. Dist. LEXIS 8716, at *17 (E.D.N.Y. Feb. 16, 2006) (remedying attorney's use of block-billing by applying 10% reduction to the number of hours worked, since the "commingling of activities within one time entry impedes the court's efforts to evaluate the reasonableness of any of the listed activities" (internal quotation marks omitted)).

SNET has included a sampling of the types of block-billed entries that are found throughout counsel's billing records.[8]  However, one example consists of the nine block entries

---

[8]  See, e.g., the billing entries for July 3, 2003 ("Receive and review responses to proposed confidentiality agreement; Incorporate requested revisions, prepare joint motion for confidentiality order and correspondence to Ms. Alexander" - .50 hours); Feb. 25, 2004 ("Review subpoenae issued to four doctors by Defendant; Prepare a draft

between June 26 and July 6, 2008 that simply state "Preparation for trial." Not only are these

entries impermissibly vague; see P. v. Newington Bd. of Educ., 512 F. Supp. 2d at 114-115

(completely excluding 16.4 hours recorded as "preparation for a hearing"); but they also include

an unknown number of discrete, unrelated tasks.

There is no way for this Court to know the nature of the items that counsel failed to

document during those days. These vague entries, spanning nine full days and encompassing

45.5 hours, leave the Court with no way of verifying that the time was spent on tasks for which

counsel should receive his ordinary hourly billing rate, rather than a reduced rate for clerical

work or work that could have been performed by a secretary or paralegal. Given the large

amount of time involved, at least some of the tasks performed during those days consisted of

photocopying and mailing documents, collating and labeling trial exhibits, organizing the case

file, preparing witness binders, and other types of similar work for which counsel's billing rate

should be reduced. Counsel should not be permitted to mask clerical tasks with the mantra of

"trial preparation."

In consideration of the long-standing and established law on attorney billing records, and

the fact that plaintiff had the burden of properly documenting his time expenditures, the Court

should apply a percentage reduction to plaintiff's overall award of attorney's fees. From other

cases in the Circuit, a standard deduction for the use of "block-billing" appears to be ten percent.

See, e.g., Klimbach, 467 F. Supp. 2d at 332 (applying 10% reduction in attorney's fees for vague

entries and block-billing, including large block entries recorded as "work on motion for summary

---

motion for protective order; Multiple telephone calls with Ms. Cannavino; Resolution of this issue and confirming
correspondence with Ms. Cannavino." – 5.50 hours); June 29, 2004 ("Finalize opposition to Defendant's motion for
order and supporting documents; Prepare rebuttal to Defendant's Opposition to Plaintiff's motion for protective
order; Miscellaneous motions to seal." - 6.75 hours); Nov. 30, 2006 ("Receive Ms. Alexander's materials and
comments; Confer with counsel; Discuss comments objections and Possible changes; Finalize materials." – 6.50
hours).

judgment."); <u>Rikhy</u>, 2006 U.S. Dist. LEXIS 8716, at *17 (remedying attorney's use of block-billing by applying 10% reduction to the number of hours worked, since the "commingling of activities within one time entry impedes the court's efforts to evaluate the reasonableness of any of the listed activities."); <u>see also</u> <u>Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.</u>, 277 F. Supp. 2d 323, 326 (S.D.N.Y. 2003)(applying 15% reduction in attorney's fees for block-billing, vague entries, and counsel's failure to separate his travel time, and citing cases). SNET seeks an order of the Court that plaintiff's attorneys' fees award must be reduced by ten percent for all block billing entries previously submitted and that plaintiff's counsel work with SNET's counsel to reach an agreement on the net amount of this reduction.

### 3. Travel Time Is Improperly Billed At Counsel's Regular Hourly Rate and Must be Reduced.

"While most courts . . . allow counsel to recover the travel time spent working and preparing the . . . case, this District and the Second Circuit apply a fifty percent reduction method for such time." <u>Electro-Methods, Inc. v. Adolf Meller Co.</u>, 473 F. Supp. 2d 281, 306 (D. Conn. 2007) (internal quotation marks omitted); <u>see also</u> <u>Luciano v. Olsten Corp.</u>, 109 F.3d 111, 115 (2d Cir. 1997) (affirming district court's award of fees for travel time at half of the reasonable hourly rates); <u>Klimbach</u>, 467 F. Supp. 2d at 333 ("Regarding travel time [attorney's] fees, the case law is clear that courts regularly reduce attorney's fees by fifty percent for travel time."); <u>Green Party</u>, 2006 U.S. Dist. LEXIS 30041, at *15 n.8 ("[C]ourts in the Second Circuit regularly reduce attorney's fees by 50% for travel time because time spent by attorneys in transit may be beneficial, but it probably is not as productive as time at the office or in court." (internal quotation marks omitted)).

