UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| KIMBERLY BACHIOCCHI, | \* | |
| | \* | |
| Plaintiff, | \* | CIVIL ACTION NO. 3:02-CV-908 (CFD) |
| | \* | |
| v. | \* | |
| | \* | |
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, | \* | AUGUST 23, 2008 |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff filed an earlier brief, dated July 29, 2008, in opposition to Defendant's motion for judgment as a matter of law. Thereafter Defendant filed a later, written motion for judgment as a matter of law dated August 4, 2008.[1] Plaintiff submits this Objection to Defendant's most recent motion on this subject, and respectfully asks that the substance of her earlier brief be incorporated herein.

---

[1] Defendant had moved for judgment at the conclusion of plaintiff's case. It then renewed its motion at the conclusion of all evidence. The Court took the motion under advisement, noting that it could be treated as a Rule 50 motion after the verdict was rendered, if appropriate. It was that pending motion to which Plaintiff was replying with her brief of July 29. Thereafter Defendant filed the instant motion and memorandum.

Essentially Defendant continues the same lines of argument that it had earlier employed. Part of Defendant's technique, as Plaintiff perceives it, is to be selective with respect to the facts cited as the basis for some of the arguments being made. Therefore, Plaintiff has prepared a list of the facts which she believes she proved at trial, taking the proofs in the light most favorable to her.

<u>The Incidents Proven At Trial:</u>

Plaintiff worked for SNET and was assigned to the West Group. Other than a single clerical employee, plaintiff was the only woman assigned to the group and was the only woman performing the same function as the male engineers in the group.

Defendant relies on <u>Alfano v. Costello</u>, 294 F. 3d 365 (2d Cir. 2002). However, unlike <u>Alfano</u> where the court narrowed its consideration to five incidents in a span of four years, here plaintiff has proven a total of 43 incidents in a span of eighteen months, or only 7 months if we limit our consideration to the time of her active employment. Those incidents are as follows:

**December, 1999 – May, 2000**

1. Manager Light prints directions to plaintiff's home.

2. Manager Vallario asks Plaintiff: What do you see in Nick; He's sick and old. One punch and it would take him out.

3. Manager Vallario says to Plaintiff: If I were younger, I would go out with you myself.

4. Manager Vallario says to Plaintiff that he knows Nick's wife and she sure puts up with a lot.

5. Manager Vallario, referring to plaintiff, asks Faiella:  Are her breasts real ?

6. Manager Vallario, referring to plaintiff, asks Faiella: Is she good in bed ?

7. In response to these and other like comments Faiella asks Manager Vallario to stop making such comments, but his request is ignored.

8. Manager Vallario excessively criticizes plaintiff's work.

9. Rumors begin to circulate about an affair between Faiella and plaintiff, sometimes referred to as the "Nick and Kim thing."

10. Women, including customers, are referred to as "broads," "bitches" and "knuckleheads."

11. Co-worker John Dunn tells off-color jokes and circulates off-color cartoons.

12. SNET contractor Joe Bordieri speaks with Manager Vallario at the Vallario residence one evening after working on a job engineered by plaintiff.  Bordieri testified that it was on this occasion that an affair between Nick and Kim was first mentioned.  Thereafter, Bodieri made his first complains about plaintiff.

13. Manager Light uses "code words" toward plaintiff, telling her that "it is not her place" to interact with installation contractors; and, in a different context, that she was "aggressive."

14. Carl Lorentzen is assigned to check up on Kim's work.  In doing so he disparages plaintiff to Janice Vereb Peterson, plaintiff's client contact.

15. Plaintiff complains to Manager Vallario, but receives no relief.

16. Plaintiff complains to Manager West, but receives no relief.

17. Plaintiff contacts Ms. Chris Macri of SNET's EEO compliance office, but no action is taken.

18. Faiella complains to Manager Vallario concerning Plaintiff's treatment, but receives no relief.

19. Faiella complains to Manager West concerning Plaintiff's treatment, but receives no relief.

**May 22, 2000 – January 17, 2001**

Plaintiff is on medical leave.