In his Affidavit, plaintiff's counsel does not separate for the Court the time he spent traveling to depositions, conferences, the Daubert hearing, and the trial. However, SNET spot-

checked several entries, and it is clear that counsel included all of his travel time, in some cases excessively so, related to his attendance at depositions and hearings.

The most concerning entry is May 3, 2004, which states that counsel spent seven hours to "Attend the deposition of Psychological Health Asso." According to the official transcript, the deposition lasted only three hours. See Exh. A, attached.

There are other examples of excessive hours in counsel's billing records. Although the transcript reflects that Dr. Zachariah's January 16, 2004 deposition lasted only 1.5 hours, plaintiff's counsel represented that he spent 4.75 hours in attendance. See Exh. B, attached. Nick Faiella's October 27, 2003 deposition lasted 2.5 hours, but according to counsel, he spent 4.75 hours in attendance. See Exh. C, attached. Dr. Anna Lee Tirado's May 11, 2005 deposition lasted 2.25 hours; counsel recorded 3.5 hours.

Given the aforementioned discrepancies and counsel's failure to break out or even mention travel time in his Affidavit, there is a firm basis for concluding that *at least* one hour of travel time was included in the time entry for each deposition, hearing, and other proceeding. Accordingly, SNET respectfully requests that the Court order plaintiff's counsel to work with SNET to isolate his travel time, so that it may be charged at the customary 50% billing rate. Alternatively, SNET asks that the Court apply a one-hour reduction to all twenty-one depositions, the pre-trial conference, the settlement conference, the Daubert hearing, the date of jury selection, and the nine days of trial, resulting in thirty-four hours total reduction. Additionally, with regard to the four billing entries discussed above, SNET respectfully requests that the extraneous time be excluded in its entirety, since it is unsupported by the documentation and wholly questionable in nature.

**4.      Several Of Counsel's Entries Consist Of Clerical Work And Tasks Which Should Have Been Performed By A Clerk Or Paralegal and Must Be Reduced for This Reason.**

"Under fee-shifting statutes, attorneys may not be compensated at their regular hourly rate for time spent performing clerical tasks.  Rather, they should be compensated at the rate for clerical employees, or, if the task at issue is the type included in overhead, they should not be compensated at all."  Rozell v. Ross-Holst, No. 05 Civ. 2936, 2008 U.S. Dist. LEXIS 41609, at *22 (S.D.N.Y. May 29, 2008); see, e.g, Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) (affirming district court's award of fees for time the attorney spent on "clerical" work at $50); Klimbach v. Spherion Corp., 467 F. Supp. 2d 323, 332 (W.D.N.Y. 2006) (reducing attorney's hourly rate for clerical work, and tasks that should have been performed by either an associate or paralegal); Retained Realty, Inc. v. Estate of Spitzer, No. 3:06-CV-0493, 2007 U.S. Dist. LEXIS 54518, at *3-4 (D. Conn. July 26, 2007) (finding that charging an attorney's normal hourly rate for routine clerical tasks would be unreasonable, and eliminating all of the time spent on those tasks).

Rather than spending inordinate amounts of time combing through the billing records, SNET has picked out a few examples of plaintiff's attempts to be compensated at his normal hourly rate for what was obviously clerical work.  These entries, which are sprinkled throughout his billing records, include:

- May 28, 2002: "File Complaint with the Clerk and arrange for service." (.50 hours)

- June 3, 2002: "Attend to service of complaint."  (.75 hours)

- April 26, 2004: "Preparation of receipt to be used in connection with the delivery of the videotape." (.25 hours)[9]

---

[9] This entry is also curious given that counsel did not actually produce the videotape until the Court ordered him to do so on June 17, 2004, almost two months later.  Moreover, on June 14, 2004, there is another entry