20. Plaintiff calls into the office. Mr. Dursza answers the phone. When plaintiff asks to speak with Carol Stanevich, Dursza replies: Carol is in the men's room.

21. Frank Andrews is assigned to replace plaintiff on the SNET Wireless account. The customer is dissatisfied with his work and complains, but no corrective action is taken.

22. At Manager Vallario's instigation, three employees write similarly worded complaints concerning plaintiff's alleged inappropriate physical interactions with Faiella. These three complaints are all written in mid-November, 2000 notwithstanding that the alleged incident occurred in May, 2000 and the fact that both plaintiff and Faiella had been out on medical leave for months at the time of the writing of these complaints.

**January 18, 2001**

23. Plaintiff returns to work in an effort to re-acclimate to the workplace. No other regular full time employee is present at any time that day. Walter Czapor, a job bank worker, is present briefly in the morning, but then leaves.

24. Manager West declines to speak with plaintiff. He declines to go over any changes in office procedures. Plaintiff spends the day alone, reading a manual.

25. Manager West closes the office in mid afternoon due to a snow storm. Official weather records show that there was no storm on that day.

**January 19, 2001 – May 6, 2001**

Plaintiff is on medical leave.

26. At the end of April or in early May Plaintiff calls Manager West in an effort to arrange for her return to work. She has trouble getting her telephone calls returned.

27. On short notice plaintiff is told that she will be returned to the payroll on May 7, but that she should not report into the office until May 14.

**May 7, 2001 – June 4, 2001**

28. During the week of May 7 Plaintiff attempts to arrange for a ride into the office on May 14. No-one is available to give her a ride. She then seeks to arrange for a car to be assigned to her and dropped off at her residence so that she can use it on May 14. An agreement is reached.

29. A car is then dropped off at plaintiff's home. She is given no notice of the delivery. The car is left perpendicular to the curb, blocking plaintiff's residential street. Plaintiff first learns of this situation when a neighbor calls her on her mobile phone and complains.

30. The car is dirty. Contrary to established SNET policy, the car smells of smoke and there is film on the car windows. There is trash on the floor. Plaintiff cleans the car and uses it.

31. Plaintiff physically returns to her SNET work location on May 14, 2001. The office environment is cold, unfriendly. Essentially she finds that she is being "shunned," a situation which persists until she leaves the West Group.

32. Plaintiff is told that her work must be reviewed before it is sent out.

33. On her first day back plaintiff is asked to make out her vacation requests. One or two days later she is told that her requests may not be honored due to the press of business.

34. Manager West declines to go over newly implemented office procedures with plaintiff.

35. Upon returning to work, plaintiff is informed by Manager West that her rating has been reduced to average.

36. Plaintiff is assigned to two geographically diverse jobs, one in New London, the other in Enfield. Notwithstanding her reduced rating and the requirement that her work be reviewed, the New London assignment is very complex.

37. Notwithstanding the complexity and geographic diversity of plaintiff's assignments, she is told: "There will be no overtime for you, Kim."

38. Manager West, contrary to his past interactions with plaintiff, informs her of her salary increase by leaving a "yellow sticky" on her office telephone.

39. According to Mr. Manouse's notes a fishing trip was being arranged in this time period. Plaintiff was not invited.

40. Plaintiff asks to be reassigned to the SNET Wireless account and is refused. When plaintiff pursues it, she is threatened with a possible claim of insubordination.

41. On or about June 4, 2001 Manager West grabs plaintiff's wrist and rips a paper from her hand while shouting at her.

42. Mr. Dunn's e-mail announcing plaintiff's departure from the West Group with "great pleasure."

43. At trial, Manager Moffett testifies that when West tried to get the paper from plaintiff it "tore" from plaintiff's hand, contrary to Ms. Moffett's deposition testimony and the contemporaneous notes she made when she interviewed Manager West on the day of the incident.