- December 28, 2004: "Correspondence to Ms. Alexander forwarding pharmacy records." (.25 hours)

- November 13, 2006: "Exchange materials with Ms. Alexander." (.25 hours)

- November 27, 2006: "Send materials to Ms. Alexander." (.10 hours)

- April 29, 2008: "Organize and duplicate exhibits for exchange." (3.50 hours)

- April 30, 2008: "Delivery of plaintiff's exhibits to Defendant." (.25 hours)

Additionally, there are many instances in which plaintiff included the filing or service of documents as part of larger time entries.[10]

It would be patently unreasonable to award counsel his normal rate of $275 or $295 per hour for these sorts of routine clerical tasks. Instead, these activities should be compensated at the customary $50 hourly rate for clerical work, and $75 hourly rate for tasks typically performed by a secretary or paralegal. See cases cited, infra. Therefore, SNET requests that the Court order that plaintiff's counsel work with SNET's counsel to reduce the amounts charged for clerical work and paralegal work to $50.00 and $75.00 per hour, respectively.

**D.     A Reduction Is Also Warranted Due To Plaintiff's Limited Success.**

After litigating for six years and making a final settlement demand of more than four times the amount awarded, the jury awarded plaintiff only $20,000 in compensatory damages, and $80,000 in punitive damages. The relatively small compensatory damage award indicates that the jury disbelieved plaintiff's contention that she suffered severe emotional distress. The

---

for "Correspondence to Attorney Cannavino; Preparation of a receipt for the videotape."

[10] See, e.g., the billing records for Nov. 8, 2002 ("Preparation and service of initial disclosures" - 2.25 hrs.); May 28, 2004 ("Finalize and serve opposition to Defendant's motions to compel." – 5.0 hrs.); June 29, 2004 ("Finalize and serve Reply (#107) to Defendant's opposition to Plaintiff's motion for a protective order (#87) with supporting affidavits." - 3.75 hrs.); Sept. 17, 2004 ("Preparation and filing of Plaintiff's motion for order concerning wage and benefit materials." - 4.75 hrs.); Oct. 3, 2004 ("Preparation of Plaintiff's Objection to Ruling of the Magistrate Judge concerning privilege issues and service of same." – 5.75 hrs.)

jury also disbelieved plaintiff's claim that she was subject to repeated acts of retaliation by SNET, including her heavily pursued theories that various employees conspired to be absent from the office on January 18, 2004 and later, intentionally excluded her from a fishing trip.

Most importantly, the jury rejected her contention that West grabbed her wrist, which was in many ways the centerpiece of her case. The jury never got to consider plaintiff's Equal Pay Act claim because she withdrew it during SNET's case-in-chief for lack of evidentiary support.

It is undeniable that plaintiff only achieved a partial or limited degree of success in this litigation, whether "success" is measured qualitatively or quantitatively. See Barfield v. N.Y. City Health & Hosps. Corp., Nos. 06-4137-cv and 06-4310-cv, 2008 U.S. App. LEXIS 16731, at *52 (2d Cir. Aug. 8, 2008) ("Both the quantity and quality of relief obtained as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved." (internal quotation marks omitted)). Qualitatively, she prevailed on a claim which was arguably not her primary one, given her consistent focus on the various circumstances attendant to her retaliation claim. She did not prove that she suffered extreme emotional distress, which was the sole aspect of her compensatory damages. No significant issue of law was at stake in this case.

Plaintiff's recovery does not fare any better when assessed quantitatively. She prevailed on one out of her three claims. After six years of litigation, she was able to net a total of $100,000. This is a small fraction of her last settlement demand.

In cases such as this, "[w]here a plaintiff has achieved only partial or limited success, full compensation for attorney's fees would not be reasonable." United States Football League v. Nat'l Football League, 887 F.2d 408, 414 (2d Cir. 1989) (internal quotation marks omitted).

22.

"This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." Hensley, 461 U.S. at 436. As the Second Circuit recognized, this can also be true even where the plaintiff won a substantial judgment on a single claim. See Kassim v. City of Schenectady, 415 F.3d 246, 256 (2d Cir. 2005) (reviewing cases and observing that "[o]ur circuit has thus clearly adopted the view . . . that a district judge's authority to reduce the fee awarded to a prevailing plaintiff below the lodestar by reason of the plaintiff's 'partial or limited success' is not restricted either to cases of multiple discrete theories or to cases in which the plaintiff won only a nominal or technical victory."); Hensley, 461 U.S. at 440 ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.")