In its memorandum Defendant deals with some, but not all of these incidents. At the heart of its selection process seems to be a desire to chose those incidents which, in isolation, might be viewed a neutral on their face. Plaintiff believes that this cannot be a successful method of analysis because, in this circuit, we look to the totality of the circumstances. In any event, Plaintiff now turns to the major factual issues raised by Defendant.

Defendant seeks to minimize the incident concerning Mr. Light's invasion of Plaintiff's privacy when he printed out directions to her home. It mildly maintains that when challenged Light explained his reasoning, destroyed the directions and never went near her home. Defendant's memorandum at 16.

However, this bland rebuttal overlooks several facts: A) the intrusive nature of Light's conduct; B) his angry rebuttal that he was entitled to print the directions because they were "public record;" C) Defendant's bumbling and incredible efforts to explain Light's conduct by giving multiple reasons for printing the directions including the need to have the directions available for an emergency (although it was admitted that this is not standard practice), his alleged interest in real estate – as well as the most recent proffered excuse – his interest in awnings; D) Light also was confronted by the story set forth in his affidavit about how he was just driving through the area filled with beautiful homes when he said to himself – Gee, I wonder if Kim lives in one of these houses ?  That is when he went to print the directions so that he could check up on his curiosity.

By failing to correct Manager Light's behavior Defendant sent a signal to the other engineers and supervisors in the Group – all of whom were male - that it was all right to treat plaintiff differently :  after all, she was different, she was a woman.

Similarly Defendant seeks to isolate some of the Vallario comments made to, or about, Faiella, noting that references to taking him out with one punch, to Nick being old and sick, and that his wife puts up with a lot were not sexually

suggestive.  Defendant's memorandum at p.13-14.  This overlooks the fact that such comments support plaintiff's theory that Vallario was jealous and that he was trying to act on that jealousy.  It also overlooks the fact that such comments frequently related to the existence of an alleged affair.  That, plaintiff believes, is why Vallario maintained that Nick's wife "put up with a lot."

In a different gambit, Defendant argues that plaintiff cannot effectively maintain that Vallario criticized her work more than he criticized others. Defendant's memorandum at pp. 17-18.  Defendant points to the testimony of Vallario and Handfield for this purpose and concludes

> no reasonable jury could conclude based upon her "conclusory" testimony "without corroborating detail" that Vallario treated Plaintiff differently because of her gender by criticizing her work.
>
> Defendant's memorandum at 17-18.

In order to reach this conclusion, however, Defendant must once again overlook a few inconvenient facts.

- A. Faiella testified to his own observations, corroborating plaintiff's view.

- B. Vallario was the first among equals as plaintiff's harasser, and there are, as noted above, several indications as to his state of mind and intent.

- C. Vallario assigned Lorentzen to "check up on Kim's work."

- D. Lorentzen then did report back to Vallario that Plaintiff's work at the SNET Wireless site in Orange was "wrong" in two respects.  He went so far as to make a diagram for the Defendant to use in illustrating his points.

- E. Lorentzen sought to undermine plaintiff while speaking to her client contact, Janice Vereb Peterson.

    F.    Although a Ms. Peterson later criticized the work of Frank Andrews, plaintiff's successor at the SNET Wireless site, no-one corrected his work or checked up on his performance.

In short, Defendant's 49 page brief is a tired rehash of the same arguments it made earlier in this case. Defendant's most recent packaging of those now tired arguments should, again, be rejected.

THE PLAINTIFF
KIMBERLY BACHIOCCHI

By: /s/ Peter E. Gillespie
Peter E. Gillespie  (ct06554)
46 Riverside Avenue
P. O. Box 3416
Westport, CT 06880
Tel: (203) 227-7000
Fax: (203) 454-5508
Email: petelaw@mac.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 23, 2008 a copy of this Objection was filed and served by first class post upon anyone unable to accept electronic filing (as noted where applicable). Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Lori B. Alexander, Esq.
Litter Mendelson
265 Church Street – Suite 300
New Haven, CT 06510

By: _/s/ Peter E. Alley_