Accordingly, SNET respectfully requests that the Court apply a downward adjustment to the amount of attorneys' fees requested by the plaintiff to account for plaintiff's limited success in this litigation. Taking into consideration the other adjustments that are suggested herein, SNET requests a 40% reduction after the reductions for travel time, plaintiff's counsel's work on discovery disputes for which the Court found against plaintiff's position, elimination of time recorded in block billing, and reductions for clerical and paralegal work noted above. This adjusted calculation would result in a reasonable attorney's fee that reflects "the degree of success obtained" by counsel in this case.

## III.    CONCLUSION

Based on the foregoing, SNET respectfully requests that the Court grant each of the requests made with respect to plaintiff's motion for attorney's fees. Specifically, SNET asks that the Court order the parties to work collaboratively to either (1); identify and apply the reductions in the amounts requested above for plaintiff's counsel's travel time, work on plaintiff's

unsuccessful or meritless discovery activities, clerical and secretarial work, and block billing, and then apply a 40% reduction to the remaining amount; **or** (2) identify and apply the reductions in the amounts requested above for plaintiff's counsel's travel time, work on plaintiff's unsuccessful or meritless discovery activities, clerical and secretarial work, and block billing, and then also eliminate fees for activities related to plaintiff's unsuccessful claims for retaliation and unequal pay.

THE DEFENDANT,

SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By: _____
Jennai S. Williams (Federal Bar No. CT27762)
Lori B. Alexander (Federal Bar No. CT08970)
LITTLER MENDELSON, P.C.
One Century Tower, Suite 300
265 Church Street
New Haven, CT 06510
Tel: 203.974.8700
Fax: 203.974.8799
jswilliams@littler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2008, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic

filing system.  Parties may access this filing through the court's CM/ECF System.

**Plaintiff's Counsel**

Peter E. Gillespie, Esq.
46 Riverside Avenue
Post Office Box 3416
Westport, Connecticut 06880


Jennai Williams
Federal Bar No.:  CT27762

# EXHIBIT A

Kimberly Bachiocchi vs. The Southern New England Telephone Company

Patricia Morisse; 05/3/04



**1**

```
 1    UNITED STATES DISTRICT COURT
 2    FOR THE DISTRICT OF CONNECTICUT
 3    * * * * * * * * * * * * * *
 4    KIMBERLY BACHIOCCHI,          *
 5         Plaintiff,               *
 6    VS.                  *  Civil Action No.
                          *  02-CV-908(CFD)
 7    THE SOUTHERN NEW              *
      ENGLAND TELEPHONE             *
 8    COMPANY,                      *
 9         Defendant.               *
10    * * * * * * * * * * * * * *
             West Hartford, CT
11           May 3rd, 2004
             11:56 a.m.
12
13    DEPOSITION OF PATRICIA MORISSE
14    APPEARANCES:
15    FOR THE PLAINTIFF KIMBERLY BACHIOCCHI:
        BY: PETER E. GILLESPIE, ESQUIRE
16           46 Riverside Avenue
             Westport, CT 06880
17
      FOR THE DEFENDANT THE SOUTHERN NEW ENGLAND
18    TELEPHONE COMPANY:
        TYLER, COOPER & ALCORN, LLP
19      BY: DEBORAH DeHART CANNAVINO, ESQUIRE
             One Landmark Square
20           Stamford, CT 06901
      FOR THE DEPONENT AND PSYCHOLOGICAL HEALTH
21    ASSOCIATES:
        COONEY, SCULLY AND DOWLING
22      BY: JEFFREY C. PINGPANK, ESQUIRE
             Hartford Square North
23           Ten Columbus Boulevard
             Stamford, CT 06901
24
25
```

**2**

```
 1
 2
 3
 4
 5
 6
 7
 8         Deposition of PATRICIA MORISSE, a witness
 9    herein, taken on behalf of the defendant herein,
10    for the purpose of discovery and for use as
11    evidence in this cause, pending in the United
12    States District Court for the District of
13    Connecticut, pursuant to Notice, before
14    Dorothy J. M. McGrath, Licensed Shorthand
15    Reporter, No. 442, and a Notary Public within and
16    for the State of Connecticut, at the offices of
17    Psychological Health Associates, Suite 302, 345
18    North Main Street, West Hartford, Connecticut, on
19    the 5th day of May, 2004, at 11:56 a.m., at which
20    time counsel appeared as hereinbefore set
21    forth. . .
22
23
24
25
```

**3**

```
 1         Thereupon:
 2         PATRICIA MORISSE, whose primary business
 3    address is 345 North Main Street, West Hartford,
 4    Connecticut, being first duly sworn, as
 5    hereinafter certified, was examined and testified
 6    as follows:
 7    DIRECT EXAMINATION BY MS. CANNAVINO:
 8    Q.   Hello.
 9    A.   Hi.
10    Q.   My name is Debbie Cannavino.
11    A.   Uh-huh.
12    Q.   I'm a lawyer --
13    A.   Uh-huh.
14    Q.   -- for SNET, Southern New England
15    Telephone Company.
16    A.   Uh-huh.
17    Q.   We're the defendant in a case that's
18    been brought by Kimberly Bachiocchi who as I've
19    come to understand a patient of Psychological
20    Health Associates.
21    A.   Uh-huh.
22    Q.   We have requested certain records from
23    Psychological Health Associates, and I think you
24    have a stack of documents here.  Could you just
25    state for the record their heading, what they are?
```

**4**

```
 1    A.   These are Dr. Zachariah's personal
 2    records and the billing records for him.
 3    Q.   When you say Dr. Zachariah's personal
 4    records, what does that mean?
 5    A.   Those are his records from when he meets
 6    with his clients, his progress notes, any other kind
 7    of correspondence I'm sure he's had.
 8    Q.   Did you undertake a search to locate
 9    records in response to a request that has been made
10    by us?
11    A.   Yes.
12    Q.   And what did you do?
13    A.   I looked in our billing files, our
14    closed billing files, Dr. Zachariah's files to find
15    the records.
16    Q.   Any other files?
17    A.   There was one from a Dr. Kelleher, a
18    psychiatrist.
19    Q.   Did you understand our request to
20    include every file essentially in your office that
21    relates to Kimberly Bachiocchi?
22    A.   Yes.
23    Q.   She's also known as or has been known
24    as Kimberly Kurtz, K-U-R-T-Z, or Kimberly Strobino,
25    S-T-R-O-B-I-N-O.  Do you have any records under the
```

**5**

```
 1    name of Kimberly Kurtz or Kimberly Strobino?
 2         MR. GILLESPIE:  Objection as to
 3    time frame for when she was known by those names
 4    unknown.  To the extent you may answer that
 5    question -- I'm sorry -- to the extent you can
 6    answer that question, you may.  I beg your pardon.
 7         THE DEPONENT:  Ask me again.
 8    Sorry.
 9    Q.   (By Ms. Cannavino) Did you undertake a
10    search to look for records for Kimberly Strobino?
11    A.   No.
12         MR. GILLESPIE:  Same objection.
13    Q.   (By Ms. Cannavino) Did you undertake a
14    search to look for records for Kimberly Kurtz?
15    A.   No.
16         MR. GILLESPIE:  Same objection.
17    Q.   (By Mr. Gillespie) Was there a reason
18    that you didn't, or did you just not understand our
19    request to include those names?
20    A.   I probably did not know that that was
21    another name that she had.
22    Q.   They're just, you know, former names --
23    A.   Uh-huh.
24    Q.   -- of Ms. Bachiocchi at different
25    times, you know, maiden name, I think, and a
```

**6**

```
 1    married name.
 2         Where would you look to locate documents
 3    on any patient once you have the name?
 4    A.   We have -- all the billing files are in
 5    the main office.  If it was a closed billing file,
 6    in a different closet, locked up.  If a closed
 7    patient chart we'd have alphabetically in the hall,
 8    and then the therapist -- depending which therapist.
 9    Some have their records in the main office, and
10    some -- Dr. Zachariah's are here in his office.
11    Q.   I know there are three offices for
12    Psychological Health; is that correct?
13    A.   Two, two.
14    Q.   Two.  Where are they located?
15    A.   Danbury and West Hartford.
16    Q.   There isn't one in South Windsor?
17    A.   No.
18    Q.   We both thought in the case that there
19    is.
20    A.   Oh, okay.
21    Q.   If a patient was seen at the Danbury
22    office --
23    A.   Uh-huh.
24    Q.   -- would those records be here?
25    A.   No, those would have been in Danbury.
```

1 (Pages 1 to 6)

**73**

1  or caregiver examine the computer generated
2  electronic version before it is sent to the
3  insurance company?
4      A.   No.
5      Q.   And as to this particular piece of
6  paper, when we started today, did you have the
7  original?
8      A.   Yes.
9      Q.   And did I understand that after a
10  little bit of questioning and copying and
11  supplementing copies and so forth you cannot now a
12  few hours later find the original?
13      A.   Correct.
14      Q.   Well, I'm sorry if we've rattled you.
15          MR. GILLESPIE:  I have nothing
16  further.
17  FURTHER REDIRECT EXAMINATION BY MS. CANNAVINO:
18      Q.   Question:  There were some documents I
19  showed you from -- that were sent by our office at
20  Tyler, Cooper?
21      A.   Uh-huh, yes.
22      Q.   These records.  Were they in the
23  treatment -- where would they be kept?  I didn't
24  see them in your files --
25      A.   Not -- they would be in this -- in

**74**

1  Dr. Zachariah's files.
2      Q.   But they're not in there.  Well, if
3  they aren't in there -- I didn't see them in there
4  when we looked through his files, Defendant's
5  Exhibit Number 1.  Do you know if they'd be
6  anyplace else, or did you look through --
7      A.   No.
8      Q.   Could you just look through there and
9  see if you can find it?
10          MS. CANNAVINO:  Off the record.
11          (Discussion off the record.)
12          MS. CANNAVINO:  Back on the record.
13      Q.   (By Ms. Cannavino) Did you locate any
14  documents in there that were the documents we talked
15  about that are now Exhibit 11 from Tyler, Cooper &
16  Alcorn?
17      A.   No.
18      Q.   Would there be anyplace that they would
19  be other than Dr. Zachariah?
20      A.   Not that I'm aware of.
21      Q.   You testified you remembered seeing our
22  request come in, did you?
23      A.   Yes.
24          MS. CANNAVINO:  Thank you.
25          MR. PINGPANK:  All done?

**75**

1          MR. GILLESPIE:  I have nothing
2  further.  Ms. Cannavino?
3          MS. CANNAVINO:  No, I have nothing
4  further.
5          (Discussion off the record.)
6          MS. CANNAVINO:  Let's go back on
7  the record.  All right.  One second.
8      Q.   (By Ms. Cannavino) We've gone back on
9  the record.  In our originals, we've located the
10  original of the health insurance claim form; is that
11  correct?
12      A.   Correct.
13      Q.   And I just request a copy of it made
14  without the Post-It on it so we can have a complete
15  copy of the record.
16      A.   Yes.
17          MS. CANNAVINO:  Thank you.  No
18  further questions.
19          (Whereupon, the deposition was
20  adjourned at 2:52 p.m.)
21  (Exhibits were retained by Attorney Cannavino.)
22
23
24
25

**76**

1  STATE OF CONNECTICUT
2  JUDICIAL DISTRICT OF STAMFORD
3
4
5
          PATRICIA MORISSE
6
7
8
9          PATRICIA MORISSE personally appeared
10  before me at _____, Connecticut,
11  this _____ day of _____, 2004, made oath
12  and acknowledged this deposition to be a true and
13  accurate transcription of her testimony.
14
15
16
17  My Commission Expires:
18
19
20
21          _____
          NOTARY PUBLIC
22
23
24
25

**77**

1
2      C E R T I F I C A T E
3
      I, DOROTHY J. M. MCGRATH, certify that I am a
4  Notary Public within and for the State of
  Connecticut, duly commissioned and qualified to
5  administer oaths.
6
      I further certify that the deponent named in
7  the foregoing deposition was by me duly sworn and
  thereupon testified as appears in the foregoing
8  deposition; that said deposition was taken by me
  stenographically and reduced to writing by me; and
9  that the foregoing is a true and accurate transcript
  of the testimony.
10
      I further certify that I am neither attorney or
11  counsel for, nor related to or employed by any of
  the parties to the action in which this deposition
12  is taken, and further, that I am not a relative or
  employee of any attorney or counsel employed by the
13  parties thereto or financially interested in the
  action.
14
      IN WITNESS WHEREOF, I have hereunto set my hand
15  and affixed my notarial seal this _____ day
  of _____, 2004.
16
17
18
19          _____
          Dorothy J. M. McGrath, LSR
  My commission expires   Notary Public
20  March 31, 2009      State of Connecticut
  Lic. No. 442
21
22
23
24
25

**78**

1          I N D E X
2                          PAGE
3  PATRICIA MORISSE
4    Direct Examination by Ms. Cannavino      3
5    Cross-Examination by Mr. Gillespie      51
6    Redirect Examination by Ms. Cannavino    62
7    Recross-Examination by Mr. Gillespie    71
8    Further Redirect Examination by Ms. Cannavino  3
9      DEFENDANT'S EXHIBITS
10  No.    Description            ID
11  1  Medical Records            8
12  1(a) Registration Form          31
13  2  Dr. Kelleher's Progress Notes    11
14  3  Billing Records            12
15  4  Transaction Ledger for Kimberly Bachiocchi 14
16  5  Billing                22
17  6  Billing                22
18  7  Billing                22
19  8  Statements from Sessions with Dr.    26
20    Zachariah
21  9  Blank Daily Log            45
22  10  May 21, 2003, Request for Production of  67
23    Records
24  11  Redacted Daily Log          68
25

CAMPANO & ASSOCIATES COURT REPORTING SERVICES                    203-846-3402

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

KIMBERLY BACHIOCCHI,
      Plaintiff,

VS
      :02CV908(CFD)

THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY,
      Defendant.

- - - - - - - - - - - - - - - x

    Continued deposition of DR. GARY S. ZACHARIAH
taken pursuant to subpoena and the Federal Rules of
Civil Procedure, before Suzanne A. Levesque,
Professional Shorthand Reporter and Notary Public
within and for the State of Connecticut, held at the
offices of Tyler, Cooper & Alcorn, LLP, 185 Asylum
Street, CityPlace, 35th Floor, Hartford, Connecticut,
on January 16, 2004 at 11:49 A.M.

      DEL VECCHIO REPORTING SERVICES, LLC
       PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443     100 PEARL ST., 14TH FL.
203 245-9583       HARTFORD, CT 06106
          800 839-6867



1       Defendant's 8 for one moment.

2           I have nothing for today.  Thank

3   you.

4           MS. CANNAVINO:  Okay.  Thank you for

5   your time, Doctor.

6   (The deposition concluded at 1:18 P.M.)

7

8                   —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -x

KIMBERLY BACHIOCCHI                    :

                                       :

                                       :

                                       :

VS                                     : 02 CV

                                       : 908(CFD)

                                       :

THE SOUTHERN NEW ENGLAND TELEPHONE     :

COMPANY                                :

- - - - - - - - - - - - - - - - - - -x


    Deposition of NICHOLAS FAIELLA taken pursuant to

the Federal Rules of Civil Procedure, before Jacinda

A. Grigaitis, Licensed Shorthand Reporter #00381 and

Notary Public within and for the State of Connecticut,

held at the offices of Cummings & Lockwood, 700 State

Street, Connecticut, on October 27, 2003, at 10:17

a.m.


              DEL VECCHIO REPORTING SERVICES, LLC
              PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE                    100 PEARL STREET
MADISON, CT 06443                  HARTFORD, CT 06106
203 245-9583                       800 839-6867

1   had provided to me so that she might peruse

2   them in her office.  The sole exception being

3   the folder of sworn affidavits a copy of which

4   was provided, but the original that has been

5   marked remains here.  Anything further?

6       MS. ALEXANDER:  No.  But could I get a

7   copy of the subpoena from you?

8       MR. GILLESPIE:  It is in the file and

9   there are extra -- I had extra copies made.

10      MS. ALEXANDER:  Okay.  Thank you.

11  (The deposition concluded at 12:41 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25